UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DANIELLE RAUSA,

Plaintiff,

v.

THE BOARD OF EDUCATION OF THE NORTH SYRACUSE CENTRAL SCHOOL DISTRICT, AND STEVEN WOLF,

Defendants.

Civil Action No. 5:11-cv-01152-TJM-AJB

**ATTORNEY DECLARATION**

**LAURA H. HARSHBARGER**, an attorney duly admitted to practice in the courts of this state and before this Court, hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a member of the law firm of Bond, Schoeneck &King, PLLC, attorneys for Defendants the Board of Education of the North Syracuse Central School District and Steven Wolf. I make this declaration in support of Defendants' motion for summary judgment.

2. Attached as **Exhibit A** are excerpts from the transcript of the 50-h examination of Plaintiff that I conducted on March 18, 2011.

3. Attached as **Exhibit B** are excerpts from the transcript of the deposition of Plaintiff that I conducted on January 4, 2013.

4. Pursuant to N.D.N.Y. Local Rule 7.1(a)(1), copies of all decisions exclusively reported on computerized databases are attached as **Exhibit C**.

5. To protect the identity of students and to be in compliance with the "Confidentiality and Protective Order" signed by Hon. Andrew T. Baxter on August 10, 2012 (*See* Docket No. 29), we have redacted certain portions of the exhibits attached to this

Declaration, and we have redacted certain portions of the exhibits attached to the seven affidavits submitted by the Defendants in support of its motion for summary judgment.

6. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 29, 2012

/s/ Laura H. Harshbarger
Laura H. Harshbarger

# Exhibit A

ORIGINAL

S T A T E   O F   N E W   Y O R K

---------------------------------------------------x

DANIELLE RAUSA,

Claimant,

-against-

THE BOARD OF EDUCATION OF THE NORTH SYRACUSE CENTRAL SCHOOL DISTRICT and STEVEN WOLF, Principal of ROXBORO ROAD MIDDLE SCHOOL,

Respondents.

---------------------------------------------------x

The 50-h Hearing of DANIELLE RAUSA, held on March 18, 2011, at the Law Offices of Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York, before Melissa M. Phelps, Court Reporter, and Notary Public in and for the State of New York.

A P P E A R A N C E S

For Claimant: O'HARA, O'CONNELL & CIOTOLI, P.C.
Attorneys at Law
7207 East Genesee Street
Fayetteville, New York 13066
BY: STEPHEN CIOTOLI, ESQ.

For Respondents: BOND, SCHOENECK & KING, PLLC
Attorneys at Law
One Lincoln Center
Syracuse, New York 13202-1355
BY: LAURA H. HARSHBARGER, ESQ.

Also Present: Steven Wolf
Annette Speach

A Yes.
Q And are you telling me that that was something that was agreed to the previous year?
A Yes.
Q Who agreed to that the previous year?
A We had a meeting, Robin Launt, Jane Ginsburg, Dr. Morten, and myself in removing me from my instrumental position over to vocal. It was said that I could do anything I needed to do to build up the vocal program. We met and I said, "These are the things that we, the three of us that direct would like to do."
Q And your understanding then was Dr. Morten had approved that?
A That was all of our understandings.
Q Okay. And at some point, you were informed that the select chorus would not be permitted at Roxboro; is that correct?
A After my --
Q I'm sorry. If you could just answer my question. That would be yes or no. At some point, was that communicated to you?
A At the meeting with Mr. Wolf, yes.
Q At what meeting with Mr. Wolf?
A On the 22nd.
Q Of September?

A Yes.

Q So, okay, so as of the 22nd of September, you understood that there was to be no select chorus; correct?

A He said he was going to double-check with Mr. Morten.

Q Okay.

A And then I received the memorandum.

Q Okay. Do you agree with me that it's the district's prerogative to decide whether or not it wants to have a select chorus in the middle school or not?

A Of course.

Q And do you -- so your -- your claim is not that the decision to have a -- to not have a select chorus was not unfair or discriminatory towards you in any way; correct?

A No. What's discriminatory towards me is -- well, go ahead. Keep asking.

Q Well, you tell me. What -- what about the situation --

A I understood --

Q I'm sorry. Can I finish my question? Otherwise, we'll have a mess of a record.

What about the decisions relating to chorus are the subjects of your Notice of Claim?

A Chorus had been run the prior three years by

way the holiday pops concert was handled?

A No.

Q Did you ever tell your students that Mr. Wolf didn't want them in the holiday pops concert?

A I don't believe I did.

Q Did you ever say anything like that?

A They asked if we were performing. I said, "No, we're not." That's as far as I recall ever saying anything.

Q Did any other colleague ever invite you to be a part of the holiday pops concert?

A No.

Q At some point in time, Ms. Rausa, you had a male student in the drama club who engaged in some sexually inappropriate behavior toward female students in the drama club; is that correct?

A Yes.

Q What was that male student's name?

A [redacted].

Q And who were the female students that were touched or spoken to inappropriately?

A [redacted].

MR. CIOTOLI: I'm sorry. Say that again.

THE WITNESS: [redacted].

MR. CIOTOLI: If we're going to -- if we're going into a new thing, I'm going to take a quick bathroom break and make a phone call.

MS. HARSHBARGER: Sure.

MR. CIOTOLI: Thank you.

(Whereupon a brief recess was taken.)

Q You were giving us the names of the female students. You said [redacted]?

A [redacted], [redacted], [redacted].

MR. CIOTOLI: Close enough.

A [redacted] -- I'm not thinking of all of the names right now.

Q Okay. Is that all of the names that you can remember at the moment?

A Yeah. More will come to me as we go.

Q And when did those allegations first come to your attention that the female students were alleging that they had been touched or spoken to inappropriately?

A After they had spent the morning in a deposition, given testimony or statements to the sheriff's department.

Q Do you recall approximately when that was?

A The date?

Q Yes.
A (Witness gesturing negatively.)
Q Can you give me a month?
A It was before we were doing the show. I'm thinking. Sorry.
(A discussion was held off the record.)
MR. CIOTOLI: If you talk to yourself out loud, she'll write it down.
THE WITNESS: She's going to write it down?
MS. HARSHBARGER: Yeah.
A I can't remember. No, I -- no.
Q Well, what -- what month was the show?
A April.
Q Of what year?
A '09.
Q And you think it was, perhaps, a couple -- a week or so before the show --
A It was a week.
Q -- that you first found out about it?
A It was a week and two days before we went on, yes.
Q Okay. Now, do you believe that those female students' reports are accurate?
A Yes.

Q So you believe that these acts that they complained about actually happened?

A Yes.

Q Do you agree that those are the kinds of acts that should not have happened?

A Yes.

Q Okay. What is your understanding of what the girls claim [redacted] did to them?

A Making sexually harassing remarks, grabbing some of them, inappropriate conduct or contact.

Q Grabbing their breasts?

A Yes.

Q Grabbing their behinds?

A Yes.

Q And do you understand that some or all of them contend that this behavior occurred during drama club?

A Yes.

Q Do you agree that that is the kind of thing that the district has an obligation to see doesn't happen again in the future?

A I most certainly do.

Q Okay. Now, where -- where would drama club practices be held?

A Auditorium.

Q At what time were they held?

A After school.
Q What time after school?
A 3:00 until 4:20.
Q Were there other adults present for the drama club practices?
A Yes.
Q Okay. Who?
A Robin Launt, who was the choral director and part of the show, as well as Jane Ginsburg, who was the codirector, as well as parents.
Q Okay. You say Jane Ginsburg was the codirector, but she wasn't being paid as the drama club advisor; right?
A Not by the district, no.
Q Were you being --
A And prior to Mr. Wolf coming, she was being paid as chaperon pay because we had special-needs children involved, and that's the way that it had always been.
Q Was it also the way that it was when Mr. Wolf joined the district? Was she paid as an aide to a disabled child?
A First year, yes; the second year, I believe she was not paid.
Q In which year -- when you say "first" or "second year," which year --

drama club?

A She was responsible for the chorus.

Q And did she spend part of her practice in the choral room with the chorus?

A Not usually.

Q You recall --

A No, I don't think she did in that show.

Q You recall that she was with you in the auditorium for the entire practice?

A Yeah. On the stage sitting in the center with the chorus on each side.

Q And which direction was she facing, towards the stage or towards the audience?

A Towards the stage.

Q Now, you also say that there was a male technology club director; who was that?

A Joe Clayton.

Q And what was he responsible for during these practices?

A He was supposed to be responsible for lights, including lights in the wings. Supposed to be responsible for sound because at that point in time, I was removed from doing any sound and lights or anything on my own shows. He was supposed to be present to oversee the tech club that was put in place to take care of all of my needs, and he was

responsible for those things.

Q Okay. So his responsibilities were for the tech club?

A (Witness gesturing affirmatively.)

Q Correct?

A And the lights and the sound, yes.

Q And the lights and sound. And the students participating in the technology club, they were different than the students participating in the drama club; is that true?

A Yes. There were a few that wanted -- the way it had been run in the past was I always did my own sound, Mr. Clayton always helped with lights and things, and if you signed up to do sound, we trained you to do it, as well as training you with lights. There were a few children who signed up for drama club thinking it was going to be the same way, so they moved over to the tech club.

Q And do you agree with me that Joe Clayton was not responsible for the students in the drama club?

A No, but he was certainly responsible for the lighting.

Q Well, I -- I asked you if you kind of agreed with me, and I think your answer might be a little ambiguous. So if you don't mind, I'm just going to ask it again to clarify it for -- for the record.

Was Joe Clayton responsible for the students in the drama club?

A Nope.

Q Because that was your responsibility; right?

A That was three directors' responsibility, yes.

Q But there's only one drama club advisor; correct?

A And a course advisor.

Q Okay. And [redacted], was he participating in the show as a member of the chorus or as a member of the drama club?

A Both.

Q And how about the female students that you listed, were they participating as members of the chorus or as members of the drama club?

A Both.

Q When students are on the stage, and they're -- they have some part that requires them to be in the wings, are they participating at that point as part of the chorus or as part of the drama club?

A Both.

Q So you could have a student who is not a member of the drama club, but has a part in the show?

A I think you're not understanding that the chorus and drama club became one unit. The chorus, instead

Q Okay. Now, Mrs. Rausa, you agree with me that as part of your duties as drama club advisor, you were obligated to exercise ordinary vigilance over all students; right?

A Exercise what?

Q Ordinary vigilance over all students.

A In the drama club, yes.

Q Does that include knowing where they are at all times?

A As best I can, yes.

Q Does that include knowing what they're doing at all times?

A As best I can, yes.

Q Do you think you had enough adults -- in retrospect, do you think you had enough adults to exercise sufficient supervision in the spring of 2009?

A Yes, because I think someone that emanates that behavior is going to do it regardless of how many people are in an area or not and I have never had an issue with this prior.

Q How many parents did you have involved in the program as volunteers the year after this occurred? Did you try to get more parents involved?

A What was the show the year after? That was Wizard of Oz, I think. Wizard of Oz was -- if that's the

Q And is that the settlement agreement that resolved the charges against you?

A Yes.

Q Who gave you a copy of that document?

A Dennis O'Hara.

Q Can you tell me where in that settlement agreement it states that Charge 1 is being dropped?

A I don't know.

Q What's the source of your knowledge that for your accusation in paragraph 47 that Charge 1 was dropped by the district?

A All I was understanding about this are, that the charges were dropped, dismissed; however you want to put it, they were gone, other than the one charge for the grades.

Q Are you aware Ms. Rausa, that pursuant to this settlement agreement, all of the charges remain a part of your personnel file?

A Yes, I was told that.

Q So your source of understanding about your -- that led to your Allegation Number 47 is a conversation you had with your attorney?

A Uh-huh, yes.

Q Because you -- because you were not actually present for the meeting that resulted in the settlement agreement; correct?

representative saying, "You didn't turn your grades in and they're writing you up on it."

Q When did that phone call come in?

A I think that was Thursday.

Q Okay. So you also knew as of Thursday that your grades had not been turned in?

A Thursday, yeah, Thursday or Friday. One of the two.

Q So when did you turn your grades in?

A As soon as I could. As soon as I got to school the following day, I contacted guidance, and said, "My grades aren't in. What do I need to do? What can I do?" Mr. Wolf wanted me to turn over the grade book and he would have his secretary handle it. I said, "No," and we contacted and got the portal open, and the grades were submitted, and I would say they were done and in within a half an hour after they opened the portal to allow me to do this.

Q Did this happen on Friday?

A I don't remember.

Q So who are the other teachers who have submitted late grades with no disciplinary repercussions?

A I believe everyone gets their grades in late at different times.

Q Can you give me the name of any teacher who has submitted any late grades --

A I can give you the name of a bunch.
Q That's what I'm asking for. What are the names of the teachers who have submitted late grades without disciplinary repercussions?
A Most of the teachers on my team. I don't -- I don't know what the circumstances were. All I know is we're told it was due at 8:00, and at 12:00 when I was walking out of the building, teachers were still in the building doing their grades.
Q What are the names of the teachers that you're referring to?
A Claudia Hertzberg is one. I don't -- I don't really want to answer this. These are colleagues that I get along with very well.
Q Ms. Rausa, this is part of your Notice of Claim.
MR. CIOTOLI: If you can remember some names, say, you know. I think if you remember the names, you should say the names you remember.
A I think Mrs. Waznickel [phonetic] was still trying to get her grades in. I think Mrs. Desimone was still trying to get her grades in.
(A discussion was held off the record.)
Q Is this a single day that you are referring

for something he could use against me.

Q And in fact, had you posted something about Mr. Wolf on your web -- on your Facebook page?

A No.

Q You don't have -- you didn't have a post on your Facebook page that had said something to the effect of, "It's on. He picked the wrong person to mess with." Referring to Steve Wolf?

A No.

Q Okay. You are aware that Facebook's on the internet; right, Ms. Rausa?

A Yes, I am.

Q And you're aware that any one of your friends can show what is on your Facebook page to anyone else in the world; right?

A Sure.

Q And you understand that you take that risk when you sign up for a Facebook page; right?

A Yes.

Q You contend that Mr. Wolf would not meet with you about your year-end summary?

A Correct.

Q You say that you repeatedly requested a meeting with him; correct?

A Yes.

A I don't consider Michael Jackson to be "interesting music."

Q Okay. How do you --

A It's not like we were doing a 12-tone sequence or something. It was Michael Jackson.

Q Your -- your group was doing Michael Jackson?

A Yes.

Q And your objection is that he used the word "interesting"?

A Yes.

Q What words did he use to introduce the other performances?

A "Great performance tonight. Wonderful musicians."

Q You say that in Subset S, in January 2010, Steve Wolf illegally disciplined you for failing to work with the male members of the department. What -- in -- in what form did he discipline you?

A I don't remember that one. That's funny.

Q Okay. And by the way, Ms. Rausa, if any of -- if any of these allegations, you, upon rereading them, would like to correct or believe are incorrect, you want to modify, you're free to do that.

A Well, yeah. Well, the discipline, when he said, "I was disciplined by Wolf," he wrote me up. He didn't

discipline me because it did, in fact, go to Dr. Finkle, so that -- that's inaccurate. His allegations against me went to Dr. Finkle, and Dr. Finkle decided not to --

Q Okay.

A -- give me another counsel memorandum.

Q Okay. And the write-up that you refer to is the Weingarten notice --

A Yes.

Q -- stating that you are -- there's going to be a meeting and you are allowed to --

MR. CIOTOLI: You -- you just went back to Subparagraph P.

THE WITNESS: P, yeah.

MS. HARSHBARGER: Oh, I'm sorry. I'm still on S.

THE WITNESS: Oh, I'm sorry. I ...

MR. CIOTOLI: Okay. I believe you said something that goes back to P.

A Yeah, it is. In paragraph P, you said, "I was disciplined by Wolf, no."

Q That's just the Weingarten notice?

A That was the Weingarten. He had written me up again and given it to Dr. Finkle, so I don't know.

Q You're calling that discipline?

A I -- I'm not because it went to Dr. Finkle and

he said, "I'm not disciplining you."

Q Okay. So you agree that's not disciplinary?

A No.

Q Okay.

A The allegation --

Q And so I --

A -- it's an allegation that I was unprofessional, yet again, by hanging up on his secretary, which I will contend and say, "No."

Q You contend that you did not hang up on his secretary?

A Correct.

Q But just so the record is clear, we are agreeing, are we not, Ms. Rausa, that in fact, you were not disciplined in September 2010?

A I will agree to you, I was written up by Mr. Wolf, yes.

Q When you say "written up," you're referring to a Weingarten memo?

A Yes.

Q Now let's talk about S.

A Okay. Sorry.

Q What's that discipline you're referring to?

A I can't remember.

Q Who is the male member of the music department

classroom space; correct?

A They're using the auditorium for rehearsals, yes.

Q For rehearsals. Okay. Explain to me subletter T, the racial discrimination investigation you're referring to.

A There was a student that, again, problem child, in drama club was getting into trouble, got herself into ISS a few times. I said, "You're done. You're out." I was told she needed to stay in. An occurrence happened where her and two other girls kind of ganged up on [redacted] [phonetic].

MR. CIOTOLI: It would have been easier if you just said another girl.

A Yeah, I know; right? I keep -- don't ask me to spell any of that, I can't. This started out okay. It was the first time that in probably the most communication that Mr. Wolf and I had had since he had been there, but I was called up to the front office to assist in what was being -- what was happening, the investigation that was occurring. The mother alleged that -- you know what, I don't even know what was alleged. All I know is there -- there was discrimination and racial slangs and charges being tossed around. I sat there, I said what I saw, what I heard, what I knew, and tried to help get through it, and this girl was

subsequently removed from the school, so ...

Q Were these supposed racial comments, did they supposedly happen in drama club?

A No, I don't know. No, I think it was more directed his way.

Q Okay.

A I -- I don't remember.

Q You say that in February of 2010, you organized an event involving Syracuse Crunch, and that Steve Wolf took credit for the event. How did he take credit for the event?

A Oh. Well, he attempted to come out on the ice, you know, and do his thing (indicating).

Q Okay. Well, you just made a gesture of kind of waving?

A Waving, yes, waving to the crowd.

Q Is that what he did to take credit for the event?

A That's what he attempted to do, but I kind of didn't allow that. He --

Q So did he actually --

A He tends to like to get himself into the spotlight when some of the great events had happened, which, you know, on occasion, that would be fine, especially if the support was there to -- behind the event, but when it's not

there -- he needed himself seen as part of what I was doing with my chorus to try to, you know, look at me, this is my group, my school, my chorus, my kind of thing. That's how I interpreted it.

Q Yeah. That's your interpretation of his participation in the event; correct?

A Yes.

Q Do you think it's inappropriate for the principal to have shown up at -- at an off-site event that involved his school?

A No. They should definitely be there, especially if they're showing support towards a program, which I don't get.

Q In February, you say -- the subset B there, February through June of 2010, you were responsible for organizing several successful events. What are we talking about there?

A Syracuse Crunch, Spring Musical, Seventh Grade Award Night. This was the Wizard of Oz. This was the big year. We were on TV. The kids were interviewed on TV. We had L. Frank Baum, his grandson came in. There were a lot of things that happened. There were beautiful write-ups in the paper. I did all of the legwork to the Seventh Grade Award Night, and I never got a thank you. I never -- basically kind of took the credit and ignored any contributions that

were going on.

Q How did he take the credit?

A Opening night of the show, he's in the spotlight with the program, and I know he thought he was being very funny, but considering I hadn't gotten very much support to do this, I took offense at it.

Q You took offense at what?

A You know, it's -- I asked him to go up and welcome everyone. You know, and then he went into this spiel with the program. "We have this beautiful program for only $5," and on, and on, and on, and delaying out the start of the show.

There's never any -- I walked into Kathy Gramet's office the day after we did Seventh Grade Award Night, and I was in tears. I said, "You know, I had two kids at home. I missed another night with them, I was here." And I said, "He thanked the PTO from up there, thanked some other people." I said, "Not even a thank you." And I said, "And I don't think that's a lot to ask." I had a thank you note by Kathy Gramet in my mailbox by the end of the day.

Q So, in your opinion, what should he have done to appropriately commend you on your contributions?

A Perhaps, he wants to do the same thing that he does with the band and the orchestra, and put nice write-ups

# Exhibit B

ORIGINAL

S T A T E   O F   N E W   Y O R K
SUPREME CUORT   COUNTY OF ONONDAGA

---

DANIELLE RAUSA,

Plaintiff,

-vs-

THE BOARD OF EDUCATION OF THE NORTH SYRACUSE CENTRAL SCHOOL DISTRICT and STEVEN WOLF, Principal of ROXBORO ROAD MIDDLE SCHOOL,

Defendants.

---

Deposition of DANIELLE RAUSA, held on January 24, 2013, at the Law Offices of Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York, before Melissa M. Phelps, Court Reporter, and Notary Public in and for the State of New York.

A P P E A R A N C E S

For Plaintiff: O'HARA, O'CONNELL & CIOTOLI, P.C.
Attorneys at Law
7207 East Genesee Street
Fayetteville, New York 13066
BY: STEPHEN CIOTOLI, ESQ.

For Defendants: BOND, SCHOENECK & KING, PLLC
Attorneys at Law
One Lincoln Center
Syracuse, New York 13202-1355
BY: LAURA H. HARSHBARGER, ESQ.

Also Present: Steven Wolf
Annette Speach

MR. CIOTOLI: He got there eventually. I'll stand up for you. You didn't ask him his anniversary, though, by the way, he knows that. Give you an easy one and they let you get away with it.

Q Ms. Rausa, I'm going to hand you what has been marked as Defendant's Exhibit B. We're going to start with that one. Do you recognize that document?

A Yes.

Q And is this a Notice of Claim that you filed on September 2010?

A Yes.

Q I'd like to turn your attention to paragraph 56B. I just need a couple of points of clarification before we get started. Would you please read that and then let me know when you're done? It's 56B.

A Okay.

Q And if I understand the allegation, it is that Mr. Wolf communicated through others, to you, about drama club; is that correct?

A Yes.

Q Who were those other people that he spoke to about drama club instead of you?

A Jean Ginsburg and Robin Launt.

(A discussion was held off the record.)

Q I'd like to take you back to February of 2008, Ms. Rausa. At that time, Steve Wolf was the principal; correct?

A Yes.

Q And Ellen Hardy was the assistant principal, is that correct?

A Yes.

Q And Steve Wolf had come to the district on or about January 28, 2008; is that your recollection?

A Yes.

Q And there came a time when there was a meeting on or about February 12, 2008, involving the music department; correct?

A Yes.

Q And now, is that a meeting that was a regularly scheduled meeting of the music department or is that a meeting that Ms. Hardy called for a special occasion or a special issue?

A I don't remember why it was called.

Q Was Ms. Hardy the -- the administrator running that meeting?

A Yes.

Q Who else was at the meeting?

A The music department.

Q Okay. Who? Who would that be?

A Mark Bossert, Pat Wallace, Robin Launt, Kristen Kopf and myself.

Q And do you recall during that meeting a disagreement arising about scheduling?

A Yes.

Q And was the disagreement, if I could maybe sum it up, did it have to do with your drama club rehearsals and the timing of those versus Pat Wallace's chorus rehearsals?

A I believe it had something more to do with the concerts that were coming up.

Q Okay. What do you recall about the substance of that meeting?

A There was a conflict with the concert dates and where he was going to perform.

Q "He," being Pat Wallace?

A Pat Wallace. There was a -- there was -- there was an issue with -- well, he was given, I think, rehearsal seventh period during the day.

Q Why was he given rehearsal seventh period during the day?

A I think there was some conflict with the children who were in both chorus and drama club.

Q And wasn't the conflict, Ms. Rausa, that he had students in his after-school chorus that also wanted to participate in your drama club; correct?

A That was one of the issues, yes.
Q And the students couldn't be at two places at the same time, correct?
A Correct.
Q So the conflict was, who was going to have the students on what day at what time as between you and Pat Wallace; is that right?
A Yes.
Q Now, at the time Pat Wallace had a sixth-seventh grade chorus?
A I believe so.
Q And Robin Launt had a stand-alone fifth grade chorus; is that right?
A I think so.
Q Now, did that meeting get heated?
A Yes.
Q Did you get heated?
A Yes.
Q You were mad at Mr. Wallace; correct?
A No.
Q Well, what did you get heated about?
A I needed to get to the band room to send out passes for my students for that day so I could teach and the principal -- vice principal refused to let me leave the room.
Q She wanted to continue the meeting?

that November 12, 2008 meeting that you were just telling us about; correct?

A Yes.

Q Now, Steve Wolf was not at the February 12, 2008 meeting; correct?

A No.

Q Okay.

A I'm sorry. Is it February 12th or is it February 15th? This says the 15th.

Q I believe there are two meetings, Ms. Rausa. So the first paragraph deals with the initial meeting that you and I were just talking about, if I'm following this exhibit, February 12, 2008, and then there was a subsequent meeting, what we would call Weingarten meeting.

A Okay.

Q Right?

A Yes.

Q On February 15, 2008; correct?

A Yes.

Q Now, in that second meeting, is it your recollection that Dr. Mortan, Mr. Wolf, Ms. Berti, B-E-R-T-I, and Ellen Hardy attended that meeting?

A Yes.

Q And were you asked about your conduct during the February 12 meeting?

here, that she believes you were not being truthful when asked about what happened on February 12; is that right?

A That's what she said.

Q And do you agree that you were not being truthful?

A No, I don't.

Q Ms. Rausa, this is not the first time that you had been spoken to about your professionalism while working at the district; correct?

A Correct.

Q You worked at Smith Road prior to coming -- Smith Road Elementary School prior to moving to Roxboro Road Middle School; correct?

A Yes.

Q And in that building, you had a significant personal conflict with your comusic teacher, Becky Gay; correct?

A Yes.

Q Becky Gay would later be married and her name would be changed to Becky Hall; correct?

A Yes.

Q What was the source of that personal conflict that you had working with Becky Gay at Smith Road?

A I'm not sure.

Q Well, tell me the kinds of problems that you

experienced working with Becky Gay.

A You'll have to show me the document to refresh my memory.

MS. HARSHBARGER: I'll have this marked as Defendant's D.

(Whereupon Defendant's Exhibit D was marked for identification, 1/24/13, MMP)

Q Handing you what's been marked as Defendant's Exhibit D; do you recognize that document?

A Yes.

Q And what is it?

A A memo from the principal at Smith Road.

Q To whom?

A Myself and Becky Gay.

Q And it concerns -- the re: line reads "Professional Cooperation"?

A Yes.

Q It's dated February 8, 2002?

A Yes.

Q In this memo -- you know what I realize is we've marked the wrong one. We shouldn't mark the one that I highlighted. That's not appropriate.

MR. CIOTOLI: The fact that it was highlighted caught my eye, but ...

Q Yeah. That's not right. I usually have the

one on top. See if it'll stick again. Okay. So this memo reads, "I'm disappointed you are unable to communicate in a professional manner to reach compromise regarding program."

Does that refresh your recollection as to what the source of this conflict was between you and Becky Gay?

A Well, as it says, we had a difference of opinion regarding program.

Q A difference of opinion that was not being expressed in a professional way; correct?

A Yes.

Q And you took this to be a criticism of your professionalism; correct?

A I don't recall how I took this.

Q How do you read it now?

A I read it as two people that weren't seeing eye to eye regarding program and the principal was concerned and handled it himself with a memo to both of us telling us both that we needed to communicate.

Q In fact, what he says is that "all future correspondence are to be done in wr -- by e-mailing or in writing with a copy to me"; correct?

A Yes.

Q So, am I to understand that the inability of you and Ms. Gay to communicate had reached such a level that you could -- you were not being -- strike that.

A Yes.
Q And a document that purports to be a counseling memo in November of 2008?
A Yes.
Q There comes a time -- we'll talk about all of this in more detail, but there comes a time that 3020-a charges are served against you by the district; correct?
A Yes.
Q And that is June of 2009; correct?
A Yes.
Q And then amended charges were served in September 2009; correct?
A Yes.
Q Now, the amended charges in September 2009 added one charge; is that right? Do you recall that?
A No.
Q Okay. You served your 30-day suspension from the beginning or the first day of the September 2009 school year until about October 20, 2009, when you returned to work from suspension; correct?
A Yes.
Q Since the time you returned to work on October 20, 2009, you've not received any further counseling memos; correct?
A No.

Q And you've not been suspended again; correct?
A Correct.
Q And there have been no further 3020-a charges; correct?
A Correct.
Q And Mr. Wolf was your supervisor through the end of 20 -- the 2011 -- calendar year 2011; correct?
A October 2011.
Q When he went out on a medical leave; correct?
A Yes.
Q The October -- the November. Sorry. The February 2008 counseling memo, Ms. Rausa, from Ellen Hardy, do you blame Steve Wolf in any way for the fact that Ms. Hardy issued you that counseling memo?
MR. CIOTOLI: I'll object as to form. Go ahead.
Q Do you believe that Mr. Wolf had anything to do with the fact that you were issued a counseling memo in February 2008?
A I believe that because he was a principal at the time and she was his subordinate that he had to have known about it and I believe that was the beginning of the targeting that then took place.
Q Who do you believe initiated the idea of giving you a counseling memo, do you know, Mr. Wolf or

her, I had e-mailed her.
Q When was that?
A I don't recall. I know I had been in to see her about what was happening.
Q Are you aware that the district has a policy against discrimination and harassment in the workplace?
A Yes.
Q Have you been to training involving that policy, either conducted by Ms. Speach or someone else?
A Yes.
Q And are you aware that there is a form that you can fill out if you believe you're being harassed or discriminated against?
A Yes.
Q And Ms. Speach referred you to that policy, didn't she, in February 2008?
A Yes.
Q And you never filled out that form or made a written complaint; right?
A No.
MS. HARSHBARGER: This will be E.
(Whereupon Defendant's Exhibit E was marked for identification, 1/24/13, MMP)
Q Okay. Ms. Rausa, there came a time when you were asked to go see Ms. Speach at district office because of

a meeting you had with Mr. Bosser; correct?
A Yes.
Q Was that on or about May 14, 2008, that you had the conversation with Mr. Bossert?
A Okay.
Q Well, does that sound about right?
A That sounds about right.
Q And that was a conversation in your office; correct?
A Yes.
Q And you called him into your office to have a conversation; correct?
A He was in my doorway and I asked if he had a minute.
Q So you initiated the conversation with Mr. Bossert; correct?
A Yes.
Q And you are aware that following that meeting, Mr. Bossert made a complaint about your behavior during that meeting; correct?
A Yes.
Q I'm handing you what's been marked as Defendant's E, do you recognize that document?
A Yes.
Q What is it?

A A counseling memorandum.
Q And it's dated June 25, 2008?
A Yes.
Q And this is issued to you; correct?
A Yes.
Q From Annette Speach; correct?
A Yes.
Q And in this counseling memo, Ms. Speach refers to your meeting with Mr. Bossert on May 14, 2008; correct?
A Yes.
Q And she advises you at the end of that paragraph that your colleague, meaning Mr. Bossert, perceived your statements and interaction as intimidating causing an uncomf -- uncomfortable feeling in the work environment; do you see that?
A Yes.
Q And are you aware that is what Mr. Bossert reported to the district?
MR. CIOTOLI: I'll object as to form as to what Bossert said to the district, but go ahead.
Q Did Ms. Speach discuss those allegations with you prior to issuing you this counseling memorandum?
A Yes.
Q And is it your understanding that Ms. Speach

investigated Mr. Bossert's allegations against you?

MR. CIOTOLI: I'll object as to form as to that, as to what she investigated, but go ahead.

Q Ms. Speach spoke to you about Mr. Bossert's allegation; correct?

A Yes.

Q And you were allowed to give your side of the story; correct?

A Yes.

Q Now, did you believe that you had been intimidated or caused an uncomfortable feeling for Mr. Bossert?

A No.

Q And did you make a complaint about Mr. Bossert's behavior prior to being informed that Mr. Bossert had made a complaint against you?

A I don't follow your question.

Q So following the May 14, 2008 meeting, there comes a time when you're issued what -- what would be called a Weingarten letter, asking you to come to Ms. Speach's office to discuss your behavior on May 14; correct?

A Yes.

Q Prior to that time, had you raised any concerns about Mr. Bossert's conduct during this May 14

A With the climate of the building under the new principal.

Q Ms. Rausa, there comes a time when you are moved from an instrumental position to a chorus position; correct?

A Yes.

Q And I want to rephrase that. That's actually not quite right. You were moved from an instrumental teaching position to a classroom teaching position; correct?

A Yes.

Q And then the corollary change that went along with that is that instead of teaching band after school, you taught chorus after school; correct?

A Yes.

Q When were you notified that you would be moved?

A Like, in the third week of April, I'm thinking.

Q Of 2008?

A Yes.

Q And who told you about that change?

A I received a memo from Mr. Wolf.

Q Did you have a conversation with Mr. Morten before that about moving from the instrumental band -- instrumental position to the classroom position?

A I had a conversation with both Dr. Morten and Mr. Wolf. Mr. Wolf left halfway through the conversation.

Q Okay. And was it your understanding that Dr. Morten's recommendation was that you be placed in a classroom position to teach chorus?

A No. It was my understanding that they had an idea for staffing for next year they wanted to run by me, and they were meeting to discuss that idea with me, it was not my understanding at all that this was solidified. I was actually told to think about it, and I asked how long I had to think about it, he said, "take through April break and we'll talk after that."

Q And who's "he"?

A Dr. Morten.

Q Okay. And do I understand you to be saying that you were informed that the decision was, in fact, final prior to the end of April break?

A I don't remember where April break fell that year.

Q Well, did you, in fact, think about it and get back to Dr. Morten?

A No. I received a memo before I spoke with Dr. Morten.

Q And that memo indicated that you would move from the instrumental position to the classroom position;

correct?

A Yes.

Q And during the meeting that you had with Mr. Wolf and Dr. Morten, did they explain to you that they believed you were a strong vocalist who could be more affective for the school in the vocal program?

A Yes. They explained they wanted to try to build the numbers in the choral program.

Q And you are a strong vocalist, aren't you, Ms. Rausa?

A I'm also a strong instrumentalist.

Q But you're also a strong vocalist?

A I'm both.

Q So you don't see any difference in your skill set as between being an instrumentalist and being a vocalist?

A Correct.

Q Now, I believe you explained to me that in the previous year, Mr. Wallace was in the choral position with Ms. Launt; correct?

A Yes.

Q Is Mr. Wallace a strong vocalist?

A I've never heard him sing.

Q Well, you had an opportunity presumably to observe a concert or two of his, something else; do you believe that you are a stronger vocalist than Mr. Wallace?

A Again, I've never heard him sing.
Q Okay. So you can't comment at all on how well Mr. Wallace did in the classroom music position teaching chorus?
MR. CIOTOLI: Objection as to form. That's two different questions.
Q Okay. Can you comment on how well Mr. Wallace performed in the classroom position?
A I wasn't in his classroom.
Q Can you comment on how he performed in the chorus position?
A All I know is chorus numbers went down.
Q Okay.
A That's all I know.
Q And under you, chorus numbers went up; correct?
A Yes.
Q Now, is it your standing that Mr. Wallace sings professionally?
A I don't know what he does professionally.
Q Okay. You sing professionally, though, correct?
A I sing and play saxophone professionally, yes.
Q You have a couple of bands; correct?
A Yes.

Q So there's Danielle and the State Street Band; correct?

A That's no more.

Q Okay. That is defunct. How about the bands that you're currently in, what -- what -- what are their names?

A Mood Swing.

Q Mood Swing; anything else?

A I've been singing with a band called Brass, Inc. for a while, but I pulled back due to health issues.

Q Okay. And how about during this period of time that we're talking about, was Danielle and the State Street Band, they were still up and running?

A Yes.

Q And this is a local group of people that -- musicians that get together to play; is that right?

A Yes.

Q Do you practice in someone's home?

A Yes.

Q And you know, you do local gigs, for lack of a better term; correct?

A Yes.

Q Do you believe that you're a stronger instrumentalist than Mr. Wallace?

A Again, I've never heard him play tuba or play

any instrument. I don't know.
Q Okay. So you can't comment on Mr. Wallace's skills as an instrumentalist?
A I know his numbers went down in band, also.
Q Well, you're talking about --
A That's all I can say.
Q Well, you're talking about numbers of students that you recruited versus Mr. Wallace; correct?
A The number of students involved in the programs.
Q And recruitment is an important factor in any of these after-school music programs; correct?
A It's a part of it, yes.
Q But it is only part of it, right, the other part of it is quality of instruction; correct?
A Yes.
Q Now, have you ever played in an Army band?
A No.
Q Have you ever toured nationally?
A No.
Q Have you ever entertained foreign dignitary?
A I'm not sure who was at the Jazz Fest and the 40,000 people who were there, I bet there was one there.
Q You think there was a foreign dignitary at Jazz Fest; do you remember his or her name?

Q And this informational meeting, that was going to be for students or students and parents?

A Students.

Q And at the informational meeting, you planned to announce some changes to the choral program; correct?

A Just what we were going to be offering that year.

Q And what did you plan to announce as offerings that year?

A We wanted a combined chorus, we wanted a select chorus, we were talking about a possible jazz chorus, a show chorus. We were --

Q And who's "we"?

A Robin Launt and myself.

Q And was this a meeting that you then jointly organized?

A Yes.

Q And had any of your ideas that you just listed, had any of those been approved by Dr. Morten prior to September 16, 2008?

A Yes.

Q You had written approval from Dr. Morten?

A I had a meeting with Dr. Morten, Jane Ginsburg, Robin Launt. We sat in June, and I said, "I've accepted the change that you've made and I will do my

best and this is what we'd like to do" and we went through all of it with Dr. Morten.

Q And was your understanding then that he had approved all of your ideas and that you did not have to come back to him again for any changes you were going to make?

A No. He said, "We want you to build the vocal program. Do whatever you need to do to build the vocal program." Those were his words.

Q Okay. Now, at some point, Steve Wolf cancels your September 16th informational meeting; correct?

A The day of, yes.

Q And is that because he had concerns about the programmatic changes you were going to announce?

A I don't know what -- I didn't know at that time why he had canceled it because he didn't speak to me about it. He just canceled it.

Q Did you later find out that those were her -- were his concerns?

A Yes.

Q And, in fact, Dr. Morten told you on or about September 22nd, 2008, that there could be no select chorus at the middle school; correct?

A I don't believe he ever told me that. He was in the building and I had called him after the meeting was canceled and after I spoke with Mr. Wolf and Dr. Morten

didn't know anything about it, but he would be at the school to find out. I guess he came and met with Mr. Wolf, but he didn't speak with me.

Q And, in fact, you received a memo on or about September 29th, 2008, indicating that there could be no select chorus at Roxboro Road Middle School; correct?

A Yes.

Q And do you understand that the reason for that is Dr. Morten believes that it's educationally inappropriate to have a select chorus in middle school?

MR. CIOTOLI: I'll object as to form as of that, as to Dr. Morten's thinking on that, so ...

MS. HARSHBARGER: You can go ahead and answer.

A I understand that now as to listening to him say that in his deposition.

Q That was the first time he had explained to you his rationale to denying the select chorus?

A Yes.

Q Knowing what you know now about Dr. Morten's position on select chorus, do you agree with me it's a good idea you didn't go forward with that September 16th informational meeting?

MR. CIOTOLI: I'll object as to the form

and myself about a select chorus, I think he would have understood the select chorus as to be the best of the school that we wanted to take into the Festival of the Arts, and I think he may have looked at it differently. I don't know. That conversation didn't occur, nor did the select chorus, nor did the informational meeting.

Q Well, I'm not asking you about Dr. Morten's decision-making process. I'm -- I'm asking you about your informational meeting you wanted to hold on September 16th, 2008. You were going -- you planned on September 16th, 2008, to announce a select chorus; right?

A I planned on telling them what we were looking at trying to do in that upcoming year.

Q Oh. So you were going to announce several programs that weren't necessarily ever going to be on the table even in your own agenda?

A We were going to talk about the drama club chorus, the regular chorus, possibly a select chorus, possibly a jazz chorus. We wanted to spark some interest. We wanted to see if there was an interest in that. That was going to be more geared towards the students and their abilities to see what we could be doing.

Q Wouldn't it have been a better idea to make sure that administration was going to allow you to have those programs before you announce them to students?

A I was already under the impression, as was Robin Launt and Jane Ginsburg based on a meeting with Dr. Morten in June of the prior year that we were to go ahead and do whatever we could do to build the vocal program. That's what we were functioning off of.

Q Okay. And In retrospect, that was a miscommunication; right?

A On the part of who?

Q It was a misunderstanding between you and the other teachers and Dr. Morten; correct?

A It was a misunderstanding, miscommunication, I'm not sure. We heard what we heard and we knew what we were going to do. We spent the summer planning that. The miscommunication happened when Mr. Wolf decided to cancel and not have a conversation with me about it.

Q Well, that got cleared up in the next couple of weeks, right, over these series of meetings about the select chorus?

A Yes.

MS. HARSHBARGER: Defendant's F. Let's make this Defendant's G.

(Whereupon Defendant's Exhibits F and G were marked for identification, 1/24/13, MMP)

Q Handing you what's been marked as Defendant's Exhibit F and G. Can you start with Exhibit F? Do you

recognize that document?
A Yes.
Q What is it?
A Mr. Wolf's memorandum to Robin Launt and myself about not having a select chorus.
Q And what is Exhibit G?
A The original flyer that was put together by Robin Launt and myself to hand out at the original meeting.
Q Did there come a time when you were made aware that the flyer that is Exhibit G was actually being distributed?
A I was made aware that someone had returned one sign in a Weingarten meeting.
Q Okay. And when you say "someone," was that a student?
A A student.
Q And how did the student get ahold of that flyer?
A I would imagine she took it off of my file cabinet because that's where they were.
Q So they were not outside your room on a music stand?
A I did not place them outside my room on a music stand.
Q Is it possible that students did?

A We always put down "return all permission slips to the classroom music teachers," and Ms. Kopf was a classroom music teacher.

Q Did Ms. Kopf know that you were putting her name on this permission slip?

A I don't know.

MS. HARSHBARGER: H.

(Whereupon Defendant's Exhibit H was marked for identification, 1/24/13, MMP)

Q Handing you what's been marked as Defendant's Exhibit H. Do you recognize that document?

A I'm sorry?

Q Do you recognize that document?

A Oh, I didn't hear you. I'm sorry. Yes.

Q You've seen it before today?

A This was read to me in my Weingarten meeting.

Q And this is an e-mail in part from a student whose name has been blocked out for privacy reasons, indicating that "Ms. Rausa's been mean to me" and someone else, another student's whose name has been blocked out for privacy reasons "this summer. She deleted my messages I sent her, she deleted me and [redacted] off her Myspace. She said WTF," which I assume is what the fuck; right? Is that what you understand that to mean?

A Usually, yes.

Q "To [redacted] on IAM," is that instant messaging?

A AIM. I don't know.

Q "And sent him a picture of someone's middle finger." Did you -- did you do those things?

A Absolutely not.

Q And is it your position that the student sent you some kind of an apology for making this allegation against you?

A Yes.

Q How did -- how did the student send you that apology?

A Sent it on the Myspace.

Q Okay.

A So obviously I didn't delete him if I received it.

Q So he was on your Myspace page?

A Yes.

Q And he could see what you posted on your Myspace page?

A Yes.

Q Would you ever post something like "WTF" on your Myspace page?

A He said I sent him that, sent him a picture of a middle finger and said that on AIM, no.

Q And you wouldn't -- you wouldn't do those

Q Okay. And did you kind of take that to heart? Did you agree that that was probably a good idea to be careful about what you say online as a teacher?
A Yes.
Q Okay. Now, you said that the -- what we're looking at as Defendant's I is not a counseling memo; right?
A Correct.
Q And I think what you're alluding to is that there may be some confusion as to the relationship between this document, Defendant's I, that purports to be a counseling memo dated October 20, 2008, and a later counseling memo that you would receive in November 2008; correct?
A Yes.
Q What is your position on the relationship between those two documents, the October 2008 counseling memo and the November 2008 counseling memo?
A They're the same document.
Q Really, kind of one large counseling memo, if -- if you will, all talking about substantially the same incident?
A Yes.
Q Okay. When did it come to your attention that there was that, you know, arguable confusion about the relationship between those two counseling memos, October 28

A No, I'm not anti-male.
Q Okay. So you -- you weren't being accurate in that post?
A It's an ongoing joke with my friends.
Q About being anti-male?
A Yes.
MS. HARSHBARGER: All right. Why don't we take our break now. Maybe lunch is over there; okay, and then we'll continue?
(Whereupon a brief recess was taken.)
(Whereupon Defendant's Exhibit M was marked for identification, 1/24/13, MMP)
Q Ms. Rausa, I've handed you what's been marked as Defendant's Exhibit M. Have you ever seen this document before? Oh, I haven't handed it to you. Now I've handed it to you. Have you ever seen those documents before, Ms. Rausa?
A I don't know if I have or haven't.
Q Do they appear to be statements written by students reporting abuse by Student A?
A Yes.
Q And there are two of them that I've handed you; correct?
A Yeah.
Q Okay. Did there come a time, Ms. Rausa, that

you were made aware that students reported being touched by Student A sexually and inappropriately during drama club?

A Yes.

Q When did those allegations come to your attention?

A The day that they were giving statements.

Q Do you remember when?

A It was a Monday. It was a week and a few days before the play was going to open.

Q What day was the play going to open?

A On a Wednesday.

Q Okay. If I said to you that that Monday would have been March 30, 2009, does that sound about right?

A Yes.

Q So that's the first time these allegations came to your attention; correct?

A Yes.

Q And there were multiple girls in drama club making the same allegations; is that your understanding?

A Yes.

Q Did they talk to you about their allegations on or about March 30th 2009?

A On that day?

Q Or thereabouts, not before; correct?

A Never before, no.

Q Okay. So you learned about these allegations on or about March 30, 2009?

A Yes.

Q And did the girls speak to you about their allegations?

A They came into my room during lunch, sobbing, crying. There was a big group of them, so I couldn't imagine what had happened and then they told me.

Q And what did they tell you?

A They told me that they had spent the morning giving statements because Student A had been doing -- touching them, doing things to them, harassing them.

Q And Student A was suspended as of that day; correct?

A I don't know.

Q Okay.

A I don't recall re -- I know it was in and around that time, he was suspended.

Q Well, Student A was in drama club; correct?

A Yes.

Q And Student A had the lead or one of the leads in your play; is that right?

A One of the leads.

Q Okay. So you lost the lead of your play that week; correct?

A Yes.

Q And you were aware that the reason Student A couldn't attend school from that point forward was because of these allegations; correct?

A Yes.

Q Were you aware as of that Monday, March 30, 2009, that the police were going to investigate this?

A They told me that they had made -- made statements. I don't -- I think they told me the sheriffs were there. That's all I -- I didn't know anything about it until I saw them seventh period and they said they were making statements with the sheriff and I don't know if that was the deputy that was in our building or outside. I do not know.

Q As a former police officer, did you understand that based on the nature of these allegations, that this very likely would be investigated by the police?

A Yes.

Q Now, you were asked about your knowledge of these allegations at some point by Ms. Speach; correct?

A Yes.

Q And she asked you about how you ran the drama club; correct?

A Yes.

Q And who was in charge and what dates and times

and those kinds of things; correct?

A Yes.

Q Ultimately, Ms. Rausa, the events concerning Student A and his abuse of other students in drama club would become the subject of a charge against you in the 3020-a proceeding; is that right?

A Yes.

Q Now, in the context of your conversations with Ms. Speach, did you tell her how you went about supervising the drama club?

A Yes.

Q What did you tell her about how you went about supervising the drama club?

A I told her typically I was in the front row with the audience looking at the stage. The codirector, Robin Launt, was in the center stage sitting between the two choruses and Jane Ginsburg I think was wherever she needed to be.

Q So -- so let's talk about everyone's involvement here. You were the director of the drama club; correct?

A Yes.

Q And the only paid director of the drama club; correct?

A Yes.

Q So student supervision was your responsibility; correct?
A Yes.
Q Jean Ginsburg, she's a teacher's aide?
A Yes.
Q And she's assisted you on various productions?
A Yes.
Q And was she being paid the year that we're talking about, which is the '08/'09 school year?
A I don't believe she was.
Q Okay. And the production that we're talking about was called "Little Stars"; right?
A Yes.
Q Now, how about --
A I'm sorry. I'm trying to get my timeline in my head.
Q Sure. Understood. Robin Launt, what was her connection to your drama production?
A Robin Launt is the -- was the chorus teacher. The chorus flipped over to the drama club, so she was staying after and getting paid her chorus stipend to be working with the kids in the chorus of the show.
Q So, is it fair to say that she was responsible for the students in the chorus?
A The whole production was a chorus. The whole

A No, I don't.

Q Okay.

A Can I use the bathroom?

MS. HARSHBARGER: We'll go off the record.

THE WITNESS: Thank you.

(Whereupon a brief recess was taken.)

Q Ms. Rausa, I just want to be clear that I understand your testimony. So on Saturday, April 4, 2009, you left the building while a drama club rehearsal was going on and you did not tell an administrator that day before you left that you were leaving; correct?

A Correct. Steve Wolf hadn't arrived yet.

Q And Steve Wolf's not in charge of your drama club rehearsal, though; right?

A No, but he was coming that day.

Q But you -- you are in charge of that drama club rehearsal; is that right?

A Yes.

Q So you knew you were leaving before Steve Wolf had arrived?

A When I was -- when we got to the point where I needed to go or Jane needed to go, based on where we were in the show in rehearsing and coming up on lunch, because the majority of the time I was gone was a lunch break, Steve Wolf

Q You would have been -- you were more comfortable leaving your drama club days after the sheriff's department had been there investigating allegations of abuse than you were having a parent drive your daughter to Solo -- Solo Fest?

A All of the people that had been working with the drama club up until that point, Jane Ginsburg, Robin Launt, Joe Clayton and all of the parents had been working, were all there.

Q You didn't answer my question. My question is, why didn't you have a parent, one of the other parents who's not responsible for those students at drama club, why didn't you have one of those parents go pick your daughter up and take her to Solo Fest?

A I think I had already told Mr. Wolf and Dr. Gramet that it was either going to be either myself or Ms. Ginsburg taking her at the meeting.

Q Did you understand they had given you permission to leave this rehearsal?

A I'm sorry?

Q Did you understand they had given you permission to leave this rehearsal?

A No. I understood it that they -- that it had been discussed that these things were going on and we were all going to all do the best we could to get a last-minute

rehearsal in and get the kids ready for production next week.

Q You're not answering my questions. Was it your understanding at -- at the conclusion of this meeting with Dr. Gram -- Dr. Gramet and Mr. Wolf that you had their permission to leave the Saturday rehearsal to take your daughter to Solo Fest?

A Again, it was my understanding they knew that that might be a possibility and nothing was said to me at that meeting to contradict that.

Q You also told them that you were going to make other arrangements for your daughter in Solo Fest; right?

A I told them I was going to try to rearrange as much as possible.

Q Did you think it was good judgment on your part to leave that Saturday rehearsal given the sheriffs investigation into activities that had occurred at your rehearsals?

A I believe the children were in a safe environment with the directors that they were accustom to, and the parents, and the tech club director as well as Mr. Wolf scheduled to arrive.

Q But you believed that prior to March 30, 2009, right? You believed --

A I don't --

Q -- at the time that Student A was abusing

female students behind the curtains, they were with that same group of people that you just described; right?

A Yes.

Q And you believed at the time that they were safe; right?

A No. They weren't with all of the same people. The rehearsal -- I -- we were after school. This was a Saturday rehearsal and there were far more parents there. The administration was there, which they hadn't been at --

Q Well, you -- you just testified that the administration wasn't there when you left.

A No. He arrived shortly after I left and was there during the children's lunch break.

Q At the time you left --

A And I didn't testify that. I said he was scheduled to arrive.

Q At the time you left the building, Mr. -- Mr. Wolf was not there; correct?

A Correct.

Q Okay. Now, Ms. Rausa, you also did not enter any grades at all for any of your students in the third marking period of the '08/'09 school year; correct?

A Correct.

Q And that is despite the fact that you knew when the deadline to enter grades was; correct?

not disappeared?

MR. CIOTOLI: When even you're not sure, then ...

Q It's time to object to the form. But you -- you don't have a technological answer for what we're seeing there, do you, Ms. Rausa?

A I am not the tech person in the district. I just brought it to their attention what was happening.

Q Okay.

A How come no one's had any absences in any of these? There's no absences, hmm ...

Q Ms. Rausa, I'd like to turn your attention to the 3020-a charges that were served against you. So there were original charges served against you in June of 2009; correct?

A Yes.

Q And you were placed on suspension as of the first day of the fall semester, 2009; correct?

A Second day, I think. I went in for the first day and then was out.

Q Okay. And I think we've had previous testimony that you were out through October 20, 2009; correct?

A Uh-huh, yes.

Q Now, the original set of charges called for a

30-day suspension; is that right?

A Which set are you -- you referring to?

MS. HARSHBARGER: Maybe we'll just go ahead and mark them and let's do two at a time. So that'll be Q, R, S, T.

(Whereupon Defendant's Exhibits S and T were marked for identification, 1/24/13, MMP)

Q Ms. Rausa, I've handed you what's been marked as Defendant's S and Defendant's T. Do you recognize Defendant's S?

A Yes.

Q This is the original set of 3020-a charges that the district served on you; correct?

A Yes.

Q And if you go to the last page, it says, "The maximum penalty sought if Ms. Rausa's found guilty of any of the charges is a 30-day unpaid suspension from employment"; Correct?

A Yes.

Q And that was your understanding, that the maximum penalty the district was seeking was a 30-day unpaid suspension; correct?

A For these charges, yes.

Q You knew you wouldn't -- you didn't stand to be terminated or fired based on these charges; right?

A I believe Ms. Speach told me that.
Q Did Ms. Speach explain to you that the district has a contractual provision that provides for unpaid suspensions prior to a 3020-a Hearing?
A I don't believe we discussed a 302-a Hearing or any of that. I believe that was something I had taken up with my attorneys and the union at that point.
Q Did the union explain to you that there is a provision of the collective bargaining agreement that allows for unpaid suspensions prior to a 302-a Hearing?
A I don't recall being -- the union said that.
Q Are you presently -- as you sit here, are you presently aware that that provision is in the collective bargaining agreement?
A Yes.
Q Now, you had a meeting with Ms. Speach prior to the time that these charge -- charges were served in which she discussed with you a three-day unpaid suspension; is that right?
A Yes.
Q And did she explain to you that if you accepted a three-day unpaid suspension and waived any of the formal 3020-a process, that the three-day suspension would be your total penalty?
A No.

Q What did you understand Ms. Speach to be telling you when she discussed with you the -- a possibility of a three-day unpaid suspension?

A There was going to be a three-day -- I don't remember what was discussed with Ms. Speach. I remember the conversation with my union, and they said, "Do not sign it. There's more charges pending."

And I said, "I don't know what that means."

And she said, "There's more charges pending and they're looking at a ten-day suspension, so don't sign it."

Q Did you understand at some point you were being offered a ten-day suspension?

A The ten-day suspension was still offered in September of '09, if I was to waive my right to a hearing. It was still ten days.

Q Okay. So, as originally discussed with you by Annette Speach, it was your understanding that you were being offered a three-day unpaid suspension originally; correct?

A There was a three-day unpaid suspension offered. The union said, "Don't sign it because more charges are coming and they're looking for more days."

Q Okay.

A So, you know, the three-day was there, but it wasn't really there.

Q According to the union?

A Yes.

Q Now, did you ever go back and clarify that with Ms. Speach?

A No, because I received more charges.

Q You received the additional charges, though, in September 2009; correct?

A No, no. They were investigating the [redacted] incident, I believe. I -- I -- I'm not -- I'm sorry, Student A. I'm sorry.

Q So the amended charges that we have marked as Defendant's Exhibit T, those are dated September 2009; correct?

A Uh-huh.

Q So you had already rejected the offer of a three-day suspension to resolve all the charges prior to the date that you got this document; correct?

A I was -- yes, but I was told it was not going to resolve all of the charges. There were more charges pending.

Q You were told that by the union; correct?

A Yeah.

Q But never by Ms. Speach; right?

A I don't recall if she told me that or not.

Q And Ms. Rausa, ultimately, you ended up

entering into a settlement agreement with the district to resolve the 3020-a issues; right?

A Yes.

Q And that was entered into in June 2010; correct?

A Yes.

Q And by that time, of course, you had served the 30-day unpaid suspension; correct?

A Yes.

Q And you understood that you were accepting as compensation a refund or a repayment of 25 paid days; correct?

A Yes.

Q And did you, in fact, receive that payment?

A Yes.

Q Did you receive that payment in about August of 2010; does that sound about right?

A Yes.

Q Now, Ms. Rausa, you did not attend the settlement conference before the hearing officer that resulted in the settlement agreement; correct?

A Correct.

Q You, however, were in communication with your attorney by phone; correct?

A Yes.

Q And you consented to the settlement agreement; correct?

A Yes.

Q You authorized your attorney to engage in that settlement; correct?

MR. CIOTOLI: These questions and answers are fine, but I don't want any attorney-client communications.

MS. HARSHBARGER: That's fine. And I'm not -- I'm not going there.

MR. CIOTOLI: Okay.

MS. HARSHBARGER: You let me know if you think I do. We're just going through what her knowledge was about this process.

MR. CIOTOLI: All right.

Q So, Ms. Rausa, you understood that the settlement agreement meant that things related to the 3020-a, the unpaid suspension, that was being resolved with a settlement agreement; right?

MR. CIOTOLI: I'll -- I'll object there. I don't know if she can answer to the -- to the legal affect of that settlement agreement.

MS. HARSHBARGER: Well, I'm just --

MR. CIOTOLI: -- which has already been an issue in the motion to dismiss.

MS. HARSHBARGER: Uh-huh.
MR. CIOTOLI: I know we argued that.
MS. HARSHBARGER: Uh-huh.
MR. CIOTOLI: I'm not sure she has the ability to say what is the legally-binding affect of language. And I think even you and I have a dispute over what's ...
MS. HARSHBARGER: I'm not asking her for legal. I'm asking her for her understanding. Did she understand that the affect of this settlement agreement was to resolve the 3020-a issues.
A To stop the 3020-a issues, no hearing, that was going to be it. That's the question you're asking me?
Q Well, I'm asking you if when you accepted the 25 days of repayment, if you understood that that was compensation as a result of the 3020-a proceedings that had led up to that point in time?
MR. CIOTOLI: And I'll object. I think you just kind of switched the question. Now you're talking -- before you were just talking about 3020-a charges, now you're talking about compensation. Okay. Before you were talking about 3020-a charges, now you just mentioned compensation. I'm not sure what you mean at

all by compensation.

MS. HARSHBARGER: The compensation is the 25-day repayment that you received in August of 2010. That's what I mean by compensation.

THE WITNESS: Okay. I want to answer your question. I'm having trouble focusing with you right now. Can I just walk around and come back? May I do that?

MS. HARSHBARGER: That's fine.

THE WITNESS: I -- I want to answer your question.

MS. HARSHBARGER: It's normal.

THE WITNESS: I'm just starting to get a little fuzzy and I just want to go walk.

MS. HARSHBARGER: Okay.

MR. CIOTOLI: Can I also say for the record, the document speaks for itself. It is a legal document. I know there's been some dispute between the sides on exactly what that document covers, and I think it was even the subject of the motion to dismiss. My guess is there will be some further legal argument on what that document exactly covers, but all that said, if Danielle can focus and concentrate she can answer that question.

Q So in 2008/2009, what chorus did Ms. Launt direct, fifth grade, only --
A Fifth.
Q -- or fifth and sixth?
A Wait. You're in '08/'09, fifth grade.
Q Okay. And you directed then the sixth and seventh grade chorus?
A No. I'm sorry. You're in year '08/'09; yes?
Q Yes.
A Okay. Ms. Launt had the fifth and sixth grade chorus and I had the seventh grade chorus.
Q And if I understand one of your complaints, Ms. Rausa, it's that the previous year, '07/'08, Mr. Wallace had a six-seventh grade chorus, but when you were moved into the classroom position for the '08/'09 year, you had a seventh grade-only chorus; is that right?
A Yes.
Q That's one of your complaints; yes?
A Yes.
Q You wanted to have a sixth-seventh grade chorus; correct?
A I thought in taking over the same position that Mr. Wallace occupied, I would have the same chorus and same -- yes.
Q So if I can frame that a different way, the

students in dispute in the '08/'09 school year are the sixth-graders; correct? It's who's going to get to direct the sixth-graders; correct?

A Yes.

Q And those sixth-graders that you wanted went to Ms. Launt; correct?

A Yes.

Q Now, how about for the '09/2010 school year, how were the choruses divided?

A I was on suspension at the beginning of that year, when I came back there was a fifth grade chorus and a -- a six-seventh chorus. They -- they were back to what they had been before.

Q And Ms. Launt had the fifth grade chorus; correct?

A Yes.

Q And you had the sixth-seventh grade chorus; correct?

A Yes.

Q So that's what you wanted; correct?

A Yes.

Q And Steve Wolf was still the principal at the time that the choruses went back to the configuration that you wanted; correct?

A Yes.

Q Ms. Rausa, in the Notice of Claim, section 56G, you indicate that one of your complaints is that Mr. Wolf accessed your private Facebook profile without your knowledge or consent; correct?

A Yes.

Q And when we were together previously during your earlier deposition you explained to me that it was your understanding that one of your Facebook friends, Tammy Moran, was Mr. Wolf's secretary; correct?

A Yes.

Q And that Mr. Wolf asked Tammy Moran to log into her Facebook so that he could see what you were posting about him on your Facebook page; is that correct?

A Yes.

Q Yes?

A (Witness gesturing affirmatively.)

Q Okay. And I asked you at that time if you had posted anything, in fact, about Mr. Wolf on your Facebook; do you recall that?

A No. We -- we can read it.

Q Do you recall this question? This is my question.

MR. CIOTOLI: What page are you on?

MS. HARSHBARGER: 130. Give you a minute.

MR. CIOTOLI: Okay. 130, here I am.

Q "Q. And, in fact, had you posted something about Mr. Wolf on your Web, on your Facebook page?"

And this is your answer; you answered, "No."

"Q. You don't have -- you didn't have a post on your Facebook page that had something to the effect of, "It's on. He picked the wrong person to mess with, referring to Steve Wolf"?

Answer, "No."

Do you remember that testimony?

A Uh-huh, yes.

Q Is that testimony truthful?

A No, not after some of the documents that have popped out, no.

Q Were you lying at the time that you gave that testimony?

MR. CIOTOLI: Well, I object to the use of the word "lying."

Q Well, lying means not telling the truth. Were you intentionally not telling the truth to me when I asked you that question?

A No. I did not recall putting anything up about Mr. Wolf at that time.

Q Since the time of our last deposition it's come to your intention that you, in fact, had posted

something on Facebook about Mr. Wolf; correct?

A Yes.

MS. HARSHBARGER: Can I get this marked? What are we up to, U?

(Whereupon Defendant's Exhibit U was marked for identification, 1/24/13, MMP)

Q Handing you what has been marked as Defendant's Exhibit U. Do you recognize that document?

A Yes.

Q What is it?

A Photocopies of my Facebook page.

Q And do I read correctly that your status that you posted on this date, which would be, I guess, at or around June 19, 2009, "If there's any justice in this world, and I do believe there is, Wolfy picked on the wrong person to mess with. Oh, yeah, it's on." Do you see that?

A Yes.

Q And that was what you posted; right?

A Yes.

Q And when you were talking about "Wolfy," you were talking about Steve Wolf; right?

A Yes.

Q And this is about the time you were notified that the district would be bringing charges against you; correct?

A This was four days after I was served charges.
Q And you blame Mr. Wolf for those charges; correct?
A I feel he's responsible for a vast majority of the charges, yes.
Q Not all of the charges?
A I'd say he had a hand in all of them, yes.
Q And when you say, "He's picked the wrong person to mess with, it's on," does that mean that you are intending to get back at Mr. Wolf?
A No.
Q What does it mean?
A Well, if you read the first sentence, "If there's any justice in this world, and I believe there is," I was going to fight this because I felt that the charges were wrong, I felt that the whole thing was wrong, I felt targeted and I felt like he was doing things to me intentionally on a different level, treating me differently than he treated everyone else. Again, this is -- I had just been served charges on -- I had never received charges. I had never had any issue in the district up until that time. This is --
Q Well, that's not entirely --
A -- this is four days after I received 3020-a and a suspension notification.
Q Okay. So -- so you were angry; right?

A I was very frustrated --
Q And --
A -- and I was very taken back, I was, yes.
Q Now, there are other teachers that are on here in terms of Facebook friends; correct?
A Yes.
Q Pamela Woznica, W-O-Z-N-I-C-A; right?
A Woznica.
Q She's a teacher; correct?
A Yes.
Q And Katie Krueger, she's an SRO at the district; correct?
A She was.
Q At the time you posted this on Facebook, she was; right?
A No.
Q Do you think it is understandable that Steve Wolf would want to see something that you had posted referring directly to him on Facebook?
A Say that again.
Q Can you understand why Mr. Wolf might have wanted to see what you were posting about him on Facebook?
MR. CIOTOLI: I will object as to form about what his understanding was.
MS. HARSHBARGER: Well, it's not -- his

understanding. I'm asking her if -- if she would concede that if she had made a specific comment about a person on Facebook, that that person might be interested to see what the comment is.

A No.

Q That makes no sense to you?

A Not unless he's trying to get information to use against me, no. I wasn't -- no, no, no, I don't.

Q Okay. Now, when you gave Ms. Moran rights to see your Facebook, you gave her rights to share that with whomever she wanted to; right?

A Facebook is restricted to just my friends and I'm certain --

Q But once you're --

A No. That's not the intent when you friend someone.

Q But it's the risk you take when you friend someone, right, Ms. Rausa?

A I don't believe the people that I friend would do that.

Q That's not the question I'm asking. Ms. Rausa, when you accept someone as a Facebook friend, you understand that they can see your Facebook page; correct?

A Yes.

Q You understand that they can see what you post; correct?

A Yes.

Q You understand that they can print what you post; correct?

A Sure.

Q They could show it to whomever they wanted to; correct?

A Yes.

Q Ms. Rausa, the next allegation in your Notice of Claim is 56H and this deals with your '08/'09 YES Form what's a YES Form?

A Year End Summary.

Q And now, isn't it true, Ms. Rausa, that Mr. Wolf made an appointment to meet with you to discuss your YES Form and the meeting was to occur on June 12, 2009; sound about right?

A Yes.

Q And on that day, you went down to Mr. Wolf's office believing you were going to have that YES meeting; correct?

A I don't think that was the first meeting we had scheduled, but yes.

Q And you walked into Mr. Wolf's office and he told you that he was going to have to reschedule; correct?

A I don't recall if it was that meeting that was rescheduled or I received an e-mail from his secretary.
Q Do you recall that Mr. Wallace was in Mr. Wolf's office with a student in crisis?
A No, I've heard that, but no.
Q You don't recall assisting Mr. Wallace and Mr. Wolf with this student in crisis?
A "Assisting"?
Q Assisting, yeah. Help -- helping talk to this student who was in crisis.
A I -- no. I can't remember that.
Q Do you recall receiving an e-mail where some -- where an administrator complimented you and thanked you for your help with that situation with the child, said how helpful you were?
A I can't remember that.
Q Can't remember. Okay. But you do recall that there was a meeting scheduled for November 12 or thereabouts; correct --
A Yes.
Q -- 2009? And that Mr. Wolf had to reschedule that meeting; correct?
A Uh-huh.
Q But as you sit here presently, you don't recall why Mr. Wolf had to reschedule that meeting; is that

right?

A No.

Q And now, Ms. Moran, Steve Wolf's secretary, she tried to reschedule that meeting with you; right?

A I think we tried to reschedule a few times and this was all, I believe supposed to have been wrapped up at the end of May, and we were coming into the end of the school year and yeah, that's a yes, yes.

Q And do you recall, Ms. Rausa, there came a time when Tammy Moran called you at home after the end of the school year and tried to schedule that appointment with you?

A I believe she called on my cellphone in the middle of July or so.

Q Okay.

A Beginning of July. I don't -- I don't recall.

Q And that was for the purpose of scheduling a meeting that you -- that had -- had -- that had been canceled earlier in June; correct?

A Yes.

Q Do you recall telling Ms. Moran that you -- something to the effect of "that you were not going to schedule a meeting with Steve because you liked having Steve squirming for not doing his job"?

A No. What's -- what? I'm sorry. What's the date on that just ...

because he's not doing his job; right?

MR. CIOTOLI: Well, I'll object to the form. I don't know if there's any part about joy, but go ahead.

A Well, she's stating something that she interpreted as to what I said.

Q This message is consistent with the idea that you wanted to get back at Steve Wolf; right?

A No.

Q You wanted to make his life difficult; didn't you?

A No. I wanted everything to end. I wanted him to stop targeting me. I wanted the communication back there. I did not want to be in the situation I was in.

Q So ...

A And again, this is the summer --

Q Well, if you want --

A -- the stress of everything going on, the fact that I had asked him to meet with me before the year. I told her I was not coming in in the summer. This should have been taken care of before the end of the year and that was it. I was not going to come in during my summer.

Q So the meeting wasn't important enough to come in during the summer?

A The meeting should have been held before the

that?

A Yes.

Q Who? Who's the male member of the Roxboro staff?

A The only person I recall him approaching and asking him to take over drama club was Steve Hearn, who was in the auditorium running lights and sound at that point.

Q Steve Hearn is not a direct employee; right?

A No, but was approved by the board, too.

He was in a paid position in the auditorium. Can't be right. That doesn't line up with the timeline.

Q Ms. Rausa, you were, in fact, always the -- rephrase that.

In all of the years that are relevant to this claim, and let's just put a circle around that to say it's from 2007 forward, you've always been the drama club director; right?

A From '03 on, yes.

Q No one else has ever been paid to do that job; right?

A No.

Q You've always had that position if you wanted it; correct?

A Yes.

Q Ms. Rausa, I meant to ask you a couple of

additional questions about the change in position from instrumental to classroom music. When that change occurred in the fall of 2008, you did not lose any salary; correct?

A No.

Q So your -- your pay was unchanged; correct?

A Correct.

Q And you were still assigned to the same school building; correct?

A Yes.

Q And you still worked the same school hours; correct?

A Yes.

Q And you didn't lose any seniority in terms of the union or tenure or bidding rights or anything like that; right?

A Seniority and bidding rights are ...

Q Entirety different; right?

A Well, they don't even exist anymore.

Q Okay. But --

A With principal building massage, it doesn't exist, so ...

Q But those -- but the change in your position didn't result in any --

A No.

Q -- detriment to you in terms of tenure or

seniority or any of those things; correct?
A Correct.
Q In fact, the only difference really, Ms. Rausa, is what you were teaching; correct?
A Yes.
Q So if I can just go back to 56J. As you sit here, you cannot think of any male member who was asked to fill that drama club position; correct?
A I can't think of it right now, no.
Q And, in fact, your drama club position was never posted while you were out; correct? Posted, meaning ...
A I know -- I know what it means.
Q -- allowing someone -- well, maybe clarify it for the record. Posted, meaning, it would allow someone else to come in and take that job. It was never posted; right?
A I think there was a question of if it had been posted. I think I -- I'm trying to remember. I think I e-mailed Ms. Speach about it.
"Was it posted?"
She came back and said, "No. You're still with drama club." That's what I remember.
Q Just quickly -- well, we don't even need it as an exhibit. Ms. Rausa, I'm showing you an e-mail from Annette Speach to you, "Danielle, you're all set. You are

already board -- board-appointed for the musical."
Is that the e-mail you were talking about? "In the seventh grade chorus position on the board agenda. I'm glad to hear you'll be coming back. Is this the e-mail you're thinking about?
A I -- I think it is.
Q Maybe we should mark it. What the heck.
A It doesn't correlate with the timeline.
Q Right. It's not the timeline, but I think this might be the e-mail you were thinking of. Of course there I am in your head again; right?
(Whereupon Defendant's Exhibit W was marked for identification, 1/24/13, MMP)
Q You have what's been marked as Defendant's Exhibit W and -- and we just had a brief discussion about that, Ms. Rausa, to -- to wrap up this discussion about the drama club director position, you are unaware that your drama club position was ever posted except to give it to you; correct?
A Correct.
Q Okay. Ms. Rausa, in -- back to the Notice of Claim, 56I, you complain that you were not given copies of staff meeting minutes.
It says, "Upon information and belief," which usually triggers something less than certainty, usually means

Q But you can't sit here and testify that you have any personal knowledge of any male employee getting copies of any meeting minutes; correct?
A There's something there saying yes, there's --
Q But you can't recall?
A I can't remember.
Q Okay. And Ms. Rausa, at some point, the district hired Steve Hearn to come in and do your sound for your productions; correct?
A Yes.
Q What year was that that that started?
A I don't know.
Q Could it have been the '09/'10 school year, which I believe would have been "Wizard of Oz"?
A "Wizard of Oz."
Q And is that the year that they hired Steve Hearn to come in and do your sound?
A He wasn't just hired to come in and do my sound. He was appointed to the auditorium because I -- I think the tech club had gone defunct.
Q Okay. So he did -- he did lights and sound?
A Did he know how to do them? I'm asking myself a question. I don't -- I don't -- I don't remember. He was there to do sound. Who was there? I don't remember if he -- if he did lights.

Q Okay.
A I don't -- I don't know.
Q Okay. Ms. Rausa, would you agree with me that that was an attempt on behalf of the district to try to improve the quality of the sound of your productions to hire a professional sound company?
A I don't know what the district's motivation to bringing him in was other than the letter you showed me earlier was Mr. Clayton saying he wasn't going to work in there if I was in there as well as I -- I believe the tech club had fallen apart.
Q Let me ask you this: Having Mr. Hearn there as a professional soundman, did that, in fact, improve the sound quality of your productions?
A I don't think anything was as bad as the one the year before.
Q So that's a yes?
A I'm trying to remember "Oz." I think "Oz" was -- "Oz" was good, Steve -- I could at least talk with Steve, speak with Steve and there was communication going on there.
Q So it was a better situation for you having Steve Hearn to work with as a professional soundman?
A To a degree. There were some things that started to get a little messed up in the auditorium with

that.

Q But you were happier working with Steve Hearn; correct?

A I don't recall how I felt at the time. I was simply -- I don't recall. I don't know if I was happy or not happier. I don't know. All I know is we wanted to do the "Wizard of Oz."

Q And -- and the sound for "Oz" was good, correct? It was at least better?

A I -- I believe it was better.

Q Okay. 56L of the Notice of Claim, Ms. Rausa you contend that you had issues with Mr. Wolf about a plan book and a grade book that were stolen from your classroom; correct?

A Yes.

Q When was the last time you saw the plan book and the grade book?

A Beginning of June.

Q And is that the time that you asked Mr. Wolf to try to find it?

A Yes.

Q And whose responsibility is it to keep track of your plan book and grade book?

A That is my responsibility, leaving it where I had left it for forever.

A There was something that occurred at -- I -- I think I asked him after I had first took the position. I -- I had let him know that there was plans missing -- not plans, my ...

Q We can move on, if you want to.

A Okay.

MR. CIOTOLI: I'm in favor of moving on.

Q Ms. Rausa, one of your complaints, it's listed in 56M of your Notice of Claim is that Mr. Wolf openly praised male band members, but did not praise you; correct?

A Excuse me. Tell me again.

MR. CIOTOLI: "M."

MS. HARSHBARGER: 506M.

Q Okay. Is that right? You believe that Mr. Wolf did not sufficiently praise your work?

A Yes.

MS. HARSHBARGER: Can I have this marked as Exhibit Z?

(Whereupon Defendant's Exhibit Z was marked for identification, 1/24/13, MMP)

Q Handing you what's been marked as Exhibit Z; do you recognize that document?

A Yes.

Q Is that an e-mail -- at the top, from Steve Wolf to Linda Jackson and Danielle Rausa and

Stan Finkle and Kathy Gramet?

A Yes.

Q And in very large type, "This is awesome stuff. Congratulations and good luck tonight. From Steve"; right?

A Yes.

Q Now, he praised you in this communication; right?

A It says, "In December 2009, he openly praised the male band members and orchestra directors following a student performance and wholly ignored me and the performance of my student." That is accurate in December of 2009.

Q So when is it?

A This is in April of 2010.

Q Okay. So your allegation really in 56M is -- is limited to that one concert?

A No.

Q Okay. So we're back to Defendant's Exhibit Z. Do you agree that Defendant's Exhibit Z is Steve praising you?

A He -- well, "This is awesome stuff." It was awesome. It was the grandson of L. Frank Baum that was sending out "good luck with the play. That was awesome stuff" and he said, "Congratulations." That's ...

Q He acknowledged --

A He acknowledged it.

Q -- that you had done awesome work; right?

A He said, "Congratulations." I don't know how much you want to read into that. There's a "congratulations" there.

Q Okay.

A I can tell you ...

Q What -- what more should he have said in this e-mail? What would have made you happy?

A This is his e-mail. I ...

Q Right. But it was of his own accord where he -- you didn't ask for this e-mail -- of his own volition, Steve Wolf sent you an e-mail very complimentary of you; correct?

A It's -- it's a nice e-mail.

Q Thank you.

A "Congratulations and good luck."

Q Okay.

A That's it.

MS. HARSHBARGER: Let's go with AA on this.

(Whereupon Defendant's Exhibits AA and BB were marked for identification, 1/24/13, MMP)

Q So Ms. Rausa, this is the -- this is a packet of news letters. Now, in January 2010, the January 2010

newsletter, which is the second one in, the second page in on BB, Defendant's BB. If I understand, the top left, "Band/Orchestra Concert," you didn't participate in that concert; right?

A No.

Q So you wouldn't expect to be praised there; right?

A No.

Q And go a couple of pages in. You're going to see a link to Roxboro Road Middle School.

A Yes.

Q Do you see that your production "Oz" is the leading bullet point?

A Yes.

MR. CIOTOLI: What page am I on? Where am I?

MS. HARSHBARGER: About three pages in, four pages. There you are.

MR. CIOTOLI: Okay.

Q And it says, "April 14 and 15 will be our spring musical "Oz." This promises to be a terrific production and I hope you can be a part of it. A big thank you to Ms. Rausa and all of the drama club members for all of their hard work"; right?

A Yes.

Q So Mr. Wolf is praising you there; correct?
A He's thanking me and the drama club for their hard work.
Q And that's praising you; right? It's recognizing you; right?
A That is recognizing me.
Q It's clearly not taking credit for your work; right?
A No.
Q It's giving you credit for your work; right?
A (Witness gesturing affirmatively.)
Q And I want you to flip two more pages in. It's DW000186 at the bottom. This says, "Roxboro Road Middle School Drama Club Presents Oz Production."
It says, "Our musical production of "Oz" was a tremendous success. Thank you to Ms. Rausa for her tireless dedication to this intensive project. It was a lot of fun and we were sold out both nights."
You see that?
A Yes.
Q Now, that's a significant amount of praise for you; right?
A Yes.
Q That's not taking credit for your work; right?
A No.

MR. CIOTOLI: Are you representing that he wrote this? I mean ...
Q Yes. These are the newsletters. These are Mr. Wolf's Roxboro Rock newsletters. And you agree that Mr. Wolf ultimately decides what goes out in the Roxboro Rocks newsletters; right?
A Yes. Hmm. Here, missing his write-up on the winter chorus concert, though.
Q Okay. Tell me about that. Where's that?
A It's not in there. I mean, there's an announcement on the chorus concert, but after the concert was over, this was cut and pasted onto the newsletter (indicating).
Q I don't understand your complaint, that there was not a -- I won't try to guess. What's your complaint about the chorus concert?
A Well, we did our chorus concert.
Q Well, it may just be that I don't have that newsletter here; right?
A No, you don't.
Q Okay. It doesn't necessarily mean that you weren't mentioned in that one; right?
A It was cut and pasted off of this one. This -- into the new newsletter.
Q I -- I don't understand why that -- what

had problems with Mr. Wolf; correct?

A Yes.

Q And it's true that Mr. -- Mrs. Dober and Mr. Bassett had trouble with Mr. Bossert; correct?

A Okay. I -- I -- I'm ...

Q And you also have trouble with Mr. Wolf; right? You didn't like Mr. Wolf?

A It wasn't a matter of not liking him. I didn't feel he was being fair.

Q Okay. You were angry with him?

A I felt targeted.

Q And you had -- had conflicts with Mr. Bossert; correct?

A Yeah.

MR. CIOTOLI: Did you answer? I'm sorry. I missed it, too.

THE WITNESS: I did.

Q Ms. Rausa, just to be clear, in the Notice of Claim, 56P, saying "January 2010, I was disciplined by Wolf for an unsubstantiated claim that I had acted unprofessionally by hanging up on Wolf's secretary." But you were, in fact, not disciplined in January of 2010; correct?

A I had received a Weingarten.

Q That, and a Weingarten is a memo asking you to come to a meeting to discuss an incident; correct?

A Yes.
Q So you were spoken to about hanging up on Mr. Wolf's secretary; correct?
A Yes.
Q Who is Mr. Wolf's secretary?
A Tammy Moran.
Q Do you believe that she is discriminatorily motivated against you because you're female?
MR. CIOTOLI: Objection as to form. You can answer that, if you can.
A I -- I don't know how to answer that. I -- she hasn't been -- say that question again.
Q Does Mrs. -- does Ms. Moran not like you, have anything against you, out to get you because you are a woman?
A Not that I know of.
Q Same question to Kristen Kopf, is she discriminatorily motivated against you because you're a woman?
MR. CIOTOLI: And same objection.
A I don't believe so.
Q And how about Robin Launt, is she discriminatorily motivated against you because you're a woman?
A Yes.
Q How about --

TECHNICIAN: That's my question to you.

MS. HARSHBARGER: I'm all set. I know what to do from here. Thank you.

TECHNICIAN: You're welcome.

Q Now, Ms. Rausa, this exhibit that's marked as Exhibit DD, this is a multibullet point list. I counted them up at some other occasion. I want to say it's in excess of 20, maybe 30 bullet points of grievances that you are asking the union to file; correct?

A I had asked the president to consider any of those.

Q Okay. And did the union file any of those grievances on your behalf?

A No. I told them never mind.

Q You told them never mind or he told you that you didn't have any viable grievances?

A I told him never mind.

Q Why did you tell him never mind?

A Because we were moving forward with what was happening here and I just knew it wasn't going to get anywhere with the union. They hadn't done much to support me prior to this.

Q So your testimony under oath is that union -- you told the union not to move forward with any -- with any of these grievances and not vice versa; right?

A We discussed some of them. He wanted to get together and meet about some of them. What he told me about teacher-to-teacher would never occur because it's only union. You couldn't take the union against -- one person against another and one teacher --
Q But that wouldn't apply --
A -- against another teacher because it's under the union.
Q But that wouldn't apply to all of your proposed grievances against administrators; right?
A No, no, it wouldn't.
Q In fact, as I look at this list, I don't -- the only -- I -- I see only one of these proposed grievances that would be against another teacher; right?
A No. There's Bossert.
Q One against Bossert?
A Tammy Moran.
Q Tammy Moran's not in the union, is she?
A It's someone I work with.
Q But she's not in the union.
A No.
Q Okay.
A Not in this union; Bossert, Wallace.
MS. HARSHBARGER: I'd like to mark the video clip and it looks like we're at EE for

go in the center.

Q Ms. Rausa, would you please turn to page 10, paragraph number 55? It says, "Since plaintiff returned to work in March 2011" -- and that's after your medical leave; correct.

A Yes.

Q -- "the discriminatory, animus and retaliatory behavior continued through the end of the year with threats of write-ups, multiple meetings with administration."

Let's just stop there. The "threats of write-ups," are those the couple of Weingarten letters that I see in your file? Is that what -- is that what you're referring to?

A Yes.

Q Which we agree never actually resulted in any write-ups; correct?

A That's why it says "with threats of write-ups."

Q Okay. And "multiple meetings with administration, including Superintendent for Instruction, Stan Finkle."

Now, when you came back -- take that back. What -- what meetings? What multiple meetings are you complaining about there?

A It was Stan Finkle I had to meet with on the Weingartens, I believe.
Q Okay. So those are those same Weingartens?
A Yes.
Q Okay. "And unfair and improper evaluation." is that -- is that an evaluation that Linda Jackson did?
A I think she did the evaluation that year.
Q Okay. And why was it unfair and improper?
A Oh, I -- I think I have the right one unless you want to show me the original, I -- I -- I think I have the right one in my head.
Q Does it have to do with the cognitive growth?
A It was cognitive growth as well as a -- a statement about ...
Q Do you want the documents, Ms. Rausa? I'm -- I'm happy to give you the document.
A The original? Okay.
Q Why don't we try not to mark them, only because I'm getting sick of marking exhibits. So why don't we -- why don't you look at it and let's just see if we can't get away with, perhaps, you can tell me --
A I'm fairly certain it was a comment about -- all right.
Q -- what -- what comment of Linda Jackson's you're complaining about?

A Is this the right one?
Q Is that not the right one?
A I'm not sure.
MS. HARSHBARGER: Just a minute. Let me see if I have another one.
MR. CIOTOLI: I mean, you're in March 2011 here.
MS. HARSHBARGER: Yeah, okay.
MR. CIOTOLI: That's a year before.
MS. HARSHBARGER: Okay. So, perhaps ...
THE WITNESS: No. This is '10 and '11.
MR. CIOTOLI: '9 and '10.
THE WITNESS: This is it.
Q That is it?
A Yes.
Q Okay. What is the comment there that you are complaining about that you think is unfair?
A The cognitive growth model.
Q Tell me what about Linda Jackson's comment about the cognitive growth model that you felt was unfair?
A She -- she -- I had asked her where she gotten her information on the cognitive growth model and she had Googled something and what she had pulled up was a -- an incomplete -- like, a PowerPoint from a college student in the Carolinas or something. I thought it was an inadequate

form of measure for my year-end summary. I had completed the growth model class and I was trying to incorporate some of that into what I was doing. The other thing that bothered me, the collaboration comment.

MS. HARSHBARGER: I think if we're going to do this, we probably have to mark this as an exhibit.

MR. CIOTOLI: I would think so.

MS. HARSHBARGER: Though I am loathed to do it.

THE WITNESS: I'm -- I'm sorry.

MS. HARSHBARGER: So we're going to make it Document FF. Now, all --

(Whereupon Defendant's Exhibit FF was marked for identification, 1/24/13, MMP)

Q And, Ms. Rausa, you --

MR. CIOTOLI: You got one for me?

Q -- raised --

MS. HARSHBARGER: I might not. Can I make you one before we go?

MR. CIOTOLI: Well, I don't know.

MS. HARSHBARGER: Can you give me a hint? Well, you -- you can have mine for right now; okay?

MR. CIOTOLI: Is this -- is this the only

one you have, the one you need to refer to to ask the questions?

MS. HARSHBARGER: Oh, do we have one here? Do you have one, Ms. Rausa? But what's the one that's marked? Why am I so confused. Okay.

THE WITNESS: That's -- that was attached to this (indicating).

MS. HARSHBARGER: Oh, okay. I'm sorry. That was the top page. I don't need it.

MR. CIOTOLI: You sure?

MS. HARSHBARGER: I know what it is.

MR. CIOTOLI: Can I write on it? Is it officially mine?

MS. HARSHBARGER: Officially yours.

MR. CIOTOLI: Okay. Because I'm going to write on it, this very second.

Q Ms. Rausa, you raised an issue about Ms. Jackson making some comment to the effect of "Jeez, if you go with this cognitive growth model, that's fine, just don't throw the baby out with the bath water."

A Uh-huh.

Q Right? Was that the -- the comment that upset you?

A I don't know if it upset me. I think what

bothered me about the write-up was Googling and picking a PowerPoint that didn't -- didn't make sense to what it was. That wasn't the only thing about the summary that bothered me. It was the collaboration piece at the end, once again indicating that it was all on my shoulders to be -- being collaborative. So that's why I had asked her, "It has not been addressed with my male counterparts in the year-end summary."

Q Ultimately, did Ms. Jackson make revisions to your YES Form in response to your rebuttal?

A Yes.

Q And ultimately, were you satisfied with it?

A Yes.

Q Okay. We're done with that.

A It was that simple; wasn't it? I'm sorry. It was just because I couldn't remember.

Q The next line in that, the paragraph of the Complaint. So we're back to the Complaint, Exhibit A; right? Paragraph 55, the next thing that you say here is that there were -- "there was favoritism in teaching assignments," what was the favoritism in teaching assignments?

A I believe Mr. Wallace was doing an internship at this time.

Q Okay.

A I think.

doing an internship?

A I believe Mr. Wallace was favored all along because he was a male friend of Mr. Wolf's.

Q Okay. But not all along. I need to know specifically about this allegation about the way his classes were scheduled. You've explained to me he had an internship that he would do in the afternoon; correct?

A Yes.

Q Now, this year that Mr. Wallace was doing the internship, did you want to do an administrative internship? Did you apply for an administrative internship?

A Not for that year.

Q Okay. You had for earlier years?

A Yes.

Q And those were years before Steve Wolf was in the district; correct?

A Yes.

Q So you never applied for an internship while Steve Wolf was an employee of the district; correct?

A Yes.

Q At this point, Ms. Rausa, in the deposition, when we think about everything that is in your Complaint and everything that is in your Notice of Claim, have we talked about all of the allegations that you have in this lawsuit?

MR. CIOTOLI: Okay. I'll object as to

MS. HARSHBARGER: -- completely blindsided by some brand-new allegation that I never heard before then I'm -- I'm satisfied.

MR. CIOTOLI: I -- I would -- at this point, I am not aware of some new allegation of -- of any extent.

Q I -- I did forget to ask you about one allegation that you do have in here, Ms. Rausa, and same paragraph in the complaint, paragraph 55. I missed this. It says, "Instigation of a confrontation with a parent."

A Yes.

Q Who -- and I assume this means that a parent confronted you; correct?

A Yes.

Q Who instigated that confrontation with the parent?

A I think Linda Jackson.

Q Okay. And what did she do to instigate the confrontation with the parent?

A From what the parent had said, she had spoken with Mrs. Jackson and Mrs. Jackson was siding with her, that -- on the -- on what was going on. The parent also told me that Mrs. Jackson said she could come and say anything she wanted to me. She was very abrasive and dropping bad words as the kids were coming in for performances and things.