# Exhibit C

*2010 U.S. Dist. LEXIS 26578, **

RUSSELL BRYANT, Plaintiff, v. DELPHI AUTOMOTIVE SYSTEMS CORP., Defendant.

08-CV-6215

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

2010 U.S. Dist. LEXIS 26578

March 22, 2010, Decided
March 22, 2010, Filed

**PRIOR HISTORY:** Bryant v. Delphi Auto. Sys. Corp., 2009 U.S. Dist. LEXIS 96318 (W.D.N.Y., Oct. 16, 2009)

**CORE TERMS:** summary judgment, prima facie case, gender discrimination, gender, pretext, co-workers, male, Shop Rule, similarly situated, termination, supervisor, material fact, terminated, female, pro se, stated reason, nonmoving party, discriminatory, pretextual, discrimination claims, genuine issue, party opposing, reasonable jury, giving rise, disparate treatment, non-discriminatory, discriminated, articulated, terminating, misconduct

**COUNSEL:** **[*1]** Russell T. Bryant, Plaintiff, Pro se, Rochester, NY.

For Delphi Automotive Systems Corp., Defendant: James C. Holahan, LEAD ATTORNEY, Brian Laudadio, Bond Schoeneck & King, PLLC, Fairport, NY.

**JUDGES:** Michael A. Telesca, United States District Judge.

**OPINION BY:** Michael A. Telesca

**OPINION**

**DECISION and ORDER**

**INTRODUCTION**

Plaintiff Russel Bryant ("plaintiff"), proceeding *pro se* brings this action pursuant to Title VII of the Civil Rights Act of 1964, ("Title VII"), 42 U.S.C. § 2000e et seq. against Delphi Automotive Systems Corp. ("Delphi" and/or "defendant") claiming that he was discriminated against by Delphi on the basis of his sex. Specifically, plaintiff claims that Delphi intentionally discriminated against him when he was terminated based upon allegations of two female employees who claimed that he had touched/hit them. Defendant denies plaintiff's allegations, and moves for summary judgment dismissing plaintiff's Complaint on grounds that plaintiff has failed to state a *prima facie* case of gender discrimination. Further, defendant contends that even if plaintiff were able to prove a *prima facie* case of discrimination, Delphi articulated a legitimate non-discriminatory reason for its decision to discharge him **[*2]** and plaintiff failed to establish that Delphi's stated reason was pretextual. Plaintiff has opposed defendant's motion by submitting numerous pages of documents and exhibits essentially claiming that he should not have been discharged since it was due to other co-workers' lies that resulted in his termination. For the reasons set forth below, I grant defendant's motion for summary judgment and dismiss plaintiff's Complaint in its entirety.

**BACKGROUND**

**I. Factual History**

Plaintiff started working for Delphi [1] as a temporary hourly employee on November 21, 2006. See DSOF, P2. On May 21, 2007, employees Tashara Levans ("Levans") and Pamela Monroe ("Monroe") complained to their

supervisor, Frank Griffin ("Griffin") that earlier in the day, plaintiff entered the break room, started yelling at Levans accusing her of telling Griffin that plaintiff made remarks about Griffin's wife, particularly the length of her skirt. See id., P17. Thereafter, plaintiff pushed Levans in the face. See id., P18. After the two were separated by co-workers who were also in the break room, plaintiff turned to Monroe and started yelling at her and claiming that she informed Griffin about his remarks. See id. On the **[*3]** same day, Griffin, plaintiff's immediate supervisor, advised Thomas Redmond ("Redmond"), Delphi's Senior Labor Relations Representative that two of plaintiff's female coworkers had complained about an altercation they had with plaintiff in Delphi's break room. See id., PP12-13.

**FOOTNOTES**

1 Defendant is a global supplier of mobile electronics and transportation systems. It is headquartered in Troy, Michigan and prior to October 6, 2009, owned and operated a manufacturing site in Rochester, New York. See Defendant's Statement of Undisputed Materials Facts ("DSOF"), P1.

As soon as Redmond was informed of the incident, he began an investigation. See id., P14. In this regard, Redmond interviewed plaintiff who was accompanied by his union representative, David Kittle. See id., P15. [2] At the meeting, plaintiff admitted that he was "pissed off" that someone would report the comments he made about his supervisor to his supervisor. See id. In addition, plaintiff conceded that there was yelling between the co-workers. However, plaintiff denied pushing Levans and instead stated that he "put [his] finger in [Levans] face." See id. The following day, Redmond interviewed Levans and Monroe, who both verbally acknowledged **[*4]** and provided written statements confirming that plaintiff had threatened both of them and pushed Levans. See id., PP16-18. As a result of the events of May 21, 2007, defendant suspended plaintiff pending completion of its investigation into the incident.

**FOOTNOTES**

2 While employed by Delphi, plaintiff was a member of UAW Local 1097 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO (the "Union"), the labor organization that represents hourly employees at the Rochester, New York manufacturing facility. The terms and conditions of plaintiff's employment with defendant were governed by a series of collective bargaining agreements between Delphi and the Union.

Delphi's Shop Rule # 20 prohibits an employee from "[t]hreatening, intimidating, coercing or interfering with employees" of Delphi. See id., P20. Based on the information revealed during the investigation, defendant determined that credible evidence showed that plaintiff had (1) verbally assaulted and threatened both Levans and Monroe, and (2) physically assaulted Levans. See id., P21. Accordingly, defendant found that plaintiff had committed a serious violation of Shop Rule # 20. Because **[*5]** the offense was serious, effective May 24, 2007, plaintiff was terminated by Delphi. Plaintiff was sent a Notice of Discharge from Delphi by certified mail on May 25, 2007.

**II. Procedural History**

On or about August 16, 2007, plaintiff filed a charge of gender and race discrimination with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC"). See DSOF, P6. The NYSDHR dismissed plaintiff's complaint on February 4, 2008 determining that there was no probable cause to believe that Delphi engaged in the discriminatory practice complained of. See id., P7. The EEOC adopted the NYSDHR's findings, dismissed plaintiff's charge of discrimination and on April 17, 2008 issued him a right-to-sue notice. See id., P8. Thereafter, plaintiff commenced this lawsuit by filing the Complaint *pro se* on May 16, 2008. See id., P9. Plaintiff's complaint alleges that his discharge from Delphi was based solely on gender discrimination. See id., P10. Delphi filed its Answer to plaintiff's Complaint on October 16, 2008 denying all material allegations of the Complaint.

**DISCUSSION**

**I. Defendant's Motion for Summary Judgment**

The Court may grant summary judgment **[*6]** only where "there is no genuine issue as to any material fact

and...the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The nonmoving party must show, by affidavits or other evidence, admissible in form, that there are specific factual issues that can only be resolved at trial. See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995). **[*7]** Where, as here, the party opposing summary judgment is proceeding *pro se*, the Court must "read the pleadings...liberally and interpret them to raise the strongest arguments that they suggest." Corcoran v. New York Power Auth., 202 F.3d 530, 536 (2d Cir.1999). Nevertheless, "proceeding *pro se* does not otherwise relieve [an opposing party] from the usual requirements of summary judgment." Viscusi v. Proctor & Gamble, 2007 U.S. Dist. LEXIS 51307, 2007 WL 2071546, at *9 (E.D.N.Y.2007). Those requirements include the obligation not to rest upon mere conclusory allegations or denials, but instead to set forth "concrete particulars" showing that a trial is needed. See R. G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984).

In determining whether to grant summary judgment, the Court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion **[*8]** for summary judgment." Id. at 1776. The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, or by a factual argument based on "conjecture or surmise." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991). In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998).

Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, a common component of discrimination actions, see Montana v. First Fed. Sav. and Loan Ass'n of Rochester, 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials-apply no less to discrimination cases than to...other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S. Ct. 91, 88 L. Ed. 2d 74 (1985) (summary judgment rule would **[*9]** be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (trial courts should not "treat discrimination differently from other ultimate questions of fact").

**II. Plaintiff's Gender Discrimination Claim**

Gender discrimination claims brought pursuant to Title VII are analyzed under the McDonnell Douglas burden-shifting test. See McDonnell Douglas, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). The initial burden lies with the plaintiff. To establish a *prima facie* case of gender discrimination, a plaintiff must show (1) he was within the protected class, (2) his job performance was satisfactory, (3) he was subjected to an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. See Meiri, 759 F.2d at 995,; Kaplan v. Multimedia Entertainment, Inc., 2005 U.S. Dist. LEXIS 40351, 2005 WL 2837561, at *5 (W.D.N.Y.2005); Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir.2000); see also McDonnell Douglas, 411 U.S. at 802 (stating the prima facie case more **[*10]** generally). Although the Second Circuit has stated that "the burden...that must be met...to establish a *prima facie* case is minimal," Hollander, 172 F.3d at 199, it has also noted that "[a] jury cannot infer discrimination from thin air." Norton v. Sam's Club, 145 F.3d 114 (2d Cir.), cert. denied 525 U.S. 1001, 119 S. Ct. 511, 142 L. Ed. 2d 424 (1998).

If the plaintiff is able to establish a *prima facie* case of discrimination, the burden of persuasion shifts to the

employer/defendant to articulate a legitimate, nondiscriminatory rationale for its actions. See Burdine, 450 U.S. at 254. Once the employer meets its burden, the presumption of discrimination that arose by plaintiff stating a *prima facie* case is eliminated. See Hunter v. St. Francis Hosp., 281 F.Supp.2d 534, 541-42 (E.D.N.Y.2003). The burden then shifts to the plaintiff to demonstrate that the employer's stated rationale is merely a pretext for discrimination. See McDonnell-Douglas, 411 U.S. at 802; St. Mary's Honor, 509 U.S. at 510-11; Reeves, 530 U.S. at 143; see also Droutman v. NY Blood Center, Inc., 2005 U.S. Dist. LEXIS 42951, 2005 WL 1796120, at *6 (E.D.N.Y.2005) (Plaintiff must "prove that the employer's stated reason for its actions is merely pretextual, and that discrimination was **[*11]** an actual reason for the adverse employment action"). Thus, to defeat a defendant's properly supported motion for summary judgment, the plaintiff must produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reason ("LNDR") proffered by the employer was false, and that more likely than not discrimination was the real reason for the discharge. See Viola v. Philips Med. Sys. of N. Am., 42 F.3d 712, 716 (2d Cir.1994).

**A. Plaintiff has failed to state a *prima facie* case of gender discrimination**

For purposes of this summary judgment motion, the Court will assume that plaintiff has satisfied the first three elements of the *prima facie* case, (1) that plaintiff was within the protected class, (2) his job performance while at Delphi was satisfactory and that (3) he was subjected to an adverse employment action when he was terminated from his position at Delphi. See McDonnell-Douglas Corp, 411 U.S. at 802; Promisel v. First Am. Artificial Flowers, 943 F.2d 251, 259 (2d Cir. 1991), cert. denied, 502 U.S. 1060, 112 S. Ct. 939, 117 L. Ed. 2d 110 (1992). However, plaintiff has failed to establish the fourth prong-that the discharge occurred under circumstances giving rise to an inference of **[*12]** gender discrimination. See McDonnell-Douglas Corp, 411 U.S. at 802; St. Mary's Honor, 509 U.S. at 510-11 (under the *prima facie* case plaintiff must show that his termination "occurred under circumstances giving rise to inference of discriminatory intent").

"[A]n inference of discrimination may be drawn from a showing that the employer criticized the plaintiff's performance in [gender related] degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably." See Hunter, 281 F.Supp.2d at 542 (citing Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir.1994)). In addition, "[a] plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir.2000). For disparate treatment to be probative of discrimination, a plaintiff must first demonstrate he was "'similarly situated in all material respects' to the individuals with whom [he] seeks to compare [himself]." Id. (quoting Shumway v. UPS, 118 F.3d 60, 64 (2d Cir.1997)). **[*13]** [3]

**FOOTNOTES**

3 The factfinder usually determines whether two employees are similarly situated. See 230 F.3d at 39. However, the Second Circuit has provided guidance to help courts resolve at the summary judgment stage whether employees are similarly situated such that disparate treatment raises an inference of discrimination. The Second Circuit has acknowledged that the factors to be considered in determining whether persons are "similarly situated in all material respects" will vary by case. See id. at 40. However, it advises courts to consider "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." See id. (citing cases). To compare conduct under this standard, a plaintiff's and comparator's facts and circumstances need only bear a "reasonably close resemblance" and need not be identical. See id.

In this case, plaintiff testified that neither his supervisors, nor anyone else at Delphi, made derogatory comments to him, including comments relating to his gender. See Bryant Tr. at p. 30. Similarly, plaintiff could offer no examples of **[*14]** other males that received discriminatory treatment based on their gender. See id., at pp. 32-33. Further, plaintiff does not claim that there were similarly situated females who received more favorable treatment. Rather, as shown by the transcript below, plaintiff merely disagrees with defendant's decision that he violated Shop Rule # 20 based on what he argues were lies made by Levans and Monroe during the investigation.

Q. Okay. Were there ever any remarks made to you that you believe were based on your gender, the fact that you're a male?

A. No.

Q. No? Okay. Were there ever jokes or stories told to you regarding your gender?

A. No. I kept to myself and I did my job. Simple as that.

Q. Okay. Did anybody, a supervisor or anyone else at Delphi, ever say anything derogatory about the fact that you're a male as opposed to a female?

A. No.

See Bryant Tr. at p. 30

Q. Are you aware of any individuals that could testify that the reason your terminated is because you were a male?

A. **It's not because I was a male. It was false lies that people made against me**.

Q. You think that the reason your terminated is because they believed Ms. Monroe and Ms. Levans and not you related to what happened in the incident, **[*15]** correct?

A. Yes.

See Bryant Tr. at pp. 31-32 (emphasis supplied).

Q. And there's a significant number of males that work at Delphi?

A. Uh-huh.

Q. Okay. And did you believe that any other male employee at Delphi was discriminated against based on his gender?

A. Like I said, I kept to myself. I really didn't know too much about other people and I just worked.

Q. So the answer is no?

A. It's no.

See Bryant Tr. at pp. 32-33. Accordingly, plaintiff has made no showing from which an inference of discrimination could be drawn.

Further, the fact that Delphi credited the statements of the two female co-workers concerning the incident that occurred at the break room over plaintiff does not give rise to an inference of gender discrimination. A "plaintiff's...gut instinct and personally held beliefs" are not enough to support an inference of discrimination. See D'Cunha v. New York Hosp. Med. Ctr. of Queens, 2006 U.S. Dist. LEXIS 11929, 2006 WL 544470, at *7 (E.D.N.Y.2006). Indeed, plaintiff's own testimony fails to show that his discharge was due to discriminatory animus. Plaintiff concedes that his termination was based on statements made by his co-workers regarding the break room incident. In this regard, it is not enough for plaintiff **[*16]** to dispute the results of the investigation and claim his innocence in the break room incident. Plaintiff must offer objective evidence that the circumstances surrounding his discharge gave rise to an inference of gender discrimination. See Shumway, 118 F.3d at 64. Plaintiff has failed to show such inference. Accordingly, I find that plaintiff offers no evidence that gives rise to an inference of gender discrimination related to his termination from Delphi. Because I find that plaintiff has failed to establish a *prima facie* case and state a claim for gender discrimination under Title VII, I grant defendant's summary judgment motion, and dismiss plaintiff's Complaint with prejudice.

**B. Legitimate, Non-Discriminatory Reason and Pretext**

Even if plaintiff had stated a *prima facie* case of discrimination, defendant had a LNDR for its action. See Def. Br. at 8. Here, Delphi's LNDR for terminating plaintiff was plaintiff's violation of Shop Rule # 20 when he

"threatened, intimidated, coerced or interfered" with his co-workers Levans and Monroe during the break room altercation. Defendant further contends that plaintiff does not establish that Delphi's legitimate reasons for its action was pretextual. **[*17]** See id. at 9-10; see also St. Mary's Honor, 509 U.S. at 502; Reeves, 530 U.S. at 143 (burden of production shifts back to plaintiff to show that employer's stated reason was merely a pretext and that retaliatory animus was the true reason for employer's actions). Accordingly, in order to prove that the reasons articulated by Delphi for plaintiff's termination was a pretext for gender discrimination, plaintiff has the burden to show both that Delphi's reasons were "false, and that discrimination was the real reason." See St. Mary's Honor, 509 U.S. at 515. The court finds that plaintiff fails to make both showings.

Here, plaintiff disputes that he violated Shop Rule # 20 that served as the basis for his discharge. In addition, he argues that he was treated unfairly because Delphi believed Levans and Monroe. He further points to the fact that Levans and Monroe were permitted to provide written statements concerning the incident, but he was not. Moreover, plaintiff challenges the accuracy of statements made by his fellow co-workers regarding his misconduct and the decision made by Delphi to terminate him based on its belief that the plaintiff committed a serious violation of Shop Rule # **[*18]** 20. However, plaintiff's **disagreement** with defendant's conclusion is not evidence of pretext. See Droutman, 2005 U.S. Dist. LEXIS 42951, 2005 WL 1796120, at *9 ("An employer's good faith belief that an employee engaged in misconduct is a legitimate reason for terminating [him], and the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination"). Also, plaintiff offers no affirmative evidence to demonstrate that the real reason for his termination was his gender. See **Das v. Our Lady of Mercy Med. Ctr., 2002 U.S. Dist. LEXIS 7771, 2002 WL 826877, at *7 (S.D.N.Y.2002)** ("In order to prove pretext, Plaintiff must show 'both that the reason was false, and that discrimination was the real reason.'") (quotations omitted); see also Silva v. Peninsula Hotel, 509 F. Supp. 2d 364, 386 (S.D.N.Y.2007) (Plaintiff's subjective belief that he was not treated fairly is simply not enough to demonstrate pretext).

The Court finds that Delphi has articulated a LNDR for terminating plaintiff and plaintiff cannot present sufficient evidence to show that Delphi's stated reason is pretextual. Accordingly, plaintiff's claim of gender discrimination fails as a matter of law. Based on the foregoing, there **[*19]** is no genuine issue of material fact regarding plaintiff's discrimination claim, and Delphi is entitled to summary judgment.

**CONCLUSION**

For the reasons set forth above, I grant defendant's motion for summary judgment, and dismiss plaintiff's Complaint in its entirety with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

/s/ Michael A. Telesca

Michael A. Telesca

United States District Judge

DATED: Rochester, New York

March 22, 2010

Service: **Get by LEXSEE®**
Citation: **2010 U.S. Dist. LEXIS 26578**
View: Full
Date/Time: Thursday, March 28, 2013 - 2:18 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

In

About LexisNexis | Privacy Policy | Terms & Conditions | Contact Us
Copyright © 2013 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

LexisNexis®

**NOREEN A. BUNDSCHUH, Plaintiff, v. THE INN ON THE LAKE HUDSON HOTELS, LLC, Defendant.**

**09-CV-6037-CJS**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK**

***2012 U.S. Dist. LEXIS 158443***

**November 2, 2012, Decided**
**November 5, 2012, Filed**

**COUNSEL:** [*1] For Plaintiff: Steven Laprade, Esq., Christina A. Agola, PLLC, Rochester, NY.

For Defendants: Scott D. Piper, Esq., Harris Beach PLLC, Pittsford, NY.

**JUDGES:** CHARLES J. SIRAGUSA, United States District Judge.

**OPINION BY:** CHARLES J. SIRAGUSA

**OPINION**

DECISION and ORDER

**INTRODUCTION**

**Siragusa, J.** This is an action alleging hostile work environment, retaliation, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. §§ 2000e et seq.*, and the New York State Human Rights Law ("HRL"), *N.Y. EXEC. LAW §§ 296 et seq.* Now before the Court is Defendant's motion for summary judgment, filed February 22, 2010, ECF No. 14, and motion to opt-out of Alternative Dispute Resolution ("ADR"), filed October 5, 2012, ECF 27. The application for summary judgment is granted, and the request to opt-out is denied as moot.

**BACKGROUND**

Unless otherwise noted, the following are the facts of this case, viewed in the light most favorable to Plaintiff. Plaintiff worked for the Inn on the Lake[1] ("Inn") as its Director of Sales and Marketing from May 1, 2006, to July 5, 2007. The 134-room Inn is a largely seasonal resort, with its "busy season" lasting from Memorial Day to Labor Day. Christopher Burns [*2] ("Burns"), the Inn's Managing Director, is the person who interviewed Plaintiff, reviewed the position requirements with her, and offered her a position as one of five Directors reporting directly to him. All Inn personnel, including Burns, ultimately are answerable to the President and Chief Executive Officer of Canandaigua Hotel Corporation, Tom Blank.

1 The 134-room Inn is owned by a subsidiary of HHC Hotel Group, LLC, a holding company.

Plaintiff supervised a three-person staff responsible for booking business and social events at the Inn's facilities. This involved calling on existing and potential clients, reserving blocks of rooms and hotel facilities, overseeing the preparation of contracts, and coordinating with others, such as the Director of Food and Beverage and the Director of Hotel Operations, to ensure that the requested facilities were available and to oversee the execution of events. Plaintiff was the Inn's only female director.

Early in her tenure, Inn employees complained that Plaintiff was heavy-handed and demanding, and Burns describes her as having a "prickly personality." Burns Aff. ¶ 10. In or about August 2006, Burns spoke to Plaintiff, in the presence of Food [*3] and Beverage Director Walt Berkstresser ("Berkstresser"), and advised that she needed to be more cooperative with Burns and her co-workers, and less heavy-handed with subordinates. *Id.* ¶¶ 10-11. According to Burns, he was required to discuss Plaintiff's heavy-handedness with her on sev-

eral other occasions, including in approximately January 2007, when one of Plaintiffs staff, Judy White, broke down in tears over difficulties she had dealing with Plaintiff. *Id.* ¶¶ 12-14.

For her part, Plaintiff felt that Burns belittled and humiliated her. In late summer 2006, Plaintiff felt "belittled" by Burns when the two met with a local trade organization. After the meeting, she went to Roger Miller ("Miller"), the Inn's Director of Finance, who also administers corporate HR policy at the Inn, and asked who she could speak to about human resources issues. Miller gave her the phone number for Wendy Blank, the Inn's corporate HR Director. Plaintiff opted not to call Blank at that time. Pl's Dep., 46:4-20. She did not contact Blank until June 8, 2007, when she left a voicemail asking that the HR Director return her call. In the meantime, she continued to approach Miller with grievances about her treatment [*4] by Burns. Plaintiff states that she repeatedly told Miller that Burns was treating her differently because she was a female, Pl's Dep. 202:11-23, a claim Miller calls "absolutely incorrect," Miller Reply Aff. ¶¶ 11-12. There were no witnesses to Plaintiffs and Miller's discussion.

After Plaintiffs first meeting with Miller, Burns called an emergency Directors' meeting. During the meeting, Burns "yelled" at Plaintiff for wanting to call CEO Tom Blank, questioned why he hired her, and stated he could not trust her.

As a Director who attended regular meetings with both of them, Miller observed that "Plaintiff and Mr. Burns generally did not communicate well with one another." Miller Reply Aff. ¶ 19. Miller describes Burns as occasionally having a "rough style," and as someone who did not hesitate to single out a particular Director--"as virtually all of the Inn's Directors have been on occasion"--and criticize him or her for making a mistake. *Id.* ¶¶ 7-9. Berkstresser offered a similar view, noting that Burns criticizes the performance of individual Directors during meetings in a way that can be "embarrassing and unwanted," such as his recent reference to Berkstresser as a "crybaby." Berkstresser [*5] Reply Aff. ¶ 8. Berkstresser describes Burns as having "frequently" criticized Director of Hotel Operations, Mike Reinhard, due to performance problems until his termination, in December 2007. *Id.* ¶ 9. Miller opines that Plaintiffs mistakes stood out at their meetings because no other Director during her tenure made mistakes of a sort that cost the Inn significant amounts of money, as Plaintiffs did. Miller Reply Aff. ¶ 8.

Plaintiff describes certain incidents, occurring after she first spoke with Miller, which she believes were harassing and/or retaliatory. These the following: Burns: approved her taking her sales team to dinner for reaching a goal, but later questioned the bill and delayed paying it; Burns directed her to discuss with Food and Beverage Director Berkstresser the various events that she arranged; Burns became upset with her for booking an expensive band during the off-season; Burns assigned her to work on a project beyond her job responsibilities and then marched into her office when she experienced challenges with the project; Burns indicated he wanted all of the Directors to lie about underage drinking at an employee event; Burns took an event away from her and [*6] assigned it to one of her subordinates; Burns gave her the "silent treatment;" Burns called her last for, or excluded her from, director meetings; and Burns unfairly disciplined her. Pl's *Rule 56* Counter Stmt.¶¶ 39-152. To the extent necessary, these various actions will be discussed more fully below.

During her tenure, Burns addressed a number of performance-related issues with Plaintiff. In September 2006, at the end of the Inn's busy summer season, Burns requested that Plaintiff begin making outside sales calls to local businesses over the next six weeks, advise him how many calls she could reasonably make per week, and provide him with a call summary at the end of each day. At some point in December 2006, Burns met with Plaintiff at his desk in the Inn's lobby to express his disappointment at the level of her outside sales activities and to again advise her that she needed to actively start doing sales calls. Pl's Dep. 56:14-57:25. Burns sent Plaintiff a follow-up email, dated December 21, 2006, "to put this in writing so there is no misunderstanding." He then set out a detailed call schedule for Plaintiff, explaining that "[t]his is the only way we can pick up new business in the [*7] first quarter when we badly need it." Burns thanked Plaintiff for her hard work, and assured her the sales calls "will pay off in spades." Def's *Rule 56* Stmt., Ex. C. Plaintiff disagreed with Burns' approach, and believed his comments were unfair, because as "director of the department, [she] was trying to make the best decisions for the department and the hotel. If [she] needed to be in the office to assist [her] team, that was more important." Pl's *Rule 56* Stmt. 62:3-7, 63:21-64:2.

At-will Inn employees, such as Plaintiff, are subject to a progressive discipline program that incorporates both verbal and written warnings. Written warnings are administered on Personnel Action Forms ("PAFs") which are placed in the employee's personnel file. During the course of her employment, Plaintiff received four PAFs. The first, dated January 12, 2007, related to an error Plaintiff made in September 2006, when she booked a banquet event for Latinas Unidas, a charitable organization. Plaintiff did not put pricing information on the order submitted for the event and, afterward, the organization disputed the bill, stating they did not know the event

would cost so much. Def's *Rule 56* Stmt., Ex. F. [*8] The Inn ultimately was able to collect only half of the disputed bill, which cost it approximately $3,200.00. Burns met with Plaintiff on January 12, 2007, to discuss the matter and give her the PAF. Plaintiff did not dispute the error and signed the written warning.

The next PAF, dated June 8, 2007, related to a singles dating event Plaintiff arranged for May 11, 2007. This warning was issued because she did not enter the event into the datebook kept by the Inn to track upcoming functions, and did not complete a Banquet Event Order until the day before the event, necessitating a hasty set-up. *Id.* Ex. G. Plaintiff explained to Burns that she had entered the event in the book a month or two prior, but that the client called and cancelled due to a low response, so she removed it. After the client left a late night message two days before the event to say it would, in fact, go forward, Plaintiff prepared the BEO. Pl's Dep. 115:5-116:8, 117:16-118:8. Nevertheless, Burns issued the PAF, stating "[w]hat we don't understand is why a tentative BEO was not issued in our May 9 staff meeting as the event was advertised in the newspaper a week before." Def's *Rule 56* Stmt., Ex. G. Plaintiff refused [*9] to sign this PAF due to her disagreement with Burns' final comment that "[t]his gives the appearance that the singles dating event may be for [Plaintiff's] personal benefit as she attends them." *Id.*, Pl's Dep. 118:21-119:7.

A third PAF also was issued to Plaintiff on June 8, 2007, due to her failure to submit sales reports to Burns, as he had requested. Plaintiff signed this PAF, noting that she had organized a sales blitz on March 20th which generated a minimum of three contracted events. Def's *Rule 56* Stmt., Ex. E. She did not dispute her failure to submit call reports after November 2006.

According to Plaintiff, the two PAFs she received on June 8, 2007, were issued in retaliation for an anonymous letter Burns believed she had written. The circumstances were as follows. Burns organized an employee morale-boosting event to be held on May 20, 2007, in advance of the busy summer season. All Inn employees were invited and the event featured food, a bar, and live music. After the party, a 20-year-old Inn employee was stopped by police and cited for public intoxication. Approximately a week to ten days later, Tom Blank, Tony Gullace, who operated a restaurant on Inn property, and Richard [*10] Sands, the President and CEO of Constellation Brands, Inc., each received an anonymous letter written by an individual purporting to be an Inn employee. The writer was "appauld [sic] and disgusted by what happened at Sunday's employee pep rally" and opined that "[u]nattended alcohol, drinking games and under-aged drinking is a poor example of good management practices." *Id.* Ex. H. Plaintiff denies writing the letter and denies knowing who did. Burns nonetheless came to believe Plaintiff was the author because she had used the word "appalled" in conversations about the party, and because the letter was signed "respectfully," which is the closing Plaintiff uses in all her emails and letters. At the next Wednesday staff meeting after the letter came to light,[2] Burns "told the entire team there was a rat among us," and he "was going to find out who did this," while looking directly at Plaintiff. Pl's Dep. 174:19-176:14. On June 8, after receiving the two PAFs, Plaintiff called and left a voice mail for Ms. Blank, the corporate HR Director. Immediately after June 8, Plaintiff began looking for another job. *Id.* 232:18-22.

2 Plaintiff does not recall the date, but this Court notes that, based [*11] on the undisputed timeframe given, the meeting would have occurred on May 30 or June 6, 2007.

Ms. Blank returned Plaintiff's call the following Monday, June 11, 2007, and arranged to meet with Plaintiff the next day. The June 12 meeting lasted five-and-a-half hours, during which Plaintiff detailed the difficulties she had with her employment. Plaintiff stated she felt Burns exposed her to a hostile work environment and "harassed" her by humiliating her in front of the other Directors after she sought an HR contact number from Miller, giving her the "silent treatment," failing to praise photos she had taken to pair with a fishing package advertisement, and insinuating at the June 6 staff meeting that she was a "rat." Ms. Blank advised Plaintiff she would be turning the matter over to Tom Blank, and relayed the substance of Plaintiff's complaints to him the following day. Ms. Blank followed up with Plaintiff on June 15 to advise that Tom Blank had met with Burns that day, and would be coming to the Inn to interview other employees. Blank Aff. ¶ 28; Def's *Rule 56* Stmt., Ex. K. On June 19, Ms. Blank again updated Plaintiff "with respect to the next step in the process of assisting with [*12] a resolution to the employment-related problems you are experiencing" and advised that an individual from VitalWorks, with whom Plaintiff was comfortable, would be engaged to conduct "development/coaching sessions" with Plaintiff and Burns. Def's *Rule 56* Stmt., Ex. L. VitalWorks is a workforce development consulting firm the Inn had previously retained to study employment relations and offer recommendations. In the meantime, Tom Blank continued his investigation by interviewing the Inn's other Directors and Plaintiff's subordinates on June 20 and 21.

Plaintiff's fourth PAF is dated June 25, 2007, and was written after she admitted lying to a client. Plaintiff told Xerox rooms were available for a business function it wished to book, and signed a contract on behalf of the Inn. In fact, the rooms already had been booked by another organization. After becoming aware of the dou-

ble-booking, Plaintiff untruthfully told Xerox the rooms were not available because they had been damaged in a windstorm. When Xerox learned of the falsehood, the Inn was required to place the group at another facility, and compensate Xerox for the difference in room rates and food and beverage costs. The total loss [*13] to the Inn was approximately $8,900.00. As a consequence, Plaintiff was placed on a 90-day probation. The PAF also confirmed the prior decision that she and Burns would participate in a coaching session with VitalWorks. Plaintiff signed the PAF without comment on June 27, 2007. Def's *Rule 56* Stmt., Ex. L. On June 28, Burns sought to schedule an initial coaching session for July 10. *Id.* Ex. M.

On July 3, 2007, Plaintiff notified Burns, by email and a letter placed in his mailbox, that she was submitting her two-week notice and would resign effective July 17, 2007. She accepted another position in the hotel services industry later that day. Burns accepted Plaintiff's resignation and had her escorted from the property on July 5, 2007, but continued to pay her through her notice period.

In September 2007, Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"). In this action followed, which was commenced on January 26, 2009, Plaintiff claims she was subjected to a hostile work environment, disciplined in retaliation for her complaints regarding her treatment, and constructively discharged.

On February 22, 2010, Defendant filed the subject summary [*14] judgment motion in which it maintains Plaintiff cannot show that the allegedly harassing behavior was "because of" her sex or sufficiently severe or pervasive to constitute a hostile work environment, that she suffered an adverse employment action under circumstances giving rise to an inference of retaliation, or that she can establish a *prima facie* claim of constructive discharge. Plaintiff disagrees, and contends she has made a sufficient *prima facie* showing as to each of her claims, and also shown that any purportedly legitimate reasons offered by Defendant are pretextual. Defendant submitted a reply, contesting each of Plaintiff's arguments. Counsel appeared on November 4, 2010, for oral argument.

**DISCUSSION**

***Rule 56***

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*. "[T]he [*15] movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir.)* (*citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)), cert. denied, 517 U.S. 1190, 116 S. Ct. 1678, 134 L. Ed. 2d 780 (1996)*.

The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)*. Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy, 988 F.2d 303, 308 (2d Cir.1993)*.

Courts must be "particularly cautious about granting summary [*16] judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, could show discrimination." *Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)* (citations and internal quotations omitted). However, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S. Ct. 91, 88 L. Ed. 2d 74 (1985)*.

***Title VII and the HRL***

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 436 (2d Cir. 1999)* (citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199 (2nd Cir. 2006)*. "Title VII is not [*17] a general civility code for the American workplace; it prohibits only harassment that is discriminatory." *Marshall v. NYC Bd. of Elections, No. 07-4561-cv,*

*322 Fed. Appx. 17, 2009 WL 928083 at *19 (2d Cir. Apr. 7, 2009)* (citation and internal quotation marks omitted).

It is well settled that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano, 116 F.3d 625, 629, n.1 (2d Cir. 1997), cert. denied, 522 U.S. 997, 118 S. Ct. 563, 139 L. Ed. 2d 404 (1997)*. Consequently, unless otherwise noted, references to Title VII below are also intended to refer to the HRL.

***Hostile Work Environment Claim***

The legal standards for a hostile environment claim are well settled:

> In order to establish a hostile work environment claim ... a plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. A hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive. The plaintiff must show more than a few isolated [*18] incidents of [ ] enmity [based on a protected category], although a hostile work environment can also be established through evidence of a single incident of harassment that is extraordinarily severe.

*Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 723-724 (2d Cir.2010)* (citations and internal quotation marks omitted) (alterations added); *see also, Fitzgerald v. Henderson, 251 F.3d 345, (2d Cir. 2001)* ("If a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of lack of an adverse employment decision is inappropriate.").

A plaintiff may, but is not required to, demonstrate that she suffered a tangible employment action as part of a hostile environment claim. *See, Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)* (indicating that a hostile environment can be proven, "notwithstanding the fact that the employer takes no tangible employment action").

In a sex discrimination action such as this, the female plaintiff must prove that the hostile environment was based on her gender:

> It is axiomatic that to prevail [*19] on a claim of hostile work environment based on gender discrimination, the plaintiff must establish that the abuse was based on her gender. The harassing conduct need not be motivated by sexual desire, however, so long as it was motivated by gender. Further, facially neutral incidents may be included among the "totality of the circumstances" that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory. Circumstantial evidence that facially sex-neutral incidents were part of a pattern of discrimination on the basis of gender may consist of evidence that the same individual engaged in multiple acts of harassment, some overtly sexual and some not. In *Raniola v. Bratton, 243 F.3d 610 (2d Cir. 2001)]*, for example, we concluded that, given proof of instances of overt gender hostility by the supervisor of the female plaintiff, a rational juror could permissibly infer that his entire alleged pattern of harassment against her was motivated by her gender, even though some [*20] of the harassment was not facially sex-based. Thus, the relevant circumstances in *Raniola* included not only offensive sex-based remarks, but also, *inter alia*, one dire facially gender-neutral threat of physical harm by the supervisor who had made those remarks. In *Fitzgerald v. Henderson, 251 F.3d 345 (2d Cir.2001), cert. denied, 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002)*, we held that a claim of gender-based hostile work environment (as well as an "embedded" claim of retaliation) may be premised on evidence that a supervisor heaped abuse on the plaintiff because she had rejected his sexual advances. *See 251 F.3d at 361*[.] So long as there is some evidentiary basis for inferring that facially sex-neutral incidents were motivated by the plaintiff's gender, the ultimate question of whether such abuse was "because of" the plaintiff's gender . . . is a question of fact for the factfinder.
>
> In sum, the question of whether considerations of the plaintiff's sex caused the

> conduct at issue often requires an assessment of individuals' motivations and state of mind, and an invidious discriminatory purpose may often be inferred from the totality of the relevant facts. Thus, especially [*21] in the context of a claim of sexual harassment, where state of mind and intent are at issue, the court should not view the record in piecemeal fashion, and summary judgment should be used sparingly.

*Kaytor v. Electric Boat Corp., 609 F.3d 537, 547-548 (2d Cir. 2010)* (emphasis added, citations and internal quotation marks omitted).

In this case, Defendant first argues that Plaintiff cannot show the alleged hostile environment she experienced was related to her gender. The Court agrees. Construing the facts in a light most favorable to Plaintiff, Burns began his hostile actions toward her not long after her hire, although he was the individual who interviewed her and decided to extend the offer of employment. Plaintiff does not identify any sex-based comments or conduct by Burns over the entire course of her employment. The claim that he treated her harshly "because of" his enmity against women is premised on the fact that, of the five Directors reporting to Burns, she was the only female. This alone is not a sufficient basis from which to infer that the facially-neutral conduct of which Plaintiff complains--*e.g.*, Burns being overly-critical, issuing progressive discipline, requiring that [*22] she communicate with other Directors, requiring that she take on tasks outside her job description, and the like--was, in fact, discriminatory.

Moreover, Plaintiff's inferences notwithstanding, it is apparent from the record that her male counterparts also were subjected to Burns' "embarrassing and unwanted" critiques. Berkstresser Reply Aff. ¶¶ 8-9. Indeed, in her lengthy meeting with Ms. Blank, Plaintiff described in detail an emergency Director's meeting held in May 2007 in which Burns openly questioned Director Reinhard's leadership and made it "very unpleasant for him." Blank Aff. ¶ 13. In the field of employment discrimination, the term "hostile" work environment has a particular meaning in that it relates only to discriminatory conduct.

> [It] is not synonymous with an unpleasant, harsh, combative or difficult work environment. The nation's workplace is most likely populated with abusive, banal, profane, and vulgar supervisors.... Although Title VII protects employees from improper discriminatory intimidation, it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors.

*Benette v. Cinemark U.S.A., Inc., 295 F. Supp. 2d 243, 250 (W.D.N.Y. 2003)* [*23] (citations, internal quotation marks and alteration omitted). Since the record does not suggest Burns' conduct toward Plaintiff was "because of" her gender, there is no need to consider Defendant's further argument that the conduct was not sufficiently severe and pervasive to constitute a hostile work environment.

***Retaliation Claim***

The legal principles applicable to retaliation claims are as follows:

> "Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis. *Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir.2005)*; *see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. First, the plaintiff must establish a prima facie case of retaliation by showing: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Jute, 420 F.3d at 173* (quoting *McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001))*. The plaintiff's burden in this regard is "*de minimis*," and "the court's role in evaluating a summary judgment request [*24] is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.* (internal quotation marks omitted).
>
> If the plaintiff sustains this initial burden, "a presumption of retaliation arises." *Id.* The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* A

> plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir.1990).*

*Hicks v. Baines, 593 F.3d 159, 164-165 (2d Cir. 2010).*

Here, Defendant argues Plaintiff has not made a *prima facie* showing because she did not participate in protected activity prior to June 12, 2007 (the date she met with Ms. Blank), all conduct she complains of other than [*25] her final PAF is not adverse, and she has conceded there is no causal connection as to some conduct, even if it could be construed as adverse.

***Protected Activity***

A plaintiff engages in "protected activity" when she (1) opposes employment practices prohibited under Title VII; (2) makes a charge of discrimination; or (3) participates in an investigation, proceeding or hearing arising under Title VII. *42 U.S.C. § 2000e-3(a)*; *see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000).* "'[P]rotected activity' [ ] must relate to an alleged violation of Title VII, *i.e.*, the complaints must relate to . . . gender. Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her employment would ultimately find relief in Title VII even when . . . gender was not an issue." *Kelly v. Howard I Shapiro & Assocs. Consulting Eng'rs, P.C., No. 11-CV-5035 (ADS) (AKT), 2012 U.S. Dist. LEXIS 110935, 2012 U.S. Dist. LEXIS 110935, at *36-37 (E.D.N.Y. Aug. 3, 2012)* (citation and quotation marks omitted).

It is undisputed on this record that, beginning in or about late summer 2006, Plaintiff took various complaints about her interactions with Burns to Roger Miller, who is responsible for administering HR [*26] policy at the Inn, including fielding employee complaints and offering input on the steps an employee should take next. Miller Reply Aff. ¶ 3. Plaintiff attests that she repeatedly told Miller she believed she was treated differently because she is female, a statement Miller forcefully denies. Defendant maintains that Plaintiff has failed to make out her *prima facie* case because Miller disputes her testimony and, in any event, Miller was simply a co-worker and not a proper individual to approach with her complaints. Neither argument is persuasive on this record and Plaintiff has met her de *minimis* burden with regard to protected activity.

***Materially Adverse Action***

To make a *prima facie* showing of an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d at 207* (quoting *Burlington N. & Santa Fe Railway Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)).* Conversely, "petty slights or minor annoyances that [*27] often take place at work and that all employees experience" do not constitute actionable retaliation. *Burlington N. & Santa Fe Railway Co. v. White, 548 U.S. at 68.* The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.

Defendant argues that virtually all of the conduct Plaintiff complains of involved the kinds of minor slights and annoyances that commonly arise from personality conflicts in the workplace, and so are not materially adverse. Def's Mem. in Supp. of Mot. for Summ. J. at 15-16. In response, Plaintiff contends that, after she first spoke with Miller, Burns retaliated against her by continuing to belittle and berate her and by issuing two inaccurate PAFs on June 8, 2007. Pl's Mem. in Opp. at 13. Plaintiff recites the conduct of which she complains, but does[3] not provide context, argument, or authority in support of her assertion that the actions were *materially* adverse--*i.e.*, would have dissuaded a reasonable person from pursuing his or her statutory rights.

> 3 Plaintiff contends that all conduct by Burns occurring after August 2006 is retaliatory. Those alleged incidents are set out above, and need [*28] not be repeated here.

Assuming, for purposes of this motion, that Plaintiff engaged in protected activity in August 2006, the Court finds Burns' actions after that date--other than the alleged false disciplinary write ups--fall into the category of "trivial harms" that are not likely to deter a reasonable employee from making a complaint. This is so whether the actions are viewed individually or collectively. *See, e.g., Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 571 (2d Cir. 2011)* (supervisor's empty verbal threats, comment and staring during employee meeting, and public yelling directed at plaintiff are nonactionable slights that do not cause harm); *Cody v. Cnty. of Nassau, 345 Fed. App'x 717, 719 (2d Cir. 2009)* ("(1) falsely accusing [plaintiff] of being absent without authorization, (2) threatening her with future counseling notices and disciplinary actions, (3) writing her up for leaving work early, (4) placing her on a medical review list, (5) issuing her a counseling notice while she was on

leave, and (6) engaging in a pattern of conduct that created a hostile working environment" were not adverse actions for purposes of a retaliation claim); *Dillon v. Morano, 497 F.3d 247, 254 (2d Cir. 2007)* [*29] (assignment of additional tasks and exclusion from certain staff meetings not materially adverse); *Workneh v. Pall Corp., 2012 U.S. Dist. LEXIS 147397, at *30-32 (E.D.N.Y. 2012)* (assignment of additional responsibilities, scrutiny of plaintiff's job performance and daily schedule, and increased scrutiny of charges to corporate card not adverse employment actions); *Hall v. New York City DOT, 701 F. Supp. 2d 318, 336 (E.D.N.Y. 2010)* (holding that reprimands and close monitoring may cause embarrassment or anxiety, but these intangible consequences are not materially adverse); *Monroe v. Xerox Corp., 664 F. Supp. 2d 235, 245 (W.D.N.Y. 2009)* (supervisor's general antagonism not materially adverse); *Wallace v. New York Stat Dep't Corr. Servs., 2006 U.S. Dist. LEXIS 51863, at *27 (W.D.N.Y. July 28, 2006)* (allegations that plaintiff was "completely ostracized and excluded from important meetings and social events" not sufficient to establish adverse action). Even assuming Plaintiff could prove the incidents of which she complains occurred and that they were motivated by retaliation, no rational jury could conclude that these acts, taken together, resulted in an injury or harm that would dissuade [*30] a reasonable worker from making or supporting a charge of discrimination. Notably, Plaintiff attests that Burns' actions did not dissuade her from making a number of subsequent complaints about him to Miller and Ms. Blank. *See Jantz v. Emblem Health, 2012 U.S. Dist. LEXIS 14977, at (S.D.N.Y. Feb. 6, 2012)* ("The Second Circuit has instructed that while the test [for a materially adverse action is] objective, it remains relevant whether the plaintiff himself was deterred from complaining.") (citing *Tepperwien, 663 F.3d at 572*)).

***Causal Connection***

As for the two purportedly inaccurate PAF's Plaintiff received on June 8, 2007, she consistently links their issuance to Burns' belief that she had written an anonymous letter critical of an employee party, and his desire to retaliate against her for her being a "rat." Assuming the truth of Plaintiff's assertions, these PAFs had nothing to do with her gender or her purported complaint to Miller almost one year earlier, in August 2006.[4] Accordingly, the Court finds that Plaintiff has not made a *prima facie* showing that she suffered a materially adverse action that could support a retaliation claim.

4 Because Plaintiff is unable to recall even a general [*31] timeframe for any other alleged complaint to Miller, she could not establish a temporal connection to these PAFs, even if she believed they were related to a complaint of discrimination, which she does not.

***Constructive Discharge***

A constructive discharge occurs when an employer "intentionally creates a work atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily." *Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003)*; *see also Pa. State Police v. Suders, 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)*. This requires a "further showing" beyond what is necessary to establish a hostile work environment or retaliation claim, such that resignation qualified as a fitting response. *Suders, 542 U.S. at 134*. Whether working conditions are sufficiently intolerable to constitute a constructive discharge "is assessed objectively by reference to a reasonable person in the employee's position." *Petrosino v. Bell Atl., 385 F.3d 210, 230 (2d Cir. 2004)*.

Defendant urges that Plaintiff cannot show Burns deliberately attempted to compel her resignation, nor that her working conditions were so objectively intolerable that she was forced to resign. Def's Mem. in Supp. [*32] of Summ. J. at 20-22. Plaintiff contends that for all of the reasons relied on in support of her other claims, she has sufficiently established a *prima facie* constructive discharge claim as well. Pl's Mem. in Opp. at 19.

Plaintiff's constructive discharge claim is predicated on precisely the same post-August 2006 incidents that give rise to her retaliation claims. Pl's Mem. in Opp. at 19. "[W]here, as here, a plaintiff is claiming that [s]he was constructively discharged based upon acts of retaliation, the acts complained of must actually constitute retaliation under Title VII." *Johnson v. Potter, 2009 U.S. Dist. LEXIS 62845, at *47-49 (W.D.N.Y. July 22, 2009)* (collecting cases). As already determined, Plaintiff has not established a *prima facie* retaliation claim. And even assuming she had, she has not attempted to make the "further showing" required to support a constructive discharge claim. Thus, summary judgment as to this claim is warranted, as well.

**CONCLUSION**

For the reasons stated, Defendant's motion for summary judgment, ECF 14, is granted. Consequently, Defendant's motion to opt-out of ADR, ECF 27, is denied as moot.

IT IS SO ORDERED.

Dated: November 2, 2012

Rochester, New York

/s/ [*33] Charles J. Siragusa

CHARLES J. SIRAGUSA

United States District Judge

LexisNexis®

**BARBARA BURHANS, Plaintiff, v. COUNTY OF PUTNAM, SHERLITA AMLER, Putnam Commissioner of Health, and PAUL ELDRIDGE, Putnam County Personnel Director, Defendants.**

**06 Civ. 8325 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***2011 U.S. Dist. LEXIS 31999***

**March 25, 2011, Decided**
**March 25, 2011, Filed**

**COUNSEL:** [*1] For plaintiff: Michael D. Diedrich, Jr., Stony Point NY.

For defendants: James A. Randazzo, Gelardi & Randazzo LLP, Rye Brook, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

**OPINION AND ORDER**

DENISE COTE, District Judge:

Barbara Burhans was employed as a public health nurse with the County of Putnam (the "County") until May 29, 2008, when she was fired following a hearing conducted pursuant to *§ 72 of the New York Civil Service Law* ("NYCSL"). Burhans has sued the County and two County officials, Sherlita Amler ("Amler"), the Commissioner of Health, and Paul Eldridge ("Eldridge"), the Personnel Director, asserting principally that they retaliated against her due to her expression of concern regarding nursing services provided by the County's Department of Health ("Department"). For the following reasons, the motion to dismiss is granted in part.

**BACKGROUND**

The second amended complaint ("Complaint") asserts that from January 2002 to May 29, 2008, Burhans was employed as a public health nurse in the Department's Nursing Division. From 2003 to 2006, Burhans told the defendants, representatives of the New York State Department of Health ("DOH"), and the Medicaid Fraud Unit of the New [*2] York State Office of the Attorney General that the Department was, inter alia, failing to provide competent nursing services and to maintain proper records.

As a result of deficiencies in the Department's operations that were discovered by the DOH during an audit, and in retaliation for Burhans's complaints, the Department took many actions against Burhans, including the following. It transferred Burhans in February 2005 from the position of Admission Coordinator to nurse-case manager, removed her from weekend rotations and other opportunities for overtime, and did not allow her to use a fax or copy machine. In March 2005, the Department denied Burhans the opportunity to attend a conference. In June and July 2005, Department employees gave Burhans warning memoranda and issued verbal warnings to her. On October 12 and December 7, 2005, pursuant to *NYCSL § 75*, [1] an attorney interviewed Burhans to investigate her conduct an draft disciplinary charges against her. In December 2005, the County car that Burhans drove was ransacked and her personal cellular telephone was taken.

1 *Section 75 of the NYCSL* provides, in part, that certain civil servants "shall not be removed or otherwise subjected [*3] to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section." *NYCSL § 75(1)* (emphasis supplied). In contrast, *NYCSL § 72(5)*, discussed infra, sets out the pro-

> cedure for placing a civil servant on leave when the "employee is unable to perform the duties of his or her position by reason of a disability." *NYCSL § 72(1)*.

In December 2005, the Department initiated proceedings against Burhans pursuant to *NYCSL § 72(5)*. *Section 72(5)* provides in pertinent part:

> [I]f the appointing authority determines that there is probable cause to believe that the continued presence of the employee on the job represents a potential danger to persons or property or would severely interfere with operations, it may place such employee on involuntary leave of absence immediately; provided, however that the employee shall be entitled to draw all accumulated unused sick leave, vacation, overtime and other time allowances standing to his or her credit.

*NYCSL § 72(5)* (emphasis supplied).

By letter dated December 8, Burhans was notified that, based on statements she made to colleagues regarding mistakes "she had been making [*4] . . . in relation to patient care" and "near car accidents while operating a County vehicle," the Department had concluded that it had probable cause to place her on involuntary leave pursuant to *§ 72(5) of the NYCSL*. Burhans was instructed to meet in late December with a psychiatrist retained by the County.

The Complaint explains that the psychiatrist advised Burhans that she was a whistleblower. Nonetheless, the psychiatrist filed a report finding that Burhans suffered from a major depressive disorder and was unfit to work. In March 2006, Burhans obtained a second psychiatric evaluation which recommended that she be reinstated. On March 27, 2006, Burhans exhausted her vacation and sick leave. As a result, she was unpaid for the remainder of her involuntary leave.

From June 26 through December 11, 2007, a *§ 72* hearing was conducted concerning Burhans's fitness for employment. During that hearing, Burhans was served with disciplinary charges under *NYCSL § 75*.

On April 21, 2008, the hearing officer who conducted the *§ 72* hearing found that there was probable cause to believe that as of December 8, 2005 Burhans was unable to perform the essential duties of a registered nurse. The hearing [*5] officer, however, also found that Burhans should be permitted to return to work and should receive back pay and benefits (the "April 21 Report"). Amler rejected the recommendation that Burhans be reinstated, but authorized another psychiatric evaluation of Burhans. On May 29, 2008, after Burhans declined to undergo another psychiatric evaluation, Amler sent Burhans a notice of termination pursuant to *NYCSL § 72(4)*. [2]

> 2 *Section 72(4)* provides, in part, that "[i]f an employee placed on leave pursuant to *[§ 72]* is not reinstated within one year after the date of commencement of such leave, his or her employment status may be terminated . . . ." *NYCSL § 72(4)*.

**PROCEDURAL HISTORY**

On October 12, 2006, plaintiff filed an action in federal court against the County and twelve individual defendants. The case was assigned to the Honorable Stephen C. Robinson. On January 1, 2007, individual defendant Jane Meunier-Gorman was dismissed from the action with prejudice. On December 16, 2007, the remaining defendants filed a motion to dismiss. This motion was never decided since, on April 24, 2007, plaintiff filed an amended complaint. On June 8, 2009, defendants filed a motion to dismiss the plaintiff's [*6] amended complaint. By an order dated October 30, 2009, the parties' joint application for the filing of a second amended complaint was approved. On December 9, 2009, defendants filed a third motion to dismiss. That motion became fully submitted on December 9, 2009.

On November 15, 2010, the case was reassigned to this Court. At a conference on December 17, the parties identified the arguments in the various motion papers that they wished this Court to consider.

**DISCUSSION**

The defendants have moved to dismiss Burhans's federal claims and have requested that the Court decline to exercise supplemental jurisdiction over her remaining state law claims. "Under *Federal Rule of Civil Procedure 8(a)(2)*, a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)*. For a plaintiff's claim to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (citation omitted)). Applying this plausibility standard is "a context-specific [*7] task that requires the reviewing court to draw on its judicial experience and common sense." *Id. at 1950*.

A court considering a motion to dismiss pursuant to *Rule 12(b)(6)* "must accept as true all allegations in the

complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008)* (citation omitted). A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal, 129 S. Ct. at 1949-50* (quoting *Twombly, 550 U.S. at 555, 557)*.

**I. Federal Law Claims**

Plaintiff currently brings eight claims against the defendants, five of which appear to be federal law claims. In these five federal claims she essentially asserts the violation of three rights: that the defendants violated (1) her *First Amendment* right to free speech through their retaliatory conduct, (2) her right to a pre-deprivation hearing before placing her on involuntary leave pursuant to *§ 72(5)*, and *(3)* her right to equal protection of the laws based on the protected classes to which her [*8] patients belong.

**A. First Amendment Claim**

Burhans asserts that the defendants retaliated against her, in violation of her right to free speech as protected by the *First Amendment of the United States Constitution*, because she complained about the quality of nursing care provided by the County and related issues. The defendants have moved to dismiss this claim on the grounds that Burhans has not pleaded that she engaged in protected speech, that she suffered an adverse employment action as a result of her speech, or that their actions undertaken pursuant to *§ 72* were substantially motivated by her protected speech.

A *First Amendment* retaliation claim by a public employee requires plaintiffs to prove at trial that "(1) they engaged in constitutionally protected speech because they spoke as citizens on a matter of public concern; (2) they suffered an adverse employment action; and (3) the speech was a motivating factor in the adverse employment decision." *Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008)* (citation omitted). See also *Anemone v. Metro. Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011)*. The Supreme Court addressed the scope of public employees' *First Amendment* speech [*9] rights in *Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)*. As the Court observed, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Id. at 418*. Nevertheless, public employees may retain "*First Amendment* protection for expressions made at work," and even for "expressions related to the speaker's job." *Id. at 420-21*. But "when public employees make statements pursuant to their official duties," they "are not speaking as citizens for *First Amendment* purposes." *Id. at 421* (emphasis supplied). In these instances, the employee's speech is not analogous to the speech of citizens who are not government employees, and therefore, such speech is not protected by the *First Amendment. Id. at 424.*

Courts engage in "an objective inquiry" to determine whether speech is made pursuant to official duties. *Anemone, 629 F.3d at 116* (citation omitted). "[S]peech can be pursuant to a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." Id. (citation omitted). And, "without more," an employee's speech pursuant to his official [*10] duties is not "transform[ed]" into the speech of a "private citizen" just because an employee has "persist[ed] in such speech after a supervisor has told him to stop." Id. (citation omitted).

In order to show that the plaintiff experienced an adverse employment action, the plaintiff must demonstrate that the defendants took an action against her that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Id. at 120 n.14* (citation omitted). This standard has been described as "broad" and recognizes that an "adverse employment action can take a wide variety of forms." Id. A plaintiff is not "required to show that the defendants' action had an actual chilling effect." *Zelnik v. Fashion Inst. Of Tech., 464 F.3d 217, 226 n.2 (2d Cir. 2006)* (citation omitted). Indeed, "[it] is well settled that public employees alleging retaliation for engaging in protected speech are not normally required to demonstrate a chill subsequent to the adverse action taken against them." Id. (citation omitted).

Finally, the third prong requires proof that the protected speech was a substantial motivating factor in the adverse action. "A plaintiff can [*11] establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009)*. If the plaintiff demonstrates such a causal connection, however, "the defendant can still prevail . . . if it can show that it would have taken the same adverse employment action 'even in the absence of the protected conduct.'" [3] *Cotarelo v. Village of Sleepy Hollow Police Dep't, 460 F.3d 247, 251-52 (2d Cir. 2006)* (citing *Mount Healthy City Sch. Dist. Bd. of Educ. V. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977))* (summary judgment ruling).

3 The defendants can also prevail if they show that "the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of

the plaintiff's expression." *Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006)* (citation omitted). The defendants do not argue for dismissal on this ground.

The Complaint asserts that Burhans engaged in constitutionally protected speech. The Complaint describes a series of complaints that the plaintiff made to state agencies to alert them to the deficiencies she had observed [*12] in the County's operation of its public nursing program. There is no basis to find from the face of the Complaint that these statements were made in the course of or pursuant to the plaintiff's official duties. Indeed, the plaintiff asserts that she "was not required, as part of her job duties/responsibilities, to report intra-departmentally concerns she had regarding the incompetent provision of nursing services by the Department of Health's staff/administration that put at risk patients['] health and safety." Speech that relates to information acquired in the course of one's duties as a public employee may be protected speech.

The defendants contend that the complaints lodged by the plaintiff are not protected speech because *N.Y. Public Health Law, Article 28*, required the plaintiff to report abuses of patients in a residential healthcare facility. Assuming that a complaint made pursuant to the public health law would not qualify as protected speech, the defendants have not shown that the plaintiff's complaints were made pursuant to that law. As described in the Complaint, the plaintiff's complaints extended beyond issues of physical abuse to patients and concerned patients who were [*13] not living in residential healthcare facilities. Moreover, the defendants do not contend that the plaintiff's complaints were made to the officials authorized to receive complaints pursuant to the public health law.

Defendants' argument that Burhans has not pleaded the existence of adverse employment actions fails as well. The Complaint identifies a number of actions taken by various Department employees that Burhans contends were retaliatory including, denying her overtime pay, demoting her from the position of Admission Coordinator to the position of nurse case-manager, prohibiting her from using the Department's fax machine and copy machine, refusing her request to attend a conference at Pace University School of Nursing, initiating disciplinary proceedings against her pursuant to *NYCSL § 75*, and placing her on involuntary leave pursuant to *NYCSL § 72(5)*. Several of these actions were sufficiently severe that they would deter an individual in the plaintiff's position and possessing ordinary firmness of character from engaging in the protected activity the Complaint describes. These include denying her the opportunities for overtime pay that she had previously been given, the official [*14] reprimands, and the placement on involuntary leave. See, e.g. *Zelnik, 464 F.3d at 226* ("[A]dverse employment actions include discharge . . . demotion, reduction in pay, and reprimand." (citation omitted)); *Skehan, 465 F.3d at 106* ("[T]he institution of disciplinary proceedings is sufficient in this circuit to constitute an adverse employment decision."). Given that at least some of the adverse actions that Burhans identifies are sufficiently severe to support a *First Amendment* retaliation claim, it is unnecessary at this stage to determine whether each of them would independently support such a claim.

The defendants are correct, however, that the *First Amendment* claim must be dismissed to the extent it seeks to recover for the defendants' initiation and prosecution of the *§ 72(5)* proceedings. Given the independent determination of the hearing officer that there was probable cause to believe as of December 8, 2005 that Burhans was unfit to perform her job, a decision that Burhans did not challenge through the procedures provided under New York State law, plaintiff is unable as a matter of law to establish a causal connection between her protected speech and the defendants' resort to [*15] the *§ 72(5)* process. Thus, the defendants' motion to dismiss the *First Amendment* claim is granted to the extent that it asserts that the *§ 72(5)* proceedings were retaliatory.

1. Qualified Immunity

Amler and Eldridge also contend that the *First Amendment* retaliation claim against them must be dismissed since their conduct was protected under the doctrine of qualified immunity. "Under qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Faghri v. Univ. of Conn., 621 F.3d 92, 96 (2d Cir. 2010)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982))*. A right is "clearly established if it would be clear to a reasonable officer in the position of the defendant that his conduct was unlawful in the situation he confronted." *Id. at 96-97* (citing *Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001))*. This inquiry, in turn, hinges on "the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id. at 97* [*16] (citing *Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 822, 172 L. Ed. 2d 565 (2009))*. Even if Second Circuit decisions "have not explicitly held a law or course of conduct to be unconstitutional, . . . [the] course of conduct will nonetheless be treated as clearly established if decisions by [the Second Circuit] clearly foreshadow a particular ruling on the issue." *Scott*

*v. Fischer, 616 F.3d 100, 105 (2d Cir. 2010)* (citation omitted).

It was clearly established in 2005 that a government employee could not retaliate against a subordinate for engaging in speech "on matters of public concern." See *Connick v. Myers, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)*. Thus, it would not have been objectively reasonable for Amler and Eldridge to take adverse employment actions against Burhans in retaliation for her repeated notification of state agencies of her concerns regarding the quality of the County's public nursing program. The individual defendants' motion to dismiss based on qualified immunity must be denied.

2. *Monell* Liability

The County alleges that Burhans's retaliation claim against it must be dismissed since she failed to plead that the alleged retaliation took place pursuant to a "municipal policy or custom." *Hartline v. Gallo, 546 F.3d 95, 100 (2d Cir. 2008)*. [*17] [4] It is well-established that a municipal entity is not subject to respondeat superior liability under *42 U.S.C. § 1983*. *Monell, 436 U.S. at 691*. "To prevail against a municipality on a *§ 1983* claim, a plaintiff must demonstrate both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." *Hartline, 546 F.3d at 103* (citation omitted).

> 4 A county is equivalent to a municipality for the purpose of *Monell* liability. *Owens v. Haas, 601 F.2d 1242, 1245 n.2 (2d Cir. 1979)*.

An official has final policymaking authority "if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Anthony v. City of N.Y., 339 F.3d 129, 139 (2d Cir. 2003)* (citation omitted). "[T]he question of which municipal officials are final policymakers is one of law, and the question is resolved by looking to relevant state law." *Skehan, 465 F.3d at 109*; accord *Pembaur v. City of Cincinnati, 475 U.S. 469, 481-82, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)*.

Burhans contends that Amler, the County's Commissioner of Health, and Eldridge, the Department's Personnel Director, [*18] were responsible for the adverse employment actions taken against her. Since the parties have not addressed whether either Amler or Eldridge had final policymaking authority for the County for the adverse employment actions identified by Burhans, the County's motion to dismiss the *First Amendment* claim is denied.

**B. Due Process Claim**

Burhans's claim pursuant to the *Due Process Clause of the Fourteenth Amendment* is addressed to the *§ 72(5)* proceedings that resulted in her being placed on involuntary leave, specifically the absence of any pre-deprivation hearing. [5] She asserts both a property interest in continued employment and liberty interest in her reputation. [6] Burhans contends that she "was not provided with notice of the accusations against her, nor any opportunity to respond." She also alleges that the ultimate decisionmaker regarding the *§ 72* charges -- Amler -- was not impartial.

> 5 Although Burhans does not explicitly claim that the termination of her employment violated the *Due Process Clause*, if she had made such a claim it would also have been dismissed for the reasons described here.
>
> 6 The defendants do not contest that Burhans has stated a constitutionally cognizable property [*19] interest in her continued employment, and since there is no reason to distinguish between the liberty and property interests for the remainder of the due process analysis, it is unnecessary to determine whether Burhans has stated a valid liberty interest.

The defendants move to dismiss the due process claim on the grounds that *NYCSL § 72* afforded Burhans all the process that she was due and that, to the extent that there were any deviations from the standard *§ 72* procedures, a post-deprivation Article 78 hearing provided Burhans a constitutionally adequate remedy. The defendants are correct, and the due process claim must be dismissed.

The *Fourteenth Amendment* requires that state public employees with a property interest in their continued employment be afforded "adequate procedural protections" before being placed on "unpaid sick leave, which is the equivalent of suspen[sion] . . . without pay." *O'Connor v. Pierson, 426 F.3d 187, 197 (2d Cir. 2005)*. When determining what procedural protections are "adequate," the Supreme Court has required courts to consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such [*20] interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Faghri, 621 F.3d at 99-100* (citing *Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976))*. "[T]he ultimate conclusion about procedural adequacy . . . turns on the full set of pre- and post-deprivation procedures available." *O'Connor, 426 F.3d at 197*. Where post-deprivation process is concededly adequate, a plaintiff must demonstrate that the "pre-deprivation process was so inadequate that it violated the constitution." *Id. at 198*. In this context, "[p]re-deprivation process need not be elaborate." Id. (citation omitted). It serves a "limited function" and need only include "notice and the opportunity to respond." Id.

At the time that Burhans was placed on involuntary leave pursuant to *§ 72(5)*, she received a letter stating the reasons for the Department's decision. Subsequently, pursuant to *§ 72(1)*, Burhans demanded and was afforded a hearing. The independent hearing officer determined that [*21] Burhans had properly been placed on involuntary leave on December 8, 2005. Amler required Burhans to undergo another psychiatric examination before reinstating her. Burhans's employment was terminated when Burhans refused to participate in such an examination. Despite the availability of Article 78 procedures to challenge the decisions by the hearing officer and Amler, Burhans filed no such proceeding. Indeed, "a successful Article 78 proceeding for reinstatement is a prerequisite to a claim for damages by a discharged public employee." *Finley v. Giacobbe, 79 F.3d 1285, 1292 (2d Cir. 1996)*. Combined, these procedures afforded Burhans adequate process to protect her interest in continued employment. See *Rivera-Powell v. N.Y. City Bd. of Elections, 470 F.3d 458, 467 (2d Cir. 2006)*.

The Complaint fails to plead a violation of the *Due Process Clause*. The Complaint and its recitation of the procedural history that preceded the termination of Burhans's employment establish that she received all the process she was due. Cf. *Leonard v. Sugarman, 466 F.2d 1366, 1367 (2d Cir. 1972)* (holding that *due process clause* did not require state to provide employee with a hearing before compelling him [*22] to undergo a medical examination pursuant to *§ 72(1)*).

Burhans relies on a single case -- *Cleveland Bd. of Edu. v. Loudermill, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)* -- to support her claim to pre-deprivation hearing. In *Loudermill*, the Supreme Court held that a public employee was entitled to a pre-deprivation hearing before his employment was terminated. *Id. at 542*. *Loudermill*, however, does not support Burhans's right to a pre-suspension hearing. Indeed, in *Loudermill*, the Supreme Court distinguished between termination and suspension, noting that "in those situations where the employer perceives a significant hazard in keeping the employee on the job," it can avoid the delay and administrative burden caused by a pre-deprivation hearing "by suspending [the employee] with pay." *Id. at 544-45*. The due process claim is dismissed.

**C. Equal Protection Claim**

Burhans contends that was she denied the equal protection of the law since she was fired in "retaliat[ion]" for her efforts to "aid public health patients in protected classes." The *Equal Protection Clause of the Fourteenth Amendment* "requires that the government treat all similarly situated people alike." *Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005)* [*23] (citation omitted). Significantly, however, "the *Equal Protection Clause* does not apply to a public employee asserting a violation of the Clause based on a 'class of one' theory of liability." *Huth v. Haslun, 598 F.3d 70, 72 n.1 (2d Cir. 2010)* (citation omitted). Instead, in the public employment context, the *Equal Protection Clause* is only implicated when the "government makes class-based decisions . . . treating distinct groups of individuals categorically differently." *Engquist v. Or. Dept. of Agric., 553 U.S. 591, 605, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008)*.

Burhans does not allege that she was treated differently based on her membership in a protected class and thus her equal protection claim must be dismissed. [7] Attempting to distinguish her claim from an impermissible "class-of-one" claim, Burhans alleges that defendants retaliated against her because she advocated for patients who were members of protected classes. Beyond this conclusory allegation, however, nothing in the Complaint suggests that the defendants treated Burhans differently based on the identity of the patients on whose behalf she advocated. [8] Thus, even if Burhans had standing to assert an equal protection claim on behalf of her patients, her [*24] Complaint fails to plead such a claim. See *Rivera-Powell, 470 F.3d at 470* ("a conclusory allegation of discrimination . . . without evidentiary support or allegations of particularized incidents, does not state a valid claim and so cannot withstand a motion to dismiss" (citation omitted)).

7 In her motion papers, Burhans notes that as a woman she is a member of a protected class. Nothing in the Complaint, however, asserts that the defendants treated Burhans differently based on her gender.

8 Burhans avers that a Supervising Public Health Nurse for the Department Homecare Program made a number of racist and anti-semitic remarks to Burhans concerning some of the Department's patients. That individual is not named as a defendant in this action and there is no evi-

dence that these views were shared by any of the named parties.

### II. State Law Claims

Burhans raises three categories of claims pursuant to state law: (1) claims arising under provisions of the New York State Constitution (the "N.Y. Constitution") that are analogous to the clauses of the federal constitution discussed above; (2) a violation of *§ 741 of the New York Labor Law* ("NYLL"), also known as the Health Care Whistleblower Law (the [*25] "Whistleblower Law"); and, (3) a request for review of the County's decision pursuant to *Article 78 of the New York Civil Practice Law and Rules* (the "CPLR").

Defendants move to dismiss these claims on a variety of grounds. First, defendants contend that all state law claims against the County must be dismissed since plaintiff failed to timely file a notice of claim. Second, defendants argue that Burhans is time-barred from pursuing an Article 78 proceeding. And, finally, defendants assert that Burhans has failed to state claims arising under the N.Y. Constitution and the Whistleblower Law against the individual defendants.

#### A. State Law Claims Against the County

Generally, "in a federal court, state notice-of-claim statutes apply to *state*-law claims." *Hardy v. N.Y. City Health & Hosp. Corp., 164 F.3d 789, 793 (2d Cir. 1999)* (citing *Felder v. Casey, 487 U.S. 131, 151, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988)). Section 52 of the N.Y. County Law* provides, in part, that

> [a]ny claim . . . against a county for damage . . . arising at law or in equity, alleged to have been caused or sustained in whole or in part by or because of any misfeasance, omission of duty, negligence or wrongful act on the part of the county, its officers, [*26] agents, servants or employees must be made and served in compliance with § 50-e of the general municipal law.

N.Y. Cnty. *§ 52(1)* (McKinney 2004) (emphasis supplied). *Section 50-e* specifies that absent a court-granted extension, a notice of claim must be filed "within ninety days after the claim arises." N.Y. Gen. Mun. *§ 50-e(1)(a)* (McKinney 2009).

Burhans failed to file a timely notice of claim and therefore all of her state law claims against the County for damages must be dismissed. By letter dated May 29, 2008, the Department notified the plaintiff that her employment was terminated. Plaintiff did not file a notice of claim against the County in the succeeding ninety days.

Burhans does not contend that she filed a notice of claim. Instead, she argues that the County has failed to identify a "specific statute" requiring her to file a notice of claim. This argument lacks merit. The plain text of *§ 52(1)* requires plaintiffs to serve a notice of claim pursuant to *§ 50-e* for all actions to recover "damages" from a County. See *Mills v. Monroe Cnty., 89 A.D.2d 776, 453 N.Y.S.2d 486, 487 (App. Div. 4th Dept. 1982)* (applying notice of claim requirement to suit for wrongful discharge). Due to Burhans's failure [*27] to file a timely notice of claim, all of her state law claims for damages against the County are dismissed.

#### B. Article 78 Proceeding

Burhans requests that this Court review pursuant to *Article 78 of the CPLR* the Department's decision to place her on involuntary leave on December 5, 2008. An *Article 78* proceeding must be filed in state court "within four months after the determination to be reviewed becomes final and binding upon the petitioner or the person whom he represents in law or in fact." *CPLR Art. 78.* It is unnecessary to address the defendants' argument that the Article 78 claim is time barred since *Article 78* is a type of proceeding that is available in state court, and not in federal court. *Finley, 79 F.3d at 1291.* The Article 78 claim is dismissed.

#### C. N.Y. Constitution Claims

Burhans has not provided any basis to find that her equal protection and due process claims survive under the New York Constitution despite her failure to state a claim under the parallel provisions of the United States Constitution. Consequently, Burhans's claims brought pursuant to *Article I, §§ 6, 11* of the New York Constitution providing for due process and equal protection are dismissed. The motion [*28] to dismiss Burhans's freedom of speech claim pursuant to *Article I, § 8 of the New York Constitution* is similarly granted to the extent it has been granted on the *First Amendment* claim.

#### D. Whistleblower Law Claim

Plaintiff alleges that in retaliation for her efforts to bring to the attention of various state agencies the poor quality of the home health care provided by the Department, and in violation of *NYLL § 741*, the defendants placed Burhans on involuntary leave and later terminated her employment without affording her adequate procedural protections. Amler and Eldridge contend that Burhans has failed to state a claim pursuant to New York's Whistleblower Law since she has "failed to allege any retaliatory act directly caused by her speech." [9]

9 The memorandum of law in support of defendants' motion to dismiss that was filed on June 8, 2009 -- before Burhans filed her second amended complaint -- also suggested that Burhans was not a "health care professional" within the meaning of *§ 741*. In defendants' November 6, 2009 reply memorandum of law in further support of defendants' motion to dismiss, defendants concede that in her second amended complaint, Burhans stated facts adequate to demonstrate [*29] that she is a protected health care professional.

*Section 741* prohibits employers from taking a "retaliatory action against any employee because the employee . . . discloses or threatens to disclose to a supervisor, or to a public body any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care." *NYLL § 741(2)(a)*. The statute defines retaliatory action to mean the "discharge, suspension, demotion, penalization or discrimination against an employee, or other adverse employment action taken against an employee in the terms and conditions of employment. Id. *§ 741(1)(f)*. It also provides that "[i]n any court action brought pursuant to this section, it shall be a defense that the personnel action was predicated upon grounds other than the employee's exercise of any rights protected by this section." Id. *§ 741(5)* (emphasis supplied).

For the same reasons Burhans's *First Amendment* claim was dismissed to the extent it asserted that the *§ 72(5)* proceedings were undertaken in retaliation for her protected speech, Burhans's *§ 741* claim must be dismissed. The hearing officer determined that Burhans was [*30] properly placed on involuntary leave on December 8, 2005. To the extent that Burhans wished to challenge the soundness of that decision or the termination of her employment which followed that decision, she had an opportunity to do so through the filing of an *Article 78* proceeding. Having failed to pursue the procedural remedies that were available to correct any deficiency in the *§ 72* process, Burhans has forfeited her right to challenge that determination by the filing of a *§ 741* claim. The *§ 741* claim is dismissed.

**CONCLUSION**

The defendants' motion to dismiss the retaliation claims brought pursuant to the *First Amendment* and *Article I, § 8 of the New York Constitution* is denied, with the following exceptions. It is granted to the extent that those claims are premised on the *§ 72 (5)* proceedings or the termination of the plaintiff's employment. The County's motion to dismiss the claim for damages under *Article I, § 8 of the New York Constitution* is also granted. The defendants' motion is granted as to all other claims and as to plaintiff's request for reinstatement or any other equitable relief. As a consequence, the surviving claims are for adverse employment actions taken during [*31] 2005, but prior to the commencement of *§ 72(5)* proceedings, in retaliation for the plaintiff's protected speech.

SO ORDERED:

Dated: New York, New York

March 25, 2 011

/s/ Denise Cote

DENISE COTE

United States District Judge

LexisNexis®

**RAMONA DE LA ROSA, Plaintiff, -against- THE CITY OF NEW YORK POLICE DEPARTMENT AND THE CITY OF NEW YORK, Defendants.**

**09 Civ. 5290 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***2010 U.S. Dist. LEXIS 112770***

**October 22, 2010, Decided**
**October 22, 2010, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *De La Rosa v. City of New York Police Dep't, 2012 U.S. App. LEXIS 3112 (2d Cir. N.Y., Feb. 17, 2012)*

**COUNSEL:** [*1] Ramona De La Rosa, Plaintiff, Pro se, Bronx, New York.

For Defendants: Devor Deland Perry, Assistant Corporation Counsel, Corporation Counsel of the City of New York, New York, New York.

**JUDGES:** Shira A. Scheindlin, United States District Judge.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I. INTRODUCTION**

Ramona De La Rosa, a former Police Administrative Aide ("PAA") with the New York City Police Department ("NYPD"), proceeding pro se, brings suit against the NYPD and the City of New York (collectively, "Defendants"), alleging failure to accommodate her disability, discrimination, retaliation, and a hostile work environment under the Americans with Disabilities Act of 1990 ("ADA"). [1] Defendants move for summary judgment with respect to all claims. For the reasons set forth below, Defendants' motion is granted in full.

1 *See 42 U.S.C. § 12112 et seq.*

**II. BACKGROUND**[2]

2 *Local Civil Rule 56.1(a)* requires a party moving for summary judgment to "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." *Rule 56.1(b)* requires the party opposing summary [*2] judgment to respond to the movant's statement with a correspondingly numbered statement. "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." *Rule 56.1(c)*. If the non-moving party controverts any statement, the non-moving party must cite to evidence that would be admissible at trial that shows that the controverted statement is in fact in dispute. *See Rule 56.1(d)*; *see also Rodriguez v. Schneider, No. 95 Civ. 4083, 1999 U.S. Dist. LEXIS 9741, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999)*. Although De La Rosa's response to Defendants' 56.1 statement contains correspondingly numbered paragraphs, De La Rosa does not, with the exceptions of paragraphs 40, 43, 49-50, 60-62, 66, 76, and 83, identify any evidence in the record, or any evidence at all, to support her contention that certain facts are dis-

puted. *See* Plaintiff's 56.1(b) Statement ("Pl. 56.1"). Further, many of De La Rosa's response paragraphs either do not specifically dispute Defendants' [*3] statements or consist of "conclusory allegations, speculation or conjecture." *Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996)*. Accordingly, I deem Defendants' 56.1 statement admitted by De La Rosa, except insofar as De La Rosa disputes statements made in paragraphs 40, 43, 49-50, 60-62, 66, 76, and 83. Nevertheless, in light of the more lenient standards applied to the pleadings of pro se litigants, *see Hughes v. Rowe, 449 U.S. 5, 9, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980)* (per curiam), I consider De La Rosa's disputed statements to the extent that they might be material to the outcome of this motion.

De La Rosa suffers from degenerative disc disorder, arthritis in her knees, and herniated discs in her neck and back. [3] These conditions affect her ability to walk and to stand. [4]

3 *See* 4/29/10 Deposition of Ramona De La Rosa ("De La Rosa Dep."), Exs. D-H to 6/28/10 Declaration of Devor Deland Perry, counsel to Defendants, in Support of Defendants' Motion for Summary Judgment ("Perry Decl"), at 193:18-194:13.

4 *See id.* at 194:15-23 ("Basically, I can't sit or stand."); *id.* at 203:4-13 ("I can't stand for a long time. I can't sit for a long time."); *id.* at 204:11-18 ("I [*4] can't go places that requires [sic] walking.").

**A. Employment History and Reasonable Accommodation Requests**

De La Rosa began as a civilian employee with the NYPD on July 10, 2002. [5] On November 5 of that year, De La Rosa took an unpaid medical leave of absence. [6] While on leave, she requested an assignment upon return that would not involve standing for long periods of time or climbing stairs. [7] The NYPD's Office of Equal Employment Opportunity ("OEEO") responded to her request for accommodation by offering De La Rosa a position in the 48th Precinct in the Bronx. [8] A resident of the borough, De La Rosa explained that she could not work there as she did not want her family or friends knowing about her employment with the NYPD. [9] De La Rosa further advised that she could not travel to the 48th Precinct as the length of the trip on public transportation required her to stand for too long. [10] In response, the OEEO offered her two additional choices, the 40th or 44th Precincts. [11]

5 *See* 6/16/04 Personnel Profile of Ramona De La Rosa ("Profile"), Ex. B to Perry Decl., at 1-2.

6 *See id.* at 2.

7 *See* 2/20/03 Request for Reasonable Accommodation for New York City Police Department Employees ("First [*5] Request"), Ex. G to Perry Decl, at 1.

8 *See* 2/28/03 Investigating Officer's Report, Ex. G to Perry Decl.

9 *See id.*

10 *See* 3/12/03 Investigating Officer's Report, Ex. G to Perry Decl.

11 *See id.*; 3/18/03 Investigating Officer's Report ("3/18/03 Report"), Ex. G to Perry Decl.

De La Rosa resumed active duty on March 17, 2003, returning to medical leave two days later on March 19. [12] During this time, the OEEO and De La Rosa continued to discuss her reassignment location options. [13] In response to her concerns regarding public transportation, the OEEO offered her information on the Access-a-Ride program, to which De La Rosa also objected. [14] Finally, the OEEO assigned De La Rosa to the 44th Precinct, informing her that her request for accommodation to a location that would not require climbing stairs or standing for long periods of time was deemed granted. [15]

12 *See* Profile at 2-3.

13 *See* 3/18/03 Report.

14 *See id.* De La Rosa later explained to the OEEO that the Access-a-Ride program caused her back pain. *See* 5/22/03 Letter from Ramona De La Rosa to Neldra M. Zeigler ("5/22/03 Letter"), Ex. P-351 to Declaration of Ramona De La Rosa in Opposition to Defendants' Motion for Summary Judgment ("De La Rosa [*6] Decl").

15 *See* 3/25/03 Letter from Neldra M. Zeigler to Ramona De La Rosa, Ex. G to Perry Decl; 5/16/03 Letter from Neldra M. Zeigler to Ramona De La Rosa ("5/16/03 Letter"), Ex. H to Perry Decl.

Following her reassignment to the 44th Precinct, De La Rosa and the NYPD continued to correspond regarding her accommodation request. [16] In these letters, De La Rosa repeated her objections to the three precincts for the reasons she had previously articulated--the length of the commute on public transportation and the location near her home. [17] In response, the OEEO explained that her assignment to the 44th Precinct, a location accessible by public transportation and offering either an elevator or no stairs, responded to her request. [18]

16 *See* 5/16/03 Letter; 5/22/03 Letter; 5/25/03 Letter from Ramona De La Rosa to Raymond W. Kelly ("5/25/03 Letter"), Ex. H to Perry Decl.;

7/8/03 Letter from Neldra M. Zeigler to Ramona De La Rosa ("7/8/03 Letter"), Ex. H to Perry Decl.

17 *See* 5/22/03 Letter; 5/25/03 Letter.

18 *See* 5/16/03 Letter; 7/8/03 Letter.

During this second medical leave, De La Rosa made an additional OEEO request for a chair with lumbar support. [19] The OEEO approved the request for the chair on [*7] November 21, 2003. [20] De La Rosa's second medical leave lasted until December 16, 2003 when she reported to the 44th Precinct. [21] She immediately requested a transfer from the precinct due to safety concerns, [22] and on January 8, 2004, the NYPD reassigned De La Rosa to Transit District 11 ("TD-11"). [23] De La Rosa received the requested chair with lumbar support at this location on January 28, 2004. [24]

19 *See* 11/6/03 Office of Equal Employment Opportunity Reasonable Accommodation Request Report ("Second Request"), Ex. H to Perry Decl.

20 *See id*

21 *See* Profile at 2-3.

22 *See* 12/15/03 Memorandum from Ramona De La Rosa to Commanding Officer, Ex. P-20 to De La Rosa Decl.

23 *See* Profile at 2-3.

24 *See* 12/1/03 Letter from Commanding Officer, 44th Precinct to Deputy Commissioner, Equal Employment Opportunity, Ex. H to Perry Decl.; 3/2/04 Request for Reasonable Accommodation for New York City Police Department Employees ("Third Request"), Ex. H to Perry Decl., at 2.

On March 2, 2004, De La Rosa submitted a third request for reasonable accommodation: to remain stationary throughout the day. [25] This request occurred at the same time as a scheduled meeting with her supervisor, Yvette Santiago, regarding her [*8] first performance evaluation. [26] According to De La Rosa, the performance evaluation meeting was then rescheduled to include more senior personnel. [27] At the meeting, De La Rosa's supervisors discussed her problems with arriving to work on time and removed her from the Flextime program. [28]

25 *See* Third Request at 1-2; *see also* 2/11/04 Letter from Harvey Insler, M.D. ("2/11/04 Letter"), Ex. P-24 to De La Rosa Decl. (stating De La Rosa must remain stationary to avoid health complications); 3/1/04 Letter from Harvey Insler, M.D. ("3/1/04 Letter"), Ex. P-31 to De La Rosa Decl. (same).

26 *See* 3/6/04 Letter from Ramona De La Rosa to Janine Thomas, Union Grievance Representative ("3/6/04 Letter"), Ex. P-36-37 to De La Rosa Decl. at 1-2.

27 *See id.* at 2.

28 *See* 3/2/04 Memorandum from Commanding Officer, Transit Bureau Dist #11 to Deputy Director, Civilianization/Staff Development re Deletion from Flextime Program ("3/2/04 Memorandum"), Ex. H to Perry Decl. The NYPD noted that De La Rosa's removal from the Flextime Program was "due to her excessive pattern of tardiness eleven (11) times in two months." 5/19/04 Memorandum from Captain Warner S. Frye, Commanding Officer, Transit Bureau District 11 to [*9] Director, Employee Management Division re Recommendation for Termination of Probationary P.A.A. Ramona De La Rosa ("5/19/04 Termination Recommendation"), Ex. K to Perry Decl. at 1. *But see* 3/6/04 Letter at 2 ("My lateness was never an issue until I handed over the EEOC reasonable accommodation form.").

Santiago initially denied De La Rosa's third request to remain stationary, explaining that "[De La Rosa] is currently assigned to the 124 Rm in a stationary capacity." [29] In response, De La Rosa informed OEEO that her main concern with her posting at TD-11, where she wished to remain, was "not standing for long periods of time" because "most of her duties require standing." [30] Later, the parties compromised by allowing De La Rosa to perform any work activity requiring walking or standing between 3:30-5:30 pm, a proposal with which De La Rosa agreed. [31] This accommodation also addressed De La Rosa's request for Flextime by moving the start of her tour back from 9:00 a.m. to 9:30 a.m. [32]

29 Third Request at 2. Santiago further noted that De La Rosa's job required her to "mov[e] her swivel chair with wheels six (6) feet to another desk to use the PC" and make copies "in an office approx. 15 [*10] ft. from her desk." *Id.*

30 3/9/04 Investigating Officer's Report, Ex. H to Perry Decl. The Investigating Officer noted that De La Rosa also mentioned "many concerns regarding her assignment at Transit District 11," suggesting transfer to another command as a possible solution. *Id.* OEEO instructed her to have a full medical evaluation before more comprehensive accommodations would be discussed. *See id.*

31 *See* 3/18/04 Investigating Officer's Report, Ex. H to Perry Decl. ("I/O conferred with PAA Delarosa, who agreed with the aforementioned proposal."); 3/29/04 Memorandum from Deputy Commissioner, Equal Employment Opportunity to Commanding Officer, Transit District 11 re Request for Reasonable Accommodation ("3/29/04 Memorandum"), Ex. H to Perry Decl,;

3/29/04 Letter from Neldra M. Zeigler to Ramona De La Rosa ("3/29/04 Letter"), Ex. H to Perry Decl.

32 *See* 3/29/04 Memorandum; 3/29/04 Letter.

On March 24, 2004, De La Rosa filed a complaint with the OEEO, alleging she had endured disparaging remarks regarding her disability at TD-11 and retaliation in connection with the March 2 meeting, where she had presented her third accommodation request. [33] In her complaint, De La Rosa alleged that her removal [*11] from Flextime was in response to her request for reasonable accommodation. [34] In addition, she reported that Santiago called her a "make believe handicap" and suggested that she apply for disability if she could not perform her job functions. [35] The OEEO later exonerated Santiago on both allegations. [36]

33 *See* 3/24/04 Office of Equal Employment Opportunity Case Report ("3/24/04 OEEO Report"), Ex. K to Perry Decl. at 1.

34 *See id.* at 2.

35 *See id.*

36 *See* 9/1/04 Report of Investigation Into Allegation That Principal Administrative Associate Yvette Santiago Retaliated Against Police Administrative Aide Ramona De La Rosa After Receiving a Reasonable Accommodation, Both Assigned to Transit District #11 ("9/1/04 Report"), Ex. L to Perry Decl. at 4.

**B. Disciplinary Actions**

While De La Rosa and the OEEO were negotiating her request to remain stationary, she told TD-11 she would not be reporting for her scheduled tour on March 19, 2004. [37] To grant an Emergency Excusal Day, De La Rosa had to provide a reason for the proposed absence, which she refused to give, explaining only that it was for personal reasons. [38] In response, Lieutenant Gonzalez ordered De La Rosa to report to work to avoid being documented [*12] Absent Without Leave ("AWOL"). [39] De La Rosa did not report for duty, and she was later punished for being AWOL. [40]

37 *See* 3/19/04 Diary Entry prepared by Lt. Gonzalez ("3/19/04 Diary Entry"), Ex. J to Perry Decl.

38 *See id.*

39 *See id.*

40 *See* 3/19/04 Report of Violation of the Rules and Procedures ("3/19/04 Report"), Ex. J to Perry Decl.; 4/23/04 Memorandum from Yvette Santiago to Ramona De La Rosa re G.O. 15 on A.W.O.L. of 3/19/04 ("4/23/04 Memorandum"), Ex. P-73 to De La Rosa Decl. A Command Discipline was also issued to De La Rosa for being "Absent Without Leave" and "Refus[al] to Comply With an Order." *See* 5/19/04 Termination Recommendation at 1. De La Rosa was the subject of a Departmental Hearing regarding the AWOL incident on May 4, 2004. *See id.* at 2.

From March until May 2004, the NYPD documented other actions for which De La Rosa received discipline, including her failure to sign out of roll call, [41] insubordination, [42] early arrival to work, [43] and lateness. [44] Additionally, De La Rosa's first performance evaluation documented seven sick days through March 8, 2004, while her second evaluation documented twelve total sick days through May 9. [45] As part of her placement in the NYPD [*13] Performance Monitoring Program in April stemming from "poor performance, excessive absenteeism and/or tardiness, misconduct or below standard evaluation," [46] De La Rosa acknowledged that termination might result if her absenteeism did not improve. [47]

41 *See* 3/9/04 Report of Violation of the Rules and Procedures ("3/9/04 Report of Violation"), Ex. J to Perry Decl. (documenting in addition three prior occasions in February and March where De La Rosa failed to sign out of roll call), A Command Discipline was issued in connection with these incidents. *See* 5/19/04 Termination Recommendation.

42 *See* 4/16/04 Report of Violation of the Rules and Procedures ("4/16/04 Report of Violation"), Ex. J to Perry Decl. (recounting an incident reported by Santiago where De La Rosa refused to move her chair to a nearby computer station to perform an assigned task). A Command Discipline was also issued after this incident for being "Insubordinate to a Civilian Supervisor." 5/19/04 Termination Recommendation at 1.

43 *See* 4/22/04 Memorandum from Yvette Santiago to Ramona De La Rosa re Early Arrival to Work ("4/22/04 Early Arrival Memorandum"), Ex. J to Perry Decl. (noting that arriving early and signing out early [*14] constitutes an "unauthorized tour change").

44 *See* 5/8/04 Report of Violation of the Rules and Procedures ("5/8/04 Report of Violation"), Ex. J to Perry Decl. (documenting twelve instances of lateness between March 6 and May 8); 6/5/04 Report of Violation of the Rules and Procedures ("6/5/04 Report of Violation"), Ex. J to Perry Decl. (documenting eight additional instances of lateness between May 12 and June 5). A Command Discipline was issued in connection with the twelve instances of lateness between March and May. *See* 5/19/04 Termination Recommendation at 1.

45 *See* 3/10/04 Performance Evaluation of Ramona De La Rosa ("3/10/04 Evaluation"), Ex. I to Perry Decl. at NYPD00516; 5/17/04 Performance Evaluation of Ramona De La Rosa ("5/17/04 Evaluation"), Ex. I to Perry Decl. at NYPD00503.

46 4/15/04 Notice of Placement into Performance Monitoring ("4/15/04 Performance Monitoring"), Ex. 1 to Perry Decl. at NYPD 00481-82.

47 4/15/04 Acknowledgment of Performance Monitoring, Ex. I to Perry Decl.

**C. Performance Evaluations**

De La Rosa's first performance evaluation, covering the period January 8 through March 8, 2004, awarded her an overall score of "Below Standards." [48] Santiago prepared the evaluation [*15] and described De La Rosa as lacking "professionalism, cooperation, motivation, and self-initiative" and being "argumentative and impudent with her supervisors." [49] Specifically, Santiago rated De La Rosa "Below Standards" with respect to four out of the six critical tasks for her position: updating files, records, and reports; performing routine clerical tasks; answering telephone calls; and updating roll calls. [50] Santiago also appended a list of fourteen poor performance incidents to the evaluation. [51]

48 *See* 3/10/04 Evaluation at NYPD00516.

49 *Id.*

50 *See id* at NYPD00517-18.

51 *See id.* at NYPD00520-22.

At De La Rosa's second performance evaluation in May 2004, covering the period March 9 through May 9, 2004, she again received a "Below Standards" rating. [52] Santiago noted that De La Rosa had "demonstrated no change in her performance skills since the conference held on March 2nd." [53] De La Rosa "continue[d] to be argumentative" and "[did] not follow instructions as given by her uniform supervisors." [54] This evaluation rated her "Below Standards" in five of the six critical tasks: processing forms; typing reports and forms; filing records, reports, and forms; performing routine clerical tasks; [*16] and updating roll calls. [55] Santiago again attached a list of eight specific incidents related to De La Rosa's poor performance rating. [56]

52 5/17/04 Evaluation at NYPD00503.

53 *Id.*

54 *Id.*

55 *See id.* at NYPD00504-05.

56 *See id.* at NYPD00506-08.

**D. Suspension and Termination**

Following her second performance evaluation, Santiago recommended that De La Rosa be terminated because of her "negative attitude towards her work," "lack of respect for those who serve as her supervisors," "lack of cooperation when given clerical tasks to complete," and "rude demeanor." [57] The Commanding Officer of TD-11, Captain Warner Frye, also recommended De La Rosa's termination to his superiors due to her accumulation of four Command Disciplines, two "Below Standards" performance evaluations, and her "poor attendance and job performance." [58]

57 5/18/04 Memorandum from Yvette Santiago to Commanding Officer, TD-11 re Performance Appraisal Interview, Ex. J to Perry Decl.

58 5/19/04 Termination Recommendation at 1-2.

The NYPD suspended De La Rosa for thirty days following an incident of insubordination on June 9, 2004. [59] According to the incident report prepared by Captain Frye, De La Rosa refused Lieutenant Morillo's order [*17] to close an open complaint report at 10:30 a.m., telling him that "she ha[d] a reasonable accommodation letter from the Office of Equal Employment Opportunity, recommending that she is to remain at her desk until 1530 hours, barring exigent circumstances." [60] Lieutenant Morillo repeated his order twice, with De La Rosa refusing to comply each time, [61] After hearing the warning that her behavior could result in suspension, De La Rosa replied that she did not care and the lieutenant should "do what he had to do." [62] The report concluded that De La Rosa was "insubordinate and discourteous toward a supervisor" and recommended that Charges and Specifications be filed. [63]

59 *See* 6/9/04 Report of On Duty Police Administrative Aid was Suspended as a Result of an Investigation Conducted under I.A.B. Log # 04-17272 ("6/9/04 Suspension Report"), Ex. K to Perry Decl. at NYPD00462-65.

60 *Id.* at NYPD00462. The report documented that the computer De La Rosa would need to complete the task was located three feet from her desk. *See id.* After the incident, De La Rosa made a voluntary statement to investigating officers that she refused the lieutenant's order because of her reasonable accommodation letter, [*18] recommending that she remain at her desk until 3:30 p.m. *See id.* at 2. De La Rosa repeated this explanation to the OEEO Investigating Officer during her suspension, explaining that there was another PAA with a computer who could have completed the task. *See* 6/15/04 Investigating Officer's Report, Ex. L to Perry Decl.

61 *See* 6/9/04 Suspension Report at NYPD00462-63.
62 *Id.* at NYPD00463.
63 *Id.* at NYPD00464. Charges and Specifications were filed on June 15. *See* 6/15/04 Charges and Specifications against Ramona De La Rosa, Ex. K to Perry Decl.

De La Rosa returned from her suspension on July 9, 2004. [64] On the same day, the NYPD again placed her in the Performance Monitoring Program. [65] As before, De La Rosa acknowledged that her "record of misconduct" might result in her termination. [66] The NYPD terminated De La Rosa on July 21, 2004. [67]

64 *See* 7/9/04 Memorandum from Herbert G. Woods, Jr., Assistant Commissioner, to Chief of Personnel re Change in Duty Status for Member of the Service, Ex. K to Perry Decl.
65 *See* 7/9/04 Notice of Placement into Performance Monitoring ("7/9/04 Performance Monitoring"), Ex. J to Perry Decl. at NYPD00456-57.
66 7/9/04 Acknowledgment of Performance Monitoring, Ex. J to [*19] Perry Decl.
67 *See* 7/21 /04 Termination Notice ("7/21 /04 Notice"), Ex. B to Perry Decl.

**E. Retaliation and Hostile Work Environment Claims**

De La Rosa cites several instances of perceived retaliatory and hostile actions at TD-11. For example, De La Rosa objected to the nature of her work at TD-11, in particular her varying duties regarding "summonses, statistics, and warrant checks" to "roll call" duties to working in the complaint room, believing it to be a greater amount of work than given to the other PAAs. [68] De La Rosa also alleged that insults about her disability affected her working environment. Specifically, she cites an instance where Santiago allegedly called her "a want to be handicapped" [69] and threatened her by saying "she wanted to take ray head and kick it out in the middle of the street." [70] Santiago denies that she made these disparaging remarks towards De La Rosa. [71]

68 De La Rosa Dep. at 113:17-114:11 ("Instead of just doing things dealing with the complaint room, I also was doing the duties of other PAAs like roll call updates and statistics and whatever duties the PAAs probably had.").
69 *Id.* at 116:22-23.
70 *Id.* at 116:17-18.
71 *See* 9/1/04 Report at 4. The OEEO later deemed [*20] this allegation unfounded. *See id.* at 5.

De La Rosa also objected to other discrete instances at TD-11, including being asked to type a lieutenant's evaluation, [72] the threat of receiving a Command Discipline, [73] use of her chair by other employees, [74] damage to her chair, desk, and ID card, [75] denial of a sick day, [76] the inability to eat lunch at her desk when other employees were allowed to do so, [77] calling her name over a microphone while on break, [78] not being included in a coworker's retirement party, [79] dim lighting, [80] and the general attitude towards her, [81]

72 *See* De La Rosa Dep. at 119:9-18.
73 *See id.* at 144:7-20.
74 *See id.* at 121: 17-25.
75 *See id.* at 145:4-146:18,148:2-12,192:15-16; 4/22/04 Memorandum from Ramona De La Rosa to Deputy Commissioner of OEEO re Reprisal and Retaliation Needs to Stop ("4122/04 Memorandum"), Ex. P-71-73 to De La Rosa Decl., ¶ 2.
76 *See* De La Rosa Dep. at 152:14-154:121; 5/20104 Letter from Ramon De La Rosa to Janine Thomas ("5120104 Letter"), Ex. P-85 to De La Rosa Decl.; 5/21104 Memorandum from Ramona De La Rosa to Commanding Officer, TD-ll re Supervisor's Retaliation Tactics ("5/21104 Memorandum"), Ex. P-88 to De La Rosa Decl., ¶ 1.
77 *See* De La Rosa [*21] Dep. at 170:16-172:11; 4/22/04 Memorandum ¶3.
78 *See* Complaint ("Compl") ¶¶ 58-59.
79 *See* De La Rosa Dep. at 169:20-170:15.
80 *See id.* at 173:23-174:10.
81 *See id.* at 125:5-7, 172:14-173:22.

**F. Procedural History**

On August 4, 2004, De La Rosa filed a formal complaint against Defendants with the New York City Commission on Human Rights. [82] The Commission dismissed the complaint in August 2008, finding no probable cause that the Defendants had discriminated against De La Rosa, [83] The U.S. Equal Employment Opportunity Commission ("EEOC") issued a "Dismissal and Notice of Rights" on March 4, 2009, noting that the agency had "adopted the findings of the state . . . agency that investigated this charge." [84] De La Rosa initiated the instant action on June 8, 2009. [85]

82 *See* 8/5/04 Verified Complaint, Ex. L to Perry Decl.
83 *See* 8/4/08 Determination and Order after Investigation, Ex. M to Perry Decl.
84 3/4/09 Dismissal and Notice of Rights, Ex. M to Perry Decl.
85 *See* Docket Sheet.

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as [*22] to any material fact and that the moving party is entitled to judgment as a matter of law." [86] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'" [87] "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ." [88]

86 *Fed. R. Civ. P. 56(c).*
87 *SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009)* (quoting *Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008)).*
88 *Miner v. Clinton County, N. Y., 541 F.3d 464, 471 (2d Cir. 2008)* (citing *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007)). Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).*

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." [89] To counter a motion for summary judgment, the non-moving [*23] party must do more than show that there is "'some metaphysical doubt as to the material facts,'" [90] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'" [91] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" [92]

89 *Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). Accord In re September 11 Litig., 500 F. Supp. 2d 356;, 2007 WL 2332514, at *4 (S.D.N.Y. 2007)* ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case.") (quotation marks omitted).
90 *Higazy v. Templeton, 505 F.3d 161, 169 (2d Cir. 2007)* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).*
91 *Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005)* (quoting *Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 428 (2d Cir. 2001)).*
92 *Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 206 (2d Cir. 2006)* [*24] (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).*

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor. [93] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" [94] Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." [95]

93 *Sledge v. Kooi, 564 F.3d 105, 108 (2d Cir. 2009)* (citing *Anderson, 477 U.S. at 247-50, 255).*
94 *McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006)* (quoting *Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997)). Accord Anderson, 477 U.S. at 249.*
95 *Pyke v. Cuomo, 567 F.3d 74, 76 (2d Cir. 2009)* (per curiam).

The submissions of a pro se party should be held "'to less stringent standards than formal pleadings drafted by lawyers . . . .'" [96] District courts should "read the pleadings of a pro se plaintiff liberally and interpret [*25] them 'to raise the strongest arguments that they suggest.'" [97] These same principles apply to briefs and opposition papers submitted by pro se litigants. [98] Nonetheless, proceeding pro se "does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." [99]

96 *Hughes, 449 U.S. at 9* (quoting *Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)* (per curiam)).
97 *McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999)* (quoting *Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)).*
98 *See Ortiz v. McBride, 323 F.3d 191, 194 (2d Cir. 2003); Burgos, 14 F.3d at 790.*

### B. Americans with Disabilities Act

The ADA prohibits discrimination against a "qualified" individual on the basis of disability. [100] An individ-

ual is qualified if, with or without reasonable accommodation, she "can perform the essential functions of the employment position that such individual holds or desires." [101]

99 *Cole v. Artuz, No. 93 Civ. 5981, 1999 U.S. Dist. LEXIS 16832, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)* (quoting *Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)).*
100 *42 U.S.C. § 12112(a).*
101 *Id. § 12111(8).* The ADA [*26] defers to the employer's judgment of which job requirements qualify as essential functions. *See id.*

The ADA defines disability as either "a physical or mental impairment that substantially limits one or more major life activities," "a record of such impairment," or "being regarded as having such an impairment." [102] As "[t]he ADA does not define 'impairment,' 'major life activities,' or 'substantial limitation,'" [103] the Equal Employment Opportunity Commission's ("EEOC") administrative regulations implementing the ADA provide guidance. [104]

102 *Id. § 12102.*
103 *Delgado v. Triborough Bridge & Tunnel Auth., 485 F. Supp. 2d 453, 459 (S.D.N.Y. 2007).*
104 *See 29 C.F.R. § 1630.* "We accord 'great deference' to the EEOC's interpretation of the ADA, since it is charged with administering the statute." *Francis v. City of Meriden, 129 F.3d 281, 283 n. 1 (2d Cir. 1997)* (quoting *Ford v. Bernard Fineson Dev. Or., 81 F.3d 304, 309 (2d Cir. 1996)); see also Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 870 (2d Cir. 1998)* ("While these regulations are not binding, they provide us with guidance in interpreting the ADA.").

First, the EEOC defines a physical or mental impairment as "[a]ny physiological disorder, [*27] or condition, cosmetic disfigurement, or anatomical loss affecting one or more . . . body systems . . . ." [105]

105 *29 C.F.R. § 1630.2(h)(1); see also Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 641 (2d Cir. 1998)* (explaining that initial analysis of whether a plaintiff qualifies as disabled under the ADA queries whether she suffers from a mental or physical impairment).

Next, a claimant must also demonstrate that her impairment substantially limits a major life activity. [106] The EEOC lists major life activities as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." [107]

106 *See Toyota Motor Mfg., Ky, Inc. v. Williams, 534 U.S. 184, 195, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)* ("Merely having an impairment does not make one disabled for purposes of ADA.").
107 *29 C.F.R. § 1630.2(i); see also Colwell, 158 F.3d at 641* (noting that the second step in the ADA disability analysis identifies the limited life activity and determines whether it qualifies as major).

Finally, substantially limit means an individual is "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the [*28] condition, manner or duration under which an individual can perform a particular major life activity," compared to an average person in the general population. [108] Three factors aid in the consideration of whether the impairment substantially limits a major life activity: *first*, "the nature and severity of the impairment;" *second*, "the duration or expected duration of the impairment;" and *third*, "the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." [109]

108 *29 C.F.R. §§ 1630.2(j)(1)(i)-(ii);; see also Colwell, 158 F.3d at 641* (listing the last step in the disability determination as determining whether the impairment substantially limits the major life activity).
109 *29 C.F.R. §§ 1630.2(j)(2)(i)-(iii).*

**1. Failure to Accommodate**

To prove failure to accommodate, a plaintiff is required to show that "(a) plaintiff is a person with a disability under the meaning of the ADA; (b) an employer covered by the statute had notice of h[er] disability; (c) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (d) the employer has refused to make such accommodations." [110]

110 *Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004).*

"The [*29] ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."" [111] "If an employer has made reasonable efforts to communicate with an employee, or if the employee causes 'the interactive process to collapse,' an employer will not be liable for failing to make an accommodation under the ADA." [112] Moreover, an employer's reasonable accommodation does not have to be the plaintiff's requested accommodation. [113]

111 *Jackan v. New York State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000)* (citation omitted).
112 *Julius v. Department of Human Res. Admin., No. 08 Civ. 3091, 2010 U.S. Dist. LEXIS 33259, 2010 WL 1253163, at *10 (S.D.N.Y. Mar. 24, 2010)* (quoting *Williams v. British Airways, PLC, Nos. 04 Civ. 0471, 06 Civ. 5085, 2007 U.S. Dist. LEXIS 73997, 2007 WL 2907426, at *9 (E.D.N.Y. Sept. 27, 2007)*).
113 *See Misek-Falkoff v. International Bus. Machs. Corp., 854 F. Supp. 215, 228 (S.D.N.Y. 1994)* ("A plaintiff may not, however, complain successfully about the employer's choices if reasonable.").

**2. Disability Discrimination**

The ADA creates a private right of action for disability-based employment discrimination. [114] To establish a prima facie case of discrimination [*30] under the ADA, a plaintiff must show: (a) her employer is subject to the ADA; (b) she was a person with a disability within the meaning of the ADA; (c) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (d) she suffered an adverse employment action because of her disability. [115]

114 *See 42 U.S.C. § 12112(a).*
115 *See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).*

Courts analyze claims of ADA disability discrimination using a three-part burden shifting analysis. [116] The plaintiff has the initial burden of establishing a prima facie case of discrimination. [117] If the plaintiff succeeds, the burden shifts to the employer to show a "legitimate, nondiscriminatory reason" for the actions. [118] If the employer can articulate such a reason, the plaintiff may show that the stated justification is pretext and that the employer intentionally discriminated against her. [119] If the plaintiff "'make[s] a substantial showing' that the defendants' proffered explanation [i]s false, 'it is *permissible* [*31] for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.'" [120]

116 *See Regional Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002).*
117 *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).*
118 *Id.*
119 *See id. at 804*; *Middletown, 294 F.3d at 49.*
120 *Middletown, 294 F.3d at 49* (quoting *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 144, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*) (emphasis in original).

**3. Retaliation**

The ADA prohibits retaliation by employers directed at employees who have opposed a protected practice or filed a charge under the statute. [121] Proving retaliation requires a plaintiff to show "(1) she was engaged in an activity protected under [the ADA]; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff based upon her activity; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." [122] Like discrimination, retaliation claims are also subject to the *McDonnell Douglas* three-part burden-shifting analysis. [123]

121 *See 42 U.S.C. § 12203(a).*
122 *Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)* [*32] (explaining a Title VII prima facie case). *Accord Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001)* ("We analyze a retaliation claim under the ADA using the same framework employed in Title VII cases.").
123 *See Flynn v. New York State Div. of Parole, 620 F. Supp. 2d 463, 488 (S.D.N.Y. 2009).*

A plaintiff need not show that the employer actually violated the ADA to establish her participation in a protected activity. [124] For example, a complaint is protected activity so long as the plaintiff had a "*good faith, reasonable belief* "that the underlying challenged actions of the employer violated the law." [125] A request for reasonable accommodation also constitutes protected activity for a retaliation claim. [126]

124 *See id. at 489 n.31.*
125 *Id.* (quoting *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998)*) (emphasis in original).
126 *See Weixel v. Board of Educ. of N.Y., 287 F.3d 138, 149 (2d Cir. 2002)*; *Jenkins v. New York City Transit Auth., 646 F. Supp. 2d 464, 2009 WL 1940103, at *7 (S.D.N.Y. 2009).*

An employer takes an adverse action against a plaintiff if the plaintiff experiences "a [*33] 'materially adverse change' in the terms and conditions of employment." [127] This material adverse change must be "more than a mere inconvenience or an alteration in job respon-

sibilities." [128] Indeed "'[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" [129] Whether an employer's action is materially adverse is objective and should be evaluated under a reasonable person in the plaintiff's position standard, considering all the circumstances. [130]

127 *Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)* (citation omitted).
128 *Alvarez v. Nicholson, No. 03 Civ. 4173, 2005 U.S. Dist. LEXIS 45744, 2005 WL 1844595, at *8 (S.D.N.Y. Aug. 3, 2005).*
129 *Flynn, 620 F. Supp. 2d at 490* (quoting *Burlington N. & Sante Fe R.R. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)).*
130 *See id.*

Last, the causation requirement between the protected activity and the adverse change in employment status may be established indirectly by showing a short time period between the two. [131]

131 *See Cifra v. G.E. Co., 252 F.3d 205, 217 (2d Cir. 2001).*

**4. Hostile Work Environment**

A hostile work environment [*34] claim is evaluated under the same standard in Title VII and ADA actions. [132] "[A]n employee seeking to bring a hostile work environment claim must show that she: 1) is a member of a protected class; 2) that she suffered unwelcome harassment; 3) that she was harassed because of her membership in a protected class; and 4) that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." [133]

132 *See Disanto v. McGraw-Hill, Inc./Platt's Div., No. 97 Civ. 1090, 1998 U.S. Dist. LEXIS 12382, 1998 WL 474136, at *5 (S.D.N.Y. Aug. 10, 1998).*
133 *Monterroso v. Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008).* The Second Circuit has not explicitly held that a hostile work environment claim is actionable under the ADA, but the district courts have so held. *See id.*

The standard for a hostile work environment claim is "demanding," and the plaintiff must prove that the conduct was "offensive, pervasive, and continuous enough to amount to a constructive discharge." [134] Evaluating a hostile environment involves reviewing the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically [*35] threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [135] The question is whether a reasonable person would have found the environment to be hostile and if the plaintiff subjectively perceived it as such. [136] Isolated acts, unless serious, ordinarily do not meet the threshold of pervasiveness. [137]

134 *Scott v. Memorial Sloan-Kettering Cancer Ctr., 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002).*
135 *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).*
136 *See Brennan v. Metropolitan Opera Ass 'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999).*
137 *See id.*

**5. Statute of Limitations**

Before bringing a claim in federal court, a New York plaintiff must file a charge with the EEOC within 300 days of the allegedly discriminatory action. [138] This statutory requirement functions as a statute of limitations. [139] A plaintiff who fails to file a timely charge with the EEOC is generally barred from bringing a claim of discrimination in federal court, [140] unless she "come[s] forward with evidence of exceptional circumstances that would justify tolling the 300-day filing period," [141]

138 *See 42 U.S.C. § 12117(a)* (incorporating Title VII's statutory [*36] limitations, codified at *42 U.S.C. § 2000e-5(e)(1)*). As New York has its own state enforcement agency, the 300 day limitation applies instead of Title VII's general 180-day limitation. *See Hill v. Citibank Corp., 312 F. Supp. 2d 464, 472 & n.4 (S.D.N.Y. 2004).*
139 *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996).*
140 *Butts v. City of New York Dep't of Rous., Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993).*
141 *Tsai v. Rockefeller Univ., No. 00 Civ. 329, 2002 U.S. Dist. LEXIS 2552, 2002 WL 237843, at *4 (S.D.N.Y. Feb. 15, 2002).*

## IV. DISCUSSION

### A. First Accommodation Request

De La Rosa filed a complaint with the New York City Commission on Human Rights on August 4, 2004. Thus, barring exceptional circumstances that would warrant tolling, any actions occurring before October 10, 2003 are time-barred.

De La Rosa made a request on February 20, 2003 to be assigned to a precinct where her job would not require standing for long periods of time or climbing stairs. [142] The OEEO deemed the request granted on July 8, 2003. [143] As she presents no evidence supporting an extension of the limitations period, [144] any claim relating to her first request for reasonable accommodation is time-barred.

142 *See* First Request [*37] at 1.
143 *See* 7/8/03 Letter.
144 Nor can this Court, through an independent search of the record, find any evidence to warrant tolling.

**B. New Claims**

In her 56.1 statement, [145] De La Rosa alleges two new claims: the first for "negligence, tort" and the second for denial of rights under "all State Human Rights Law." [146] Plaintiff's amended complaint alleges neither state law nor tort law causes of action. Because these new claims appear for the first time in opposition papers, they will not be considered by the Court. [147] In the alternative, if the tort and state law claims had been pleaded in the complaint, both would be procedurally barred. [148]

145 In response to Defendants' Motion for Summary Judgment, De La Rosa submitted only a Statement of Undisputed Facts Pursuant to *Local Rule 56.1*, not a Memorandum of Law. To the extent that the document raises legal arguments, they will be addressed herein.
146 Pl. 56.1 at 1.
147 *See Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111, 119 (S.D.N.Y. 1997)* ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment").
148 Any discrimination claims arising under state or local law are barred [*38] by De La Rosa's election of remedies, that is her Complaint with the New York City Commission on Human Rights. *See N.Y. Exec. Law § 297(9)*; *N.Y.C. Admin Code § 8-502(a)*. Further, De La Rosa was required to file a notice of claim if she had intended to assert tort claims against Defendants. *See N.Y. Gen. Mun. Law §§ 50-e, 50-i*.

**C. Disability**

For the purposes of the failure to accommodate and discrimination claims, Defendants contend that De La Rosa does not meet the ADA's definition of an individual with a disability. [149] Defendants concede that De La Rosa suffers from a mental or physical impairment. [150] Defendants also agree that walking and standing are major life activities. [151] Defendants contest that De La Rosa's osteoarthritis and herniated discs substantially limit the major life activities of walking and standing. [152]

149 *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem.") at 3-6.
150 *See id.* at 3.
151 *See id.*
152 *See id.* at 4-6.

Finding De La Rosa's walking to be substantially limited requires overcoming a high threshold. [153] Moderate limitations on walking do not ordinarily meet this threshold. [154] Similarly, infringements on the ability to stand [*39] are not generally considered to be substantial limitations. [155]

153 *See, e.g., Elfenbein v. Bronx Lebanon Hosp. Ctr., No. 08 Civ. 5382, 2009 U.S. Dist. LEXIS 100201, 2009 WL 3459215, at *9 (S.D.N.Y. Oct. 27, 2009)* ("'Courts have placed the bar relatively high when determining when the activity of walking has been substantially limited.'") (quoting *Potenza v. City of N. Y. Dep't of Tramp., No. 00 Civ. 0707, 2001 U.S. Dist. LEXIS 17112, 2001 WL 1267172, at *10 (S.D.N.Y. Oct. 23, 2001), aff'd in part, 95 Fed. App'x 390 (2d Cir. 2004))*; *Watson v. Arts & Entm't Television Network, No. 04 Civ. 1932, 2008 U.S. Dist. LEXIS 24059, 2008 WL 793596, at *12 (S.D.N.Y. Mar. 26, 2008)* ("Courts in this district have repeatedly held that the need to walk slowly and the inability to walk long distances or for long periods of time ... do not constitute substantial limits on walking.").
154 *See Watson, 2008 U.S. Dist. LEXIS 24059, 2008 WL 793596, at *14* (avoiding excessive walking is not a substantial limitation); *Garvin v. Potter, 367 F. Supp. 2d 548, 562 (S.D.N.Y. 2005)* (finding no substantial limitation where plaintiff could not walk quickly or walk for over eight hours); *Rosa v. Brinks, Inc., 103 F. Supp. 2d 287, 290-91 (S.D.N.Y. 2000)* (finding limitations on walking or sitting or standing for long periods of time to [*40] be insufficiently substantial).
155 *See Colwell, 158 F.3d at 643-44* (inability to engage in prolonged standing is not a substantial limitation); *Glozman v. Retail, Wholesale & Chain Store Food Emps. Union, Local 338, 204 F. Supp. 2d 615, 622 (S.D.N.Y. 2002)* ("The inability to ... stand for an extended duration does not amount to a substantial limitation on a major life activity.").

De La Rosa's evidence of substantially limited ability to walk and stand consists primarily of doctor's notes [156] and deposition testimony. She testified that her impairments caused chronic pain and affected her ability to walk or to stand for a protracted time period. [157] Further, she explained that alternating between standing and sitting aggravated her condition. [158] Medicine is ineffective in relieving the pain. [159] A doctor's report prepared after her termination from the NYPD capped her ability to stand and walk at less than two hours in an eight-hour workday. [160]

156 *See, e.g.*, 8/2/02 Letter from Concourse Plaza Medical Complex, Ex. P-4 to De La Rosa Deck; 9/13/02 Letter from Harvey Insler, M.D., Ex. P-6 to De La Rosa Deck; 1/6/03 Letter from Harvey Insler, M.D., Ex. P-10 to De La Rosa Deck; 6/20/03 Letter [*41] from Harvey Insler, M.D., Ex. P-17 to De La Rosa Deck; 2/4/04 Letter from Harvey Insler, M.D., Ex. P-23 to De La Rosa Deck; 2/11/04 Letter; 3/1/04 Letter.

157 *See, e.g.*, De La Rosa Dep. at 194:15-23 ("Basically, I can't sit or stand. Sitting is bad and then standing is bad so what am I supposed to do? Even laying down is not that good. . .. Everything is bad. If I had one thing like before when I just had back pain, at least I know like I could stand and relieve some of the back pain like my knee and I wouldn't feel pain in my legs. Then I started feeling pain in my legs and then my neck."); *id.* at 203:4-13 ("I can't stand for a long time. I can't sit for a long time."); *id.* at 204:11-18 ("I can't go places that requires walking.")

158 *See, e.g.*, 1/28/10 Deposition of Ramona De La Rosa ("De La Rosa Dep. II"), Ex. D to Perry Deck, at 80:17-24 (responding that getting up and sitting down hurts her knees "if [she does] it all the time); De La Rosa Dep. at 138: 20-24 ("[I]f you are going to give me something that requires me to get up, sit down, get up and sit down, it is going to take a toll on my knees.").

159 *See, e.g.*, 1/28/10 Deposition of Ramona De La Rosa, Ex. 14 to De La Rosa Deck, at 89:2-6 [*42] ("I've been dealing with pain for so long, for so many years, I've grown to have some tolerance. Plus, like I said before, you saw me take the medication. It helps me with the pain but the medication does not take the pain away completely."); De La Rosa Dep. at 203:14-20 ("[The medication] helps but not really."); *id.* at 204:1-8, 19-25 ("[The symptoms are] basically constant because I think if I don't take the medication or sometimes I spend a long time without taking the medication and it starts burning.").

160 *See* 7/18/05 Social Security Administration Medical Source Statement of Ability to do Work-Related Activities (Physical), Ex. G to Perry Decl., at 1.

De La Rosa's testimony and medical documentation does not clearly describe the extent to which her ability to walk and to stand are substantially limited by her back and knee problems. Viewed in the light most favorable to De La Rosa, and considering her pro se status, I cannot conclude that she is not disabled within the meaning of the ADA. The question of whether De La Rosa's herniated disks and osteoarthritis substantially limit her ability to walk and to stand raises a disputed issue of material fact.

**D. Failure to Accommodate**

Although [*43] I cannot conclude that De La Rosa is not disabled under the ADA, she fails to establish a prima facie case of failure to accommodate her disability because she cannot identify a requested accommodation denied by the NYPD. As her first request is time-barred, De La Rosa's remaining claims are that Defendants failed to accommodate her second request for a chair with lumbar support [161] and her third request to remain stationary during the work day. [162]

161 *See* Second Request at 1.

162 *See* Third Request.

It is undisputed that the NYPD provided De La Rosa with the requested chair on January 28, 2004, although she did not have it when she returned from medical leave in December 2003. [163] To prevail on the claim that the Defendants failed to accommodate her request in a timely manner, De La Rosa must prove that the delay was motivated by discriminatory intent. [164] De La Rosa does not offer any evidence to support that the delay was motivated by such an intent.

163 *See id* at 2.

164 *See Lyman v. City of New York, No. 01 Civ. 3789, 2003 U.S. Dist. LEXIS 16471, 2003 WL 22171518, at *6 (S.D.N.Y. Sept. 19, 2003).*

It is also undisputed that the NYPD responded to De La Rosa's third request by allowing her to remain stationary at her desk [*44] for the first six hours of the day and requiring her to perform tasks requiring walking and standing only in the last two hours of her tour. [165] De La Rosa's deposition testimony confirms that even the end of her day was not spent walking or standing continuously. [166]

165 *See* 3/29/04 Memorandum; 3/29/04 Letter.

166 *See* De La Rosa Dep. II at 80:10-19 ("It wasn't the whole two hours, like walking two hours and not sitting down.").

De La Rosa's 56.1 statement alleges an additional eighteen instances of the NYPD's failure to accommodate her disability;

1) Failure to provide accommodations at first assignment Midtown North, 2) [F]ailure to allow plaintiff to return to work with physical limitations on two (2) written notices, 3) Failure to abide by plaintiffs first request to not be place at residential precinct the 44th for safety concerns 4) Failure to realize that the 44th precinct require taking two public busses and walking three blocks everyday causing pain in knees and back 5) Failure to provide the granted request of a chair with lumbar support at the 44th precinct on plaintiffs return to duty on December 15, 2004. [sic] 6) Failure to continue to not provide chair and having plaintiff [*45] sit on hard uncomfortable chair, during Plaintiff's stay at the 44th precinct and when plaintiff left to work at Transit District 11 on January 8, 2004 no chair was granted 7) Failure to provide chair at Transit District 11 until January 28, 2004 while they had plaintiff in charge of Roll Call 8) Failure to provide original request of not being place in a precinct that require extensive walking or standing, Transit District 11 gave me assignment requiring walking. [sic] and standing 9) Failure to provide assignment that does not require walking or standing for long periods of time throughout the tour 10) Failure to provide flextime schedule the same as the other members at the precinct 11) Failure to provide a computer at plaintiffs desk so that she can complete her task relating to her assignment on a timely manner and avoid having to stand on her feet to complete assignments dealing with making copies while standing or filing documents in folders that require bending 12) Failure to provide a stationary assignment where plaintiff is sitting 90% of the time 13) Failure to provide accommodations request to remain stationary for over 3 weeks until the accident occur that caused injuries [*46] due to weak knees from extensive walking throughout the tour 14) Failure to abide by partial accommodations for plaintiff to remain stationary for 5 hours in the early part of her tour unless there is an exigent circumstance requiring assistance 15)Failure [sic] to provide adequate accommodations that would avoid pain and suffering from walking, standing, sitting in hard chairs 16) Failure to provide chair that is not misuse by other members and is for the plaintiffs use only to alleviate any pain while sitting 17)Failure [sic] to enforce any granted accommodations 18) Failure to provide remedy to hostile work environment that cause further health complications. [167]

167 Pl. 56.1 ¶ 125.

These additional allegations largely overlap with previously-discussed accommodation claims. The second, third, fourth, eighth, and ninth examples relate to plaintiff's first, time-barred request for an accommodation involving an assignment where she would not have to stand for long periods of time or climb stairs. [168] While De La Rosa was on medical leave, she and the OEEO negotiated this accommodation, which was finalized in July 2003. [169] Similarly, the first instance alleged in the 56.1 statement concerns [*47] a September 22, 2002 request to be transferred from Midtown North, [170] which is also time-barred for falling beyond the 300-day statute of limitations.

168 *See* First Request at 1.

169 *See* 7/8/03 Letter.

170 *See* 9/22/02 Memorandum from Ramona De La Rosa to Commanding Officer, Midtown North Precinct re Transfer from Command for Medical Reasons, Ex. P-7 to De La Rosa Decl.

The fifth, sixth, seventh, fifteenth, and sixteenth allegations relate to her second request for the chair with lumbar support. It is undisputed that Defendants provided De La Rosa this accommodation. The eleventh, twelfth, thirteenth, and fourteenth instances relate to her third request to remain stationary. That Defendants provided this accommodation is also undisputed. While Defendants had to provide De La Rosa with a reasonable accommodation for her disability, they were not required to provide her with the accommodation of her choosing. [171] De La Rosa's daily work schedule was arranged so that she could remain stationary for at least 75% of her tour, allowing her to perform essential job tasks requiring walking or standing only at the end of the day. "An em-

ployer is not required to accommodate a disabled employee by eliminating [*48] one of the essential functions of the job." [172]

171 *See EEOC v. Yellow Freight Sys., Inc., No. 98 Civ. 2270, 2002 U.S. Dist. LEXIS 16826, 2002 WL 31011859, at *21 (S.D.N.Y. Sept. 9, 2002)* ("[U]nder the ADA an employee has no right to any particular accommodation, but merely to a reasonable accommodation . . . .").
172 *Misek-Falkoff, 854 F. Supp. at 228.*

Regarding the seventeenth allegation that Defendants failed to enforce the granted accommodations, Defendants provided De La Rosa with the requested chair and rearranged her work schedule, enabling her to remain seated for most of her tour. De La Rosa even admitted that she was stationary for at least part of the last two hours of her shift. [173] In short, De La Rosa points to nothing in the record showing that Defendants failed to enforce the accommodations she received.

173 *See* De La Rosa Dep. II at 80:10-19.

Only the tenth and eighteenth allegations are not duplicative or time-barred. Neither are meritorious. As to the tenth new instance of failure to accommodate, De La Rosa alleges that Defendants failed to provide her with Flextime. De La Rosa initially was part of the program but lost its privileges due to chronic lateness. [174] Further, Defendants' accommodations [*49] to her work schedule to allow her to remain stationary also changed her start time to account for the loss of Flextime. [175]

174 *See* 3/2/04 Memorandum; 5/19/04 Termination Recommendation.
175 *See* 3/29/04 Memorandum; 3/29/04 Letter.

Last, as detailed below, De La Rosa's claims regarding a hostile work environment fail; accordingly, her eighteenth allegation that Defendants did not remedy the environment cannot support a claim.

**C. Disability Discrimination**

Although I cannot conclude that De La Rosa is not disabled under the ADA, she fails to establish a prima facie case of discrimination because she cannot show a causal link between the adverse employment actions and her disability. Specifically, De La Rosa alleges that Defendants discriminated against her by (a) removing her from the Flextime program; [176] (b) disciplining her for being AWOL; [177] (c) placing her in the Performance Monitoring program; [178] (d) denying her a sick day when another PAA was granted the same day off; [179] (e) suspending her; [180] and (f) terminating her employment. [181]

176 *See* 3/2/04 Memorandum.
177 *See* 3/19/04 Report; 4/23/04 Memorandum.
178 *See* 4/15/04 Performance Monitoring at NYPD 00481-82; 7/9/04 Performance Monitoring [*50] at NYPD00456-57.
179 *See* De La Rosa Dep. at 152:14-154:121; 5/20/04 Letter; 5/21/04 Memorandum ¶ 1.
180 *See* 6/9/04 Suspension Report.
181 *See* 7/21/04 Notice.

Defendants argue that De La Rosa fails to establish a prima facie case of disability discrimination because the alleged adverse employment actions did not occur as a result of her disability. [182] They insist that only De La Rosa's conclusory allegations support her causation argument. [183] To defeat a motion for summary judgment, De La Rosa must rely on more than mere speculation. [184] Indeed, De La Rosa's unsubstantiated allegations that her disability caused the six allegations of discriminatory behavior is not supported by the record and is insufficient to allow an inference of discrimination, [185]

182 *See* Def. Mem. at 13-18. For the purposes of the motion, Defendants assume that De La Rosa could establish that these instances were materially adverse changes to her working conditions. *See id.* at 14.
183 *See id.* at 14-18.
184 *See Jeffreys, 426 F.3d at 554.*
185 *See Hawana v. City of New York, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002).*

Defendants further argue that they have legitimate reasons for their actions, and De La Rosa cannot show that they [*51] intentionally discriminated against her. [186] The record here shows that Defendants' stated reasons for disciplining and eventually terminating De La Rosa legitimately relate to her work performance.

186 *See* Def. Mem. at 18.

*First*, the NYPD withdrew De La Rosa's Flextime privileges because of her chronic tardiness. [187] Even De La Rosa admitted that she signed into work later than Flextime allowed before she lost the privilege. [188]

187 *See* 3/2/04 Memorandum; 5/19/04 Termination Recommendation. Santiago later clarified that De La Rosa reported to work later than Flextime allowed. *See* 9/1/04 Report at NYPD00742.
188 *See* De La Rosa Dep. II at 87:22-25.

*Second*, the record shows that De La Rosa's refusal to report for work on March 19 caused her to receive a Command Discipline for being AWOL. [189]

189 *See* 3/19/04 Diary Entry; 3/19/04 Report; 4/23/04 Memorandum; 5/19/04 Termination Recommendation.

*Third*, with regard to the sick day she was not allowed to take, De La Rosa herself explained that the lack of staff at TD-11 that day made her attendance necessary. [190]

190 *See* De La Rosa Dep. at 152:23-153:8.

*Fourth*, the record also establishes that the NYPD placed De La Rosa in the Performance Monitoring program [*52] twice because of her "poor performance, excessive absenteeism and/or tardiness, misconduct or below standard evaluation." [191]

191 4/15/04 Performance Monitoring; 7/9/04 Performance Monitoring.

*Fifth*, her suspension resulted directly from her refusal to follow an order of a superior officer and resulting verbal altercation. [192] Although De La Rosa explains that she refused to perform the order because of the accommodation allowing her to remain stationary in the mornings, her suspension actually resulted from her insubordination and attitude towards Lieutenant Morillo. [193]

192 *See* 6/9/04 Suspension Report.
193 *See id.* at 2 ("[S]he was suspended as of 1621 hours for insubordination and being discourteous to a supervisor.").

*Sixth*, her termination resulted from her below standards performance, poor disciplinary record, and problems with absenteeism and lateness, all extensively documented by written performance evaluations and requests for disciplinary action. [194]

194 *See, e.g.*, 3/9/04 Report of Violation; 3/10/04 Performance Evaluation; 4/15/04 Performance Monitoring; 4/16/04 Report of Violation; 4/22/04 Early Arrival Memorandum; 5/8/04 Report of Violation; 5/17/04 Performance Evaluation; 5/19/04 [*53] Termination Recommendation; 6/5/04 Report of Violation; 7/9/04 Performance Monitoring.

**D. Retaliation**

As retaliation, De La Rosa alleges the same six instances as the disability discrimination claim. She also asserts that Defendants retaliated against her by (a) failing to accommodate her disability; [195] (b) evaluating her employment performance negatively; [196] (c) the varied nature of her assignments at TD-11; [197] (d) name calling and derogatory remarks; [198] (e) use of her chair by other employees; [199] (f) negative attitudes towards her; [200] (g) the design of her work space. [201]

195 *See* De La Rosa Dep. at 113:10-16, 114:11-14.
196 *See* 3/10/04 Evaluation at NYPD 00516, 518, 520-22; 5/17/04 Evaluation NYPD00503, 505-08.
197 *See* De La Rosa Dep. at 113:17-114:11; 119:9-119:18.
198 *See id.* at 116:16-118:3.
199 *See id.* at 121:10-25.
200 *See id.* at 125:2-22.
201 *See* 3/6/04 Letter at 1 -2; 4/13/04 Complaint of Employment Discrimination, Ex. P-66 to De La Rosa Decl.

Regarding examples (c) through (g), Defendants argue that a reasonable employee would not have found these actions materially adverse. [202] The standard is that of a reasonable person. [203] "[A] plaintiff must show that a reasonable employee would [*54] have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." [204] De La Rosa's examples (c) through (g) fail here. Specifically, a reasonable person would not find the varied nature of her assignments, use of her chair by other employees, negative attitudes, or office design to change materially the terms and conditions of employment. As for the allegations of name calling and derogatory remarks, such comments also do not constitute an adverse change in employment. [205] "While verbal abuse might at times be sufficiently severe and chronic to constitute an adverse employment action, such behavior, without more, hardly rises to the level of actionable retaliation." [206]

202 *See* Def. Mem. at 20.
203 *See Flynn, 620 F. Supp. 2d at 490.*
204 *Id.* (quoting *Burlington N. & Sante Fe R.R. Co. v. White, 548 U.S. 53, 64, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)).*
205 *See Alvarez v. Nicholson, No. 03 Civ. 4173, 2005 U.S. Dist. LEXIS 45744, 2005 WL 1844595, at *7 (S.D.N.Y. Aug. 3, 2005)*; *Brennan v. City of White Plains, 67 F. Supp. 2d 362, 374 (S.D.N.Y. 1999)*; *Pomilio v. Wachtell, Lipton, Rosen & Katz, No. 97 Civ. 2230, 1999 U.S. Dist. LEXIS 53, 1999 WL 9843, at *8 (S.D.N.Y. Jan. 6, 1999).*
206 *Brennan, 67 F. Supp. 2d at 374.*

For [*55] the remaining examples, Defendants argue that De La Rosa cannot establish a causal connection between her protected activities and any adverse em-

ployment action. [207] Defendants further insist that they have legitimate non-retaliatory reasons for their actions. [208] Assuming that the other instances of alleged retaliatory activity did materially affect her employment, De La Rosa offers no evidence save speculation that Defendants retaliated against her for requesting accommodations and complaining to OEEO by disciplining her and terminating her employment. These instances overlap with the discrimination claim, where Defendants have already offered legitimate justifications for their actions, and De La Rosa did not identify any evidence tending to show that these reasons are pretextual.

207 *See* Def. Mem. at 19.
208 *See id.* at 20.

As for her two remaining allegations, examples (a) and (b), De La Rosa has not identified any accommodation she was not provided. Finally, her negative performance evaluations directly resulted from her negative work performance. De La Rosa suggests that the timing of her first evaluation--shortly after her last request for reasonable accommodation--shows that it is [*56] the result of an improper motive. [209] Still, De La Rosa offers no evidence save speculation that she received a negative performance evaluation because of her request for accommodation, and Defendants maintain that her poor performance justified her poor review. The timing of De La Rosa's performance evaluation is a question within the professional judgment of her supervisors. Courts may not "second-guess an employer's non-discriminatory business decisions, regardless of their wisdom." [210] Accordingly, De La Rosa fails to allege an instance where Defendants retaliated against her for engaging in a protected activity.

209 *See* 3/6/04 Letter at 2.
210 *Williams v. NYC Dep't of Sanitation, No. 00 Civ. 7371, 2001 U.S. Dist. LEXIS 15594, 2001 WL 1154627, at *18 (S.D.N.Y. Sept. 28, 2001).*

**E. Hostile Work Environment**

De La Rosa's hostile work claims largely overlap with earlier allegations. As in the discrimination and retaliation claims, De La Rosa also alleges that Defendants created a hostile work environment by (a) removing her from the Flextime program; [211] (b) disciplining her for being AWOL; [212] (c) denying her a sick day when another PAA was granted the same day off; [213] and (d) suspending her. [214] Overlapping with her [*57] other retaliation claims, she also alleges that the following instances created a hostile work environment: (e) name calling and derogatory remarks; [215] (f) the nature of her assignments at TD-11 ; [216] (g) evaluating her employment performance negatively; [217] and (h) negative attitudes towards her. [218] Finally, De La Rosa alleges that other discrete instances created a hostile work environment: (i) threats of a Command Discipline; [219] (j) damage to chair, desk, and ID card; [220] (k) use of a microphone to call her name while on a break; [221] (l) inability to eat lunch at her desks; [222] (m) left out of a coworker's retirement party; [223] and (n) dim lighting. [224] Generally, Defendants argue that De La Rosa cannot establish that the workplace was hostile or abusive because the instances she points to are not severe or pervasive. [225]

211 *See* 3/2/04 Memorandum.
212 *See* 3/19/04 Report; 4/23/04 Memorandum.
213 *See* De La Rosa Dep. at 152:14-154:121; 5/20/04 Letter; 5/21/04 Memorandum ¶ 1.
214 *See* 6/9/04 Suspension Report.
215 *See* De La Rosa Dep. at 129:2-130:20, 146:19-22.
216 *See id.* at 138:10-24; 4/22/04 Memorandum from Ramona De La Rosa to Administrative Lieutenant re Work Assignment and Accommodations, [*58] Ex. P-68 to De La Rosa Deck, ¶ 1.
217 *See* De La Rosa Dep. at 148:18-20; 4/22/04 Memorandum % 7.
218 *See* De La Rosa Dep. at 172:14-173:22.
219 *See id.* at 144:7-20.
220 *See id.* at 145:4-146:18, 148:2-12, 192:15-16; 4/22/04 Memorandum ¶ 2.
221 *See* Compl. ¶¶ 58-59.
222 *See* De La Rosa Dep. at 170:16-172:11; 4/22/04 Memorandum ¶ 3.
223 *See* De La Rosa Dep. at 169:20-170:15.
224 *See id.* at 173:23-174:10.
225 *See* Def. Mem. at 22-23.

De La Rosa's hostile work environment claim cannot be sustained because she has not shown a pattern of severe harassment, such that the conditions of her employment were effectively altered. De La Rosa cites fourteen separate examples of behavior she asserts made TD-11 a hostile work environment. Even viewed cumulatively, these examples are not "offensive, pervasive, or continuous enough to amount to a constructive discharge." [226] Indeed, many of the examples are discrete instances. For example, Defendants removed De La Rosa from Flextime once, disciplined her for being AWOL once, denied her a sick day once, suspended her once, and reviewed her performance negatively twice. The other discrete examples, (f) and (h)-(n), are vague and not objectively hostile viewed under a reasonable [*59] person standard. Regarding her allegation of name calling and derogatory remarks, there is no evidence that TD-11 was permeated with "frequent, severe and offen-

sive disability-related comments" to meet the demanding standard of a hostile work environment claim. [227]

226 *Scott, 190 F. Supp. 2d at 599.*
227 *Monterroso, 591 F. Supp. 2d at 585.*

**V. CONCLUSION**

For the foregoing reasons, Defendants' motion is granted. The Clerk of the Court is directed to close this motion (docket #34) and this case.

SO ORDERED:

/s/ Shira A. Scheindlin

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

October 22, 2010

Positive
As of: March 29, 2013 1:22 PM EDT

# Divers v. Metro. Jewish Health Sys.

United States District Court for the Eastern District of New York
January 14, 2009, Decided; January 14, 2009, Filed
06-CV-6704 (RRM) (JMA)

**Reporter:** 2009 U.S. Dist. LEXIS 2312; 2009 WL 103703

CATHERINE DIVERS, Plaintiff, -against- METROPOLITAN JEWISH HEALTH SYSTEMS and TERESA CAMBRINI, Defendants.

**Subsequent History:** Affirmed by *Divers v. Metro. Jewish Health Sys., 2010 U.S. App. LEXIS 13350 (2d Cir. N.Y., June 30, 2010)*

**Core Terms**

summary judgment, resigned, no evidence, discriminatory, desk, adverse employment action, hostile work environment, similarly situated, light duty, prima facie case, medical leave, colleagues, hostile, pretext, female, disability benefits, quotation marks, material fact, appointments, hostile work environment claim, racial discrimination, deposition testimony, disparate treatment, sexual orientation, working conditions, conclusory, harassment, proffered, doctor's, attend

**Counsel:** [*1] For Plaintiff: Chidi Anthony Eze, Esq., Brooklyn, NY.

For Defendants: Philip A. Goldstein, Michael J. DiMattia, McGuire Woods LLP, New York, NY.

**Judges:** JOAN M. AZRACK, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** JOAN M. AZRACK

**Opinion**

## MEMORANDUM & ORDER

**AZRACK, United States Magistrate Judge**:

Plaintiff Catherine Divers commenced this action against defendants Metropolitan Jewish Health Systems and Teresa Cambrini on December 20, 2006. She claims employment discrimination based on race and sexual orientation in violation of the Civil Rights Act of 1861, *42 U.S.C. § 1981*, the *New York State Executive Law § 296*, and the *Administrative Code of the City of New York §8-107(1)(a)* and denial of medical leave in violation of the Family and Medical Leave Act ("FMLA"), *29 U.S.C. § 2601 et seq.* She also alleges common law assault, battery, intentional and negligent infliction of emotional distress, and tortuous interference with contractual relations. Defendants have moved for summary judgment on all claims and the parties have consented to decision by the Magistrate Judge. For the reasons discussed below, summary judgment is granted on all *§ 1981* and FMLA claims and the Court declines to exercise supplemental jurisdiction over [*2] the remaining state law claims.

## I. BACKGROUND

The following facts are taken from the parties' Rule 56.1 Statements and the depositions, affidavits, declarations, and other documents they each submitted in connection with defen-

dant's motion for summary judgment. [1] Factual disputes are noted.

Plaintiff, Catherine Divers ("Plaintiff" or "Divers") a black, heterosexual female, is a registered [*3] nurse. (Divers Dep. 7:7, Aug. 15, 2007; Divers Aff. P 1, May 25, 2008). Defendant Metropolitan Jewish Health Systems ("MJHS") is a New York corporation that provides, among other things, at home nursing services through its various divisions, which are organized as a network of geriatric health maintenance organizations. (Def.'s R. 56.1 Statement P 3 ("Def. 56.1").) Between 2000 and 2006, Divers maintained a full-time position with MJHS while concurrently serving as a *per diem* fee-for-service nurse both within and outside the MJHS network. Her employment was at will at all times. (Def. 56.1 P 10.) Defendant Teresa Cambrini ("Cambrini"), a white homosexual female, was one of two of Divers' direct supervisors during Divers approximately two year tenure at the Long Term division of MJHS. (Def. 56.1.)

Divers resigned from Long Term effective August 3, 2006 but continued to perform *per diem* services for MJHS until September. She ended her employment with MJHS entirely on September 18, 2006. (Rimler Decl. Ex. H; Divers Aff. P 22.) She commenced this action on December 20, 2006, alleging, in sum, that MJHS discriminated against her by denying her requests for transfers, medical leave, and [*4] medical accommodations, by withholding or delaying her disability benefits on account of her race and sexual orientation, and by constructively discharging her. She further alleges that Cambrini subjected her to a hostile work environment on account of her race and sexual orientation by being aggressive and verbally abusive and physically threatened and assaulted her.

**A. Alleged Incidents of Racial Discrimination**

Divers did not initially allege any discriminatory or otherwise negative working conditions regarding her employment with MJHS prior to transferring to Long Term. (Divers Dep. 102:4; see also, generally, Compl.) Indeed, she testified at her deposition that she was satisfied with her working conditions at her prior divisions and had positive working relationships with the supervisors there. (Divers Dep. 102:4-25.) However, in her response to defendant's motion for summary judgment, Divers, for the first time, alleges two incidents of mistreatment that occurred before her transfer to Long Term. She alleges that in late 2000 or early 2001, after the division she had been working for was dissolved, her white colleagues were allowed to choose their new departments, whereas she was [*5] forced to work as a social worker instead of as a nurse in accordance with her education and training (Divers Dep. 98:8-99:8; Divers Aff. P 5.) When Divers protested the reassignment, a human resources representative informed her it was a mistake and advised her to file a formal complaint. However, Divers declined to pursue the matter further because "as a single-parent [sic] without monetary support from any other source" she "had little or [no] option but to remain in the role of a social worker." (Divers Aff. P 5.) Divers was eventually transferred to a nurse position in the First to Care division shortly thereafter in May 2001. Divers further alleges for the first time in her opposition papers that in May 2004, while working at First to Care, she was issued an ultimatum between transferring to the Manhattan branch or quitting and was given only two days to decide while "similarly situated white employees did not encounter such [a] dilemma." (Divers Aff. P 5).

[1] Plaintiff failed to comply with Local Rule 56.1 in that she failed to follow her statements of fact with a "citation to evidence which would be admissible" relying instead, in many instances, "upon information and belief." While the Court may therefore disregard plaintiff's facts and rely solely upon defendants' Rule 56.1 statement as the uncontested facts of the case, the Court exercises its "broad discretion" to overlook plaintiff's defective Rule 56.1 statement. DeRienzo v. Metro. Transp. Auth., Metro N. Commuter R.R., 237 Fed. Appx. 642, 646 (2d Cir. 2007). Thus, after conducting an "assiduous review of the record," the Court considers plaintiff's facts, where supported by admissible evidence, in reaching its conclusions. Id. (quoting Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)).

With one exception noted below, Divers' remaining allegations of discrimination all occurred while she was a CHN supervisor at Long Term between June 2004 and her resignation in August 2006. Divers initially applied for a *per* **[*6]** *diem* position with Long Term. However, during the interview, which was conducted by Long Term supervisors Sandra Schau ("Schau") and Cambrini together, she was instead offered a fulltime community health nurse supervisor ("CHN supervisor") position. (Divers Dep. 63:23-64:10.) According to Divers, Schau was solely responsible for recruiting and hiring Divers for this position. (Pl. 56.1 P 3.) According to the defendants, Cambrini also played a role. (Schau Decl. P 20.) The new position constituted a promotion, so Divers accepted the offer and transferred to Long Term in June 2004. [2] (Divers Dep. 63:9; 63:16-19.) While at Long Term, Divers was officially assigned to work under Cambrini but could elect to seek advice, authorization and supervision from either Schau or Cambrini. (Divers 119:3; 120:10-14.) Defendants assert that Divers reported primarily to Schau. (Schau Decl. P 10.) Divers disputes this but admits that she had a good relationship with Schau and felt comfortable with Schau even while working under Cambrini. (Divers Dep. 119:20-120:9.)

According to Divers, Cambrini began discriminating against her immediately upon her arrival at Long Term. Divers alleges that upon returning to her desk after a restroom break on her first day, she discovered a note from Cambrini on her computer stating that Cambrini needed to know where Divers was at all times, including when Divers was in the bathroom. (Compl. P 15; Divers Aff. P 8.) Divers asserts that no white employees **[*8]** were subjected to this condition. She submitted no evidence establishing the reporting or break practices imposed upon her white colleagues. (Compl. P 15; Divers Aff. P 8.) Cambrini has no recollection of the note. (Cambrini Dep. 32:2-10.)

The next day, Divers reported the incident to Sharon Rimler in the MJHS human resources department and requested a transfer back to First to Care in light of the "hostile treatment [she] suffered [at] the hands of Terri Cambrini . . . and which [she] sensed [would] continue unabated." (Divers Aff. P 9.) Divers complained to Rimler that Long Term was a bad working environment and that Cambrini often raised her voice but she did not allege race or sexual orientation discrimination at that time. (Rimler Decl. P 13; Divers Dep. 76:16-77:25.) Rimler denied Divers' transfer request citing MJHS's policy against transferring employees before they have completed at least one year of service in their current department. (Compl. P 16; Divers Aff. P 9.)

Divers alleges that her white colleagues were not held to the same one year restriction on transferring between departments and offers Dorothy Kourt as an example. (Compl. P 16; Divers Aff. P 10.) MJHS confirms **[*9]** that its transfer policy includes a "general rule to recommend people staying in their role for a year" but asserts that exceptions are made to meet the operational needs of the organization. (Rimler Decl. P 10.) Defendant's policy statement also explicitly "reserves the right to transfer employees when it is deemed necessary." (Rimler Decl. Ex. D at 2.) MJHS further admits that Kourt was transferred to Long Term in June 2004 after serving less than one year in her previous department, but asserts that Kourt's transfer was necessary to alleviate the staffing crisis that Long Term was experiencing at the time. (Cammarano Dep. 23:21-24:24.) According to MJHS, less than one month before Divers resigned, it had decided to hire a third CHN supervisor to facilitate the department's

---

[2] As a CHN supervisor, Divers was in charge of a team of approximately thirty-five field nurses. Her job duties included reviewing patient **[*7]** files, assigning nurses to patients, visiting patients when a field nurse was unavailable, and conducting field visits to supervise the nurses on her team. Divers testified during her deposition that when she started at Long Term, she spent twenty percent of her time in the field but by the end, she spent up to seventy percent of her time in the field. However, Divers disputes defendants' assertion that the CHN supervisor position is primarily a field job. (Def. 56.1 P 63; Pl.'s Response to Def.'s Rule 56.1 Statement at D:56-64.) The CHN supervisor job description submitted by defendants indicates that the physical demands of the position included, among other things, occasionally lifting greater than fifty pounds and kneeling and crouching. (Schau Decl. Ex. A at 6.)

expansion. (Rimler Decl. P 24.) However, before that position could be filled, both Divers and the other CHN supervisor at the time, Beatrice Sylvester, submitted letters of resignation. (Rimler Decl. PP 25-28.) Thus, at the time Kourt was transferred to Long Term, each of the three and only CHN supervisor positions were vacant or about to be vacated. (Rimler Decl. P 29.) Divers acknowledges that Long Term had **[*10]** substantial staffing difficulties throughout her employment there. (Divers Aff. P 14.)

Divers also alleges, for the first time in her summary judgment opposition papers, that in hiring Kourt, MJHS was attempting to force her to quit. [3] (Divers Aff. P 11.) Her belief is based on the fact that MJHS posted the opening for the position Kourt eventually filled in March 2006 while Divers was on a four to six week medical leave of absence. (Divers Aff. P 11.) MJHS asserts that it posted the opening in May 2006, by which time Divers had returned to work. (Rimler Decl. P 24; Ex. F.) MJHS further explained that it intended the new hire to fill the newly created third CHN supervisor spot and to thus supplement, not replace, Divers. (Rimler Decl. P 24.) MJHS maintained the three CHN supervisor positions after Divers' resignation.

After her request to transfer was denied, Divers continued to work under Cambrini at Long Term for the next year and then renewed her request to transfer out of that department. (Compl. 17.) This time, Divers was permitted **[*11]** to transfer but elected to remain at Long Term because the transfer position MJHS offered required weekend work and was housed in the same building as Cambrini. (Compl. 17). Defendants informed Divers of an opening in her old department, First to Care, on February 20, 2006. (Rimler Decl. P 17). The position was supervisory but would have constituted a demotion. (Rimler Decl. P 18.) Divers applied for the position but went on personal leave shortly thereafter and, according to MJHS, failed to pursue the matter after her return. (Rimler Decl. P 17; Ex. E). Divers consequently remained at Long Term. (Compl. 17.)

The next several incidents of alleged discrimination occurred after Divers slipped on ice near her workplace and injured her back in January of 2005. Divers alleges that when she attempted to report the incident to Cambrini for Worker's Compensation purposes, Cambrini called her a liar and that neither Cambrini nor anyone else from MJHS filed the necessary paperwork despite Divers' repeated inquiries. (Compl. P 23; Divers Dep. 189:14-23; Compl. P 23.) Divers alleges that though she eventually received her benefits in May 2005 after retaining an attorney, similarly situated white **[*12]** employees were able to obtain Workers' Compensation claim numbers within one week of their accidents. (Divers Aff. P 12.) However, she provided no evidence of how MJHS handled Workers' Compensation claims submitted by other employees. MJHS asserts that the proper forms were timely submitted and produced a copy of an MJHS report to the state Workers' Compensation Board, which indicates that the fall occurred on January 24, 2005 and that the report was prepared on February 1, 2005. (Pignataro Decl. Ex. A.) Defendants also submitted a copy of the Workers' Compensation Board Notice of Decision which indicates that Divers was awarded Workers' Compensation benefits on September 1, 2005. (Pignataro Decl. Ex. B.)

Divers further alleges that MJHS, through defendant Cambrini, as well as Schau and Cammarano, denied her requests for leave to attend doctors' appointments. Specifically, they denied Divers request to either come in late every other Tuesday or leave early every other Friday from January through June 2005 to attend physical therapy appointments. [4] (Compl. P 24; Divers Dep. 152:17-157:17; 155:19-25.) Defen-

[3] The Court overlooks plaintiff's failure to allege these facts in her complaint as the complaint does include a general allegation of constructive discharge.

[4] Divers offers conflicting evidence regarding the exact amount of leave she requested. Her complaint suggests it was a one-time request to leave early on a single day. In her affidavit, Divers describes repeated requests to leave half an hour **[*14]** early. (Div-

dants assert that they denied the request because Divers gave no reasons why she **[*13]** could not visit the doctor outside of the workday and because Fridays are a "critical operating time." (Cammarano Dep. 45:23.) Divers was nonetheless able to receive the necessary physical therapy three times a week by visiting her doctor after work or taking vacation or sick leave. (Divers Dep. 158:11-159:8). However, she alleges that similarly situated white employees never had trouble getting reasonable time off for doctors' visits. (Compl. 24). Divers specifically cites, without elaborating, Raymond Leirman as an example of a white employee that was permitted to take time off for doctors' appointments. (Compl. P 24). Divers submitted no evidence establishing how MJHS treated such leave requests by other employees. Divers admits that she was granted medical leave on other occasions, including ten days in 2003 for injuries from a non-work related car accident and four to six weeks in 2006 after a surgery (Divers Dep. 15:1-22; Divers Aff. P13).

Divers also alleges that she was denied a request for five months of "light duty" or "desk duty," in accordance with her doctor's recommendation while MJHS so accommodated other employees. Divers asserts that in August 2005 she noticed at least three other employees, including Ivy Brown, Carol Henry, and a secretary named Barbara, working with a leg or arm cast. (Compl. P 25.) Henry and Brown, who are both black and both described their positions as "primarily desk job[s]," both deny requesting light duty and deny wearing leg braces or casts to work. (Henry Decl. PP 2, 4, 6, 9; Brown Decl. PP 2, 6, 8, 11.) Henry admits that she wore an ace bandage and ankle support for two days (Henry Decl. P 7) and Brown admits that she periodically wore an ace bandage for a portion of the workday. (Brown Decl. P 9.)

MJHS asserts that it denied Divers' request for light duty because Divers would not have been able to perform the essential functions of her job if restricted to light duty as her position required **[*15]** her to supervise nurses in the field, care for patients as needed, lift over fifty pounds, kneel and crouch, and lift and turn elderly patients in bed. (Schau Decl. P 16.) Divers admits that she would not have been able to perform the field component of her position while on light duty and offered to have her coworkers complete her field duties while she did their paperwork and other desk duties in exchange. However, defendants rejected this compromise because the paperwork is based on the field supervision and therefore both components needed to be completed by the same person. After MJHS denied Divers' request for light duty, Divers contacted her doctor who then lifted the restrictions and Divers returned to Long Term in her normal capacity. Divers offered no evidence establishing the manner in which MJHS handled other employees' requests for medically related work accommodations, if any.

Divers further alleges that defendants withheld her New York State disability benefits on account of her race. (Divers Aff. P 13.) Divers claims that she was supposed to receive a benefit check for a four to six week medical leave of absence that she took beginning March 2, 2006. (Divers Aff. P13). **[*16]** Divers asserts that the state office told her that her check had been forwarded to MJHS but that MJHS never gave it to her whereas similarly situated white employees received their disability benefits from MJHS "within a reasonable time." (Divers Aff. P 13; Compl. P 27.) According to documents submitted by MJHS, MJHS's short-term disability benefits insurer, First Unum Life Insurance Company, awarded Divers short-term benefits on April 25, 2006. (Pignataro Decl. Ex. C.) On May 9, 2006, Divers submitted a written statement rejecting the short term award because she was advised that she would be entitled to a greater award if she submitted a claim for state benefits instead. (Divers Dep. 193-95; Pignataro Decl. Ex. C.) The state Workers' Compensation Board subsequently denied Divers' claim. (Divers Dep. 194:11-19.) MJHS

ers Aff. P 16.). During her deposition, she testified that she would have been out of the office for several hours on the day of the appointments. (Divers Dep. 156:12-157:157:10.)

asserts that Divers never reapplied for short term benefits and denies withholding any benefits from her. (Pignataro Decl. P 16.)

On June 27, 2006, Divers submitted a letter of resignation from Long Term effective August 3, 2006. (Rimler Dec. Ex. H). In her resignation letter, Divers expressed thanks for the opportunity to work with "a **[*17]** reputable organization such as [MJHS]" and stated that it had "been truly a learning experience." (Rimler Dec. Ex. H.) MJHS asserts that Divers resigned because she was finally executing her longtime plan to relocate to Rochester, where she had family and other ties and where she would be able to move into a larger house, which would have helped her and her husband gain custody of her stepdaughter. Divers admits that before resigning, she requested reduced hours so that she would have time to deal with the custody matters but asserts that Cambrini was the sole reason she resigned. However, she also stated that if she had been permitted to transfer to a different department and to cut back on her hours, she would have remained at MJHS. (Divers Dep. 53:13-58:6.)

The final incident of discrimination alleged in the complaint occurred on July 13, 2006. On that date, Divers and Cambrini had both assigned two different nurses to the same patient. (Cambrini Dep. 7:4-24; Divers Dep. 273:13-274:4) Cambrini called Divers on the telephone while the two were at work to investigate the error. (Cambrini Dep. 7:25-8:4) Divers alleges that during that phone call, Cambrini was ranting and raving and **[*18]** that she told Divers that Divers would be fired if she ever spoke again to Tyisha Dukes, another MJHS employee. (Compl. P 19.) The conversation then ended. (Compl. P 20; Divers Dep. 241:15) Divers alleges that moments later, Cambrini "ran down to plaintiff's office to physically attack" her. She alleges that Cambrini stood over her in a threatening posture, screamed and verbally abused her, banged her fists on the desk, and threatened to physically hit her. (Compl. P 20.) Divers further alleged in her complaint that Cambrini "pulled a chair, sat down, and commanded plaintiff to start talking to her, while at the same time threatening to hit plaintiff if she did not speak." (Compl. 20.) During her deposition, Divers testified that Cambrini pushed a chair into her. (Divers Dep. 260:6-23.) In her summary judgment opposition papers, Divers adds that Cambrini "physically hit me with her body." (Divers Aff. P 17; see also Pl. 56.1 P 16.) Divers speculates that Cambrini told her not to speak to Dukes anymore because Cambrini was sexually attracted to either Divers or Dukes. (Divers Dep. 243:16-12.) Divers testified that her theory is based on the fact that she could not come up with any other **[*19]** conclusion as to why Cambrini would tell her not to speak to Dukes. (243:11-244:22) She submitted nothing to support this theory.

Despite suffering chest pain that night as a result of the altercation with Cambrini, Divers returned to work the next morning. (Compl. P 21.) The chest pain continued and at approximately 11 a.m., a coworker called 911. (Compl. P 21.) Divers was taken to the hospital where she was diagnosed with cardiac arrhythmia and underwent her second cardiac ablation surgery. (Compl. P 21.) She spent the next four days in the hospital. (Compl. P 21.) Divers made a formal complaint regarding the incident to Susan Borenstein, the Director Human Resources on July 18, 2006. (Borenstein Decl. P 3.) Divers described the incident while Borenstein took contemporaneous notes. (Borenstein Decl. P 3; Ex. A.) Divers told Borenstein that Cambrini slammed a chair into her desk. Divers did not report to Borenstein that Cambrini physically threatened her or hit her with the chair, nor did she tell Borenstein that she believed Cambrini's actions were based on Divers' race or sexual orientation. (Borenstein Decl. P 5, 10, 11; Ex. A.) Divers asserts that MJHS took no action in response **[*20]** to her complaint. (NEED CITE) Barbara Farrell, another Human Resource employee, asserts that she investigated Divers' claim by interviewing Cambrini and four employees that work near Divers' office. (Farrell Decl. PP 8-9.) None corroborated Divers' allegations so Farrell dropped the matter. (Farrell Decl. P 10.)

In addition to the above complaints, Divers, for the first time in her opposition papers, al-

leges that MJHS prohibited her from cashing out her retirement account after she resigned from her full time position at Long Term because she was still doing part-time work for MJHS. Divers asserts, without explaining, that "upon information and belief, other similarly situated white employees are allowed to cash out or transfer their [retirement] benefit[s] upon quitting their full-time employment at MJHS" (Divers Aff. P 22.) Defendants confirm that MJHS policy prohibits employees from withdrawing funds from their retirement accounts while still employed at MJHS in any capacity and assert that they know of no MJHS employee in the last eight years that has been permitted to withdraw retirement funds while still employed at MJHS. (Pignataro Decl. PP 20, 28.) Divers submitted no evidence **[*21]** establishing how MJHS handled other employees' requests to withdraw their retirement account funds.

### B. Complaints regarding Cambrini generally

In addition to the above described specific incidents of discrimination, Divers alleges that Cambrini relentlessly harassed, marginalized, intimidated, and discriminated "against Divers because of her race, sex, and sexual orientation." (Compl. P 14.) She alleges that Cambrini "repeatedly addressed [her] in a condescending manner, shouted at [her] for no apparent reason, and openly disliked [her] because of a misconception that [she] was after one or two of [Cambrini's] female lovers." (Compl P 29.) Divers further alleges that Cambrini shouted at her at every turn while senior managers looked on and did nothing. (Divers Aff. P 8.) Divers also complained that Cambrini tossed files and papers on her desk instead of handing them to her, cursed and used a forceful and demanding tone, once called her at home about a case, and once called her a bitch at a time she thought Divers could not hear her. (Diver Dep. 88:2-89:8; 90:14-91:12; 93:12-94:11.) Divers asserts that she also witnessed Cambrini behave this way towards Yun Yun Li, a heterosexual Asian **[*22]** American female that was also a CHN supervisor at Long Term. Divers stated that Li and her replacement, Beatrice Sylvester, a heterosexual African American female, both resigned from MJHS because of Cambrini's discrimination. (Pl.'s Response 56.1 P 328.) However, Divers provided no evidence either supporting this allegation or establishing the basis of her knowledge regarding Li's and Sylvestre's motives for leaving MJHS.

Divers allegations of Cambrini's discriminatory and hostile manner are generally supported by Veronica Lowe, a black female CHN supervisor who was hired by Cambrini. (Schau Decl. P 3.) Lowe worked as a Long Term CHN supervisor from October 2006 through June 2007. In her declaration, she asserts that she resigned because Cambrini discriminated against her by making her do most of the less desirable field work while her white colleagues "sat in the office doing very little paper work" and by yelling at her and other black employees for things that white employees were not yelled at for. (Lowe Decl. P 3.) Defendants assert that Lowe resigned in order to pursue a promotional opportunity and that she never complained of racial discrimination while employed at MJHS. (Second **[*23]** Schau Decl. P 9.) MJHS submitted an employee evaluation in which Lowe appended a handwritten note thanking Cambrini for recognizing her hard work. (Second Schau Decl. Ex. A.)

### C. Divers' efforts to report the allegedly discriminatory behavior

Divers received a copy of MJHS' anti-harassment and non-discrimination polices at the start of her employment and was aware throughout her tenure at MJHS, that she could file complaints about discrimination with the Human Resources Department. (Divers Dep. 314:11-315:9.) However, Divers asserts that, except for the July 13, 2006 confrontation with Cambrini, she made no formal complaints regarding any of the above-described incidents because she was scared of being fired, in part because she believed her other bosses were also gay. (Divers Aff. PP 9, 14.) Divers asserts that "it is a known fact" that employees that complain about MJHS discrimination are fired but offered no examples to that affect. (Div-

ers Aff. P 15). She has not identified which other bosses she believes are gay, nor has she articulated her basis for believing they are gay. However, she asserts that she informally complained about Cambrini on several occasions and that MJHS did nothing **[*24]** to help her but she could not identify any specific instances and she could not recall the words she used to convey the issue of race discrimination. (Compl. P 31; Divers Dep. 196:13-202:11). Defendants deny receiving any indication from Divers that she was being discriminated against on account of her race or sexual orientation or otherwise. In her exit interview, which was conducted on September 12, 2006, over a month after her last day at Long Term and six days before she stopped working for MJHS all together, Divers cites Cambrini as her primary reason for leaving. She selected "interpersonal relationship with immediate supervisor" as the least rewarding aspect of her job and wrote that she had a "horrible experience working in Long Term." (Eze Aff. Ex. 7.)

### D. Divers' Performance Evaluations

Throughout her employment with Long Term, Divers was never subject to disciplinary action and never received a negative performance review. (Cambrini Dep. 32:14-20.) On her December 2004 sixth month evaluation, Cambrini gave Divers a 4 (performance within established standards), in every category except two, in which she gave Divers a 5 (superior). (Goldstein Decl. Ex. H.) In a second evaluation **[*25]** conducted on March 1, 2006, Cambrini gave Divers a 3 (fully meets expectations) in every category. (Schau Decl. Ex. A.) Cambrini wrote that Divers "has continued to grow" and "has continued to work diligently" despite the "increasing shortage of CHN staff." (Schau Decl. Ex. A.) Cambrini's performance review enabled Divers to receive the highest merit raise she was eligible for. (Diver Dep. 144:11-145:10.). Defendants assert that the performance reviews were solely the responsibility of Cambrini. (Schau Decl. P 11.) Divers counters that the reviews were based on input from Schau and Cammarano as well. (Divers Dep. 146:13-20.)

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to the Federal Rules of Civil Procedure, summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of showing that it is entitled to summary judgment. See *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Once the moving party has met its initial burden, the opposing **[*26]** party must come forward with specific facts showing that there is a "*genuine* issue of *material* fact" for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (citation and quotation marks omitted). "Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting *Fed. R. Civ. P. 56(e)*.) In considering a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (citation and **[*27]** quotation marks omitted).

**B. *§ 1981* Claims of Racial Discrimination** [5]

Divers alleges that MJHS and Cambrini discriminated against her on account of her race in violation of the Civil Rights Act of 1861, as amended, *42 U.S.C. § 1981*, by (1) taking various discrete discriminatory actions against her, (2) by creating a hostile work environment, and (3) by constructively discharging her. MJHS and Cambrini move for summary judgment. In a discrimination action, granting summary judgment merits "an extra measure of caution . . . because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. Nonetheless, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine **[*28]** issues of material fact." *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (citations and quotation marks omitted).

On a motion for summary judgment, *§ 1981* claims are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Davis v. Avaya, Inc.*, No. 07-1477-cv, 295 Fed. Appx. 380, 2008 U.S. App. LEXIS 21249, 2008 WL 4442469, at *1 (2d Cir. Oct. 2, 2008). Under this three part test, plaintiff must first establish a prima facie case of discrimination by showing: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class. *McDonnell Douglas*, 411 U.S. at 802. In addition, a plaintiff seeking personal liability under *§ 1981* must also demonstrate some affirmative link to causally connect the actor with the discriminatory action. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (citation and quotation marks omitted).

Once plaintiff satisfies this minimal burden, "the burden of production shifts to the employer to articulate some **[*29]** legitimate, nondiscriminatory reason" for the adverse action, "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Patterson*, 375 F.3d at 221 (citations and quotation marks omitted). If the employer satisfies this standard, the burden shifts back to the plaintiff to show that the defendant's legitimate reasons were a pretext for discrimination. Id. To establish pretext, it is not necessarily sufficient for a plaintiff merely to establish the prima facie case and show that the defendant's proffered justifications are false. *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Rather, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of . . . discrimination." *James*, 233 F.3d at 157. If plaintiff fails to "show that there is evidence that would permit a rational fact finder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate." *Davis*, 2008 U.S. App. LEXIS 21249, 2008 WL 4442469 at *1 (quoting *Patterson*, 375 F.3d at 221).

**1. Discrete Acts [*30] of Alleged Discrimination**

Divers alleges numerous discrete acts of discrimination. In moving for summary judgment against these claims, defendants do not dispute that Divers is a member of a protected class and that she was qualified for her position. Rather, they challenge the third and fourth elements of Divers' prima facie case by asserting that some of the complained of acts do not constitute adverse employment actions and that none of the actions give rise to an inference of discrimination. Defendants additionally assert that even if Divers has established a prima facie case, her discrimination claims must

[5] Though Divers' claims of sexual orientation based discrimination are intertwined with her claims of racial discrimination, her sexual orientation based claims are not cognizable under § 1981, 42 U.S.C. § 1981; see also Albert v. Carovano, 851 F.2d 561, 571-72 (2d Cir., 1988) (citing Zemsky v. City of New York, 821 F.2d 148, 150 (2d Cir., 1987), and will therefore be addressed separately, *infra*.

fail because their decisions were prompted by legitimate, nondiscriminatory concerns and that Divers has not established that the proffered reasons were a pretext for discrimination.

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (citations and quotation marks omitted). To be "materially adverse" a change in working conditions must be "more **[*31]** disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)) Examples of materially adverse actions include termination of employment, a demotion accompanied by a decrease in pay, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other circumstances peculiar to the particular situation. *Galabya*, 202 F.3d at 640. However, "[b]ecause there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).

A plaintiff may raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)). To establish disparate treatment, the plaintiff must show that the person to whom she compares herself is similarly situated **[*32]** in "all material respects", though she is not required to show that they are identical. *Id.* at 39-40. Consequently, where there are many distinctions between the situations of the plaintiff and the employees to whom she compares herself, the plaintiff and those employees are "not similarly situated in material respect . . . because the defendant's treatment of those [other] employees ha[s] no logical relevance to the plaintiff's claims." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001). A plaintiff may also establish pretext by evidence of disparate treatment. *McDonnell Douglas*, 411 U.S. at 804; see also *Ellis v. Long Island Rail Road Co.*, No. 05-CV-3847 (FB) (KAM), 2008 U.S. Dist. LEXIS 25597, 2008 WL 838766, at *4 (E.D.N.Y. Mar. 31, 2008) (citing *Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 n.1 (2d Cir. 2002)). Here, Divers alleges a variety of discrete discriminatory acts and I will discuss each one in turn.

***a. Denial of Transfer Requests***. The parties agree that Divers' first transfer request, which she made only two days after she started at Long Term, was denied, but dispute what occurred with respect to her subsequent requests. Divers alleges that she made numerous subsequent requests **[*33]** to transfer and that they were all denied except for one offer to transfer, which she declined. MJHS asserts that it offered Divers two positions on two separate occasions after she completed one year at Long Term and that it never denied her a position for which she actually applied. Divers asserts that the various alleged transfer denials amount to discriminatory adverse employment actions.

Whether a decision to transfer or not to transfer an employee constitutes an adverse employment action depends largely upon the unique circumstances of the case. Compare *Williams v. R.H. Donnelley Corp.*, 368 F. 3d 123, 128 (2d Cir. 2004) (denial of transfer that would have enabled plaintiff to be close to home was not an adverse employment action) with *Beyer v. County of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008) (denial of transfer to a position that required less training was an adverse employment action because the department plaintiff requested was receiving more work and newer equipment and the plaintiff's assigned department was rumored to be closing). However, the Second Circuit requires "objective indicia" that the "transfer denial created a materially significant disadvantage in the working **[*34]** conditions of the aggrieved employee." *Beyer*, 524 F.3d 160, 163-64 (2d Cir. 2008) (quoting *Williams*, 368 F.3d at 128). "[S]ubjective, personal disappointment" are not enough."

Williams, 368 F.3d at 128. Rather, the plaintiff must offer "evidence from which a reasonable juror could conclude that the position to which she sought a transfer would have involved objective and significant improvements in her conditions of employment." Id. at 165.

It is undisputed that Divers first request to transfer, which she made after only one day at Long Term, was denied. However, unlike the cases in which a denied transfer has been held to constitute an adverse employment action, Divers never asked to be transferred to a specific position and thus was never denied a position for which she actually applied. Additionally, there is no evidence in the record establishing that any comparable positions for which she was qualified were even available. Thus, Divers has come forth with no "objective indicia" that a jury could use to determine whether MJHS' handling of Divers' first transfer request "created a materially significant disadvantage" for Divers. Beyer, 524 F.3d at 163 -64. There is no point of comparison **[*35]** to determine whether a transfer "would have objective and significant improvements" in Divers employment conditions. Id. at 165. Divers' claimed improvement is that a transfer would have allowed her to get away from Cambrini's discrimination. However, as discussed below, the record does not establish that Divers was being discriminated against. Moreover, since Divers had only been at Long Term for one day and had had only one racially neutral encounter with Cambrini, namely the note she found on her screen after returning from the restroom, there is insufficient evidence to lead a rational fact finder to determine that by denying that first transfer request, MJHS caused Divers to experience a materially significant disadvantage or denied her a materially significant improvement. To the extent that the record establishes that Cambrini was a difficult boss, it is simply insufficient to impose an obligation upon MJHS to transfer Divers away from her.

Additionally, though Divers asserts that her subsequent requests to transfer, which she made after at least one year at Long Term, were denied, the record indicates otherwise. Divers admitted in her complaint that MJHS offered her another **[*36]** comparable position but that she rejected it because it required weekend work and because it required her to work in the same building as Cambrini, though not necessarily under Cambrini's supervision. Though Divers asserts that other more desirable positions were available and that she was not offered those positions, she submitted no admissible evidence establishing these facts. Consequently, Divers claim of discriminatory transfer denials fails on the third element of the prima facie case.

Even if Divers could establish a prima facie case with respect to the transfer denials, MJHS has established a legitimate non-discriminatory basis for its decision. It is undisputed that MJHS has a general policy against transferring employees before they have completed one year in a given department. This policy was included in MJHS' Human Resources Policies and Procedures handbook, which Divers admits receiving, and it also explicitly reserves the right to make exceptions to the policy. Divers has not proffered any evidence that would lead a reasonable juror to find that this explanation is a pretext for racial discrimination. She does not challenge the policy itself as discriminatory. Rather, **[*37]** to salvage her claim, she points to Dorothy Kourt, a white employee, who, unlike Divers, was permitted to transfer despite having worked less than one year in her previous position.

Here, Divers and Kourt are not sufficiently similar. Most significantly, as noted above, there is no evidence that a position to which Divers could have transferred was available at the time of her initial request whereas Kourt was transferred to fill a specific vacancy created by the newly established third CHN Supervisor position. Moreover, unlike Divers, who was denied a transfer she requested and that would not have served any particular need of the organization, Kourt was asked to transfer in order to alleviate Long Term's undisputed staffing crisis. Divers' claim of pretext also fails because she is unable to provide any other examples of disparate treatment with respect to MJHS' transfer policy. She identified no other black em-

ployees who were denied transfers and no other white employees who were preferentially transferred. This one instance of disparate treatment is not evidence sufficient to persuade a rational trier of fact to infer that MJHS's rationale for denying Divers' transfer was a pretext **[*38]** for discrimination. It would be particularly unreasonable to infer discrimination in this case when Divers was promoted into the very same position that she complains her white colleague was permitted to assume. Indeed, the record shows that Divers was one of at least two black females to hold the CHN Supervisor position. Thus, it light of MJHS's nondiscriminatory promotion decisions, it would defy logic to hold that MJHS engaged in unlawful discrimination with respect to the less important matter of transfers.

***b. Mishandling of Workers' Compensation claim***. Divers also alleges that MJHS discriminated against her by withholding paperwork and thereby preventing her from obtaining a Workers' Compensation claim number after her January 2005 fall in an MJHS parking lot. MJHS denies mishandling Diver's application and produced a copy of the Workers' Compensation form prepared by MJHS on February 1, 2005, just six business days after the fall. (Pignataro Decl. Ex. A.) Though Divers asserts that Cambrini purposefully withheld the report, she offers no admissible evidence challenging the report produced by MJHS or establishing that Cambrini or anyone at MJHS intentionally mishandled the claim **[*39]** in any manner. Moreover, even if there was evidence that the report was mishandled, it would not constitute an adverse employment action as any delay in benefits that may have been caused by the mishandling would amount to a "mere inconvenience of employment" rather than a "material alteration in the terms and conditions of employment." Consequently, Divers cannot make the necessary prima facie showing of adverse employment action with regard to this incident.

***c. Denial of time off to attend semi-weekly doctor's appointments and denial of light duty***. Divers' third claim of discriminatory adverse employment action stems from MJHS's denial of Divers' request for leave to attend physical therapy sessions. [6] Divers requested permission to miss several hours of work on one day every other week between January and June 2005. She also alleges that MJHS discriminated against her by denying her unrelated request for "desk duty" or "light duty" in accordance with her doctor's recommendations while making the same accommodation for white employees. MJHS admits denying both of these requests and implicitly concedes that they were adverse employment actions. However, it asserts that it denied the **[*40]** leave request because Divers gave no reason why she could not attend the appointments outside of the workday and because Fridays were a critical operating time and denied the light duty request because Divers would not have been able to perform the essential functions of her job on light duty.

To establish that these decisions were motivated by unlawful discrimination, Divers asserts that her white colleagues were permitted such accommodations. However, she has identified no evidence of that fact. Divers asserts that a white colleague, Raymond Lierman, was permitted to take time off for doctor's appointments. She has submitted no evidence of the circumstances of Lierman's alleged time off, no indication as to the basis of her knowledge regarding his time off, and no evidence to corroborate that he was in fact granted time off. Consequently, there is nothing in the record that could lead a rational fact finder to conclude that MJHS's denial of Divers request to miss a substantial part of the day every other week for six months gives rise to an inference of discrimination. This is particularly **[*41]** true in light of the fact that Divers admits that she was able to receive medical leave on every other occasion on which she requested it, including a period of ten days absence from work for injuries after a car accident and a four to six

[6] This allegation is also the basis of Divers' FMLA claim which will be discussed separately, *infra*.

week absence for recovery from a surgical procedure.

Similarly, Divers asserts that her white colleagues were permitted to work at MJHS despite being restricted to their desks because of casts. However, she offers no evidence supporting this claim. Two of the three people she identified as having been preferentially treated, Ivy Brown and Carol Henry, are black females and thus Divers cannot claim disparate treatment based on their experiences. Moreover, both Brown and Henry submitted affidavits stating that their jobs are primarily desk jobs, that they never requested light duty or desk duty, and that they never wore casts or leg braces to work. Divers only identified the third employee who she claims was treated differently, Barbara, by first name and described her as a secretary. Putting aside the fact that Divers has proffered no admissible evidence whatsoever regarding Barbara, based on the little that is known about her, she also is materially **[*42]** different from Divers' and therefore her case is insufficient to raise an inference of discrimination based on disparate treatment. Assuming Barbara is white, as a secretary, light or desk duty would have little impact on her job as, unlike Divers, she would not be required to perform the physically demanding tasks required of a CHN Supervisor. Consequently, Divers is neither able to raise an inference of discrimination surrounding these two decisions, nor can she establish that the legitimate nondiscriminatory reasons for the decisions proffered by MJHS were a pretext.

***d. Withholding of State Disability Benefits***. Divers also alleges that MJHS withheld her private disability benefits. MJHS disputes this claim [7] asserting that though Divers submitted a claim for benefits to both the private benefits provider and the Workers' Compensation Board, she withdrew her claim for private benefits and was denied state benefits and therefore is not entitled to any funds. In their defense, MJHS submitted a copy of a handwritten letter from Divers to the private disability benefits provider in which Divers states that she is rejecting private benefits and that MJHS will return to the provider all **[*43]** benefit checks received on her behalf. Moreover, Divers admitted during her deposition that the Workers' Compensation Board denied her claim.

Divers neither asserts nor submitted any evidence indicating that she reapplied for the private benefits after her state benefits were rejected. Based on her deposition testimony, it appears that she believes that the private benefits should have been remitted to her automatically after the state denied her claim. This is unsupported in the record and seems unlikely, however, even assuming Divers is correct, MJHS's failure to forward the funds to Divers does not give rise to an inference of discrimination. There is no evidence that MJHS regained possession of the funds or that Divers ever demanded the funds from MJHS. Moreover, though Divers asserts that other similarly situated white employees were able to receive their benefits, she provided no admissible evidence establishing whether and how white employees were treated differently with respect to benefits. Finally, **[*44]** Divers admits receiving benefits without issue on other occasions. Thus, Divers cannot establish a prima facie case of discrimination with respect to this claim. [8]

---

[7] Defendants did not specifically address this claim in their memorandum of law but they submitted responsive evidence in the form of affidavits and deposition testimony to the Court.

[8] Divers alleges three additional discrete acts of discrimination that are not assessed here because they are not properly before the Court. For the first time in her papers in opposition to summary judgment, Divers alleged (1) that she was forced to transfer to a social worker position in late 2000 or early 2001; (2) that MJHS issued her an ultimatum between transferring to the Manhattan branch or quitting in 2004; and (3) that MJHS prohibited her from cashing out her retirement account after she resigned from Long Term in 2006. Each of these allegations is a separately actionable wrong. However, since Divers did not raise them in her complaint or in an amended complaint, they are not properly before the court. See Longmire v. Wyser-Pratte, No. 05-CV-6725(SHS), 2007 U.S. Dist. LEXIS 65844, 2007 WL 2584662, at *13 (S.D.N.Y. Sept. 6, 2007); cf., Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, 127 S.Ct. 2162, 2175, 167 L. Ed. 2d 982 (2007) ("When employee alleges serial violations of Title VII's proscription against employment discrimination, i.e. series of **[*45]** actionable wrongs, as opposed to hostile work environment,

**2. Hostile Work Environment Claim**

In addition to the above discrete acts, Divers also alleges that Cambrini and MJHS are liable for creating a racially hostile work environment. To defeat a motion for summary judgment on a claim of racially hostile work environment, "a plaintiff must produce evidence that the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (citation and quotation marks omitted). A plaintiff must produce evidence that could lead a reasonable jury to conclude **[*46]** that "the work environment both objectively was, and subjectively was perceived by the plaintiff to be, sufficiently hostile to alter the conditions of employment for the worse." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006). The Supreme Court has "made it clear that that conduct must be extreme to amount to a change in the terms and conditions of employment" and that courts must filter out complaints attacking "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). Isolated incidents ordinarily will not rise to the level of a hostile work environment but may if sufficiently severe. See id.; *Kemp v. A & J Produce Corp.*, 164 Fed. Appx. 12, 14 (2d Cir. 2005); *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000).

While "[t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred" they must occur under circumstances in which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. Coll. of Staten Island*, No. 01CV-7550 (SJ), 2003 U.S. Dist. LEXIS 25816, 2003 WL 21143076, at *2 (E.D.N.Y. Mar. 28, 2003) **[*47]** (citing *Gregory v. Daly*, 243 F.3d 687, 694-95 (2d Cir. 2001)). "Everyone can be characterized by . . . race . . . and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello*, 294 F.3d 365, 377 (2002). Facially neutral incidents may be sufficient to establish a hostile work environment claim "so long as a reasonable fact finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." *Alfano*, 294 F.3d at 378. In determining whether the alleged conduct was so severe or pervasive as to create an objectively hostile or abusive work environment, courts should consider the totality of the circumstances, including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

Divers **[*48]** alleges that during her tenure at Long Term, Cambrini created a hostile working environment by treating her in a generally rude manner. She asserts that Cambrini harassed, marginalized, and intimidated her. In addition, Divers alleged a number of concrete examples of hostile treatment from Cambrini. The first such incident occurred on Divers' first day under Cambrini when Cambrini left her a note stating that she needed to know where Divers was at all times including when Divers took a restroom break. The most significant incident was the July 13, 2006 confrontation that erupted after Divers and Cambrini both assigned a nurse to the same patient. In addition, Divers asserts that Cambrini would toss papers and files on her desk instead of handing them to her, once called her a bitch, shouted at

---

timely Equal Employment Opportunity Commission (EEOC) charge must be filed with respect to each discrete alleged violation.") Moreover, since Divers' transfer to a social worker position occurred in 2001, at the latest, and she filed her lawsuit in 2006, this claim is also time-barred under the four-year statute of limitations period for § 1981 claims. See Richey v. New York City Transit Auth., No. 07-CV-3711 (SLT) (LB), 2008 U.S. Dist. LEXIS 77666, 2008 WL 4185877, at *2 (E.D.N.Y. Sept. 9, 2008).

her constantly, did not believe her when she reported her slip on the ice, and called her at home while she was out sick to inquire about a case that had not been attended to.

Applying the Harris factors, there is little if any evidence to establish that these conditions were "sufficiently severe or pervasive to alter the conditions of" Divers' employment. Cruz, 202 F.3d at 570. The specific incidents **[*49]** alleged were infrequent given Divers' more than two year tenure under Cambrini. Additionally, none of the conduct was particularly severe. Shouting and tossing papers and files may be a rude breach of etiquette but it is hardly sufficient to alter one's working conditions and Divers does not allege that it interfered with her relationship with other employees and supervisors. Indeed, she admits that she had a good working relationship Cambrini's co-supervisor Sandra Schau. Similarly, Cambrini calling Divers a liar on one occasion and a bitch on another at most amount to "mere offensive utterenace[s]," which are not within the purview of § 1981. Harris, 510 U.S. at 23; see also Faragher, 524 U.S. at 788 (offhand comments do not amount to discriminatory changes in the terms and conditions of employment). Divers also does not allege that the conduct was humiliating in the sense that it diminished her standing among other employees or embarrassed her. In her exit interview, though Divers indentified Cambrini as her primary reason for leaving Long Term, she lodged no complaints about any other aspect of her job and reported many positive aspects. Thus, what Divers describes is not a pervasively **[*50]** hostile work environment but rather a substantially typical work environment marred by a personality conflict with a single individual.

The July 13, 2006 confrontation between Divers and Cambrini, the most serious allegation, also does not establish a hostile work environment claim, whether by itself or in conjunction with the Divers' other complaints. The incident notably took place after Divers had already resigned. Moreover, while the most serious of Divers' varying accounts of the incident does describe physical contact, it was an isolated occurrence insufficient to trigger § 1981. See Aina v. City of New York, No. 05-CV-7553 (SHS), 2007 U.S. Dist. LEXIS 8396, 2007 WL 401391, at *6 (S.D.N.Y. Feb. 6, 2007) (incident in which defendant slammed the door in such a violent manner it almost hit plaintiff's knees was insufficient to sustain a hostile work environment claim in the absence of even a single additional occurrence of alleged physical aggression from defendant it was isolated and inconsequential) Ricks v. Conde Nast Publications, Inc., 92 F. Supp. 2d 338, 348 (S.D.N.Y., 2000) (holding that allegation that defendant hit plaintiff on shoulder and pushed her out of her office was insufficiently severe to **[*51]** establish a hostile work environment claim).

However, even assuming that a reasonable juror could find in favor of Divers on this point based on the current record, Divers cannot withstand summary judgment because her evidence fails to establish an inference of racial discrimination. All of the incidents Divers described were racially neutral. To make the necessary linkage to race, Divers relies on her own deposition testimony and declaration as well as the affidavit of Veronica Lowe. This evidence is inadequate to raise an inference of racial discrimination.

Divers' deposition testimony and declaration contain no "concrete particulars" but rather are comprised entirely of speculation as to the motives behind Cambrini's harsh treatment. Moreover, most of her speculation is irrelevant to the § 1981 racial hostility claim as it concerns her totally unsupported theory that Cambrini was romantically interested in either Divers or Tyisha Dukes. Throughout her complaint and declaration Divers makes general statements that white employees were not subjected to the same treatment as she, such as "No white employee needed permission to use the bathroom", "Similarly situated white employees normally **[*52]** received their worker's claim number in about a week of an incident", and "Similarly situated white employees receive their disability benefits as soon as they put a claim for same." (Divers Decl. P 8, 12, 14.) They are also rife with conclusory statements asserting that the conduct was discriminatory and moti-

vated by her race. However, except for the matter of Dorothy Kourt's transfer discussed above, she offers no evidence, admissible or otherwise, to substantiate these assertions. Further, nowhere in her deposition testimony or declaration does she identify her basis for ascribing Cambrini's conduct to racial animus. Given that Divers herself is unable to articulate what, other than her personal belief, ties Cambrini's conduct to unlawful discrimination, it certainly is not a conclusion that can be reached by a rational jury. See *Moore v. New York State Div. of Parole*, No. 06-CV-1973 (CPS) (JO), 2008 U.S. Dist. LEXIS 72260, 2008 WL 4394677, at *10 (E.D.N.Y. Sept. 23, 2008) ("Plaintiffs conclusory allegations provide an insufficient basis from which to infer that the defendants' facially neutral acts were discriminatory."); *Payne v. MTA New York City Transit Auth.*, 349 F. Supp. 2d 619, 627 (E.D.N.Y. 2004) (plaintiff's **[*53]** "unsubstantiated, subjective belief, as embodied in his deposition testimony" that employer attempted to remove him from his position because of his race insufficient to withstand summary judgment); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[A] plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.") (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

Veronica Lowe's affidavit is similarly insufficient to raise a reasonable inference that Cambrini's facially neutral acts were motivated by racial animus. Lowe, a black female, assumed the CHN Supervisor position two months after Divers left MJHS. Thus, she did not work at Long Term at any point during Divers' tenure there. Her affidavit is eleven sentences long. In it, she states that she resigned from Long Term after nine months because Cambrini subjected her to a racially hostile environment. She includes general statements supporting Divers' complaints about Cambrini's condescending manner and states that she "suffered the same fate that Catherine Divers alleged that she suffered in the hands of Cambrini and MJHS." (Lowe Aff. P 4). Like Divers' statements, **[*54]** Lowe's affidavit consists largely of conclusory allegations and personal opinions. She makes only two statements that approach concrete evidence. She asserts "Cambrini was clearly discriminating against me because I was made to do most of the less sought after field work while my white Colleagues sat in the office doing very little paper work," and "I and other black employees were repeatedly yelled at for something a white employee will suffer no such fate [sic]." (Lowe Aff. P 2, 3.) Lowe does not elaborate on either of these allegations. She provides no information regarding whether the white colleagues she refers to had equivalent job duties or were otherwise similarly situated to her and no specific examples of the conduct she describes. Consequently, Lowe's affidavit is also insufficient to raise a reasonable inference of racial discrimination. See *Hester v. BIC Corp.*, 225 F.3d 178, 182 (2d Cir. 2000) ("in an employment discrimination action, *Rule 701(b)* bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision"); see also *Moore*, 2008 U.S. Dist. LEXIS 72260, 2008 WL 4394677, at *10 (affidavit stating coworker's personal belief that **[*55]** plaintiff and other employees were discriminated against because of their race and gender where other evidence was facially neutral was insufficient to withstand summary judgment); *Minus v. West*, No. 99-CV-7229 (JG), 2003 U.S. Dist. LEXIS 9277, 2003 WL 21295122, at *4 (E.D.N.Y. 2003) (coworker's conclusory allegation that employer "did not want blacks in his office" was insufficient to withstand summary judgment).

Additionally, in this case, the lack of evidence creating an inference of discrimination is highlighted by the undisputed facts that Cambrini hired Lowe and Sylvester, who is also black, for the same position as Divers and that Cambrini gave Divers a good performance review which led to a high raise. While the record does suggest that Cambrini may have been aggressive and abrasive toward her employees, *§ 1981* does not exist to resolve personality conflicts.

Summary judgment as to MJHS' hostile work environment liability is further warranted in light of the Faragher/Ellerth affirmative defense. Un-

der this defense, an employer may not be held vicariously liable for a supervisor's harassment provided that the harassment did not culminate in a tangible employment action. To successfully assert this defense **[*56]** the employer must establish: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006). Once an employer has satisfied its initial burden of demonstrating that an employee has completely failed to avail herself of the complaint procedure, the burden of production shifts to the employee to come forward with one or more reasons why the employee did not make use of the procedures. The employer may rely upon the absence or inadequacy of such a justification in carrying its ultimate burden of persuasion. See *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001).

Here, it is undisputed that MJHS took reasonable steps to prevent and cure harassing behavior by disseminating and enforcing an anti-harassment policy and that Divers was aware of the complaint procedure. Additionally, Divers also does not dispute that she failed to lodge any formal complaints of discrimination until after her resignation. Divers **[*57]** justified her official silence by claiming that she feared retaliation. However, except for her own conclusory statements, there is no evidence in the record substantiating these fears. Consequently, MJHS has established an affirmative defense as a matter of law. See id. ("A credible fear must be based on more than the employee's subjective belief. Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints.").

### 3. Constructive Discharge Claim

Divers also alleges that MJHS constructively discharged her. She primarily asserts that MJHS is liable for constructive discharge as a result of the hostile work environment created by Cambrini but also suggests that MJHS deliberately attempted to force her to resign by posting a CHN Supervisor opening while she was on medical leave. Here, again, there is no dispute that plaintiff has established the first and second elements of the prima facie case i.e. that she is a member of a protected class and that she was qualified to perform her job. However, defendants assert that Divers' working conditions were not so difficult or intolerable **[*58]** as to prompt a reasonable person to resign.

A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. See *Lopez v. S.B. Thomas*, 831 F.2d 1184, 1188 (2d Cir. 1987) (citation and quotation marks omitted). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 130, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004). Thus, to prevail on a claim of constructive discharge based on hostile work environment, plaintiff must establish "something more" than the level of conduct that would give rise to a hostile work environment claim. See *Id*. at 146-47; see also *Steele v. Schafer*, 535 F.3d 689, 694-695, 383 U.S. App. D.C. 74 (D.C. Cir. 2008); *Ternullo v. Reno*, 8 F. Supp. 2d 186, 192 (N.D.N.Y. 1998) ("to demonstrate constructive discharge, the plaintiff must demonstrate harassment that is more severe and pervasive than that required to show a hostile work environment."). Conditions that precipitate an involuntary resignation "may be effected through coworker **[*59]** conduct [or] unofficial supervisory conduct." *Suders*, at 131.

Here, there is a genuine factual dispute regarding whether Divers' resigned because she subjectively perceived hostility or because she wanted to relocate to Rochester. However, Divers' constructive discharge claim fails on other grounds. First, since Divers fails to make the threshold showing of severe or pervasive conduct necessary to support a claim for hos-

tile work environment, she can neither survive summary judgment on the constructive discharge claim, which requires evidence of even more severe conditions. See *Suders*, 542 U.S. at 146-47; see also *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1151-52, 1156-57 (2d Cir. 1993) (plaintiff failed to state a constructive discharge claim where employer repeatedly criticized the plaintiff's work performance and style, yelled at plaintiff in front of others, pounded his fist on a table, and repeatedly threatened to fire plaintiff).

Moreover, Divers' has not proffered evidence supporting the fourth element of the prima facie case, namely that the conduct and conditions that allegedly prompted her resignation give rise to an inference of discrimination. As discussed above, all of **[*60]** the factors that Divers asserts created an intolerable working environment were facially neutral and Divers has not submitted any evidence linking those factors to race discrimination. Additionally, MJHS has produced evidence indicating that they wanted to continue to employ Divers because of the staffing difficulties they were experiencing and were burdened by her resignation. While Divers refutes this claim, she has submitted no admissible evidence to the contrary. See *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000) (affirming grant of summary judgment to employer on employees' constructive discharge claim under *§ 1981* in part because the defendant had demonstrated an interest in continuing to employ plaintiffs); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (same).

## C. FMLA Claim

Divers final federal claim alleges that MJHS violated the Family and Medical Leave Act ("FMLA"), *29 U.S.C. § 2601 et. seq.*, when it denied her requests to leave work early or come into work later every other Tuesday or Friday over a six-month period. Under the FMLA, eligible employees are "entitled to a total of 12 workweeks of leave during any 12-month period for **[*61]** . . . a serious health condition that makes the employee unable to perform the functions of the position of such employee." *29 U.S.C. § 2612(a)(1)(D)*.

The parties provided little elaboration regarding this claim. MJHS argues that Divers did not satisfy the requirements of asserting an FMLA claim because she did not work with MJHS to create a schedule that would decrease that burden of her absence as she is obliged to do under the FMLA regulations promulgated by the Department of Labor. Neither side provided any case law supporting their positions. Though Divers' counsel mentioned the claim and stated the facts surrounding it in the memorandum of law, he offered no legal analysis or argument. Nevertheless, the record before the Court is sufficient to reach a conclusion regarding summary judgment.

To state a prima facie claim for interference with FMLA rights, Divers must demonstrate that: 1) she was an eligible employee under the FMLA; 2) MJHS is an employer under the FMLA; 3) Divers was entitled to leave under the FMLA; 4) Divers gave notice to MJHS of her intention to take leave; and 5) Divers was denied benefits to which she was entitled under the FMLA. See *Garraway v. Solomon R. Guggenheim Found.*, 415 F. Supp. 2d 377, 382 (S.D.N.Y. 2006).

MJHS **[*62]** argues that Divers was not eligible for FMLA leave because she did not work with MJHS to create a schedule that would decrease the burden of her absence, as she was obliged to do. The FMLA does impose a duty on employees to "make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer, subject to the approval of the health care provider of the employee." *29 U.S.C. 2612(e)*; see also *29 C.F.R. § 825.117* ("Employees needing intermittent FMLA leave or leave on a reduced leave schedule must attempt to schedule their leave so as not to disrupt the employer's operations."); *29 C.F.R. § 825.302(e)* (same). MJHS asserts that Divers' request was unduly burdensome because she wanted time off during a critical operating time and gave no reason why she could not see her doctor outside the workday. However, in her deposition testimony, Divers implies that no appointments were

available during non-work hours and there is no evidence that MJHS proposed any less burdensome alternatives to Divers. Consequently, assessing the facts in the light most favorable to the plaintiff, there is a genuine issue of material fact as to whether Divers satisfied her **[*63]** duty to make efforts to avoid disrupting MJHS operations.

Divers FMLA claim fails for two other reasons however. As a threshold matter, the FMLA section that Divers asserts her claim under is applicable only to employees with a "serious health condition." The evidence in the record falls short of satisfying the definition of a "serious health condition." [9] Divers has submitted no evidence to establish that the leave she sought was either necessary or that her condition was serious within the meaning of the FMLA. Indeed, aside from her own self-serving affidavit and deposition testimony, which does not even name or describe the condition she was suffering from, she submitted no medical evidence whatsoever. Given the complete lack of evidence supporting the necessity of her treatments or the severity of her condition, there is no genuine issue of material fact for a jury to resolve. See *Haefling v. United Parcel Service, Inc.*, 169 F.3d 494, 500 (7th Cir. 1999) (dismissing FMLA claim on summary judgment where plaintiff failed to submit medical evidence or physician's affidavits establishing that physical therapy sessions were required or that the condition was severe).

Divers' FMLA claim must also fail because, even assuming that the leave request at issue qualified under the FMLA, the record reveals that Divers' request was not denied under FMLA standards. Divers admits that she was able to use her vacation and sick leave to attend the physical therapy appointments for which she now claims she was denied leave. The FMLA Regulations permit such a substitution of paid leave for FMLA leave, which is usually unpaid. *29 C.F.R. § 825.207(a)* ("the employer may require the employee to substitute accrued paid leave for FMLA leave"); *29 C.F.R. § 825.207(c)* ("Substitution of paid accrued vacation, personal, or medical/sick leave may be made for any (otherwise) unpaid FMLA leave . . ."). Consequently, Divers cannot succeed in her FMLA claim as a matter of law.

### D. State Law Claims

Having concluded that Divers *§ 1981* and FMLA claims must be dismissed, the Court declines to exercise supplemental jurisdiction over plaintiff's various state law **[*66]** claims. See *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) ("This Court and the Supreme Court have held that when the federal claims are dismissed the 'state claims should be dismissed as well.'") (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).

## III. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment on plaintiff's federal claims is granted. The Court declines to retain jurisdiction over plaintiff's remaining state law claims and dismisses such claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

---

[9] The statutory definition **[*64]** of a "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves: (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). This concept is further developed in the FMLA Regulations, which divides that phrase into two categories: conditions treated via inpatient care and conditions requiring continuing treatment. Continuing treatment is defined as treat for incapacity, which is defined as the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom" and is further divided into five categories. The inpatient care category is clearly inapplicable here. Of the five types of continuing treatment designations, only the fifth has potential relevance here. It provides that a serious medical condition requiring continuing treatment includes "any period of absence to receive multiple treatments . . . by a health care provider . . . either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period **[*65]** of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), kidney disease (dialysis)."

Dated: January 14, 2009

Brooklyn, New York

/s/

JOAN M. AZRACK

UNITED STATES MAGISTRATE JUDGE