*2005 U.S. Dist. LEXIS 42951, **

BARBARA DROUTMAN, Plaintiff, - against - NEW YORK BLOOD CENTER, INC., Defendants.

03-CV-5384 (DRH) (ARL)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2005 U.S. Dist. LEXIS 42951

July 27, 2005, Decided
July 27, 2005, Filed

**CORE TERMS:** disability, disabled, impairment, asthma, summary judgment, time card, termination, pretext, non-discriminatory, falsification, time sheets, sick, vacation, prima facie case, terminating, doctor's, sheet, time records, terminated, non-movant, pretextual, warned, fails to demonstrate, similarly situated, misconduct, infraction, symptoms, air, sign-in, attendance

**COUNSEL:** **[*1]** ZABELL & ASSOCIATES, LLP, Attorneys for Plaintiff, Farmingdale, New York, By: Saul D. Zabell, Esq.

HUGHES HUBBARD & REED LLP, Attorneys for Defendant, New York, New York, By: Robb W. Patryk, Esq., Jason Habinsky, Esq.

**JUDGES:** Denis R. Hurley, United States District Judge.

**OPINION BY:** Denis R. Hurley

**OPINION**

**MEMORANDUM & ORDER**

**HURLEY, District Judge:**

*INTRODUCTION*

Plaintiff Barbara Droutman filed the present Americans With Disabilities Act and New York State Human Rights Law action against her former employer, Defendant New York Blood Center ("NYBC"), claiming discriminatory termination based on her asthma. NYBC has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, NYBC's motion is granted and this case is dismissed in its entirety.

*BACKGROUND*

1

**FOOTNOTES**

1 The facts contained herein are undisputed unless otherwise indicated, and are taken primarily from NYBC's Local Rule 56.1 Statement, Droutman's Rule 56.1 Counter-statement, and the parties' memoranda.

**[*2]** NYBC is a non-profit organization located in Westbury, New York, that collects blood from volunteer donors. Droutman began her employment at NYBC as a temporary worker in January 2000, and was given a permanent position there in May 2000.

At all times relevant to this motion, Droutman worked as a "Payroll Coordinator" or "Secretary of the Collections Department," and reported to Andrew Martin, NYBC's Director of Operations, and Dianne Marullo, a "Team Leader." Her primary responsibility was to be the "time keeper" for her Department. As such, Droutman retrieved time sheets or "Time Reports" from other employees. The time reports indicated the number of hours each employee worked per day. Droutman inputted the reported hours into electronic spread sheets, submitted the spread sheets to Martin for review, and then submitted them to the Payroll Department.

As "time keeper," Droutman was also responsible for maintaining "Time Cards" for each employee, which were annual calendars designating each day that the employee was absent from or late to work, and the reason given. Management-approved vacation or personal days were marked "P," sick days were marked "S," and according to Droutman, **[*3]** "emergency personal days" were marked "EP." According to NYBC, "[o]ne of the purposes of the Time Cards is to reveal patterns of suspect or inexcusable absences and lateness by employees," such as "that an employee frequently takes sick days on Fridays and Mondays." NYBC further states that "[i]t was one of Ms. Droutman's responsibilities to look for these patterns and other suspect information in employees' time records." The parties agree that on one occasion Droutman discovered and reported that Christine Gray, another NYBC employee, "went out for lunch . . . and then came back and said that she did not take lunch"; Gray was subsequently suspended, although Droutman notes that this occurred "months later."

Marullo officially reviewed Droutman's job performance both in November 2000 and in October 2001, and on both occasions gave her favorable evaluations. But on June 19, 2002 Martin and Marullo met with Droutman to "discuss issues regarding her job performance," including that she was "not completing assignments," "the assignments that she was completing were not correct," and that "she was spending too much time in the workplace chitchatting with other people." Most importantly, **[*4]** Martin and Marullo informed Droutman that they had discovered that her 2002 Time Card was "completely and utterly blank" for that year to date, "while the other 180 employees' cards were completed within a week's accuracy," that "as the time keeper for the department, it looks HIGHLY suspect that the only incomplete time card is hers," that "a blank attendance card is, in effect, falsification by omission," and that "NYBC had terminated other employees for similar conduct." [2]

**FOOTNOTES**

2 In contrast to Martin's deposition statements clearly recalling that he warned Droutman during their June 19, 2002 meeting, Droutman insisted at her deposition that "she did not recall meeting with Andrew Martin on June 19, 2002," and that "she did not [recall] Martin or Marullo telling her it was highly suspect that her timecard was incomplete." But a "[plaintiff's] failure of recollection does not suffice to raise an issue of fact in the face of [the defendant's] clear recollection." *Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.,* 83 F. Supp.2d 384, 389 (S.D.N.Y. 2000).

**[*5]** Droutman subsequently asked to take off Monday, July 29 through Friday, August 2, 2002 as vacation days. Because Marullo was scheduled to be on vacation on July 29th, she denied Droutman's request to take that day off, but approved the rest of the week for Droutman's vacation. Droutman did not come to work on July 29th. According to NYBC, she "called in sick" that morning; according to Droutman, she "called in an Emergency Personal Day" because she "was unable to get to work because she was in Massachusetts with her husband who was ill." But the parties do not dispute that Droutman's time sheet, time card, and the Time Report were all subsequently marked, inaccurately, with a "P" for July 29th, suggesting that she had taken an approved vacation or personal day.

According to Droutman, the employee sign-in sheet "was kept in the middle of a room shared by Plaintiff [and several others including] Christine Gray," "[a]ll of the employees had access to [it]," and "[i]f an employee was out on vacation anyone of the other employees would mark the sign-in sheet to indicate that," or "if an employee called in sick anyone of the other employees would indicate that." Droutman notes **[*6]** that the sign-in sheet "was sometimes altered." Droutman says that although she called in an "Emergency Personal Day" on July 29, the employee sign-in sheet "was noted incorrectly," because Gray "told Diane Marullo that she had taken Plaintiff's phone call and that Plaintiff had called in sick." Further, states Droutman, "Marullo was Plaintiff's backup and would take over payroll when Plaintiff was out," Marullo "returned from her vacation on Tuesday, July 30, 2002," and upon her return, Marullo inputted the information on the July 29 sign-in sheet as it was written.

According to NYBC, however, Droutman inputted her own (inaccurate) time report into the system. Marullo testified that upon her return on July 30 she only inputted the phlebotomy staff's sign-in sheets, and that "[w]e always do the office staff [of which Droutman was a member] a week after." Martin discovered the discrepancy in Droutman's time records on August 23, 2002, and "determined that this was an attempt by Ms. Droutman to hide the fact that she had called in sick on the day that she had not been allowed to take as a vacation day," because she "knew that if [he] looked at her [time records] and saw sick **[*7]** on Monday and then she had four vacation days, [he] would . . . counsel her on that." According to NYBC, on that same day Martin decided to fire Droutman for falsification of documentation, effective August 26, 2002 (the next business day). At approximately 4:15 or 4:30 on August 26, Martin and another NYBC manager met with Droutman and informed her that she was terminated.

During Droutman's time at NYBC, its facility was under construction, and dust from the construction work apparently caused her to develop asthma. Droutman claims to have suffered approximately ten asthma attacks between October 5, 2001 and August 13, 2002, which she mitigated through the use of a prescribed inhaler, breathing exercises, and movement to fresh air. According to Droutman, during her asthma attacks she experienced "a feeling of tightness in my neck and chest and being unable to speak and breathe." Droutman apparently did not go to the hospital or seek immediate medical attention, although on one occasion co-workers called her husband "to come and take her home from work because of her difficulty breathing." Droutman's attacks occurred only at work, not at home. Her supervisors were aware of the attacks, **[*8]** and moved her work station "many times" in an attempt to lessen her exposure to the construction dust. NYBC also installed a "very large independent air filter" close to Droutman's desk. However, Droutman apparently continued to experience asthma-related symptoms.

On the afternoon of August 26, 2002, "in order to obtain reimbursement for the cost of her prescription asthma medication," Droutman submitted a faxed note from her pulmonologist to NYBC's Human Resources Department. The note stated in full:

> August 26, 2002
>
> RE: DROUTMAN, Barbara
>
> To whom it may concern:
>
> Barbara Droutman has been under my care since 3/27/02 for asthma. Her condition was brought on by exposure to ongoing construction at her place of work. Use of an air purifier in her work area brought about some improvement in her symptoms, however, she still suffered from asthma attacks.
>
> Relocation to an area outside the construction zone has resulted in further improvement, although her symptoms do persist.
>
> Sincerely,
>
> Jason Karp, M.D.

Shortly after submitting this note, Droutman was informed of her termination. She asserts that NYBC replaced her with "someone who does not have asthma **[*9]** and is not disabled."

*DISCUSSION*

I. *Summary Judgment: Legal Standards*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing **[*10]** Fed.

R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson,* 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful **[*11]** of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter,* 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson,* 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady,* 863 F.2d at 211 (citing *Matsushita,* 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of New York,* 224 F.3d 149, 157 (2d. Cir. 2000), **[*12]** and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo,* 22 F.3d at 1224.

II. *Droutman's Americans* **[*13]** *With Disabilities Act Claim Must Fail.*

A. *The ADA and McDonnell Douglas: Legal Standards*

The Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., states in pertinent part: "No [employer covered by the Act] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Where, as here, there is no *direct* evidence of an employer's alleged disability-based discrimination, courts analyze ADA claims under the same framework as other federal employment discrimination claims, first enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 48-49 (2d Cir. 2002). Under the *McDonnell-Douglas* standard, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate **[*14]** a legitimate, non-discriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason for its actions is merely pretextual, and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

B. *Droutman fails to state a prima facie case of disability discrimination.*

NYBC's first argument is that Droutman fails to even state a prima facie case of disability discrimination. To state a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that her employer is subject to the ADA, that she suffers from a disability within the meaning of the ADA, that she could perform **[*15]** the essential functions of her job with reasonable accommodation of her disability, and that she was fired under circumstances giving rise to an inference of discrimination. *See Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 149-50 (2d Cir. 1998); *and Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir. 1998). At the summary judgment stage, the burden of demonstrating a prima facie case of employment discrimination under the ADA and *McDonnell Douglas* is "de minimis." *See Estwick v. U.S. Air Shuttle,* 950 F. Supp. 493, 502 (E.D.N.Y. 1996) (citing *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir. 1994)). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

Droutman bases her "inference of discrimination" primarily on the fact that she was fired on the same day that she submitted a doctor's letter noting the persistence of her asthma. The temporal proximity of an employee's disclosure of a disability and her termination helps support an inference of disability discrimination. **[*16]** *See Bullock v. Balis & Co., Inc.,* 2001 U.S. Dist. LEXIS 2584, No. 99 Civ. 748, 2001 WL 253857, at *4 (E.D. Pa. March 14, 2001). Nevertheless, NYBC argues convincingly that Droutman has not established that she is "disabled," and that she has thus failed to state a prima facie case. [3]

**FOOTNOTES**

3 NYBC also argues that Droutman's purported prima facie case is disproved in part by the fact that NYBC went out of its way to *accommodate* her asthma, by repeatedly moving her desk and installing an air filter where she worked. It does seem rather unlikely that NYBC, after almost eleven months of attempting to help Droutman, reversed its attitude within the space of (by her own reckoning) forty-five minutes of receiving Dr. Karp's letter. *See Moskerc v. Am. Airlines, Inc.,* 2004 U.S. Dist. LEXIS 8326, No. 02 Civ. 710, 2004 WL 1354521, at *5 (N.D. Ill. May 11, 2004) (assisting employee in search for less taxing jobs and restricting weight-lifting requirements of employee's original position in response to ergonomist's report are "hardly the actions of an employer that deems an employee as unable to work because of a substantial limitation on a major life activity"). Because Droutman's claim clearly fails for other reasons, however, this issue need not be resolved.

**[*17]** 1. *Droutman fails to show that she is "disabled" under the ADA.*

The ADA defines "disability" as (A) a physical or mental impairment that *substantially limits* one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being *regarded as having* such an impairment. 42 U.S.C. § 12102(2) (emphases added). Regulations promulgated under the ADA define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working.*" 29 C.F.R. § 1630.2(i) (1997) (emphasis added).

"Although almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled." *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 870 (2d Cir. 1998). The term "substantially limits" has been held to mean "significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general **[*18]** population can perform the same major life activity." *Hendler v. Intelecom USA, Inc.,* 963 F. Supp. 200, 206 (2d Cir. 1997). In assessing whether a plaintiff is "disabled," courts "have been careful to distinguish impairments which merely affect major life activities from those that substantially limit those activities." *Ryan,* 135 F.3d at 870.

Thus, while asthma is certainly an "impairment," it cannot constitute a "disability" under the ADA unless it *substantially limits* or *significantly restricts* the sufferer's ability to perform a major life activity -- in this case, work. *See Nugent v. Rogosin Inst.,* 105 F. Supp.2d 106, 112 (E.D.N.Y. 2000). "Numerous [courts have] held that an asthmatic condition which only prevents plaintiff from working at one job, or a narrow category of jobs, is not a qualifying disability under the ADA." *Id.* (citing *Muller v. Costello,* 187 F.3d 298, 302-06 (2d Cir. 1999), as well as cases from Fourth and Eighth Circuits).

Furthermore, in determining whether a plaintiff is disabled, a court must consider "measures that mitigate the

individual's impairment." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 475, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999). **[*19]** In a case involving asthma, the court should thus "consider the extent to which plaintiff is able to control his asthmatic symptoms," through the use of corrective measures such as inhalers or other medications. *Murphy v. Bd. of Educ. of Rochester City Sch. Dist.,* 273 F. Supp.2d 292, 315-16 (W.D.N.Y. 2003) (citing, 187 F.3d at 313).

In the present case, Droutman's asthma clearly did not "substantially limit" her major life functions, particularly her work: Droutman's ten or so asthma attacks were apparently limited to her working environment, self-medicated with an inhaler, and mitigated by breathing exercises and movement to an area of fresh air; Droutman was also generally capable of performing her job assignments. Droutman thus did not have a "disability" as defined by the ADA, and appears to concede this point.

2. *Drautman also fails to show that she was "regarded as disabled" under the ADA.*

Droutman argues that, although not actually suffering from an impairment that substantially limited her major life functions, she still qualifies as disabled under the ADA, because NYBC "regarded her" as being disabled. Droutman's argument falls short.

**[*20]** As suggested above, even an employee who does not actually suffer from an impairment substantially limiting one or more major life activities may still be considered "disabled" for ADA purposes, if she demonstrates that she was "regarded as having such an impairment" by her employer -- even erroneously. *See Sutton,* 527 U.S. at 489 (citing 42 U.S.C. § 12102(2)(C)). The EEOC's regulations elaborate that "regarded as having such an impairment" includes "[having] a physical or mental impairment that does not substantially limit a major life activity but is treated by a covered entity as constituting such limitation." 29 C.F.R. § 1630.2(l).

A plaintiff proceeding on a "regarded as" theory of disability faces a "particularly heavy burden." *Peeples v. Coastal Office Prods., Inc.,* 203 F. Supp.2d 432, 460 (D. Md. 2002). The Sixth Circuit has explained that this type of claim "takes a plaintiff to the farthest reaches of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind. Thus, proving the case becomes extraordinarily difficult." *Ross v. Campbell Soup Co.,* 237 F.3d 701, 709 (6th Cir. 2001). **[*21]**

The fact that an employer is *aware of* an employee's impairment, without more, is insufficient to demonstrate either that the employer "regarded the employee as disabled" under the meaning of the ADA, or that that perception led to an adverse employment action. *Cavallaro v. Corning, Inc.,* 93 F. Supp.2d 334, 345 (W.D.N.Y. 2000) (citing *Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir. 1996)). Rather, the plaintiff must show "that her employer erroneously believed that she was substantially limited in her ability to work," or "mistakenly believed that she was substantially limited in other major life activities, such as breathing." *Murphy v. Bd. of Educ. of Rochester City Sch. Dist.,* 273 F. Supp.2d 292, 320 n.24 (W.D.N.Y. 2003) (citing *Rhoads v. F.D.I.C.,* 257 F.3d 373, 391 (4th Cir. 2001)).

The only evidence Droutman offers to show that NYBC regarded her as disabled is the doctor's letter that she presented to NYBC's human resources department on the day of her termination. As noted, this letter stated states only that Droutman has been treated for asthma "brought on by exposure to ongoing construction," that "[u]se **[*22]** of an air purifier in her work area brought about some improvement in her symptoms," that "[r]elocation to an area outside the construction zone has resulted in further improvement," but that "her symptoms do persist." Droutman posits that "Martin [could have] wrongly believed Plaintiff was completely unable to work after receiving Dr. Karp's note." But nowhere does the doctor's note suggest that Droutman was utterly incapable of working in other facilities or performing any other basic life functions, and she points to no other evidence remotely tending to suggest that NYBC regarded her as such. A doctor's note of this sort, without more, cannot support Droutman's claim of "regarded as disabled" discrimination. *See, e.g., Moskerc v. Am. Airlines, Inc.,* 2004 U.S. Dist. LEXIS 8326, No. 02 Civ. 710, 2004 WL 1354521, at *5 (N.D. Ill. May 11, 2004) (plaintiff "cannot simply rely upon the restrictions listed in his doctor's note to support his 'regarded as' claim"); *Christner v. Am. Eagle Airlines, Inc.,* 2003 U.S. Dist. LEXIS 9102, No. 02 Civ. 0211, 2003 WL 21267105, at *6 (N.D. Ill. May 30, 2003) ("disability certificates" from employee's doctor indicating that he was unable to perform his job were "too **[*23]** vague" to indicate whether employer regarded him as disabled); *and Hawana v. City of New York,* 230 F. Supp.2d 518, 531-32 & 532 n.5 (S.D.N.Y. 2002) (doctors' notes diagnosing plaintiff with major depression but not indicating that condition seriously impaired his ability to perform major life activity do not constitute evidence that defendant regarded him as disabled).

C. *NYBC has offered a legitimate, non-discriminatory explanation for Droutman's termination.*

Even assuming that Droutman has managed to state a prima facie case of disability discrimination under the ADA (in light of her de minimis burden), NYBC has easily met its burden of articulating a non-discriminatory reason for terminating her. An employer's burden of showing a legitimate non-discriminatory reason for its actions is not particularly onerous. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.,* 192 F. Supp.2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia, Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir. 1985).

As NYBC suggests, an employee's falsification **[*24]** of her time sheets, reported hours, or attendance records is an undeniably legitimate and non-discriminatory reason for terminating her. *See, e.g., Costello v. St. Francis Hosp.,* 258 F. Supp.2d 144, 155 (E.D.N.Y. 2003) ("falsification of a time sheet can constitute a legitimate, nondiscriminatory reason for terminating an employee"); *Sanyer v. Kimberly Quality Care,* 971 F. Supp. 86, 89 (E.D.N.Y. 1997) (employee's lateness, submission of an inaccurate time sheet, failure to seek authorization to leave early, and failure to notify supervisor regarding absences are legitimate, non-discriminatory reasons for her discharge); *Gomez v. Pellicone,* 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (employee's falsification of time records and other misconduct were legitimate and nondiscriminatory reasons for her termination).

In the present case, having previously warned Droutman about her "highly suspect" blank time card and other job performance issues, NYBC asserts that it fired her after discovering what it felt was "falsification of documentation." This is an undeniably legitimate and non-discriminatory rationale for Droutman's termination.

D. **[*25]** *Droutman fails to demonstrate that NYBC's proferred reasons for firing her were pretexts for discrimination.*

As noted previously, once an allegedly discriminatory employer has articulated a legitimate, non-discriminatory reason for its actions, the plaintiff then has the burden of showing that the stated reason was pretextual, and that more likely than not discrimination motivated the adverse employment action. An employment discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero v. Warner-Lambert Co.,* 142 F. Supp. 2d 196, 203 n.7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999), and citing *Olson v. GE Astrospace,* 101 F.3d 947, 951-52 (3d Cir. 1996)). However, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of **[*26]** any weight" if she is to withstand summary judgment. *Smith v. Am. Exp. Co.,* 853 F.2d 151, 154-55 (2d Cir. 1988). In this case, Droutman has failed to do so.

Although Droutman's briefing is hardly a model of clarity, it appears to claim pretext behind NYBC's stated reasons for her termination based on the following: (1) that Martin claimed to review time cards every three months, but discovered Droutman's blank 2002 time sheet only in June; (2) that NYBC claims to have warned Droutman upon discovering her blank time card that falsification by omission had been grounds for terminating other employees in the past, but had actually only told her that "affirmative misrepresentation" was grounds for termination, and had not actually terminated Christine Gray, or any "other employees" for falsification of time records; (3) that Droutman did not actually call in sick on July 29, 2002, but instead called in an "Emergency Personal Day" because she was stuck in Massachusetts with her husband, who was ill, and that this call was taken and misreported by Gray; and (4) that Marullo, standing in for Droutman, had been responsible for entering the time records during the remainder **[*27]** of Droutman's time away from work. Fairly read, these points seem to boil down to two basic arguments for pretext: first, that Droutman did not falsify her July 29, 2002 time information; and second, that other allegedly dishonest (but not "disabled") employees were treated more leniently than her for similar infractions. Both arguments fail to demonstrate pretext.

1. *Even if Droutman did not actually falsify her attendance records, she fails to show that NYBC's belief that she did is pretextual.*

Droutman argues that she took a legitimate "Emergency Personal Day" and did not falsify her attendance record, and seems to suggest that someone else (accidentally or purposely) altered her time card or time sheet to make it look as though she had misreported her attendance. Even assuming that all of the above is actually true, that does not suffice to demonstrate pretext under the *McDonnell Douglas* standard.

Absent discrimination, an employer may fire an employee "for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all." *Mohamed v. Marriott Int'l, Inc.,* 905 F. Supp. 141, 155 (S.D.N.Y. 1995) (quoting *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir. 1984)). **[*28]** An employer's good faith *belief* that an employee engaged in misconduct is a legitimate reason for terminating her, and the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination. *See Agugliaro v. Brooks Bros., Inc.,* 927 F. Supp. 741, 747 & n.5 (S.D.N.Y. 1996) (citing *Waggoner v. City of Garland,* 987 F.2d 1160, 1166 (5th Cir. 1993), *and Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991)). Thus, even assuming a factual issue regarding whether an employee engaged in the misconduct for which her employer claims she was fired, and even assuming that she did not in fact engage in the misconduct, where the employer presents evidence showing that it *believed* that she had engaged in the misconduct and based its decision to terminate her on that belief, the employer's error does not constitute pretext. *Id.*

In the present case, Droutman seems to surmise that Gray misreported Droutman's reason for being absent on July 29, 2002, that Marullo then entered the incorrect information onto Droutman's time report or time card, and that Martin then seized **[*29]** upon this discrepancy as an excuse to fire Droutman as soon as he saw her doctor's note. Droutman also repeatedly "avers that Martin's proffered reasons for terminating her employment were pretextual," and "avers that Defendant terminated her because of her disability or perceived disability." Such unsupported conjecture and conclusory statements obviously do not suffice to meet Droutman's burden of demonstrating pretext, and Droutman has offered no evidence whatsoever indicating that Martin, who actually made the decision to terminate her, did not believe that Droutman had falsified her time card.

2. *Droutman fails to show that she was treated differently than other similarly situated employees.*

Droutman appears to see pretext in that only she, and not Christine Gray or any other employee was terminated for falsification of time records. As Droutman suggests, the *dissimilar* punishment of similar employees committing similar disciplinary infractions, if correlated with race, sex, or some other protected classification, *can* indicate pretext behind the employer's stated reasons for the punishment. *See, e.g., Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.,* 243 F.3d 336, 342 (7th Cir. 2001) **[*30]** (finding employer's stated non-discriminatory reason for suspending female employee -- namely falsified time sheet -- pretextual, given lack of disciplinary action taken against male employees in similar incidents).

But "[e]mployees are not 'similarly situated' merely because their conduct might be analogized"; rather, the employees "must have reported to the same supervisor . . ., been subject to the same standards governing performance evaluation and discipline, and must have engaged in [similar] conduct . . ., without such . . . circumstances that would distinguish their conduct or the appropriate discipline for it." *Mazzella v. RCA Global Communications, Inc.,* 642 F. Supp. 1531, 1547 (S.D.N.Y 1986); see *also Mustafa v. Park Lane Hotel, Inc.,* 12 F. Supp.2d 360, 363 n.6 (S.D.N.Y. 1998) (no pretext behind termination of plaintiff but not plaintiff's co-worker, as plaintiff had different job description than co-worker and had engaged in more serious conduct than co-worker; plaintiff was "not a similarly situated employee" and was properly "held to a higher standard"). And it is the plaintiff's burden to demonstrate her similar situation. *See* **[*31]** *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 546 (7th Cir. 2002); *see also Francis v. Runyon,* 928 F. Supp. 195, 203 (E.D.N.Y. 1996) ("Plaintiff must also establish that the other employee's acts were of 'comparable seriousness' to her own infraction.") (quoting *Lanear v. Safeway Grocery,* 843 F.2d 298, 301 (8th Cir. 1988)). Where there are clear differences between the employees' positions, infractions, or punishments, summary judgment may be appropriate. *See Curry v. Menard, Inc.,* 270 F.3d 473, 480 (7th Cir. 2001).

In the present case, the evidence clearly shows that Droutman and Gray were *not* similarly situated employees, and that they did *not* commit similar infractions. Droutman, by her own admission, was responsible for the other employees' time sheets and time cards. It was thus eminently reasonable for NYBC to hold her to a higher standard of ethics and competence in reporting or entering her own hours and days worked. *See Hoover v. United States,* 513 F.2d 603, 607, 206 Ct. Cl. 640 (Ct. Cl. 1975) (severe punishment for tax technician's tax fraud justified, since he "did exactly what was his duty to prevent").

**[*32]** Moreover, while Martin and Marullo warned Droutman regarding her time card omissions or falsifications prior to her sick day episode on July 29, 2002, [4] she offers no indication that Gray had similarly been previously warned before her lunch hour falsification episode. Thus, the fact that Gray was not terminated for the latter incident does not indicate dissimilar treatment. *See Peters,* 307 F.3d at 546-47

(plaintiff failed to meet burden of identifying similarly situated individuals treated more favorably than he; plaintiff listed other employees who allegedly falsified "activity logs" but were not disciplined, but plaintiff failed to name any co-worker who, like he, had previously been warned about such infractions).

**FOOTNOTES**

4 Droutman also suggests that she had not been fairly warned that conduct similar to her alleged "falsification by omission" was grounds for termination, because NYBC had only "discussed that Gray's affirmative misrepresentation was ground for termination." Even assuming that this is a legitimate distinction, it is irrelevant, since NYBC terminated Droutman for her alleged affirmative misrepresentation, not any omission.

**[*33]** In sum, Droutman fails to demonstrate that NYBC treated other employees, who were *actually* similarly situated to her, differently. For this reason as well, she fails to demonstrate that NYBC's proffered reason for her termination is pretextual.

III. *Droutman's New York Human Rights Law Claim Must Fail.*

As mentioned previously, Droutman's complaint also claims that NYBC violated the New York Human Rights Law (NYHRL or NYSHRL), which provides in pertinent part: "It shall be an unlawful discriminatory practice: (a) For an employer . . ., because of the . . . disability . . . of any individual . . . to discharge from employment such individual." N.Y. Exec. Law § 296. This claim too, must fail.

"For the most part, the ADA and the NYSHRL are construed similarly, and the clear legislative purpose in drafting the NYSHRL was 'to enact a definition of disability coextensive with comparable federal statutes.'" *Burton v. Metro. Transp. Auth.,* 244 F. Supp.2d 252, 257 (S.D.N.Y. 2003) (quoting *Reeves v. Johnson Controls World Servs.,* Inc., 140 F.3d 144, 155 (2d Cir. 1998)). And absent direct proof of discrimination, summary **[*34]** judgment motions under the NYHRL are analyzed under the same *McDonnell Douglas* burden-shifting framework as ADA claims, discussed *supra* at Part II.A. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n.1 (2d Cir. 2000).

Since it has already been determined in the ADA context that Droutman fails to demonstrate pretext behind NYBC's legitimate reasons for terminating her, *see* Parts II.B and II.C, *supra,* Droutman's NYHRL claim necessarily fails as well. [5]

**FOOTNOTES**

5 The NYHRL does define "disability" more broadly than the ADA; under the NYHRL, "'if [an individual's] impairment is demonstrable by medically accepted techniques[,] it is not required that the impairment substantially limit that individual's normal activities.'" *See Burton,* 244 F. Supp.2d at 257-58 (citing N.Y. Exec. Law § 292(21); *Reeves,* 140 F.3d at 155; *and State Div. of Human Rights v. Xerox Corp.,* 65 N.Y.2d 213, 480 N.E.2d 695, 698, 491 N.Y.S.2d 106 (N.Y. 1985). However, this distinction is presently irrelevant, since Droutman fails to demonstrate that NYBC's legitimate non-discriminatory reason for terminating her is pretextual. *Cf. Clark v. New York State Elec. & Gas Corp.,* 67 F. Supp.2d 63, 73 n.8, 73-74 (N.D.N.Y. 1999).

**[*35]** *CONCLUSION*

For all of the above reasons, the Defendant's motion for summary judgment is GRANTED as to all of the Plaintiff's claims, and this case is accordingly DISMISSED in its entirety. The Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

Dated: July 27, 2005

Central Islip, New York

Denis R. Hurley

United States District Judge

Service: **Get by LEXSEE®**
Citation: **2005 U.S. Dist. LEXIS 42951**
View: Full
Date/Time: Thursday, March 28, 2013 - 2:19 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

In About LexisNexis | Privacy Policy | Terms & Conditions | Contact Us
Copyright © 2013 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

LexisNexis®

**EARL HARRIS, Plaintiff, -against- NEW YORK CITY DEPARTMENT OF HOMELESS SERVICES ELIGIBILITY INVESTIGATION UNIT, Defendant.**

**97 Civ. 0432 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***1998 U.S. Dist. LEXIS 5865***

**April 27, 1998, Decided**
**April 28, 1998, Filed**

**DISPOSITION:** [*1] Defendant's motion for summary judgement granted.

**COUNSEL:** Earl Harris, Plaintiff, Pro se, Brooklyn, NY.

For Defendant: Amy B. Regan, Esq., Assistant Corporation Counsel, New York, NY.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

***OPINION AND ORDER***

**SHIRA A. SHEINDLIN, U.S.D.J.:**

*Pro-se* plaintiff Earl Harris filed a Complaint on January 21, 1997, alleging that defendant New York City Department of Homeless Services' (DHS) Eligibility Investigation Unit (EIU) unlawfully discriminated against him as a result of his race and gender pursuant to Title VII of the Civil Rights Act of 1964. Harris contends that the discriminatory conduct consisted of termination of his employment, failure to promote him, imposition of unequal terms and conditions of employment, and retaliation. Furthermore, Harris claims that an employee of the defendant defamed him by making slanderous remarks about him to an individual seeking housing placement through the DHS. Defendant now moves for summary judgment [*2] pursuant to *Fed.R.Civ.P. 56(b)*. For the reasons stated below, defendant's motion is granted.

**I. BACKGROUND**

The Emergency Assistance Unit (EAU) is a department within the DHS that is the primary location for New York City families to apply for emergency housing assistance. *See* Declaration of Linda Sullivan, Acting Director of the EAU, January 16, 1998, at P 3 ("Sullivan Decl."). The EIU, reorganized in March, 1996, consists of teams of EAU workers who investigate each applicant family's claim of homelessness. *Id.*

Earl Harris, was hired by the DHS, effective April 15, 1996, as a per diem Clerical Associate. *Id.* at P 4. Harris was assigned to work at the EIU with five other Clerical Associates, all of whom were women. *See* Plaintiff's "Affirmation in Opposition to a Motion," February 17, 1998 ("Pl. Motion"), "Notice of Motion Opposition to a Motion," February 17, 1998 ("Pl. Memo.") at p. 1. The EIU established two shifts (8:00 a.m. to 4:00 p.m. and 4:00 p.m. to 12:00 a.m.); for each shift, three teams were created, each staffed with a Clerical Associate. *See* Sullivan Decl. at P 6. [1] The six Clerical Associates were hired in April, 1996 as part of the EIU [*3] reorganization, and each was provided with introductory computer training during the formal training period. *Id.* at P 14.

1 African American women were assigned to both shifts. *See* Sullivan Decl. at P 11.

Harris claims that Linda Sullivan, then Director of the EIU, told him that he would be assigned to the day shift so that he could help to set up the computer system. *See* Pl. Memo. at p. 2. Later, Harris found out that he was assigned to the evening shift, which Sullivan explained was part of her effort to accommodate the needs of the

Clerical Associates who had submitted hardship requests for the earlier shift. *See* Declaration of Amy Regan, Assistant Corporation Counsel, January 16, 1998 ("Regan Decl."), Exhibit "C": Deposition of Earl Harris, taken August 20, 1997 and August 28, 1997 ("Harris Depo.") at p. 58. While Harris did not submit a hardship request and did not mind working the evening shift, he saw this treatment as an example of discrimination. *Id.* He believed that had he been [*4] female, he would have been assigned to the day shift, even though there were two other women assigned to work the evening shift with him. *Id.*

At the time he was hired, Harris had some temporary employment experience with computers, had earned a G.E.D., and had completed thirty credits at Ulster Community College while in prison. *See* Sullivan Decl. Exhibit "D": Earl Harris' job application form for the Office Associate (a.k.a. Clerical Associate) position with the DHS, March 19, 1996 ("Harris Application") at pp. 4, 6-10; Harris Depo. at p. 7. While only basic computer skills were required for Clerical Associates, Sullivan was aware that Harris was very familiar with the computer system used by the EIU. *See* Sullivan Decl. at PP 13-14. Sometime in late April, the other five Clerical Associates were given additional remedial computer training; Harris was not. *Id.; see* Harris Depo. pp. 87 and 92.

Plaintiff views exclusion from the training session as a mixed blessing. *See* Harris Depo. at p. 89. On the one hand, he had to get some of the information about the printing system from the women who attended the training. *Id.* at p. 92. On the other hand, he recognized [*5] that the training would have been a waste of his time, because he already knew the system. *Id.* at p. 89. He believed that he was denied this training because Linda Sullivan was prejudiced against him because he was a male with computer skills. *Id.* at p. 90.

While he was employed at the EIU, Harris applied for and was denied a promotion to the position of Fraud Investigator. *See* Harris Depo. at p. 76. Although he had been told that he could not be promoted because he was unqualified, he asserts that Linda Sullivan purposefully made the decision not to hire him as a way of "holding [him] down." *Id.* However, Sullivan had no discretion to hire people who did not meet the minimum requisite qualifications. *See* Reply Declaration of Linda Sullivan, Acting Director of the EAU, March 6, 1998, at P 4 ("Sullivan Reply"). [2]

2 *See* discussion infra Part III.B.1 for a more detailed look at the qualifications for Fraud Investigator.

At the EIU, Harris accumulated many hours in overtime work. Sullivan [*6] maintains that he worked more overtime assignments than most, if not all, of the other Clerical Associates. *Id.* at P 9. Harris, on the other hand claims that Sullivan began to deny him overtime assignments after June, 1996, while Yara Suarez continued to receive them. *See* Pl. Memo. at p. 2. He submitted evidence of his overtime records, which show that from May 14, 1996 to June 21, 1996 he worked overtime almost every day. *See* Affidavit of Earl Harris, March 16, 1998 ("Pl. Affidavit"), Plaintiff's "Support for Opposition to Motion", March 16, 1998 ("Pl. Sur-Reply"), Ex. H. In response, Sullivan points out that not only was Yara Suarez employed as an Associate Fraud Investigator, whose work was time sensitive (often requiring overtime), but also that overtime assignments for Clerical Associates fluctuated on the basis of need. *See* Sullivan Reply at PP 8-9.

According to Harris, he had an argument with an Associate Fraud Investigator regarding his use of the telephones for personal phone calls sometime in June, 1996. *See* Harris Depo. at pp. 95-97. The confrontation escalated, and Patricia Jackson, a DHS unit office manager of some sort, advised Harris that she was [*7] going to "write [him] up." *Id.* at p. 96. However, plaintiff denies ever being formally written up or reprimanded for his behavior. *Id.* Roughly a month after this incident, on July 16, 1996, Cerenda Snowden complained to the Legal Aid Society that Harris had offered her placement in the family shelter system if she would go out with him. *See* Pl. Memo. at p. 3; Declaration of Barbara Cutler, Special Master in the case of *McCain v. Giuliani*, January 16, 1998, at P 3 ("Cutler Decl."). An attorney from Legal Aid then contacted Ms. Cutler, who was assigned to resolve disputes between homeless families who are parties to *McCain v. Giuliani*, Supreme Court, New York County, Index Number 41023/83, and the EAU. *See* Cutler Decl. at P 3. Eventually, Linda Sullivan began an investigation into Ms. Snowden's allegations. *See* Sullivan Decl. at 20. On July 17, 1996, an investigator and an attorney from the Disciplinary Unit of the DHS went to the EAU and conducted their own investigation into the allegations of misconduct. *Id.* at PP 21-23. The two investigations both concluded that Harris' termination was warranted, and he was terminated effective July 17, 1996. [*8] *Id.* at P 23.

After receiving notice of his termination, Harris began to conduct an investigation into the circumstances that led to his dismissal. Plaintiff's Notice of Motion to Amend Complaint, "Other Acts" (dated April 1, 1997) at p. 1 (filed May 7, 1997) ("Other Acts"). On July 21, 1996, a private investigator that Harris hired interviewed Ms. Snowden and learned that in a July 17, 1996 interview with Sullivan, Sullivan told Ms. Snowden that Harris couldn't be trusted, and that he had threatened to punch his co-workers in the face. *Id.*

Harris suggests that Ms. Snowden's allegations were a part of a plot orchestrated by Sullivan in order to terminate his employment because he was a black male with computer skills, and in an effort to retaliate against him for filing a Title VII sexual harassment claim against another city agency. *Id.* at p. 2; *see also* Harris Depo. at pp. 117-119. The record contains little to no information about this other case. [3] However, plaintiff submits as evidence of retaliation statements allegedly made by a DHS employee, who was friendly with Sullivan: "that's what you get for filing charges of Sexual Harassment" and "how does it feel, [*9] that you was found guilty of sexual harassment and that you are fired." Other Acts at p. 2. Plaintiff also maintains that Sullivan could not have found Ms. Snowden to be a credible complainant, because Ms. Snowden lied on her emergency shelter application and engaged in a bitter confrontation with two other EIU employees. *See* Pl. Memo. at pp. 2-4.

3 "Q: How did your employment come to end with the Child Welfare Administration?

> [Harris]: Well, basically what happened was I was working for a director... and it just didn't work out with her because she would have me doing things that I wasn't supposed to be doing so that is another issue which I believe I took that to district court and we agreed on something...."
>
> Harris Depo. at p. 31.

On August 2, 1996, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that the DHS discriminated against him on the basis of his race and sex. *See* Regan Decl. Ex. A. The EEOC issued a "right to sue" letter on December [*10] 19, 1996. On December 27, 1996, pursuant to Title VII, Harris brought this action alleging race and gender discrimination, as well as retaliation. *See* Regan Decl. Ex. B. On July 16, 1997, this court granted plaintiff leave to amend his complaint to add claims of slander and defamation.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*; *see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The moving party has the burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)*.

In determining whether summary judgement should be granted, the court resolves all ambiguities and draws all reasonable inferences against the [*11] moving party. *See D'Amico v. City of New York, 132 F.3d 145, 148 (2d Cir. 1998)*. Where, as here, a party is proceeding pro-se, this Court has the obligation to "read [the pro-se party's] supporting papers liberally... and interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)*; *accord Soto v. Walker, 44 F.3d 169 (2d Cir. 1995)*. Courts must be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is at issue. *See Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994)*. Even in these cases, however, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp, 118 F.3d at 110*. "Mere speculation and conjecture" is similarly insufficient. *Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)* (quoting *Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986))*. Instead, the plaintiff "must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes* [*12] *Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995)*.

## III. DISCUSSION

A. *Title VII Analysis*

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that:

> It shall be an unlawful employment practice for an employer... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin.

*42 U.S.C. § 2000e-2(a) (1)*. A Title VII plaintiff can use one of two theories to prove that illegal discrimination has occurred -- "pretext" or "mixed motive." *See Stratton v. Dept. for the Aging, 132 F.3d 869, 878 (2d Cir. 1997)*.

The pretext analysis requires application of the burden shifting rule, originally articulated in *McDonnell*

*Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. Under this rule, a plaintiff must first establish a prima facie case that illegal discrimination has occurred, by a preponderance of the evidence. *See Scaria v. Rubin, 117 F.3d 652, 653 (2d Cir. 1997)*. A prima facie case is established by a showing that plaintiff (1) is a member of a protected [*13] class, (2) was qualified for his position, (3) suffered an adverse employment action, and (4) that the action took place under circumstances giving rise to an inference of discrimination. *See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (2d Cir. 1997)*. Once the plaintiff has met this burden, the defendant must produce evidence that there was a "legitimate, non-discriminatory reason" for the defendant's actions. *Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*. If the defendant does provide such a reason, the presumption of discrimination established by the prima facie case disappears, and the plaintiff "must... point to sufficient evidence to reasonably support a finding that he was harmed by the employer's illegal discrimination." *Fisher v. Vassar College, 114 F.3d 1332, 1334 (2d Cir. 1997)*.

While a "mixed motive" analysis also provides for a shifting of the burdens, a prima facie case can only be made through a showing of direct evidence of discriminatory animus. *See Raskin v. Wyatt Co., 125 F.3d 55, 60 (2d Cir. 1997)* (citing *Ostrowski v. Atlantic Mutual Ins. Co., 968 F.2d 171, 180* [*14] *(2d Cir. 1992))*. Under this framework, a plaintiff must "focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the [challenged] employment decision." *Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1181 (2d Cir. 1992)* (quoting *Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989))*; *see 42 U.S.C. § 2000e-2(m)* ("An unlawful employment practice is established when the [plaintiff] demonstrates that race, color, religion, sex, or national origin was a motivating factor for an employment practice, even though other factors may have also motivated the practice."). Direct evidence of discriminatory behavior, for these purposes, includes policy documents and evidence of statements and other behavior by decision makers that reflects the alleged discriminatory attitude. *See Raskin, 125 F.3d at 60* (quoting *Ostrowski, 968 F.2d at 180*). If the plaintiff sufficiently provides direct evidence of discriminatory animus, the burden shifts to the employer to prove that it would have made the same decision had there been no such animus. *See De La Cruz v. New* [*15] *York Human Resources Admin. Dept. of Social Servs., 82 F.3d 16, 23 (2d Cir. 1996)*.

The pretext analysis, in particular, has been criticized frequently. *See Lapsley v. Columbia University-College of Physicians and Surgeons, 999 F. Supp. 506, 1998 U.S. Dist. LEXIS 3892, 1998 WL 142333, *6 (S.D.N.Y. 1998)* (citing numerous cases that by-pass the burden shifting process); *Jalal v. Columbia University in the City of New York, 4 F. Supp. 2d 224, 1998 U.S. Dist. LEXIS 2698, 1998 WL 106137, *9 (S.D.N.Y. 1998)* (where I declined to "dance mechanistically through the McDonnell-Douglas and Price Waterhouse 'minuets'" and proceeded to the ultimate issue). Ultimately, when all of the burden shifting has finished, the court must address the key issue in every Title VII case: Whether the plaintiff has presented evidence from which a rational finder of fact could conclude that the defendant illegally discriminated against him. *Stratton, 132 F.3d at 878* (quoting *Fields v. New York State Office of Mental Retardation & Dev. Disabilities, 115 F.3d 116, 119 (2d Cir. 1997))*. In most cases, this can be done without relying upon either the pretext analysis or the mixed-motive analysis, because there is often no question that the plaintiff established [*16] a prima facie case. However, in the instant case, where the plaintiff clearly fails to present a prima facie case for several of his claims, these tests may prove useful.

**B. *Race and Gender Discrimination***

1. *Failure to Promote*

As noted above, establishing a prima facie case requires the plaintiff to prove that he was qualified for the requested promotion. *See Shumway, 118 F.3d at 63*. Harris claims that he was the victim of gender and race discrimination, in part, because the EIU failed to promote him to the position of Fraud Investigator. There is absolutely no evidence that the defendant considered plaintiff's race or gender when it made this decision. In fact, all of the evidence suggests that the plaintiff was not qualified for this position.

According to the Sullivan Declaration and the DHS job postings, the minimal requirements for a position as a Fraud Investigator are:

> 1. A four year high school diploma or its educational equivalent and three years of satisfactory experience, acquired with the U.S. investigating criminal or fraudulent activities; or
>
> 2. A baccalaureate degree from an accredited college and one year of satisfactory full-time [*17] experience acquired with the U.S. as described in 1 above; or
>
> 3. A baccalaureate degree, including or supplemented by 24 semester credits in criminal justice, forensic science, police

science, criminology or criminal justice administration and planning.

Sullivan Decl. Exhibit "C" (DHS Job Vacancy Notice). When Harris applied for this position, he had only completed one year of college courses, and had had less than one year of experience working for the U.S. investigating fraudulent activities. Without adequate qualifications, plaintiff cannot establish a prima facie case that he was denied a promotion for discriminatory reasons. While there is some evidence that the DHS may have viewed Harris' felony conviction in a negative light in its decision making process, [4] felons are not a Title VII protected class. *See 42 U.S.C. § 2000e-2(a)(1)*.

4 According to Harris, Linda Sullivan told him to "be patient, just be patient ... You have a conviction. You have a record. You can't be no fraud investigator." Regan Decl. Exhibit "C" at p. 77.

[*18] 2. *Unequal Terms and Conditions of Employment*

Plaintiff maintains that as a result of his race and gender, defendant subjected him to unequal terms and conditions of employment in violation of Title VII. Plaintiff contends that such inequity is apparent because he: (1) did not receive the additional computer training given to his fellow Clerical Associates, (2) was given the evening shift, and (3) received fewer overtime assignments than his fellow Clerical Associates.

The third prong of the prima facie test requires a showing that the plaintiff suffered an adverse employment action. *See Shumway, 118 F.3d at 63*. In these circumstances, the first two of the above-listed actions cannot be viewed as adverse. First of all, plaintiff did not receive additional computer training because the training was remedial in nature. Linda Sullivan was aware that plaintiff was very familiar with computers, including the particular programs used at EIU. In fact, plaintiff designed his own database system for tracking clients at EIU. While all new Clerical Associates were given introductory computer training during their formal training period, by the time DHS provided additional computer [*19] training, Harris had proven that he was so familiar with computers that he was not in need of additional training. What little information plaintiff needed for the particular printer system at EIU he learned from the Clerical Associates who had completed the training. Moreover, plaintiff was not injured by being excused from the remedial computer training. His reputation as a Clerical Associate with computer skills was not harmed, and even he doubts that the training would have been very beneficial. *See* Regan Decl. Exhibit "C" at p. 90 (Harris deposition: "Q: You did not really need the training; is that right?" "[Harris]: Right." *Id.*).

Secondly, Sullivan's decision to assign Harris to the 4:00 p.m. to 12:00 a.m. shift cannot be viewed as an adverse employment action. Plaintiff acknowledges that he did not view placement in the evening shift as adverse. *Id. at p. 59* (Harris deposition: "Q: How did you feel about working the evening shift? [Harris]: Well, to tell you the truth, I didn't mind because I had a job, so I didn't care which one ... I didn't mind anything. As long as I was getting a check, I didn't care."). Moreover, Sullivan did not view the evening shift [*20] as any less desirable than the day shift; in fact, during most of her tenure as Director of the EIU, Sullivan worked the evening shift herself. Sullivan chose to assign three of the women Clerical Associates to the day shift because they presented her with hardship requests for that shift. Harris did not.

In his deposition, plaintiff stated that Sullivan originally told him that he would have the day shift and later changed her mind. Although Sullivan apparently explained to him that she had to accommodate hardship requests from other Clerical Associates, he believes that she changed his assignment in an effort to "test" him. Without a hardship request from Harris, or any complaints by him to indicate that he was unhappy with his placement, [5] defendant could not have known that Harris felt adversely affected by this business decision. Clerical Associates during the day and evening shifts performed the same tasks, and they received the same pay, not including overtime. [6] Furthermore, African American women were assigned to both the day and evening shifts. [7] Without some evidence of discrimination, plaintiff's assertion that he was the victim of race and gender discrimination as [*21] a result of placement in the evening shift fails.

5 Apparently Harris did ask Sullivan why she had changed his assignment, *see* Regan Decl. Exhibit "C" at p. 58, he "didn't make an issue about it," he didn't tell her that her choice bothered him. *Id. at p. 61*.

6 *See* Plaintiff's "Support for Opposition Motion," Exhibit "K" (Clerical Associate/Office Associate salaries as of April 5, 1996)(all six Clerical Associates' base salaries are listed as "Per Diem, $ 83.28").

7 There is no evidence in the record as to the race of each Clerical Associate. There is also no evidence as to the shifts assigned to non-African American women.

Finally, there is absolutely no evidence to support plaintiff's claim that he was given fewer overtime assignments than other Clerical Associates as a result of

race and gender discrimination. The only evidence he proffers are the employment records of Associate Fraud Investigator Yara Suarez, a woman of Puerto Rican descent. Plaintiff claims that Suarez received more [*22] overtime than he did. However, this comparison is inapposite, as Suarez held a different position, with different duties and different opportunities for overtime. Furthermore, plaintiff does not rebut Sullivan's testimony that he was granted more overtime assignments than "most, if not all, other Clerical Associates when he worked at DHS." *See* Sullivan Reply Decl. at P 9. Harris maintains that after June, 1996, Sullivan stopped giving him overtime assignments. Even if this is true, however, he does not suggest any reason to suppose that this action was made under circumstances "giving rise to an inference of discrimination." "Under New York law, a civil service employee does not have a right either to a specific position with specific duties in a specific location, or to a promotion or to opportunities to earn overtime." *See Guida v. Police Dept. Of the City of New York, et al., 1997 U.S. Dist. LEXIS 7053, No. 96 Civ. 0355, 1997 U.S. Dist. LEXIS 7053, at *4 (S.D.N.Y. May 20, 1997)*(no Equal Protection violation in defendant's transfer of police officer to less desirable work assignments and locations). Plaintiff has failed to produce any proof that he was denied overtime at all, much less that this was [*23] a result of unlawful discrimination.

3. *Termination of Employment*

Plaintiff's final allegation of race and gender discrimination surrounds the termination of his employment with DHS. Harris maintains that but for defendant's discriminatory attitude, he would not have been fired from DHS without a deeper investigation into Cerenda Snowden's allegations of his sexual misconduct. However, under the circumstances, DHS's decision to fire Harris cannot support a finding of discriminatory animus: Even if Harris has satisfied the requirements of a prima facie case, he nevertheless has failed to present sufficient evidence of discrimination to permit this case to reach a jury. [8]

8 Defendant has provided ample evidence of "legitimate, non-discriminatory" reasons for terminating Harris's employment with DHS: for example, plaintiff does not dispute the fact that he engaged in insubordinate conduct on at least one occasion.

Plaintiff proffers as evidence of discriminatory animus testimony to the effect that: (1) [*24] Sullivan was friends with some of the women who worked at DHS and treated them favorably because of their relationship; (2) Sullivan was a lesbian, and treated Yara Suarez favorably in an effort to foster a romantic relationship with her, *see* Harris Depo. at p. 79; and (3) Sullivan didn't like Harris, and was jealous that he was a male with computer skills, *id. at pp.82, 116-119.* [9] Even assuming these unsupported allegations to be true, none of them support the conclusion that plaintiff's termination from DHS was a result of race or gender discrimination.

9 Harris also argues that the differential treatment he allegedly received would support a rational jury verdict in his favor. This argument was addressed in Parts III.B.1 and III.B.2 supra.

First, even if Sullivan had hired Renee Jones as a Clerical Associate and had given her the day shift as a result of their friendship, doing so would not suggest discriminatory animus against Harris. [10] *See Rivera v. National Westminster Bank, 801 F. Supp. 1123, 1133 n.13* [*25] *(S.D.N.Y. 1992)* (favoritism based on friendship does not suggest discriminatory animus against a plaintiff); *see also Scaria v. Rubin, 1996 U.S. Dist. LEXIS 9659, No. 94 Civ. 3333, 1996 U.S. Dist. LEXIS 9659, at *32 (S.D.N.Y. July 11, 1996), aff'd, 117 F.3d 652 (2d Cir. 1997)* (favoritism based on familiarity with personality and performance is a valid reason to promote an individual); *Foster v. Dalton, 71 F.3d 52, 56 (1st Cir. 1995)* ("Title VII does not outlaw cronyism").

10 Renee Jones, an African-American woman, and Harris were hired by the same administrative process, in which DHS staff outside of the EAU selected both for the Clerical Associate position. *See* Sullivan Reply Decl. at PP 4-5.

Second, Harris suggests that Sullivan was interested in initiating a romantic relationship with Yara Suarez and was jealous that Harris and Ms. Suarez had become friends. *See* Harris Depo. at p. 79. He claims that because Ms. Suarez was heterosexual, Sullivan saw Harris as a potential threat to any future romantic [*26] relationship between herself and Ms. Suarez. *Id.* Even if there were some factual support for plaintiff's theory, the idea that proof of lesbianism is proof of a discriminatory animus against heterosexual males is simply ridiculous.

Finally, even if Harris could prove that Sullivan did not like him or that she was jealous of him because he had computer skills, Harris would still have failed to make a showing of discriminatory animus sufficient to sustain a jury verdict in his favor. Title VII protects individuals from discrimination specifically based upon race, color, religion, gender or national origin, *see 42 U.S.C. § 2000e-2(a)(1)*; it does not protect employees from the jealousies of their supervisors.

While plaintiff maintains that he was the victim of race and gender discrimination, without a scintilla of evidence that gender or race were ever a part of Sullivan's thought process, [11] no rational trier of fact could

conclude that discrimination was a motivating factor in Harris' termination. Thus defendant's motion for summary judgment is granted.

11 If there was some evidence that Sullivan was biased, and that she was a decision maker for the purposes of plaintiff's claims, Harris's claims might have withstood summary judgement. *See Jalal*, 1998 WL 106137, at *13 (citing *Price Waterhouse v. Hopkins, 490 U.S. 228, 256, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)* ("[A] title VII plaintiff need not show that every one -- or even a majority -- of a group of decision makers was biased in order to prove that a decision was infected by discrimination.").

[*27] **C. *Retaliation***

In the alternative, plaintiff claims that even if his employment was not terminated due to race and gender discrimination, defendant retaliated against him for filing sexual harassment charges against another city agency. In pertinent part, *42 U.S.C. § 2000e-3(a)* provides that "it shall be an unlawful employment practice for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice [made unlawful by Title VII]."

Defendant argues that because plaintiff failed to complain of retaliation in his EEOC charge, this Court has no jurisdiction to hear the retaliation claim. Defendant cites *Butts v. New York City Dept. of Housing Preserv. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993)*, where the Supreme Court held that "[a] district court only has jurisdiction to hear Title VII claims that are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Id.* The following represent the three classes of claims that are considered "reasonably related" for these purposes: (1) claims where "the conduct complained of [*28] would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination'," *id. at 1402* (citing *Smith v. American President Lines, Ltd., 571 F.2d 102, 107 n. 10 (2d Cir. 1989)*; (2) claims which allege retaliation by an employer against an employee for filing an EEOC charge; and (3) claims where a plaintiff alleges that further incidents of discrimination are carried out in precisely the same manner alleged in the EEOC charge. *Id.*

This Circuit has instructed courts to look beyond "the four corners of the often inarticulately framed charge" when determining whether the claims alleged in the complaint are reasonably related to the EEOC charge. *Chinn v. City Univ. of N.Y. School of Law at Queens, 963 F. Supp. 218, 222 (E.D.N.Y. 1997)* (citing *Silver v. Mohasco Corp., 602 F.2d 1083, 1090 (2d Cir. 1979), rev'd on other grounds, 447 U.S. 807, 65 L. Ed. 2d 532, 100 S. Ct. 2486 (1980))*. A court must also recognize that adequate notice to defendants and exhaustion of administrative remedies are crucial to Title VII's remedial scheme. *Butts, 990 F.2d at 1401 (2d Cir. 1993)* ("The purpose of the notice provision, [*29] which is to encourage settlement of discrimination disputes through conciliation and voluntary compliance, would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC") (internal citation omitted)).

While the three types of reasonably related charges raise distinct questions, the first points to the critical issue that must be addressed in all: Whether the conduct complained of falls within the scope of the EEOC investigation, i.e., whether it would be reasonably expected to grow out of the charge of discrimination. *See Chinn, 963 F. Supp. at 222* (citing *Butts, 990 F.2d at 1402* (internal citation omitted)). In *Chinn*, the court found that plaintiff's retaliation claim was not reasonably related to his EEOC charge of racial discrimination. *963 F. Supp. at 223*. Judge Dearie focused upon the lack of notice given to the EEOC about the retaliation claim. *Id.* How could the EEOC's investigation reasonably be expected to grow from race discrimination to retaliation when the EEOC had no knowledge of any potential retaliatory motive for an employer's challenged actions? *Id.* It could not. For the same reasons, a charge of gender [*30] discrimination and a retaliation claim for filing sexual harassment charges fails to satisfy the reasonably related test.

Plaintiff's retaliation charge is separate and distinct from his gender discrimination claims. Even under the broadest reading of Harris' EEOC charge, the reasonable scope of the agency's investigation could not be expected to encompass Harris' allegations of retaliatory motive. There are simply no statements in his charge that might suggest that anything other than race and/or gender discrimination was implicated. Harris' Title VII retaliation claim presents both a new legal theory (retaliation), and new factual allegations (his Title VII claim against another city agency), neither of which were properly presented to the EEOC or the DHS. The reasonably related test "is not satisfied by the improbable possibility that the EEOC could have stumbled into a new universe of allegations that the plaintiff alleges for the first time in his complaint." *Chinn, 963 F. Supp. at 224*. Defendant's motion for summary judgement regarding the Title VII retaliation claim is therefore granted.

**D. *Slander and Defamation***

Finally, plaintiff's slander and defamation [*31] claims against DHS are time barred. General Municipal Law *§ 50-i(1)(a)* requires that prior to the commence-

ment of a tort action against the City of New York and its employees "a notice of claim has been made and served ... in compliance with *section 50-e* of this chapter." Gen. Mun. Law *§ 50-i(1)(a)* (McKinney's 1986). *Section 50-e(1)(a)* further provides that except for wrongful death actions, the notice of claim must be served "within ninety days after the claim arises." Gen. Mun. Law *§ 50-e(1)(a)* (McKinney's 1986).

Plaintiff was aware of the alleged slander and defamation by July 21, 1996, if not before. He filed a notice to amend his complaint and add these claims on May 5, 1997, more than nine months later. However, amending a complaint is not an adequate means of providing municipal defendants with notice under Gen. Mun. Law *§§ 50-e* and *50-i*. *See Shakur v. McGrath, 517 F.2d 983, 984 (2d Cir. 1975)*; *Davidson v. Bronx Municipal Hospital, 64 N.Y.2d 59, 484 N.Y.S.2d 533, 534, 473 N.E.2d 761 (1984)*. While pro-se plaintiffs are entitled to have their complaints read liberally, that does not eliminate an employer's right to adequate notice.

**IV. CONCLUSION**

Plaintiff's [*32] slander and defamation claims failed to meet the procedural requirements set forth in Gen. Mun. Law *§§ 50-e(1)(a)* and *50-i(1)(a)*. Similarly, his retaliation claim fails the notice element of Title VII, which requires that all claims must be alleged in the EEOC charge filed by the plaintiff, or at least be reasonably related to the claims in that charge. Finally, Harris' race and gender discrimination claims either fail to establish a prima facie case of discrimination, or fail other aspects of the pretext and mixed-motive tests. For the foregoing reasons, defendant's motion for summary judgement is granted. The Clerk is directed to close this case.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

April 27, 1998

**PAUL-ANTHONY MAGADIA, Plaintiff, against JANET A. NAPOLITANO, United States Department of Homeland Security, Defendant.**

**06 Civ. 14386 (CM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***2009 U.S. Dist. LEXIS 30926***

**February 26, 2009, Decided**
**February 26, 2009, Filed**

**COUNSEL:** [*1] For Paul-Anthony L. Magadia, Plaintiff: William Stancill, PRO HAC VICE, Neighborhood Legal Services Program, Washington, DC.

For Secretary Michael Chertoff, United States Department of Homeland Security, Defendant: Tomoko Onozawa, LEAD ATTORNEY, U.S. Attorney's Office, SDNY (Chambers Street), New York, NY.

**JUDGES:** Colleen McMahon, United States District Judge.

**OPINION BY:** Colleen McMahon

**OPINION**

**DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**McMahon, J.**

**Introduction**

Plaintiff, Paul-Anthony Magadia ("Magadia") is a former Asylum Officer ("AO") with the Immigration and Naturalization Service ("INS" or "USCIS"). [1] He brings this action exclusively pursuant to Title VII of the Civil Rights Act of 1991, *42 U.S.C. §§ 2000e et seq.* (as amended) ("Title VII") against defendant Janet A. Napolitano, Secretary of the Department of Homeland Security (or "Government"). He claims that the Government, by and through its managers and supervisors acting within the scope of their employment: 1) discriminated against him based on his race, Asian-American (Filipino); 2) created a hostile work environment based on his race; 3) constructively terminated him; and 4) retaliated against him based on his complaints to the [*2] Federal Bureau of Investigation ("FBI") and Office of the Inspector General ("OIG"), his union grievance activity, and the filing of his administrative complaint ("EEO complaint) with Equal Employment Office ("EEO").

1 As of March 1, 2003, the United States Citizenship and Immigration Services ("USCIS") of the Department of Homeland Security ("DHS") replaced the INS with respect to the granting of immigration benefits. The terms USCIS and INS are used interchangeably in this decision.

The discriminatory and/or retaliatory conduct of which he complains include: 1) his supervisors and managers accusing him of wrongdoing and disloyalty in connection with the Shandorf investigation; 2) being given an overall "unacceptable" performance rating for the 1998-1999 rating period; 3) having the processing of his within-grade step increase in salary delayed; 4) being temporarily denied access to certain computer programs used by AOs at the NYAO; 5) being temporarily assigned to AO duties outside of the NYAO; 6) not being selected for two supervisor positions to which he applied in 1999 and 2000; and 7) a being given the option of receiving a 14-day suspension for not adhering to NYAO policy or signing [*3] an abeyance agreement, which allegedly forced Magadia to resign. The plaintiff also asserts he received a negative job recommendation from his supervisors at INS after he filed his EEO complaint with the EEO.

The Government now moves for summary judgment pursuant to *Federal Rule of Civil Procedure 56.*

For the following reasons, the Government's motion is granted.

**I. Rule 56.1 Statements**

The Court begins by noting that plaintiff has failed to comply with *Local Rule 56.1*. The purpose of the rule is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties. See *Monahan v. New York City Dep't of Corr., 214 F.3d 275, 292 (2d Cir. 2000)*; *Watt v. New York Botanical Garden, 2000 U.S. Dist. LEXIS 1611, 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000)*. To that end, the plaintiff's obligation under *Local Rule 56.1(b)* in responding to a defendant's statement under *Local Rule 56.1(a)* is clear:

> The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party . . . .

To the extent that the plaintiff disputes [*4] any of defendant's statement of material facts pursuant to *Local Rule 56.1(b)*, *Local Rule 56.1(d)* requires him to support his denial by citing to admissible evidence as required by *Federal Rule of Civil Procedure 56(e)*. See *Local Rule 56.1(d)*. *Federal Rule of Civil Procedure 56(e)* provides:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

In this Circuit, "where there are no citations or where the cited materials do not support the factual assertions in the Statements, the court is free to disregard the assertion." *Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir.2001)* (citations and internal punctuation omitted); see also *O'Keefe v. Arbon Equip. Corp., 399 F. Supp. 2d 478,482-83 (S.D.N.Y. 2005)*.

Here, plaintiff's Rule 56.1 statement did not contain a single citation to evidence for paragraphs 9, 12, 22, 23, 30, 32, 40, 44, 45, [*5] 51. As a result, the corresponding facts in these paragraphs in the Government's Rule 56.1 statement are deemed admitted

**II. Factual Background**

The following fact--drawn from the Government's Rule 56.1 statement--are deemed undisputed, unless otherwise noted; where the facts are disputed, they are viewed more favorably to the plaintiff, the non-moving party.

**A. Plaintiff's Employment with the New York Asylum Office**

Magadia worked as an AO for the INS at its New York Asylum Office ("NYAO") located in Rosedale, New York, from September 3, 1996 until June 7, 2001, when he resigned.

As an AO, Magadia's duties included, *inter alia*, interviewing aliens who applied for asylum and adjudicating their applications. AO's had the authority to grant asylum, subject to the approval of a Supervisory Asylum Officer ("SAO"), but could not deny asylum. Rather, where the AO believed that an alien did not qualify for a grant of asylum, he referred the alien to deportation proceedings before an Immigration Judge ("IJ") pursuant to the issuance of a Notice to Appear ("NTA"), where the alien may renew his asylum application. An AO's recommendation in a given case is summarized in an "Assessment Memo."

**B. The Criminal [*6] Investigation and Arrest of Magadia's Supervisor**

Magadia testified that he did not have any employment related problems at the NYAO prior to the arrest of his supervisor, John Shandorf ("Shandorf") in April 1999, and that all of his causes of action arose as a direct result of that arrest and the related governmental investigations. He contends that, following Shandorf's arrest, he was forced to work in a hostile work environment, became a target of discrimination and retaliation, and ultimately was forced to resign.

In or about April 1997, Magadia was assigned to work under the supervision of Shandorf, an SAO. This meant that Magadia submitted his asylum recommendations to Shandorf for his review and approval. (Menges Decl. P 8.)

Around this time, the FBI and OIG began investigating Shandorf on suspicion that he had been taking bribes from Albanian asylum applicants in return for grants of asylum. As part of this bribery scheme, Shandorf instructed certain AOs under his supervision to either enter grants of asylum in the first instance, or to change a referral to an IJ to a grant of asylum.

Only three people at the NYAO knew of this investigation at the time: Patricia Trubiano, the NYAO [*7] Director; Patricia Jackson [2] ("Jackson"), the NYAO District Director; and SAO Alan Simek ("Simek").

2 Patricia Jackson is now known as Patricia Menges. At all times relevant to this case, Menges held the position of either Deputy Director or Director to the NYAO, and was known by her maiden name Patricia Jackson. The Court refers to Menges by her maiden name.

In or about April 1998, as the investigation of Shandorf continued, Magadia talked to Simek about a disagreement he had with Shandorf about the disposition of an asylum application involving an Albanian. The plaintiff contends that he went to Simek to talk about his concerns in this case because, at the time, Simek was a close friend. Magadia did not know about the Shandorf investigation. When he approached Simek, and Simek told him to follow NYAO policy and report his concerns to the Deputy Director or Director, Pursuant to NYAO policy, where an AO and a SAO disagreed as to the disposition of an asylum application, the matter had to be elevated up the chain of command to the Deputy Director or Director.

In this instance, Magadia did not follow NYAO policy, because he wanted to avoid conflict with Shandorf. However, Magadia swears [*8] that, on at least two occasions during this time period, he followed the NYAO policy by asking Shandorf to elevate the dispute to the Director. (Pl. Ex. A PP 18-20.) Magadia never went directly to the Deputy Director or Director, which is what Simek had told him to do.

The investigation into Shandorf's activities concluded with his arrest on April 8, 1999. He was charged with, and ultimately convicted of, several counts of bribery of a public official and conspiracy to defraud the United States, for which he received a 21 month sentence.

### C. The FBI's, OIG's, and OIA's Investigation of Magadia

At the time of Shandorf's arrest, the FBI and OIG examined the files of his AOs to assess the nature of the bribery scheme and to determine whether any of the AOs under his supervision were culpable. To this end, the FBI and OIG removed the files of all of his AOs, including Magadia. The files of two of Shandorf's AOs--Magadia and Anthony Cannizaro ("Cannizaro"), a white male--contained more changes of asylum recommendations than the files of any other Shandorf AO. Therefore, the investigators increased the focus of their inquiry on Magadia and Cannizaro, and interviewed them on several occasions.

As [*9] part of the investigation, Magadia gave investigators a yellow hard-cover logbook in which he kept track of the cases he had adjudicated. The logbook indicated whether he had changed the outcome of a case at Shandorf's request. Magadia also admitted to the investigators that he had been suspicious of Shandorf's partiality toward Albanian asylum applicants, and recalled that on approximately ten occasions--later revised to five--he had changed the outcome of an adjudication from a "referral" to an IJ, to a "grant of asylum," based solely on Shandorf's instruction.

As a result of the post-arrest investigation, the FBI and OIG cleared Magadia of any criminal wrongdoing. However, the evidence that they uncovered caused the INS Office of Internal Audit ("OIA") to investigate whether Magadia engaged in any misconduct short of a crime. As a result of the OIA investigation, Magadia had to testify under oath in December 1999. Magadia testified that he did not know of Shandorf's criminal scheme.

On or about July 13, 1999, while the investigation was pending, certain AO duties were taken away from Magadia, and from all other AOs who reported to Shandorf. Magadia and the other Shandorf AOs were [*10] also denied access to a particular computer program, which they had used to alter results in the Albanian cases at Shandorf's direction.

As part of the post-arrest investigation into Shandorf's criminal activities, the NYAO temporarily assigned Magadia to tasks outside of its office until it could be determined whether he had committed any wrongdoing. Among other tasks, Magadia was temporarily assigned to the Asylum Pre-Screening Officer ("APSO") program, where he conducted "credible fear" interviews of asylum-seeking aliens who were detained at the Wackenhut Detention Facility. This temporary assignment did not strip Magadia of his duties as an AO; in fact, only a certified AO who has held the position for at least one year can conduct "credible fear" interviews. However, it was a deviation from his normal duties.

Once the FBI, OIG, and OIA had completed their investigations and cleared him, Magadia resumed his former duties and privileges.

### D. The Allegations Underlying Plaintiff's Complaint

#### 1. Magadia's 1998-99 Performance Appraisal, Union Grievance, and Within-Grade Step Pay Increase

Shandorf's AOs needed to be reassigned after his arrest. Magadia was assigned to Simek, who also served

[*11] as Magadia's Rating Official for the rating period beginning April 1, 1998, and ending March 31, 1999.

The 1998-99 performance appraisal rating period closed, which was shortly before Shandorf's arrest, before Simek became Magadia's SAO and Rating Official. Shandorf had not prepared Magadia's formal evaluation before he was arrested (Simek Decl. P 13), and what was available--Shandorf's initial assessment of Magadia's performance--was deemed questionable by virtue of Shandorf's criminal conduct and the potential complicity of his AOs in his criminal scheme. Consequently, Jackson asked Simek to review Magadia's work performance for an additional 90 days--from April 12, 1999, to July 13, 1999. Although the 1998-1999 rating period was technically closed, Simek's 90 day assessment was credited towards it. Magadia received his 1998-99 performance appraisal on August 19, 1999.

Simek gave Magadia an overall "unacceptable" performance rating for the 1998-99 rating period. The Performance Appraisal Form for AOs contains six ratings: five critical elements and one non-critical element. Simek gave Magadia an "unacceptable" rating for the "Prepares Written Assessment" critical element. Magadia also [*12] received an "unacceptable" rating for the non-critical element "Adheres to Standards of Conduct." Because Magadia received an "unacceptable" rating for one of the critical rating elements, his overall performance appraisal rating was "unacceptable."

Simek purportedly gave Magadia an "unacceptable" rating for the "Prepares Written Assessment" critical element because, during the 90-day additional rating period, Simek had to return a total of twenty-two assessment memoranda to Magadia due to significant inadequacies in factual analysis, legal reasoning, and/or credibility findings. For example, Simek contends that Magadia's assessment memorandum frequently erred in applying the one-year rule, which requires an asylum applicant to establish that he entered the United States within one year of applying for asylum in order to be statutorily eligible for such relief. Simek testified that Magadia's error--stipulating to dates of entry that could not be confirmed--was "simply sloppy," and "could have prejudiced if not precluded the Government from asserting the one-year bar in subsequent deportation proceedings." (Id. P 15.)

Simek gave Magadia an "unacceptable" rating for the non-critical element [*13] "Adheres to Standards of Conduct" because Magadia failed to follow the NYAO policy for resolving AO and SAO disagreements about the outcome of an asylum application. Simek faulted Magadia for continuing to enter asylum grants at Shandorf's insistence even though he disagreed with the outcome, and for failing to heed Simek's instruction that Magadia should speak to the Deputy Director or Director about his disagreements with Shandorf.

Magadia contends that this performance evaluation was "trumped up," and that there was "no need for me to get an unacceptable rating." (McNeela Decl. Ex. B at 168:14-15.) He argues that his assessment memoranda were adequate in factual analysis, legal reasoning, and credibility findings. Prior to Simek's review, Magadia asserts that he never received an unacceptable rating from any of his supervisors. (See Pl. Opp'n Ex. A. P 9.)

Magadia also argues that he should not have received an "unacceptable" rating for the non-critical element. He asserts that he followed NYAO policy about reporting disagreements, and offers evidence from a current SAO, Yuniya Van Gronigen ("Van Gronigen"), who testified that the NYAO policy is "inherently flawed" because it is impossible [*14] for an individual AO to know if the SAO elevated the dispute to the Director. (Id. P 18-19.)

Magadia believes Simek gave him a false and negative evaluation for 1998-99 because Jackson told him to do so. Magadia testified that another AO, Patty Bethea, overheard Simek say, "I will write the worst possible performance appraisal for Paul Anthony. . . . Paul Anthony does not know how to analyze cases." (Id. at 171: 19-23.) The plaintiff does not explain how this implicates Jackson.

Magadia further argues that he received the negative evaluation in retaliation for the complaints he purportedly lodged with the FBI, OIG, and OIA during the course of their post-arrest investigations, and in retaliation for filing a union grievance. However, Magadia does not specifically recall when he made such complaints, nor does he recall their substance.

Magadia filed a union grievance contesting his performance review on September 15, 1999. Magadia filed the grievance not just to have his negative performance appraisal rescinded, but to have certain "penalties" (change of duties and access to certain computer programs) be remitted. These aspects of his job had been temporarily suspended while the criminal [*15] investigation proceeded; all AOs supervised by Shandorf were similarly treated. (Menges Decl. P 13; see McNeela Decl. Ex. I at 2-3.)

Initially, the NYAO denied Magadia's grievance, that decision was appealed to John Landolis ("Landolis"), the Director of the INS' Asylum Division. After reviewing the grievance, Landolis ordered that Magadia's overall "unacceptable" performance rating be rescinded. Instead, he ordered that Magadia receive an interim rating of "unacceptable." During this interim period, NYAO management was required to assist

Magadia in improving his "unacceptable" performance. After the interim period expired, Magadia would be given a new, final rating.

Landolis denied Magadia's request to have the penalties remitted, because Magadia was still under investigation: "Due to the continuing criminal investigation of which Mr. Magadia is a part of, reassuming formal Asylum Officer responsibilities is out of the question because of the sensitive nature of the job and the required access to INS computer systems." (McNeela Decl. Ex. I at 2-3.)

Finally, Landolis ruled that, because Magadia's overall "unacceptable" rating had been rescinded, the denial of Magadia's within-grade step [*16] pay increase would also be rescinded. Instead, the final decision on whether to grant Magadia a within-grade step pay increase would be postponed "until there is a rating of record." (Id. at 3.)

Eventually--the record does not make clear when--Magadia was deemed eligible for a within-grade step pay increase. However, there was some delay in processing it. Magadia testified that it took a "couple months" for him to receive the pay increase after Landolis issued the ruling in December 1999. (McNeela Decl. Ex. B. 203:9-206:14.) Magadia believed that Jackson delayed the processing because of his race, specifically because "Ms. Jackson and Mr. Simek, they are both white. And you know they have been pretty much persecuting me since this Shandorf incident. And this was their opportunity to take advantage of the situation to constructively have me terminated or removed from the office based on my ethnicity as an Asian American." (Id. at 217:6-14.) The Government denied any such motivation, noting that Jackson did not ever have a role in processing Magadia's within-step increase, because such pay increases are processed by the USCIS Regional Administrative Office in Vermont, not the NYAO. Magadia, [*17] however, contends that Jackson "played an important, critical, and major role in the process . . . [because] she was the only one who had the authority to approve, sign, and submit the required paperwork before the USCIS Regional Administrative Office in Vermont." (Pl. Opp'n at 18.) He argues that "without [Jackson's] signature, the USCIS . . . would not be able to commence processing the paperwork." (Id.)

**2. The Denial of Computer Access and Temporary Detail**

As noted above, it took longer for the FBI and OIG to clear Magadia and another AO, Cannizaro, of wrongdoing, because they had altered more of their asylum determination at the request of Shandorf than any of the other AOs within Shandorf's supervision. Because of the alterations, they were subjected to greater scrutiny by the FBI, OIG, and eventually, by the OIA, which delayed resumption of their computer access and Magadia's return to his former duties (rather than working at APSO). However, the plaintiff was eventually restored to his former duties and got his computer privileges back. This occurred no later than the end of 2000, although the exact date is not clear from the record. (See McNeela Decl. Ex. B. 209:3-211:15.)

**3. [*18] Subsequent Accusations of Wrongdoing and Disloyalty**

After Shandorf's arrest, Magadia contends that Simek and Jackson accused him of complicity in Shandorf's illegal activities and of being disloyal to the NYAO. Magadia testified that Simek said, "Because [you] worked with Shandorf [you] might know something about Shandorf's activities . . . If [you] knew something about it [you] should tell him." (McNeela Decl. Ex. B at 152:3-6.) Magadia characterizes these remarks as accusations of disloyalty and wrongdoing. He asserts that Simek made remarks like these sporadically and with decreasing frequency during the course of the FBI's and OIG's post-arrest investigation of Shandorf's AOs, which lasted from 1999 to 2000. Magadia does not contend that Simek made any other type of remarks accusing him of disloyalty and wrongdoing. Magadia testified that Simek did not threaten him, or accuse him of taking bribes or of committing any crime. Magadia also testified that he did not believe that Simek's comments were motivated by race or were retaliatory.

Magadia contends that, during an April 2, 2001 meeting, Jackson flatly accused him of being aware of Shandorf's criminal scheme and said that the plaintiff [*19] could not be trusted. Magadia contends that Jackson's accusations were racially motivated because they were "part of her scheme to harass me into giving information I don't know anything about." (Id. at 163:15-17.) He admits, however, that he does not have any evidence to support this contention. (Id. at 163:18-22.)

Magadia attended the April 2, 2001 meeting, accompanied by his union representatives, Richard King and Kevin Love, in order to discuss inconsistencies between the FBI's and OIA's reports of what he told investigators. Magadia contends that, during the meeting, Jackson "pretty much played like the bad cop trying to accuse of [sic] you doing something." (Id. at 157:21-23.)

**4. Denial of Magadia's Applications for District Adjudications Officer and SAO**

In 1999, Magadia applied for the position of District Adjudications Officer ("DAO") at the New York District Office. He contends that Jackson discriminated against

him by giving him a negative recommendation. He also claims that Jackson denied his 2000 application for the position of SAO at the NYAO for discriminatory reasons. Magadia was not selected for either of these positions; he received notices informing him of such on October [*20] 20, 1999, and September 27, 2000, respectively.

**a. DAO**

On or about August 18, 1999, Magadia interviewed for a DAO position at the New York District Office. (McNeela Decl. Ex. B at 131:20.) The New York District Office is wholly separate from the NYAO, and has a separate chain of command. Edward J. McElroy ("McElroy"), the Director of the New York District Office, interviewed Magadia for the DAO position.

Magadia contends that Jackson became upset with him for interviewing for the job. He asserts that Jackson must have given him a negative recommendation during a telephone conversation with McElroy because, "I wasn't hired. I wasn't offered a position as the supervisory district adjudication officer of Garden City." (Id. at 134:12-14.) However, Magadia does not offer any evidence to show that Jackson and McElroy had a phone conversation about him.

Magadia offers documentary evidence that Jackson and Simek faxed Magadia's "unacceptable" performance appraisal to McElroy before McElroy made his hiring decision. (Pl. Opp'n Ex. G.) Magadia contends that he received the "unacceptable" performance appraisal a few days after he interviewed for the DAO job, and that the "evaluation was written with [*21] the intent to preclude [him] from being promoted to the position of [DAO]." (Pl. Opp'n at 6.)

The Government argues that Magadia has offered no evidence that Jackson's purported negative recommendation was motivated by his race or was retaliatory in nature.

**b. SAO**

On or about September 27, 2000, Magadia applied for an SAO position at the NYAO. (McNeela Decl. Ex. B at 221:6-9.) Jackson was the selecting official for the SAO position (subject to the concurrence of Headquarters). She did not select Magadia for the position. In fact, he never even received an interview for the position. (Id. at 221:12-14.)

Instead, Jackson selected, Mirash Dedvukaj ("Dedvukaj"), who was an attorney with prior experience as an Assistant District Attorney. The Government contends that Jackson hired Dedvukaj because he was the best candidate: his work product was superior to that of all other applicants, including Magadia. The Government contends that Jackson's evaluation of Dedvukaj as the best candidate for the job is reflected in his subsequent performance at USCIS; since being hired as an SAO, Dedvukaj has been steadily promoted and is now the District Director for the USCIS Office in Detroit, Michigan.

By [*22] contrast, the Government argues that Magadia's missteps with respect to Shandorf show a lack of judgment, which is an essential quality for an SAO.

Magadia contends that Jackson did not hire him because of his race and in retaliation for (1) his complaints to the FBI and OIG, (2) his filing of a union grievance a little over a year before applying for the SAO position. When he was rejected for the SAO position, Magadia never asked anyone why he was not hired. However, he argues that he "didn't have to ask . . . [because] with everything that was happening I really don't think [Jackson] would have hired me." (Id. at 221:17-25.)

**5. Suspension, Abeyance Agreement, and Resignation**

In or about March 2001, the Deputy Director of the NYAO at that time, Monica Sanders ("Sanders"), issued a notice of proposed 14-day suspension to Magadia for his failure to follow established procedures by not elevating his disagreement with Shandorf about his assessment of several Albanian asylum applications.

At the NYAO, the Deputy Director, not the Director, has the responsibility to initiate proposals for discipline; the Director *then* makes the final decision whether to impose discipline. Jackson was the Director [*23] at the time Sanders recommended Magadia be suspended.

Jackson accepted Sanders' recommendation. Although she did not believe that Magadia had engaged in criminal activities, she believed that he needed to be disciplined for his ethical lapses in failing to use prescribed NYAO procedures to report Shandorf's misconduct. However, Jackson decided to mitigate the proposed 14-day suspension; she offered Magadia the opportunity to avoid suspension altogether by entering into an abeyance agreement.

As initially proposed, the abeyance agreement provided that Magadia could avoid suspension if, among other things, he acknowledged wrongdoing, maintained a clean disciplinary record for one year, and donated 40 hours of annual leave to the Voluntary Leave Transfer Program (which is typically used by ill or convalescing USCIS employees who have exhausted their allotted leave).

Magadia elected to be represented by his union during the disciplinary proceedings,. He did not like various aspects of the proposed abeyance agreement and asked if he could negotiate its terms. Jackson agreed and assigned

the task of negotiating the agreement to Simek, who was her advisor on labor-management relations issues.

Between [*24] March 2001 and June 2001, Simek, Magadia, and Magadia's union representative met several times in an attempt to negotiate the terms of the abeyance agreement. Several changes were made. The Government contends the changes were made to accommodate Magadia's concerns. Magadia contends that none of the proposed changes benefited him.

In or about early June 2001, Jackson approved what management believed was a final version of the abeyance agreement, thinking that Magadia found it acceptable and would sign it. But he never did. He testified, "During the entire negotiation process . . . I voiced my opinion unequivocally that I disagree with signing this abeyance agreement, unequivocally at every meeting every step of the game in front of my union steward." (Id. at 241:5-10.) Eventually, Magadia contends that the negotiations reached the point where there was nothing left for him to do but to placate the NYAO and pretend to go along with its proposals; even though he found them unacceptable. (See Compl. P 30; Def. Rule 56.1 P 45.) The plaintiff does not deny that he pretended that the negotiations were fruitful.

On the morning of June 7, 2001, instead of signing the abeyance agreement, Magadia [*25] slipped a letter of resignation under Simek's door. The letter made his resignation effective immediately, (McNeela Decl, Ex. D.) Magadia provided his employer with no advanced notice of his departure. He left a number of cases unfinished.

Magadia contends that he did not deserve the proposed suspension or offer of the abeyance agreement because he "didn't do anything wrong," (McNeela Decl. Ex. B at 144:19-20.) Rather, he contends he received the notice of suspension and offer of an abeyance agreement based on his race, and in retaliation for the September 19, 1999, grievance he had filed, and for the complaints he had previously made to the FBI, OIG, and OIA during their investigations.

Magadia also contends that Simek threatened him with termination if he did not sign the abeyance agreement. However, Magadia testified that he did not believe that Simek's threat was either serious or motivated by race. He testified that he believed Simek threatened him because Jackson wanted the agreement "signed as soon as possible and [Simek's] way of making me sign [the agreement] [was] to threaten me with termination." (Id. at 240:22-25.)

Magadia argues that the abeyance agreement negotiation process, [*26] coupled with all of the other mistreatment he endured after Shandorf's arrest (as described above), left him with no choice but to resign from the NYAO.

**E. Magadia's EEO Complaint and Post-Complaint Retaliation**

On or about June 11, 2001, approximately four days after his resignation, Magadia first contacted an EEO counselor to complain of discrimination. He filed a formal complaint of discrimination against the Government on August 3, 2001. Prior to June 11, 2001, Magadia had never contacted an EEO counselor during his employment at the NYAO. [3]

3 Although it took five and one-half years for the plaintiff's claims to reach this Court, his lawsuit is timely (although, as discussed below, most of his claims are not). The plaintiff filed his EEO complaint approximately one month before 9/11, which may explain why his complaint took so long to reach federal court, although that is not entirely clear from the record. In or about January 21, 2003, he received a notice from the Department of Justice that his complaint of discrimination had been accepted for investigation. (McNeela Decl. Ex. R.) Subsequently, pursuant to the Homeland Security Act, the Department of Homeland Security obtained jurisdiction [*27] over the investigation of his discrimination complaint. On or about May 5, 2006, the DHS issued a final decision on Magadia's complaint, determining that there was insufficient evidence of discrimination to support his claim. (McNeela Decl. Ex. A.) Magadia received a "Right to Sue Letter" on the same day, and timely brought this action in federal court on December 13, 2006. (Id.)

In his administrative complaint, Magadia alleged that the NYAO discriminated against him based on his ethnicity (Asian/Filipino) by threatening him with suspension--not termination--if he did not sign the abeyance agreement. Magadia also alleged that he was harassed because he received a negative performance appraisal. As a result of the negative appraisal, he alleged that he did not receive promotions to various supervisory positions to which he applied.

Sometime in or about the summer of 2002, Magadia applied for an AO position with the Asylum Office in Arlington, Virginia. The Deciding Official for that position, Martha Belvedere ("Belvedere"), contacted Jackson and Simek to get information about Magadia. Jackson and Simek testified that they did not tell Belvedere not to hire Magadia; however, both testified [*28] that they could not affirmatively recommend Magadia, because of his connection to the Shandorf investigation, his failure

to follow proper procedures when Shandorf ordered him to alter asylum recommendations, the average quality of his work product, and his a lack of dedication to his job, as demonstrated by the fact that he resigned without notice and before he completed assignments.

Belvedere did not hire Magadia because of Simek's and Jackson's' unfavorable references.

Magadia contends that Simek and Jackson retaliated against him by giving him a negative reference, and that Simek, Jackson and Belvedere, "conspired to deny plaintiff access to that position when he was better qualified than the individuals who were ultimately selected." (Compl. P 35.) However, Magadia admits that he does not know the identities of the individuals who were selected for the AO positions by Belvedere, never tried to find out who was hired, and has no knowledge of the racial backgrounds of each successful applicant.

**III. Standard of Review**

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of [*29] law. *Fed. R. Civ. P. 56(c)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin., 870 F. 2d 57, 60 (2d Cir. 1989)*. The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)*, Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing [*30] law will properly preclude summary judgment." *Anderson, 477 U.S. at 248*. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., 475 U.S. at 586*. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

**IV. Timeliness of Plaintiff's Claims**

An employee suing the federal government under Title VII must "timely exhaust the administrative remedies at his disposal" *Belgrave v. Pena, 254 F.3d 384, 386 (2d Cir. 2001)*, before initiating a lawsuit in federal court.

The Equal Employment Opportunity Commission's ("EEOC") administrative procedures require that the federal employee first "(1) consult with a counselor at the relevant agency's [EEO] within 45 days of the alleged discriminatory act, and, if the matter is not resolved after a mandatory counseling period, (2) file a formal written administrative complaint [ie., EEO complaint] within 15 days of receipt of the EEO counselor's notice of final interview and right to file a formal complaint. . . ." *Id. at 386 (2d Cir. 2001)* (internal quotations, punctuation and [*31] citations omitted).

The 45-day period specified in the EEOC's regulations acts as a statute of limitations, and "as a general rule, claims alleging conduct that occurred more than 45 days prior to the employee's initiation of administrative review are time-barred." *Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001)*. But, the statute of limitations is not an evidentiary bar; "an employee [may use] the prior acts as background evidence in support of a timely claim." *AMTRAK v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)*.

The 45-day rule is not absolute. One exception to the rule is known as the continuing violation doctrine. Under this doctrine, "if a plaintiff has experienced a continuous practice and policy of discrimination . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Id. at 359* (quotation, punctuation, and citation omitted). The continuing violation doctrine provides that if a plaintiff files a single timely charge of discrimination "as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will [*32] be timely even if they would be untimely standing alone." *Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993)*.

"However, multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." Id. The Supreme Court has held that the continuing violation doctrine does not apply to discrete and easily identifiable acts of discrimination. *Morgan, 536 U.S. at 114*. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice" id., which means that a claim based on each discrete act is timely

only if the plaintiff complained of the act within 45 days after it occurred. Id.

By contrast, claims for a hostile work environment, are "treated essentially as a continuing violation," *Sundaram v. Brookhaven Nat'l Labs., 424 F. Supp. 2d 545, 560 (E.D.N.Y. 2006)* (citing *Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134 (2nd Cir.2003))*, because "a hostile work environment claim . . . is 'comprised of [*33] a series of separate acts that collectively constitute one unlawful employment practice.'" *Elmenayer, 318 F.3d at 134* (quoting *Morgan, 536 U.S. at 117*).

The vast majority of Magadia's complaints are clearly time barred.

Magadia first made contact with an EEO counselor on June 11, 2001. 45 days prior to this date is April 26, 2001. The Government argues that, as a consequence, any of Magadia's claims based on acts prior to April 26, 2001, are untimely. Magadia counters that, because he was constructively discharged (i.e., forced to resign) on June 7, 2001, his "action was filed timely." (Pl. Opp'n at 12.) It is true that Magadia's constructive discharge claim is timely. However, the majority of his claims (with the exception of hostile work environment, which is discussed below) are not. The plaintiff cannot recover for any of the following allegedly discriminatory acts: 1) Simek's purported accusations of disloyalty in the months immediately following Shandorf's April 8, 1999 arrest, and Jackson's similar comments during an April 2, 2001 meeting; 2) Magadia's denial of computer access beginning on or about July 13, 1999; 3) Magadia's temporary assignment to the APSO program some time [*34] in 2000; 4) Magadia's receipt of the August 19, 1999 negative performance appraisal; 5) the delay in processing Magadia's within-grade step pay increase a few months after December 1999; 6) the rejection of Magadia's application for the DAO position on October 20, 1999; and 7) the rejection of Magadia's application for the SAO position on September 27, 2000.

As a result, Magadia has two viable "discrete act" claims remaining: his proposed suspension in June 2001 ("Suspension") and the negative recommendation he received when he applied for a job in Virginia in 2002 ("2002 application"). He also brings claims for a hostile work environment claim and constructive discharge, and acts that occurred prior to April 26, 2001 may be considered as evidence in assessing whether he is entitled to relief on those claims. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan, 536 U.S. at 117.*

Finally, Magadia does not even mention the continuing violation doctrine in his motion papers. Even if he had, it would avail him nothing, because the acts [*35] about which Magadia complains were all "discrete acts" that were easily identifiable as discriminatory at the time that they were made. For example, Magadia received a negative performance appraisal on August 19, 1999. The appraisal is a discrete act; if Magadia thought it was the product of discrimination or retaliation he could have complained within 45 days. Magadia chose not to do so. His opportunity to contest the appraisal has long since expired. This reasoning is equally true for all other claims Magadia brings based on events prior to April 26, 2001.

### V. Employment Discrimination Claims

#### A. Discrimination

In discrimination cases, the plaintiff bears the burden of introducing evidence that would, if credited, establish every element of his *prima facie* case. The plaintiff must show "1) that be belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).* If the plaintiff meets that minimal burden, the defendant must come forward with a legitimate [*36] non-discriminatory reason for taking the action it took. At that point, the burden shifts back to the plaintiff to prove, with evidence and not conclusory supposition, that the defendant's articulated rationale is a pretext for discrimination. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 806, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* The plaintiff, with admissible evidence, "must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold, 366 F.3d at 152.*

The parties do not dispute that Magadia's evidence satisfies the first three elements of a *prima facie* case for discrimination. However, they dispute whether Magadia has offered sufficient evidence to warrant an inference of discrimination.

The Government contends that Magadia has not offered any evidence to show that any of the conduct about which he complains gives rise to an inference of discrimination.

Magadia responds by arguing that, "while, on its face, it may not appear to be blatant racial discrimination, NYAO's track records show they have done this before to other employees of color, also forcing them to

leave [*37] NYAO to obtain their promotion at another office within the former INS." (Pl. Opp'n at 18.) Magadia contends that it follows that the Government's actions in this case must have been discriminatory.

To support this argument, Magadia relies on the affidavit of Van Gronigen, a former AO at NYAO from July 22, 1996 to January 2000, who attested that, "NYAO's Management has had a reputation for wrongly accusing its 'persons of color' employees for minor infractions, forcing them to resign or transfer to other branches within INS." (Pl. Opp'n Ex. A. P 10.) Van Gronigen's statement does not claim Jackson or Simek discriminated against "persons of color." She does not claim that she saw anyone discriminate against Magadia, nor does she assert that she believes he was discriminated against. She also does not identify a single example of an employee of color who was treated differently than a white employee. She simply asserts, in conclusory fashion, that it is true.

Magadia also contends that a triable issue of fact exists because the only supervisor to give him a negative appraisal was Simek. Magadia contends that, because his prior supervisors did not find any problems with his work, Simek's [*38] evaluation must have been motivated by race.

Magadia has no evidence tending to show that *anything* that happened during his tenure in the NYAO was motivated by race. (See e.g., Def. Mem. at 22-25 (quoting Magadia's testimony about each claim where he admits that he has no evidence that race motivated Simek's and Jackson's actions).) His reasoning is on the order of: (1) something bad happened to him; (2) he is Filipino; (3) therefore the bad thing happened because he is Filipino. That fails to make out a *prima facie* case of discrimination.

For a trier of fact to be able to infer discrimination, the plaintiff must point to some *facts* that suggest the actions taken were motivated, at least in part, by racial animus. Such facts include:

> (1) actions or remarks made by decisionmakers that could be viewed as reflecting discriminatory animus; or (2) preferential treatment given to employees outside the protected class; or (3) in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees; or (4) a pattern of recommending the plaintiff for positions for which he is not qualified and not recommending him for positions for which he is qualified; or (5) the [*39] fact that following plaintiff's termination, defendant continued to seek applicants to fill the position.

*Kalsi v. New York City Transit Authority, 62 F. Supp. 2d 745, 753 (E.D.N.Y. 1998)* aff'd, *189 F.3d 461 (2d Cir. 1999)*. While there is no rigid rule for what type of proof is required to show an inference of discrimination--and the plaintiff's burden of proof is quite low at the *prima facie* stage--he has to come forward with something. On the record before me, Magadia has not offered any evidence tending to give rise to an inference of racial discrimination. See e.g., *Robinson v. Am. Stock Exch. LLC, 04 civ. 5899, 2007 U.S. Dist. LEXIS 78063, 2007 WL 3084970 at *6 (S.D.N.Y. Oct. 22, 2007)*.

In Robinson, the court granted the defendant's motion for summary judgment on the plaintiff's claim of discrimination. The plaintiff's evidence consisted of his subjective belief that his supervisor discriminated against him, and the fact that his supervisor reprimanded him after the plaintiff (Black) had a dispute with another white employee. The court held that, in the absence of any other evidence, racial discrimination could not be inferred from the underlying facts. *2007 U.S. Dist. LEXIS 78063, [WL] at 7*.

Here, nothing in the record suggests that the [*40] Government discriminated against Magadia because he is an Asian-American. The totality of Magadia's "evidence" consists of conclusory allegations, conjecture, and speculation. The fact that Simek was the first of Magadia's supervisors to criticize his work is not only devoid of racism, it is completely understandable: prior to Simek, the plaintiff's supervisor was a criminal who had no incentive to criticize an employee who was obedient to his wishes and who assisted (albeit unwittingly) in the consummation of his criminal activity. This does not defeat a motion for summary judgment.

Accordingly, the Government's motion for summary judgment dismissing the plaintiff's claims of race discrimination is granted.

**B. Retaliation**

To establish a *prima facie* case of retaliation, a plaintiff must show that: 1) he was engaged in a protected activity; 2) his employer was aware of that activity; 3) he suffered a materially adverse action; and 4) there was a causal connection between the protected activity and the adverse employment action. See *Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)*. If the plaintiff meets this burden, the McDonnell-Douglas burden-shifting analysis used [*41] in claims of discrimination--articulated above--also applies to retaliation claims. *Bush v. Ford-*

*ham Univ., 452 F. Supp. 2d 394, 415 (S.D.N.Y. 2006)* (citing *Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003))*.

Only three possible actions taken by Magadia could be considered protected activities: 1) his complaints about Jackson and Simek to the FBI and OIG, which took place some time in 1999 or 2000; 2) his September IS, 1999 union grievance; and 3) his August 3, 2001 EEO complaint. All occurred (if indeed the first occurred) far too long ago before the acts of June 2001 and November or December 2002 to give rise to a plausible inference of retaliation.

A plaintiff may establish a causal connection between the protected activity and the adverse employment action through direct evidence of retaliatory animus or indirectly with circumstantial evidence, "for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct . . . ." *Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990)*; see also *Daly v. Presbyterian Hosp., 98 civ. 4253, 2000 U.S. Dist. LEXIS 5, 2000 WL 8268, at *5 (S.D.N.Y. Jan. 4, 2000)*. [*42] Indirect proof of a causal connection may also be shown by temporal proximity. "A closeness in time between the protected act and the alleged retaliation supports an inference of discrimination sufficient to establish a prima facie case." *2000 U.S. Dist. LEXIS 5, [WL] at *6* (citations and quotation omitted).

Magadia does not offer direct evidence of retaliation--he admits he has none. The only "evidence" that he offers to support causality is that the purported adverse actions (Suspension and 2002 application) happened after he filed his grievance. Unfortunately for the plaintiff, the Supreme Court has held that to establish causality based on timing requires the temporal proximity be "very close." *Clark County School Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)*. For example, the Court noted that actions taken 20 months or later "suggest[], by itself, no causality at all." *Id. at 274*.

In this case, Magadia does not know when he complained to the FBI or OIG about his suspension. He admits he has no proof that he made such complaints and does not recall the substance of them. Nor does he offer any evidence that he communicated the fact of his complaints to Jackson and Simek. Accordingly, Magadia fails to establish [*43] two elements of a *prima facie* case for retaliation: 1) that his employer was aware of the activity; and 2) causality.

For the other two activities, Magadia has not shown causality based on temporal proximity. He filed the union grievance on August 19, 1999, but disciplinary proceedings were not initiated against him until March 2001, [4] approximately 19 months later, and he was rejected for the AO position in or about November or December 2002, approximately 38 months after he filed the grievance. Since there is a total absence of other direct or indirect evidence of retaliation, the substantial gaps in time between his protected activities and the adverse actions he suffered are too great to support an inference of causality.

4 Although the notice of the propose suspension is outside the period of timeliness, plaintiff's claim based on the suspension and abeyance agreement is not.

Similarly, Magadia fails to establish a causal connection between the EEO complaint and the decision not to hire him for the AO position in 2002. Over a year in time lapsed between when Magadia filed the complaint and when he received notice of rejection for the position. This gap in time--without more--is too [*44] great to establish the necessary nexus.

Accordingly, the Government's motion for summary judgment on the retaliation claim is granted.

**C. Hostile Work Environment**

Title VII provides that "It shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." *42 U.S.C. § 2000e-2(a)*. The phrase "terms, conditions, or privileges of employment" is broad enough to render actionable an employer's requirement that an employee work in a discriminatory, hostile or abusive environment. *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,66, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)*; *Gregory v. Daly, 243 F.3d 687, 691 (2d. Cir. 2001)*. In order to prevail on a hostile work environment claim, a plaintiff must establish two elements: 1) a hostile work environment; and 2) a specific basis for imputing the conduct that created the hostile environment to the employer. See *Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d. Cir. 1998)*; *Gallagher v. Delaney, 139 F.3d 338, 347-48 (2d. Cir. 1998)*.

With respect to the first element, the plaintiff [*45] must show that his workplace was "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)*(quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17,21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993))*. The

test has both an objective and subjective component: "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004)* (quoting *Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999))*. Moreover, the conduct of which plaintiff complains "must be sufficiently continuous and concerted in order to be deemed pervasive." *Feingold, 366 F.3d at 150*. "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support" a hostile work environment claim. *Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004)*.

In determining whether the alleged harassment is of "such quality or quantity" as to meet the "severe and pervasive" [*46] standard, courts consider the totality of the circumstances, including such factors as the frequency of the conduct, its severity, whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's work performance. *Harris, 510 U.S. at 23*; see also *Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999)* (per curiam). Finally, while the harassment complained of need not exhibit explicit racial animus in order to be actionable under Title VII, the plaintiff is required to establish that the conduct was based on his race. *Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002)* ("Everyone can be characterized by sex, race, ethnicity. or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.").

The plaintiff is also required to show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Howley v. Town of Stratford, 217 F.3d 141, 153-54 (2d. Cir. 2000)*. [*47] Where, as here, the actionable hostile environment is created by a supervisor with immediate (or successively higher) authority over the employee, the employer is vicariously liable for the wrongful conduct. See *Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*; *Burlington Indus., 548 U.S. at 63*. However, when no tangible employment action is taken against the employee, the employer may establish an affirmative defense to liability or damages by showing that (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Id.

Magadia falls far short of making out a *prima facie* case of hostile work environment. In fact, he offers no evidence that he was harassed at all--no evidence of intimidation, ridicule, or insult, let alone severe or pervasive intimidation, ridicule, or insult. Rather, he is complaining about discrete, adverse employment decisions concerning promotions, discipline, and appraisal, and about employer criticism. Hostile work environment is not a vehicle [*48] for resurrecting time-barred claims of discrimination and retaliation; it is a wholly separate cause of action designed to address *other types of work* place behavior, like constant jokes and ridicule or physical intimidation. The plaintiff cannot piggyback the discrete adverse acts about which he complains onto hostile work environment in order to make them actionable.

Furthermore, Title VII is not a "general civility code" (as Justice Scalia famously said), *Oncale, 523 U.S. at 80*, so even if there were some evidence of behavior that qualifies as harassment, not all harassment or hostile behavior is actionable under Title VII. Only hostile and harassing behavior that is motivated by race, or ethnicity, or sex, or national origin, or religion, or race, or age is actionable. The record before me contains not a scintilla of evidence of anti-Asian or anti-Filipino behavior.

Accordingly, the plaintiff fails to make out a claim for hostile work environment.

**D. Constructive Termination**

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Petrosino, 385 F.3d at 229*. [*49] Like other claims of discrimination, "the plaintiff must present proof that her discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class." *Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996)*. To establish a constructive discharge claim, courts focus on two parts of the standard: 1) the employer's intentional conduct; and 2) the intolerability of the working conditions. *Id.*

The intent requirement does not require a plaintiff to demonstrate specific intent. See *Whidbee v. Garzarelli Food Specialties, Inc.., 223 F.3d 62, 74 (2d Cir. 2000)*. If a plaintiff cannot show specific intent, "he or she must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective.'" *Petrosino, 385 F.3d at 229-30* (quoting *Whidbee, 223 F.3d at 74*).

The intolerability of an employee's work conditions is evaluated "objectively by reference to a reasonable person in the employee's position." *Id. at 230*. There must be evidence sufficient for a trier of fact to find that

the working conditions "were so difficult or unpleasant that a reasonable person in the employee's shoes would [*50] have felt compelled to resign." *Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993)* (quotation omitted). A plaintiff does not satisfy this evidentiary burden with evidence that employee merely found his working conditions difficult or unpleasant, or that the employee did not receive a raise, did not agree with criticisms of his performance, or preferred working somewhere else. See id.

Magadia contends that Jackson deliberately took advantage of the Shandorf incident to, in effect, force him to resign. He argues that 1) the accusations of disloyalty; 2) being denied computer access; 3) being temporarily assigned to APSO; 4) being denied promotions; 5) receiving a negative performance appraisal; and 6) being offered an abeyance agreement show that his working conditions at NYAO were so difficult that he had no choice but to resign.

Magadia's argument is unpersuasive.

Most of the events about which he complains were long over by the time the plaintiff resigned. The undisputed evidence demonstrates that Magadia was denied computer access and was temporarily assigned to APSO as a direct result of the post-arrest investigation. Once the investigation was over, Magadia resumed his [*51] normal duties, and had his computer access restored. This occurred some time during 2000; he did not resign until 2001.

The NYAO was considering discipline in the form of an abeyance agreement, because Magadia had refused to follow Simek's direction to take his concerns about Shandorf to higher-ups, but the plaintiff's disagreement with that decision did not render his day-to-day working conditions intolerable. Receiving a negative performance appraisal and being denied promotions are unpleasant, but they do not make one's life in the workplace so intolerable as to force one to leave. The only conclusion that a reasonable trier of fact could reach on this record is that Magadia decided he did not want to work in the NYAO any longer and made a strictly voluntary decision to resign.

Accordingly, no rational trier of fact could conclude that Magadia was constructively discharged.

**Conclusion**

For the reasons stated above, the Government's motion for summary judgment is granted.

This constitutes the decision and order of the Court.

Dated: February 26, 2009

/s/ Colleen McMahon

U.S.D.J.

LexisNexis®

**SARA LEE McWHITE, Plaintiff, -against- NEW YORK CITY HOUSING AUTHORITY, Defendant.**

**05 CV 0991 (NG) (LB)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

***2008 U.S. Dist. LEXIS 29145***

**April 10, 2008, Decided**

**COUNSEL:** [*1] Sara Lee McWhite, Plaintiff, Pro se, Brooklyn, NY.

For Nyc Housing Authority, Defendant: Elissa Krell, New York City Housing Authority, New York, NY; Jeffrey Niederhoffer, Robert L. Doan/ Acting General Councel, New York, NY.

**JUDGES:** NINA GERSHON, United States District Judge.

**OPINION BY:** NINA GERSHON

**OPINION**

**OPINION & ORDER**

**GERSHON, United States District Judge:**

Plaintiff Sara Lee McWhite brings this action against defendant New York City Housing Authority ("NYCHA") alleging that defendant: (1) discriminated against her on the basis of her race and age; (2) retaliated against her on the basis of her opposition to discriminatory practices; and (3) subjected her to a hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. §§ 2000eet seq.* ("Title VII"); the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. §§ 621 et seq.*; *42 U.S.C. §§ 1981* and *1983*; *New York State Executive Law §§ 290 et seq.* ("NYSHRL"); and New York City Human Rights Law, *NYC Administrative Code §§ 8-101 et seq.* ("NYCHRL"). [1]

1 Plaintiff also claims in her opposing papers that she was a "member of a protected group under . . . the Americans with Disabilities Act . . . , the Equal Pay Act . [*2] . . , and the [Fair] Labor Standards Act." Pl.'s Opp. Mem. at 10. To the extent plaintiff is implying that she was discriminated against under these acts, the court will not address such claims. First, plaintiff did not make claims under these acts in either her EEOC charge or complaint. *See Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)* (holding that it is inappropriate to raise new claims at the summary judgment stage). Second, even construing the plaintiff's submissions liberally, as is required for *pro se* plaintiffs, *Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)*, she offers no evidence that suggests these claims would be valid, as she merely states that she is a member of a protected group under each of the statutes.

Defendant moved for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. Plaintiff subsequently moved for injunctive relief pursuant to *Rule 65 of the Federal Rules of Procedure* and under Title VII and the ADEA, seeking relief from unlawful retaliation and harassment. For the reasons discussed below, defendant's motion for summary judgment is granted in its entirety, and plaintiff's motion for injunctive [*3] relief is denied.

**BACKGROUND**

**I. Statement of Facts**

The following facts are undisputed unless otherwise noted:

Plaintiff is an African-American woman who was born on November 1, 1949. She began her employment with defendant in 1984 as a part-time Tenant Patrol supervisor. During her tenure, plaintiff has been promoted several times, has been given above-average evaluations, and received much recognition for her efforts in developing NYCHA's alternative high schools. Currently, she is a Community Coordinator in the Brooklyn Office of the Department of Community Operations ("Brooklyn Office"), a position she has occupied since 1998.

Beginning in 2001, when Maggie Moats, an African-American woman born on December 2, 1960, became the Deputy Director of the Brooklyn Office, a series of incidents occurred between her and plaintiff that culminated in this lawsuit. In total, plaintiff cites thirteen incidents that occurred from 2001 to 2005 in connection with her discrimination, retaliation, and hostile work environment claims.

On November 30, 2001, Ms. Moats issued plaintiff a Counseling Memorandum for acting insubordinately in failing to report to work on November 29, 2001, and failing to contact [*4] Ms. Moats about her absence. Ms. Moats maintained that plaintiff did not report to work because of a disagreement she had with plaintiff. Plaintiff refused to sign the memorandum, and, on December 4, 2001, she issued a rebuttal and grievance with her union, in which she claimed that she did not report to work because she awoke that morning with a stiff neck and lower back pain. After defendant held a hearing, Ms. Moats issued a revised memorandum on January 9, 2002, which omitted the language about plaintiff failing to contact her, but still discussed plaintiffs insubordination. Plaintiff again refused to sign and filed another grievance with the union. The grievance was subsequently dismissed, and the revised memorandum remained in plaintiffs file.

On December 4, 2001, plaintiff was reassigned by then Director of the Brooklyn Office, Mary Starks, an African-American woman, to defendant's Drug Elimination Program. According to defendant, plaintiff was reassigned because of complaints Ms. Starks received from resident leaders regarding plaintiffs approach to the election process. Plaintiff claims such complaints are unsubstantiated. *See* McWhite Dep. Tr. at 105-06., However, plaintiff [*5] admits that the new position was commensurate With her skills and experience. She receive the same pay, maintained the same hours and worked at the same locations. Her overtime, however, was reduced.

Plaintiff also claims that Ms. Moats put her on pay suspension and unfairly marked her absent without approved leave ("AWOL") on November 29, 2001 and July 1, 2002, effectively "blacklisting" her for future employment opportunities. McWhite Dep. Tr. at 142. On both days, plaintiff was out sick because of injuries she sustained in car accidents and therefore should not have been marked AWOL. Plaintiffs employment records show that, in both instances, Ms. Moats rescinded her actions and restored plaintiffs pay the day after it had bene docked.

In addition, plaintiff claims that Ms. Moats harassed her on July 1, 2002 by forcing her to go to the central office. Plaintiff had been out from work since May 10, 2002 because of injuries she sustained in a car accident but planned to return to work on July 8, 2002. Plaintiff claims that, on July 1, Ms. Moats told her that she needed to give Ms. Moats a doctor's note by the end of the day in order to return to work on July 8. After reporting to the [*6] central office to submit the note, plaintiff was specifically told, by a different NYCHA employee, that she could not deliver the note that day, but that she would have to deliver it on July 8.

On March 14, 2003, plaintiff was reassigned by then Director of the Brooklyn Office, Carl Billington, an African-American born on July 16, 1955, to work under Lisa Davis and assist in the Program Unit. According to Mr. Billington, he reassigned plaintiff because of the dissolution of defendant's Drug Elimination Program; a March 2003 act of insubordination; [2] complaints by Resident Leaders; and his belief that plaintiff would be an asset to Ms. Davis and the Program Unit, which was in need of assistance. Plaintiff alleges that these reasons were not credible. In any event, the new position did not change plaintiffs salary, title, or work location, though plaintiff alleges sh was no longer able to receive overtime. She also, claims that the new position was, not commensurate with her skills, since it was mostly clerical and did not require her to perform much work.

2 In March 2003, after Ms. Moats requested that plaintiff lower her voice, plaintiff told Ms. Moats to "go sit down." Pl.'s 56.1 Opp. [*7] P 29. Although plaintiff claims she was almost given a memorandum, she was not disciplined for her actions.

On April 15, 2003, plaintiff submitted an Incident Report describing an altercation she had witnessed on April 11 between Ms. Moats and Hajj Ali-Malik, the Center Director of the Roosevelt Houses. In the Incident Report, plaintiff wrote that Ms. Moats shouted derogatory comments at Mr. Ali-Malik, such as, "I'll have your job", "Who do you think you are, in that long black robe?", and "You may be a bean pie eating Muslim, but you don't scare me." Billington Decl. Ex. E. As a result of the incident, Mr. Ali-Malik filed an EEOC Charge of Discrimination on August 19, 2003. Plaintiff claimed during her deposition that she helped Mr. Ali-Malik with

his EEOC Charge over the telephone at night and on the weekends, but never at the office. McWhite Dep. Tr. at 28-30. Plaintiff also gave a deposition on February 2, 2005, in support of Mr. Ali-Malik's lawsuit against defendant. Defendant maintains it was unaware of any assistance plaintiff provided Mr. Ali-Malik.

On June 4, 2003, Mr. Billington issued an Instructional Memorandum to plaintiff instructing her regarding the next assignment as [*8] well as scolding plaintiff for her "hints of threats, insubordination and manipulation." McWhite Decl. Ex. E. The memorandum memorialized a May 16, 2003 meeting between plaintiff and Mr. Billington, in which they discussed plaintiff's new position and her use of work time to write personal letters regarding NYCHA's hiring practices, and after which plaintiff had written a memorandum to Mr. Billington in which she claimed he had admonished her for "exercising her rights." *Id.*

In response to Mr. Billington's Instructional Memorandum, plaintiff wrote another memorandum to Mr. Billington, claiming that his memorandum was "another attempt to harass, discredit, and intimidate this employee." *Id.* Plaintiff also filed a grievance, arguing that his memorandum should not have contained negative comments and should not have been forwarded to Labor Relations. Plaintiff then wrote a letter, dated June 13, 2003, to various agencies, including the EEOC, requesting assistance in "putting an[.] end to the illegal hiring practices, promotion practices, [and] employee harassment." *Id.* The letter discussed at length the questionable demotions of employees in favor of the politically connected, and plaintiff [*9] claimed that she was reassigned and harassed because she would not "bend the rules." *Id.* Plaintiff's letter was forwarded to the NYCHA's Department of Equal Opportunity.

In July 2003, defendant posted an announcement for the position of Borough Administrator in the Brooklyn Office. Along with a number of other employees, plaintiff submitted her resume in application for the position. In August 2003, Erenisse Tavarez interviewed the applicants, including plaintiff, but, according to defendant, no one was selected for the position because budget cuts forced it to eliminate the position. Plaintiff, however, claims that Gina Watkins, another African-American woman, actually got the position because (1) Ms. Watkins had previously been appointed "Acting" Borough Administrator in April 2003, and (2) Ms. Tavarez had told plaintiff in April that Ms. Watkins already had the position. McWhite Dep. Tr. at 73-74. Plaintiff further claims that she was more qualified than Ms. Watkins and that she was denied the promotion based on age discrimination and retaliation, although not because of her race. *Id.* at 78-79. Defendant acknowledges that Ms. Watkins was appointed "Acting" Borough Administrator in [*10] April 2003 because she had already assumed some of the responsibilities of a Borough Administrator, but maintains that she was not promoted pursuant to the vacancy posting. Ms. Watkins' employment record shows that she did not receive a change in title or raise in salary in or around August 2003.

In October 2003, defendant announced an opening for the Director of the Department Citywide Programs, a position that entitled resposibilities for; among other things overseeing a staff of 1,300 individuals and a program budget of approximately $ 7 million. Plaintiff submitted her resume in application for the position. In November 2003, Ms. Pinnock interviewed potential candidates, including plaintiff. After the interviews, Ms. Pinnock determined that none of the interviewees were qualified for the position and therefore promoted none of them. With regard to plaintiff, Ms. Pinnock stated that she was not qualified because she lacked significant managerial experience, she did not have sufficient knowledge of the Department or its programs, she had previously conflicted with resident leaders, and she did not have significant experience organizing large scale events. Eventually, Ms. Pinnock appointed [*11] Mr. Ernesto Lozano, who was then the Borough Director of Staten Island Community Operations, to the position, even though he was not interviewed. Ms. Pinnock felt that Mr. Lozano, who had served as Borough Director for approximately 8 years, had the necessary managerial experience required for the job. At her deposition, plaintiff admitted that Mr. Lozano "has far more qualifications" than she, but that her problem with Mr. Lozano's promotion was "that it wasn't done procedurally." McWhite Dep. Tr. at 98-100. Plaintiff further stated that she was denied the promotion in retaliation, though not because of her race or age. *Id.* at 100-01.

On March 24, 2004, plaintiff received permission to use a Housing Authority van on March 25 to transport her and four other employees to defendant's central office to obtain replacement identification cards. On March 25, plaintiff reported to work and soon afterward discovered that the van had left the Brooklyn Office without her. Ms. Moats, allegedly unaware that plaintiff had received permission to use the van, directed Henry Gumps, the van driver, to use the van to take Sarah Cooper to the central office to submit or retrieve several boxes of applications [*12] and to take Leron Obie, a caretaker, to the Lafayette Houses to assess, a situation with the alarm system. Plaintiff claims that Ms. Moats deliberately instructed Mr. Gumps to leave without her. Mr. Obie states that Ms. Moats told Mr. Gumps to drive him and Ms. Cooper to the central office and leave plaintiff and Crystal Warlick behind.

After learning that the van had left without her, plaintiff contacted Mr. Gumps to return to the Brooklyn

Office. Although the van came back, it was no longer fit to drive because of a flat tire. Ms. Moats told Mr. Gumps, Mr. Obie, and Ms. Cooper to use her personal Housing Authority vehicle to commute to Lafayette House and then to the central office. According to Ms. Moats, her car could only fit three people because of the several boxes of applications, so she suggested that. Ms. Davis, who was plaintiff's direct supervisor, arrange for plaintiff to use her vehicle to go to the central office. Plaintiff denies that she had this opportunity because she would have missed her appointment by that time.

Also in March 2004, during the time Ms. Moats was in the process of forwarding grant proposal materials to residential associations, plaintiff claims she [*13] was accused by Ms. Moats of stealing grant proposal materials. Ms. Moats claims plaintiff took bound copies of these materials that belonged to Ms. Moats. According to plaintiff, the materials had been in her possession since 1998, and she claims that Ms. Moats' statement that plaintiff had "inappropriately removed" these documents was harassing and retaliatory. McWhite Dep. Tr. at 140. Defendant, in contrast, contends that Ms. Moats made no such statement and that she only sought a return of the copies. Most of the copies were eventually returned and plaintiff did not receive any disciplinary action.

In October 2004, defendant posted an announcement for eight Borough Administrator positions throughout the Housing Authority. Michelle Pinnock and Hugh Spence interviewed the applicants. Defendant promoted Ms. Watkins, Alexander Duque, and Rolston Hopson to Borough Administrator in the Brooklyn Office. Ms. Watkins' employee record card reflects that she received a promotion in mid-February 2005. Plaintiff was not interviewed and did not receive the promotion because: (1) she did not apply for the position; (2) She bad not been recommended for the position by the Borough Directors in the [*14] spring of 2004; and (3) Ms. Pinnock was not aware that plaintiff was interested in becoming a Borough Administrator. Plaintiff argues that she should have been considered for the job despite the fact she did not apply, because, in the rejection letter she received after applying for the same position in July 2003, defendant stated that it would keep her resume on file in the event that future opportunities arose that fit her qualifications.

In addition to the above incidents, plaintiff claims that there were other "little slights and sillinesses" that she considered to be attempts by defendant, and specifically Ms. Moats, to "irk [her] for no other reason." McWhite Dep. Tr. at 142. Specifically, plaintiff claims that Ms. Moats directed her to "mind my own business" and told other employees not to speak with plaintiff as a result of the assistance she gave to other NYCHA employees, specifically Gregory Summerlin, Natalie Henry, Debbie Lawrence, and Mr. Ali-Malik. [3] *See id.* at 151-65. According to Ms. Warlick, Ms. Moats told her not to speak with plaintiff after the March 2004 van incident. Ms. Moats denies she made such statements and also denies that she was aware of any assistance [*15] plaintiff provided to Ms. Henry, Ms. Lawrence, and Mr. Ali-Malik.

3 Despite plaintiff's claims, there is no evidence apart from plaintiff's mention of Mr. Summerlin in her June 13, 2003 letter, that defendant was aware of plaintiff's assistance to these employees.

Finally, several other employees express problems with Ms. Moats. Ms. Warlick claims in her affidavit that Ms. Moats harassed her and other employees. Ms. Lawrence describes Ms. Moats as vengeful and uncooperative and claims that she did not follow NYCHA policies and procedures. Finally, Ms. Henry claims that Ms. Moats told her to spy on co-workers and admonished her for talking to plaintiff. She also characterizes Ms. Moats as having been "rude and abrasive" from the minute she arrived at the Brooklyn Office.

**II. Procedural History**

On June 14, 2004, plaintiff filed a discrimination charge with the EEOC claiming that she had been discriminated against because of her race and age, retaliated against for assisting other employees, harassed, and subjected to a hostile work environment. In the charge, plaintiff discussed that she had been denied the Borough Administrator and Director of Citywide Programs positions despite her qualifications, [*16] had been "written up for frivolous issues by Maggie Moats", and had "all of [her] essential duties . . . removed by Ms. Moats." Niederhoffer Decl. Ex. N. After receiving a "Notice of Right to Sue" from the EEOC, plaintiff filed a *pro se* complaint in this court on February 23, 2005.

**DISCUSSION**

**I. Standard of Review**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. Proc. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The court must view the inferences to

be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts[;] [*17] . . . the nonmoving party must come forward with, specific facts showing that there is a *genuine issue for trial." Id. at 586-87* (internal quotation marks omitted). Mere conjecture and speculation as to the true nature of the facts will not suffice to overcome a motion for summary judgment. *Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)*.

In employment discrimination actions such as this, courts must be cautious about granting summary judgment when intent is at issue since "a victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991)*. Consequently, "where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate." *Id.* However, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)*. Therefore, summary judgment is appropriate, even in discrimination cases, where the standards of *Rule 56* [*18] have been met. *Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir. 2000)*.

**II. Title VII and ADEA claims**

**A. Timeliness and Exhaustion of Administrative Remedies**

**1. *Time-barred Claims***

Both Title VII and the ADEA require an employee to file an EEOC charge within 300 days of the unlawful employment practice in a state, like New York, that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice. *See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)* (Title VII); *Kassner v. 2nd Avenue Delicatessen, Inc., 496 F.3d 229, 238 (2d Cir. 2007)* (ADEA). In *Morgan,* the Supreme Court held that all discrete discriminatory acts that occurred 300 days prior to the filing of an EEOC charge, even if related to one another, are untimely and no longer actionable. *536 U.S. at 114-115*. While there is a continuing violation exception to this filing requirement; it is available only when a series of acts collectively constitute one unlawful employment action. *Washington v. County of Rockland; 373 F.3d.310, 317-18 (2d Cir. 2004)*. Thus, even when "an employee alleges 'serial violations,' *i.e.,* a series of actionable wrongs, a timely EEOC charge must [*19] be filed with respect to each discrete alleged violation." *Ledbetter v. Goodyear Tire & Rubber Co., 127 S.Ct. 2162, 2175, 167 L. Ed. 2d 982 (2007)*.

Here, the incidents plaintiff alleges to be the result of discriminatory and retaliatory conduct, *i.e.,* the failure to be promoted, the issuance of memoranda, and the reassignment of her duties, are all separate and isolated acts, and thus discrete employment actions. *See Morgan, 536 U.S. at 114* (identifying "termination, failure to promote, denial of transfer, refusal to hire" as examples of discrete employment actions). Therefore, whether or not these actions constitute "serial violations," plaintiffs' claims are subject to the 300 day filing requirement. Because plaintiff filed her EEOC charge on June 14, 2004, any alleged discriminatory act that occurred prior to August 18, 2003 is time-barred under Title VII and the ADEA.

Plaintiff's hostile work environment claims under Title VII and the ADEA are not, however, subject to the same limitations. In hostile work environment claims, "[i]n order for the charge to be timely, the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment." *Morgan, 536 U.S. at 118*. [*20] A plaintiff may include acts that fall outside the statutory time period, so long as an act contributing to the hostile work environment claim occurs within the filing period. *Id. at 117*.

**2. *Claims Barred for Failure to Exhaust Administrative Remedies***

Exhaustion of administrative remedies is an "essential element" of a Title VII claim. *Williams v. New York City Hous. Auth., 458 F.3d 67, 69 (2d Cir. 2006)*. Claims not raised in an EEOC complaint are barred unless they are "reasonably related" to the claim filed with the agency *Id.* A claim not alleged in an employee's EEOC charge is sufficiently related where the complained of conduct would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. *Butts v. City of New York Dep't of Hous. Pres. and Dev., 990 F.2d 1397, 1402-03 (2d Cir. 1993), superceded by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998)*. The same legal standards for exhaustion of administrative remedies in Title VII claims also apply to ADEA claims. *See Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003)*.

Defendant argues that the following incidents should [*21] be dismissed because plaintiff failed to raise them in her charge: the reassignment of plaintiff's duties by Mr. Billington and Ms. Starks, write-ups from persons other than Ms. Moats, being marked AWOL or

paydocked in 2001 and 2002, directing plaintiff to mind her own business and others not to speak with her, the alleged removal of written grant material, and the van incident. Because plaintiff failed to mention in her EEOC charge anything pertaining to Ms. Starks, Mr. Billington, her reassignments, or the Instructional Memorandum, these issues fall outside the scope of an EEOC investigation and are therefore barred for failure to exhaust administrative remedies. However, plaintiff discussed the write-ups and removal of plaintiff's "essential duties" by Ms. Moats in her charge. Niederhoffer Decl. Ex. N. Since an investigation of all incidents between plaintiff Ms. Moats would reasonably be expected to grow out of the EEOC charge, the non-asserted incidents involving Ms. Moats may be considered.

**3. *Plaintiff's Non-Time Barred Claims***

As determined above, the only incidents alleged under plaintiff's Title VII and ADEA discrimination and retaliation claims that were timely filed occurred [*22] after August 18, 2003. Accordingly, the court will consider, as to these claims, only the denial of plaintiff's promotion to the 2003 and 2005 Borough Administrator positions, the denial of plaintiff's promotion to the Director of CityWide Programs position, the van incident, the grant materials incident, and plaintiff's claim that Ms. Moats ordered employees not to speak with her. [4]

4 In her opposing papers and response to defendant's Rule 56.1 Statement, plaintiff claims she was qualified for three other positions: Manhattan Senior Program Manager, Deputy Director for Citywide Programs, and Assistant to the Assistant Deputy General Manager. Since plaintiff never mentioned these positions in her complaint, never claimed that she was discriminated or retaliated against in the denial of a promotion to any one of these positions, or cited any evidence which would suggest such a claim, the court will not address these incidents.

The court will consider the 2003 Borough Administrator position as timely filed since there is a dispute about exactly when the position was eliminated.

With regard to plaintiff's hostile work environment claim, some of the incidents forming the basis of this claim, [*23] while timely, are barred because plaintiff failed to exhaust her administrative remedies. Specifically, the claims based on the reassignment of plaintiff's duties by Ms. Starks and Mr. Billington, and the June 4, 2003 Instructional Memorandum are barred. Moreover, to the extent that the denials of promotion were discrete acts that involved different people and were unconnected in any way to the harassment plaintiff has alleged, they will not be considered as part of her hostile work environment claim. Accordingly, as part of plaintiff's hostile work environment claim, the court will consider the November 30, 2001 Counseling Memorandum, the November 30, 2001 and July 1, 2002 paydocking and AWOL marking, the doctor's note incident, the van incident, the grant materials incident, and the allegations that Ms. Moats told employees not to speak with plaintiff.

**B. Race and Age Discrimination Claims**

Claims of race discrimination under Title VII and age discrimination under the ADEA are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*; *Terry, 336 F.3d at 137-38*. Under this framework, a plaintiff must first present sufficient evidence [*24] to establish a prima facie case of race discrimination by demonstrating that: (1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and(4) the adverse employment actiOn occurred under circumstances rise to an inference of discrimination. *Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*; *Terry, 336 F.3d at 138*. Similarly, to establish a prima facie case of age discrimination, a plaintiff must demonstrate that: (1) she is within the protected age group; (2) she was qualified for the position; (3) she suffered adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Terry, 336 F.3d at 138*.

If the plaintiff can establish a prima facie case, the defendant must then articulate a legitimate, non-discriminatory reason for the adverse employment action. *Burdine, 450 U.S. at 252-53*. If the employer provides such a reason, the plaintiff must then prove that the allegedly legitimate reason is merely a pretext for discrimination. *Id.* "[A] reason cannot be proved to be 'a pretext *for discrimination'* unless it is shown *both* [*25] that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*; *see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* ("[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."). At the summary judgment stage, this means that the plaintiff "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse action] is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse decision." *Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1225*

*(2d Cir. 1994)*. The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine, 450 U.S. at 253*.

**1. *Discrimination as to the 2003 Borough Administrator Position***

Plaintiff has not presented sufficient establish a prima facie case of discrimination as to the denial of promotion to the 2003 Borough Administrator position. [*26] In failure to promote cases under both Title VII and the ADEA, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for a specific position and she actually applied for it; (3) she was rejected from that position; and (4) the position remained open and the employer continued to seek applicants having the plaintiffs qualifications. *Brown v. Coach Stores, Inc., 163 F.3d 706, 709-10 (2d Cir. 1998)* (Title VII); *Mauro v. S. New England Telecomm., Inc., 208 F.3d 384, 386 (2d Cir. 2000)* (ADEA). Here, the undisputed evidence shows that the position of Borough Administrator did not remain open, but rather, was eliminated because of budget cuts shortly after plaintiff was denied promotion to it. While plaintiff argues that the position did in fact remain open and that Gina Watkins was hired as Borough Administrator, she bases this conclusion on the fact that, in April 2003, Ms. Watkins had been appointed "Acting" Borough Administrator and Ms. Tavarez had told her that Ms. Watkins had secured the position. McWhite Dep. Tr. at 73-74. However, these statements do not suggest that Ms. Watkins was promoted to Borough Administrator pursuant to the July [*27] 2003 posting. The undisputed evidence shows that the position was eliminated and that Ms. Watkins was not appointed Borough Administrator in August 2003. Ms. Watkins' record card shows that she did not receive a change in title or raise in 2003. Moreover, the same job was re-posted in December 2004, at which time Ms. Watkins reapplied and eventually received the position. Plaintiff cannot raise a genuine issue of fact as to whether the position was eliminated in August 2003 based only on her conclusory allegations. Summary judgment for defendant is therefore proper.

**2. *Discrimination as to the Director of Citywide Programs Position***

Plaintiff explicitly stated at her deposition that she was not denied the Director of Citywide Programs position because of her race or age; *see* McWhite Dep. Tr. at 100, and then court accordingly assumes that plaintiff is not alleging discrimination in being denied the position. Even if plaintiff were making such a claim, it would fail on the merits.

Assuming that plaintiff could establish a prima facie case of discrimination in the denial of promotion to Director of Citywide Programs, defendant has proffered legitimate, non-discriminatory reasons for denying [*28] her the promotion: (1) plaintiff lacked significant managerial/supervisory experience; (2) she did not have sufficient knowledge of the Department or a sufficient understanding of the programs operated by it; (3) she did not have any significant resource development experience or any experience organizing large scale citywide events; and (4) she had a history of conflicts with various resident leaders. In further support of its reasons, defendant provided evidence that shows that the candidate it did hire, Ernesto Lozano, was more qualified than plaintiff.

In response, plaintiff fails to adduce enough evidence to illustrate that these reasons were a pretext for discrimination. Plaintiff claims that she was qualified for the position and submits her resume, cover letter, letters of recommendation, and numerous newspaper clippings discussing her various achievements. However, this evidence merely shows that plaintiff met the minimum qualifications for the position as stated in the vacancy posting. It does not, for example, prove that she had sufficient knowledge of the Department, significant resource development experience, or that she did not have a history of conflicts with various [*29] resident leaders.

Moreover, even if this evidence showed that plaintiff was qualified and that, consequently, defendant's proffered reasons were false, plaintiff submitted no evidence showing that defendant's real reason for denying her the promotion was discriminatory. The evidence in the record shows that plaintiff was denied the position only because defendant was looking for a more qualified candidate. Indeed, defendant sought a person with the managerial experience to oversee a program budget of approximately $ 7 million and a staff of close to 1,300 individuals, and it believed Mr. Lozano had the necessary experience. That Mr. Lozano had been a Borough Director, a position superior to Community Coordinator, for approximately 8 years supports that contention. Furthermore, plaintiff herself admitted that Mr. Lozano had "far more qualifications" than she has. [5] McWhite Dep. Tr. at 98. Unable to meet her ultimate burden of proving that the defendant intentionally discriminated against her in denying her the promotion, summary judgment is awarded to defendant.

5 Contrary to her assertions in her opposing papers, nowhere in her submissions did plaintiff claim that her qualifications outweighed [*30] Mr. Lozano's in any areas. According to her deposition, plaintiff's problem with the appointment of Mr. Lozano was that he did not interview for the position. The fact that "it wasn't done proce-

durally," McWhite Dep. Tr. at 100, is not a sufficient basis for plaintiff's claim.

3. ***Discrimination as to the 2005 Borough Administrator Position***

As with the 2003 Borough Administrator position, plaintiff cannot establish a prima facie case of racial discrimination in being denied the same position in 2005. As discussed above, to prove a prima facie case of discriminatory failure to promote, plaintiff must show that she actually applied for the position. Here, plaintiff did not apply for the position of Borough Administrator pursuant to the vacancy posting.

Plaintiff claims that she should have been considered anyway because, after being denied the 2003 position, she received a letter from defendant which stated that it would "keep [her] resume on file in the event that future opportunities that may best fit [her] qualifications arise." McWhite Decl. Ex. I. Accepting this argument would defeat the purpose of the application requirement, which protects employers from the unfair burden of having [*31] to "keep track of all employees who have generally expressed an interest in promotion and consider each of them for any opening for which they are qualified but did not specifically apply." *Brown, 163 F.3d at 710*. Only when an employer does not post the position will the court permit an exception to the application requirement. *See Petrosino v. Bell Atlantic, 385 F.3d 210, 227 (2d Cir. 2004)*; *Mauro*, 208 at 387. Here, defendant posted the position throughout the agency. Plaintiff, although well aware of its posting, failed to apply. Accordingly, defendant is granted summary judgment on this claim.

4. ***Discrimination as to the March 2004 Van Incident***

Plaintiff fails to establish a prima facie case of discrimination with regard to the March 2004 van incident because she fails to show that she suffered an adverse employment action. An adverse employment action is defined as a "materially adverse change" in the terms and conditions of employment. *Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004)*. "To be materially adverse, a change in work conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change [*32] include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* (internal citation and quotation marks omitted).

The March 2004 van incident does not rise to the level of actionable adverse employment action. There is no evidence that plaintiff's inability to replace her identification card on the day in question was anything more than a "mere inconvenience" of employment. Therefore, defendant is granted summary judgment on this claim.

5. ***Discrimination as to the Grant Materials Incident***

As with the van incident, plaintiff cannot show that she suffered an adverse employment action as a result of the grant proposal materials incident. Because plaintiff did not receive any admonishment in connection with the dispute, the incident at most, a "mere inconvenience" of plaintiff's employment. Accordingly, defendant is granted summary judgment.

6. ***Discrimination as to Ms. Moats' Alienation of Plaintiff***

Plaintiff's claim that Ms. Moats alienated her from other employees by ordering them not to speak to [*33] her also does not constitute adverse employment action. Plaintiff's alleged alienation more closely resembles an inconvenience or job alteration than an adverse employment action. Plaintiff did not receive a lower salary, loss of benefits, change in title, or diminished responsibilities as a result of the alleged conduct. Although plaintiff was "hurt" and felt "lonely" due to Ms. Moat's actions, *see* McWhite Dep. Tr. at 150, such feelings do not amount to a materially adverse change in the terms and conditions of one's employment. Thus, defendant is entitled to summary judgment.

**C. Plaintiff's Claims of Retaliation Under Title VII and the ADEA**

Both Title VII and the ADEA prohibit an employer from retaliating against an employee for, *inter alia*, complaining of employment discrimination under the respective act. *42 U.S.C. § 2000e-3(a)* (Title VII); *29 U.S.C. § 623(d)* (ADEA). Retaliation claims under Title VII and the ADEA are analyzed under the *McDonnell Douglas* framework. *Terry, 336 F.3d at 141*. To establish a prima facie case of retaliation under Title VII or the ADEA, a plaintiff must prove that: (1) she was engaged in protected participation or opposition under Title VII or the ADEA; [*34] (2) the employer was aware of the activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. *Kessler v. Westchester County Dep't of Social Servs., 461 F.3d 199, 205-06 (2d Cir. 2006)*. As in discrimination cases, the burden of proving a prima facie case of retaliation is *de minimis*. *See Richardson v. New York Dep't of Corr. Servs., 180 F.3d 426, 444 (2d Cir. 1999)*, *abrogated on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2412-13, 165 L. Ed. 2d 345 (2006)*

**1. *Retaliation as to the 2003 Borough Administrator Position***

Plaintiff claims that she was denied the 2003 Borough Administrator position in retaliation for complaints she made and assistance she gave to other employees in filing their respective EEOC charges. Plaintiff cannot establish her prima facie case of retaliation since she fails to show that the denial to her of the 2003 Borough Administrator position was an adverse action by defendant. As detailed above, the evidence shows that no one was appointed to the position, which was eliminated shortly after being posted.

Even if plaintiff had established a prima facie [*35] case, defendant has offered a legitimate non-retaliatory reason for denying plaintiff the promotion: the position was eliminated because of budget cuts. In response, plaintiff offers no evidence to prove that this reason is false, except for her speculation that Ms. Watkins was, in effect, given the promotion. As discussed above, no evidence supports plaintiff's contention and, in fact, the only evidence in the record directly contradicts it. Accordingly, defendant is entitled to summary judgment.

**2. *Retaliation as to the Director of Citywide Programs Position***

Plaintiff alleges that she was denied a promotion to Director of Citywide Programs based on retaliation. However, for the same reasons discussed above, plaintiff cannot meet her ultimate burden of proving defendant's retaliatory intent in denying her the promotion. Therefore, summary judgment is granted to defendant.

**3. *Retaliation as to the 2005 Borough Administrator Position***

Plaintiff alleges she was denied the 2005 Borough Administrator position in retaliation for her assistance to Mr. Ali-Malik in filing his EEOC charge and for filing her own EEOC charge. However, as explained above, because plaintiff never applied for the 2005 [*36] Borough Administrator position, she cannot show that defendant took any-adverse action against her by not offering it to her. Nor, then, can plaintiff show that defendant's failure to consider her candidacy was in retaliation for her complaints against employment discrimination. *See Easterling v. Connecticut, 356 F. Supp. 2d 103, 107 (D. Conn 2005)* (finding plaintiff's failure to apply fatal to her claim of retaliation). Consequently, plaintiff cannot establish a prima facie case of retaliation.

Even assuming plaintiff can establish a prima facie case, she cannot defeat summary judgment on this claim. The defendant has provided legitimate, non-discriminatory reasons for denying plaintiff a promotion to the 2005 Borough Administrator position: (1) plaintiff did not apply for the position; (2) plaintiff had not been recommended for the position by the Borough Directors in the spring of 2004; and (3) the person conducting the hiring, Ms. Pinnock, was not aware that plaintiff was interested in becoming a Borough Administrator. Plaintiff counters only that she should have been considered for the position because she applied in 2003 and that she was more qualified than Ms. Watkins, the candidate [*37] who ultimately secured the position. These statements, even if true, do nothing to show that defendant's proffered reasons were false. That plaintiff believes she should have been considered for the position does not contradict the evidence that shows that she was not. Moreover, defendant did not proffer Ms. Watkins' qualifications as a reason for denying plaintiff the position, and therefore, whether plaintiff was more qualified than Ms. Watkins is not at issue. Because plaintiff cannot demonstrate that the defendant's reasons were a pretext for retaliation, summary judgment is awarded to defendant.

**4. *Retaliation as to the Van Incident, the Grant Materials Incident, and Ms. Moats' Alienation of Plaintiff***

Plaintiff cannot establish a prima facie case of retaliation based on these incidents because none of them amounts to adverse action. *See Burlington Northern, 126 S.Ct. at 2414-15.* Unlike discrimination claims, a plaintiff establishing a prima facie case of retaliation is not limited to materially adverse actions that are related only to employment or that occur only at the workplace. *Id. at 2409.* Any employer action that "produces an injury or harm" that is "materially adverse", that [*38] is, that might have dissuaded a reasonable worker from making or supporting a charge of discrimination, is actionable. *Id. at 2414-15.* Normally, "[p]etty slights, minor annoyances, and simple lack of good manners" will not deter a worker from making a charge of discrimination. *Id.*

The van and grant materials incidents as well as the allegations that Ms. Moats ordered employees not to speak with plaintiff are exactly the type of "minor annoyances" and "lack of good manners" that would not deter a reasonable person from filing a charge of discrimination. Indeed, these incidents did not deter plaintiff: she filed her EEOC charge on June 14, 2004 and even wrote a letter to the EEOC as early as March 29, 2004. Niederhoffer Decl. Ex. J. Accordingly, these incidents do not amount to adverse action, and plaintiff cannot assert a prima facie case of retaliation.

**5. *Retaliatory Harassment***

Plaintiff alleges that she was subjected to retaliatory harassment for complaints she made and assistance she gave to her co-workers. Specifically, plaintiff claims that Ms. Moats' actions created a hostile work environment, which qualifies as a materially adverse action under the

second prong of a retaliation [*39] prima facie case. In the Second Circuit, "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute [adverse action] so as to satisfy [this] prong." *Richardson, 180 F.3d at 445-46*. And in order to establish that a retaliatory hostile work environment is sufficiently severe, a plaintiff must satisfy the same standard applied in hostile work environment claims, namely that the "incidents of harassment following complaints were sufficiently it i continuous and concerted to have altered conditions of an employees' employment." *Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006)*; *Mormol v. Costco Wholesale Co., 364 F.3d 54, 58 (2d Cir. 2004)* (stating that a hostile work environment claim requires a showing that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment). A work environment is considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it. *Mormol, 364 F.3d at 58*. In determining whether a reasonable person would perceive the [*40] environment as hostile, the court looks at the totality of circumstances, including the frequency of the conduct, the severity of the harm, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's work performance. *Id.*

The Second Circuit has cautioned against setting the bar too high for hostile work environment claims, holding that "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Terry, 336 F.3d at 148*. The test is whether "the harassment is of such a quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*." *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000)* (internal quotation marks omitted). Nonetheless, "incidents that are relatively minor and infrequent will not meet the standard for a discriminatory hostile work environment." *Deters v. Lafuente, 368 F.3d 185, 189 (2d Cir. 2004)* (internal quotation marks omitted) (in the context of a *First Amendment* retaliation [*41] claim). As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. *Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)*. There is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment; rather, courts view the circumstances in their totality, examiniring the nature, severity, and frequency of the conduct. *Id. at 379*.

Plaintiff claims that Ms. Moats harassed her by: (1) issuing her the November 30, 2001 Counseling Memorandum; (2) "paydocking" her and marking her AWOL for failing to report to work on November 29, 2001 and (3) on July 1, 2002; (4) making her report to the central office on July 1, 2002; (5) accusing her of stealing grant materials in March 2004; (6) ordering a van to go to the central office on March 25, 2004; and (7) telling co-workers not to speak with her. Evaluating the totality of the circumstances, it is clear from the nature, severity, and frequency of these seven incidents that plaintiff's claim falls below the threshold required to establish a hostile work environment. *See, e.g., id.* (citing cases in which evidence was found insufficient, [*42] as a matter of law, to establish a hostile work environment claim). All of the incidents were neutral, on their face, and do not, in and of themselves, suggest that Ms. Moats was engaging in retaliation. *See id. at 378*. Facially neutral incidents may be included in the totality of circumstances a court uses to consider a hostile work environment claim, so long as a reasonable fact finder could conclude that the incidents were based on a discriminatory or retaliatory motive. *Id.* But here, the record does not indicate or suggest such a conclusion. Statements from plaintiff's own witnesses support the notion that Ms. Moats was not acting out of retaliatory animus but that she was generally a "harsh, unjust, and rude" boss. *Id. at 377*. According to Debbie Lawrence, "Ms. Moats came in with a vengeance as if she knew everyone already. She was very defensive to all of the employees in our office. She introduced herself and made statements about not being afraid of writing people up and went as far as letting us know that she has had employees fired." Lawrence Decl. P 3. In addition, Natalie Henry stated that, "[f]rom the first day Ms. Moats was introduced to the employees . . . she was rude [*43] and abrasive." Henry Decl. P 4. General rude behavior is insufficient to demonstrate a hostile work *See Brennan v. Metropolitan Opera Ass'n, 192 F.3d 310, 318-19, (2d Cir. 1999)*.

Moreover, the timing of the incidents undermines plaintiff's claim of retaliation. The November 30, 2001 and July 1, 2002 incidents occurred well before plaintiff engaged in any of her protected activities and thus cannot support a causal connection between the protected activity and the adverse action. [6]

6 To constitute protected activity, the plaintiff must "have had a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII or the ADEA." *Kessler, 461 F.3d at 210*. Under this standard, plaintiff's June 13, 2003 letter, June 14, 2004 EEOC charge, and her assistance to other employees constitute protected activity. The court finds undisputed that defendant was unaware of the as-

sistance plaintiff gave to other employees until she gave a deposition in support of Mr. Ali-Malik on February 2, 2005. Indeed, plaintiff concedes that she did not assist employees while at work.

The incidents were also too few, sporadic, and isolated to create a genuine issue of fact as to [*44] whether plaintiff experienced a pervasive hostile work environment. Seven incidents occurring at three different times--November 2001, July 2002, and March 2004--over two and a half years is neither sufficiently continuous nor concerted to amount to a pervasive hostile work environment. *See, e.g., Stembridge v. City of New York, 88 F. Supp. 2d 276, 286 (S.D.N.Y. 2000)* (seven incidents over the course of three years held insufficient to establish a hostile work environment). There is insufficient evidence to support an inference that these incidents affected plaintiff on a daily basis.

In *Terry,* the court found that plaintiff's hostile work environment claim was pervasive based mostly on the statements of a co-worker who testified that: (1) plaintiff's supervisors took action against Mr. Terry on a daily basis; (2) she was told several times not to speak to plaintiff; (3) in one particular incident, she was ordered away from plaintiff while talking to him; and (4) at least on a weekly basis, another supervisor yelled at plaintiff. *336 F.3d at 149*. Here, the evidence is markedly different. There exists in the record only one instance in which an employee was told not to speak to plaintiff. [*45] *See* Warlick Decl. P 7. While plaintiff claims other employees would not speak to her, she cites no evidence of when employees, would not speak to her or how often this occurred. Nowhere does plaintiff claim that these episodes of harassment occurred on a daily basis. Furthermore the evidence does not suggest that the employees would not speak to plaintiff, especially in light of Ms. Warlick's statement that she refused to abide by Ms. Moats' orders. *Id.*

These incidents are not severe enough to overcome their lack of pervasiveness. Many of the incidents plaintiff alleges to be harassing were relatively minor. *See Deters, 368 F.3d at 187-89* (characterizing "being castigated for not doing his job, accused of failing to respond to phone calls, . . . , issued a summons . . . for failing to remove ice from [his] home . . . , told . . . he would never get selected for a specialized position, and ordered to remain at a street corner for hours" as minor incidents of harassment). Moreover, plaintiff does not claim that she was unable to perform the basic tasks of her job or that the harassment directly interfered with her ability to perform her job. Plaintiff's contention that this harassment [*46] made her feel "hurt" and "lonely" may show that she subjectively experienced a hostile work environment, but plaintiff cannot objectively show that the harassment was so severe as to have negatively altered the conditions of her employment. *See Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004)* (even where a victim subjectively perceives the environment to be abusive, she must show that the misconduct was severe or pervasive enough to create an objectively hostile or abusive work environment).

Ultimately, in examining the totality of the circumstances, no reasonable fact finder could find that plaintiff was subject to a workplace "permeated with [retaliatory] intimidation, ridicule, and insult." *Mormol, 364 F.3d at 58*. That plaintiff was subjected to a few inappropriate actions over the course of two and a half years suggests, at most, that she worked in an unfriendly environment with an unjust boss. However, Title VII does not establish a "general civility code" for the workplace. *Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999)*. Accordingly, summary judgment is awarded to defendant on plaintiff's claims of retaliatory harassment.

**D. Hostile Work Environment Claims [*47] under Title VII and the ADEA**

[7]

7 The court rejects defendant's argument that plaintiff's hostile work environment claim should be dismissed because it was not alleged in the complaint, since this court is required to construe *pro se* litigants submissions liberally and consider the strongest arguments they suggest. *Triestman, 470 F.3d at 474*. Because plaintiff alleged in her complaint that she was harassed, and in her EEOC charge that she was subjected to a hostile work environment, the court will consider the claim.

To prevail on a hostile work environment claim under Title VII, a plaintiff must not only demonstrate that the harassment was sufficiently severe or pervasive, but also that she was subjected to the hostility because of her membership in a protected class. *Brennan, 192 F.3d at 318*. The analysis for an ADEA hostile work environment claims is the same as under Title VII. *Id.*

As discussed above, plaintiff does not proffer a genuine issue of fact as to whether she was subjected to a hostile work environment. Moreover, even if she did, plaintiff presents no evidence that any of the harassment she was subjected to was linked to her race or age. All of the incidents plaintiff alleges [*48] to be hostile are, on their face, age- and race-neutral. Moreover, no reasonable fact finder could conclude that any of the alleged incidents of harassment were a result of plaintiff's race or age, as required for facially-neutral incidents. *Alfano, 294 F.3d at 378*. First, no age- or race-based remarks were ever made to plaintiff in any one of these incidents.

Second, plaintiff herself states that the hostility she received was the result of complaints she had made and not the result of age- or race-based animus. Pl.'s Opp. Mem. at 9. Lastly, Ms. Moats herself was, at the time of the alleged incidents, an African-American woman over the age of 40. In short, plaintiff cannot create a genuine issue of fact that she suffered from an age- or race-based hostile work environment since there is no evidence that even remotely suggests plaintiff was subjected to hostility because of her race or age. Therefore, summary judgment is awarded to defendant on plaintiffs hostile work environment claim.

**III. Plaintiff's *42 U.S.C. § 1981* and *§ 1983* Claims**

Although the Complaint refers to *42 U.S.C. §§ 1981* and *1983*, plaintiff does not otherwise address these statutes in her complaint or opposition papers. [*49] *Section 1981* outlaws race-based discrimination in the making and enforcement of contracts, including employment contracts, *see Patterson v. McLean Credit Union, 491 U.S. 164, 171, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989)*, and retaliation where the alleged conduct provoking the retaliation involved racial discrimination, *see Moore v. Consolidated Edison Co. of New York, 409 F.3d 506, 508 n.2 (2d Cir. 2005). Section 1983* governs civil rights actions against someone acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *42 U.S.C. § 1983*; *Patterson v. County of Oneida, 375 F.3d at 225*.

Claims under *§ 1981* and *§ 1983* are subject to a three year statute of limitations. Even applying this longer statute, there are no claims asserted by plaintiff which raise an issue of fact that she was discriminated against on the basis of race or retaliation. Moreover, when the defendant that is sued for discrimination under *§ 1981* or *§ 1983* is a municipality, as is the case here, it may not be held liable simply for employing a tortfeasor. *See* [*50] *Jett v. Dallas Independent School Dist., 491 U.S. 701, 733-36, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)* (*§ 1981*); *Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* (*§ 1983*). The plaintiff must show that the municipality itself caused the constitutional violation at issue, *City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1986)*, but "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle, 471 U.S. 808, 824-25, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)*. Here, plaintiff, has failed to identify even one municipal policymaker or employee below the policymaking level who engaged in any unconstitutional action. *See id. at 821*. The record also indicates that defendant's existing policies explicitly forbid discriminatory employment actions. McWhite Decl. Ex. H at 17. Because there is no basis in the record from which a reasonably jury could find municipal liability, summary judgment is granted to defendant.

**IV. *Section 1985(3)***

To state a claim under *42 U.S.C. § 1985(3)*, a plaintiff must claim [*51] that there was "(1) a conspiracy (2) to deprive a person or a class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiffs person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999)*. Here, plaintiff does not allege that defendant engaged in a conspiracy nor does she cite any facts which could show defendant was engaged in a conspiracy. Any claims plaintiff has under *§ 1985(3)* are unsupported, and summary judgment is awarded to defendant.

**V. Plaintiff's NYSHRL and NYCHRL Claims**

Plaintiffs remaining claims include discrimination, retaliation, and hostile work environment under NYSHRL and NYSCRL. Claims brought under NYSHRL and NYSCRL are "analyzed under the same substantive standards as claims brought under Title VII." *Payne v. MTA New York City Transit Authority, 349 F. Supp. 2d 619, 629 (E.D.N.Y. 2004)*; *Mack v. Otis Elevator Co., 326 F.3d 116, 122 n.2 (2d Cir. 2003)*. Therefore, for the same reasons that plaintiffs federal claims are dismissed, plaintiffs state [*52] and local claims are also dismissed.

**CONCLUSION**

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety and plaintiffs motion for injunctive relief accordingly denied. The Clerk of Court is directed to enter judgment for defendant

**SO ORDERED.**

**/s/**

**NINA GERSHON**

**United States District Judge**

Dated: Brooklyn, New York

April 10, 2008

LexisNexis®

**CLAUDIA WOODARD and ELISE LAWLESS, Plaintiffs, v. TWC MEDIA SOLUTIONS, INC. and THE WEATHER CHANNEL, Defendants.**

**09-CV-3000 (BSJ)(AJP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***2011 U.S. Dist. LEXIS 1536***

**January 3, 2011, Decided**
**January 4, 2011, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Lawless v. TWC Media Solutions, Inc., 2012 U.S. App. LEXIS 13656 (2d Cir. N.Y., July 5, 2012)*

**COUNSEL:** [*1] For Claudia Woodard, Elise Lawless, Plaintiffs: Kenneth Andrew Goldberg, LEAD ATTORNEY, Goldberg & Fliegel LLP, New York, NY.

For TWC Media Solutions, Inc., The Weather Channel, Defendants: Laura Sack, Vedder Price P.C. (NY), New York, NY.

**JUDGES:** Barbara S. Jones, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Barbara S. Jones

**OPINION**

**Memorandum & Order**

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Plaintiff Claudia Woodard brings this lawsuit for employment discrimination against Defendants TWC Media Solutions, Inc. and The Weather Channel, (referred to collectively as "TWC") on the basis of race and gender, hostile work environment and unlawful retaliation under Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. § 2000e-2* ("Title VII"), the Civil Rights Act of 1866, as amended, *42 U.S.C. §1981*, New York State Human Rights Law ("NYSHRL") Executive Law *§ 296*, and New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code *§ 8-101 et seq.* [1] Plaintiff is an African American female of Jamaican ancestry. As an employee of TWC, Plaintiff alleges that she received negative performance and salary reviews, was subjected to harassing comments, and ultimately was terminated because of her race and gender, [*2] as well as in retaliation for her complaints to TWC management. Before the Court is Defendants' Motion for Summary Judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. For the reasons set forth below, Defendants' motion is GRANTED.

1 "We have repeatedly noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997)*. NYCHRL, however, "explicitly requires an independent liberal construction analysis in all circumstances, even where State and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling . . . [NYCHRL's] 'uniquely broad and remedial' purposes, which go beyond those of counterpart State or federal civil rights laws." *Williams v. New York City Housing Auth., 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)*.

**STATEMENT OF FACTS**[2]

2 The following facts are either undisputed or resolved in favor of Plaintiff. Defendants vigorously deny most of Plaintiff's allegations.

TWC hired Plaintiff in May 2004 as a Client Development Manager ("CDM" ) reporting to Meade Camp, the Senior Vice [*3] President for Client Development. (Def.'s 56.1 Stmt. ¶ 8; Pl.'s 56.1 Stmt. ¶ 8.) Plaintiff was previously employed as an Account Executive at the Wall Street Journal. (Pl.'s 56.1 Stmt. ¶ 229.) In early 2004, prior to Plaintiff being hired, Meade Camp told various employees that he wanted to hire a black woman for the CDM position, at least in part to satisfy a diversity hiring initiative that could increase his bonus. (Pl.'s 56.1 Stmt. ¶ 237.)

As a CDM, Plaintiff was responsible for developing relationships with clients so that they would later purchase advertising space from TWC. (Def.'s 56.1 Stmt. ¶ 11; Pl.'s 56.1 Stmt. ¶ 11.) Plaintiff's initial compensation package totaled $148,050 annually, including $85,000 base salary, $57,000 annual commission opportunity, and $7,050 annual bonus opportunity. (Def.'s 56.1 Stmt. ¶ 22; Pl.'s 56.1 Stmt. ¶ 22.)

In August 2004, the CDM position was eliminated at TWC, and all three existing CDMs became Account Managers. (Def.'s 56.1 Stmt. ¶ 33; Pl.'s 56.1 Stmt. ¶ 33.) As an Account Manager, Woodard was now responsible for actually selling advertising space with TWC to a designated client list. (Def.'s 56.1 Stmt. ¶¶ 33-36; Pl.'s 56.1 Stmt. ¶¶ 33-36.) [*4] In her new position, Plaintiff's total compensation package remained the same for 2005, but her guaranteed base salary was reduced to $66,622.51. (Pl.'s 56.1 Stmt. ¶ 26.) She now reported to Mark Gall, Senior Vice President for Eastern Region Sales. (Pl.'s 56.1 Stmt. ¶ 231.)

On August 18, 2004, Plaintiff informed Gall that Paul Celt, another Account Manager at TWC, made a series of inappropriate comments to another employee, Sales Assistant Lavern Broderick, including that she was "tilling Jamaican rum in her bathtub." (Def.'s 56.1 Stmt. ¶ 52; Pl.'s 56.1 Stmt. ¶ 11.) Plaintiff's email informed Gall that she was offended by Celt's comments. (Pl.'s 56.1 Stmt. ¶ 241.) Gall told Plaintiff that he would inform human resources about her complaint. (Def.'s 56.1 Stmt. 11 53; Pl.'s 56.1 Stmt. ¶ 53.) Gall later emailed Plaintiff to report that he had warned Celt that he considered such behavior "a serious breach of conduct" that would not be tolerated at TWC. (Def.'s 56.1 Stmt. ¶ 55; Pl.'s 56.1 Stmt. ¶ 55.) Celt apologized to Plaintiff in late August 2004, and Gall requested that Plaintiff inform him if any similar situations arose in the future. (Def.'s 56.1 Stmt. ¶¶ 60-64; Pl.'s 56.1 Stmt. [*5] ¶¶ 60-64.)

During the investigation of Plaintiff's complaint, Gall made comments that Plaintiff found offensive, including that Jamaicans do not have a strong work ethic, Jamaicans think they are better than other blacks but they are not, and black males only wanted to "sow their seed" and have children with multiple women to prove their masculinity. (Pl.'s 56.1 Stmt. ¶ 243-46.) Plaintiff never reported these comments to TWC management. (Pl.'s 56.1 Stmt. ¶ 220.)

Additionally, early in Plaintiff's employment with TWC, Mark Gall, her then supervisor, "intimidated [her] . . . [and] got very close in her face." (Pl.'s 56.1 Stmt. ¶ 351.) Twice during Plaintiff's employment, Mr. Gall's pants split in front of female employees, including the Plaintiff. (Pl.'s 56.1 Stmt. ¶ 213.) Plaintiff also saw Gall rub a baseball bat he kept in his office "in a sexual manner." (Pl.'s 56.1 Stmt. ¶ 218.) On "multiple occasions," Plaintiff says that Gall summoned her and other female employees to his office, where he put his legs wide open on his desk while wearing pants. (Pl.'s 56.1 Stmt. ¶ 213.) On December 16, 2004, Plaintiff believes that various male TWC employees went through her desk without her permission. [*6] (Pl.'s 56.1 Stmt. ¶ 264.) Plaintiff never reported any of these incidents to TWC management. (Def.'s 56.1 Stmt. ¶ 216, 219-22.)

In October 2004, Plaintiff was assigned a list of accounts and agencies she was directed to contact for the purpose of selling advertising space. Defendants admit that this was a "junior" account list, assigned to Plaintiff because she lacked sales experience in cable television. (Def.'s 56.1 Stmt. ¶ 37.) Plaintiff believed she was assigned a "dead account list" that would make it difficult for her to reach her assigned sales goal. (Pl.'s 56.1 Stmt. ¶ 254.) At her request, Plaintiff was allowed to retain two accounts from her time as a CDM, Hanook Tires and TIAA-CREF. (Def.'s 56.1 Stmt. ¶ 40; Pl.'s 56.1 Stmt. ¶ 40.)

In December 2004, Plaintiff received a performance review with a score of .55 out of 3.0, which ranked between "Requires Improvement" and "Exhibits good behaviors consistently." (Def.'s 56.1 Stmt. ¶ 66; Pl.'s 56.1 Stmt. ¶ 66.) The review was conducted by Mark Gall and Mary Jo Romeo, her new supervisor. (Sack Declaration Ex. U, Woodard Performance Evaluation 12/8/04.) Plaintiff considered this to be a negative review and sent a memorandum in January [*7] 2005 claiming the review was not "a fair or timely behavioral assessment" to Paul Iaffaldano, Executive Vice President and General Manager, and Patricia Keener, Compensation Analyst. (Def.'s 56.1 Stmt. ¶ 69; Pl.'s 56.1 Stmt. ¶ 69.) The memorandum also complained about Plaintiff's 2005 compensation package. (Pl.'s 56.1 Stmt. ¶ 69.) Plaintiff also sent an email with the same complaints to Romeo. (Def.'s 56.1 Stmt. ¶ 70; Pl.'s 56.1 Stmt. ¶ 70.) Neither written complaint specifically mentioned that she believed she was being discriminated against because of her race and gender, or because of her earlier complaints against Celt. (Def.'s 56.1 Stmt. ¶ 71; Pl.'s 56.1 Stmt. ¶ 71.)

In January 2005, Plaintiff attempted to secure an advertising commitment from Active International, an advertising agency. Lisa Siewers, Associate Director of National Broadcast at Active, contacted Mark Gall in mid-January to complain about Woodard's performance in working with Active. (Def.'s 56.1 Stmt. ¶¶ 72-73; Pl.'s 56.1 Stmt. ¶¶ 72-73.) Mary Jo Romeo, then Plaintiff's supervisor, was informed of the customer complaint and intervened to assist with the client. (Def.'s 56.1 Stmt. ¶ 76; Pl.'s 56.1 Stmt. ¶ 77.) On [*8] January 20, 2005, Romeo instructed Plaintiff via email that she should not contact this client until after Romeo met with the client for lunch on January 21. During that lunch, Siewers informed Romeo that she was dissatisfied with Plaintiff's work on the deal, and that this could cause TWC to lose business. (Def.'s 56.1 Stmt. ¶ 80; Pl.'s 56.1 Stmt. ¶ 80.) Romeo later met with the Plaintiff regarding the situation. She relayed Siewers' feedback, including that "Woodard had a listening problem and a knowledge problem" and that the client had trouble reaching Plaintiff. (Def.'s 56.1 Stmt. ¶ 83; Pl.'s 56.1 Stmt. ¶ 83.) Plaintiff was removed from the deal on January 28, 2010. (Def.'s 56.1 Stmt. ¶ 84; Pl.'s 56.1 Stmt. ¶ 84.)

In the same email informing Plaintiff that she would no longer be working with Siewers and Active, Romeo expressed concerns about whether Plaintiff was a proper fit for the role of Account Manager. She noted that she and Mark Gall were considering whether a lesser role would be more appropriate, and stated that they would discuss Plaintiff's future further in the upcoming weeks. (Def.'s 56.1 Stmt. ¶¶ 100-02; Pl.'s 56.1 Stmt. ¶¶ 100-02.)

That same day, immediately after [*9] Romeo informed her that she would no longer be on the Active account, Plaintiff faxed a memo to Human Resources Representative Pam Sawyer complaining that Romeo had created a "hostile work environment" for her. (Def.'s 56.1 Stmt. ¶ 87; Pl.'s 56.1 Stmt. ¶ 87; Sack Declaration Ex. BB, Fax from Woodard to Sawyer; Woodard Dep. 227:8-16.) She stated that on December 3, 2004, Romeo told her that the only reason she was hired was because of the company's diversity initiative. On another occasion, Romeo told her that "based on her experience ... black women have problems speaking up because they do not want to appear stupid." Plaintiff also included other observations and complaints that did not mention her race or gender. (Sack Declaration Ex. BB, Fax from Woodard to Sawyer.)

Sawyer and Gall promptly contacted Plaintiff about her complaint. (Def.'s 56.1 Stmt. ¶¶ 91-92; Pl.'s 56.1 Stmt. ¶¶ 91-92.) TWC management investigated Plaintiff's accusations and Romeo's response. Sawyer met with Romeo and Plaintiff in mid-February 2005. Romeo was terminated within a few days of this meeting, both because of the comments made to Plaintiff and because of complaints by other individuals against Romeo. (Def.'s [*10] 56.1 Stmt. ¶ 95; Pl.'s 56.1 Stmt. ¶ 95.) Plaintiff then reported to Meade Camp again. (Def.'s 56.1 Stmt. ¶ 96; Pl.'s 56.1 Stmt. ¶ 96.)

In early 2005, Meade Camp reported receiving two additional client complaints about Plaintiff's performance. First, Heidi Kahme, an employee of TWC client Initiative Trade, told him to "get this woman out of my shop." (Def.'s 56.1 Stmt. ¶¶ 97-98; Pl.'s 56.1 Stmt. ¶¶ 97-98.) However, other employees of Initiative who worked with Plaintiff were pleased with her performance. (Pl.'s 56.1 Stmt. ¶ 97.) Camp also reported receiving a complaint from John Viserto, the senior executive of Active International, about Plaintiff being a "waste of his time" and potentially harmful to the client's relationship with TWC. (Def.'s 56.1 Stmt. ¶¶ 100-02; Pl.'s 56.1 Stmt. ¶¶ 100-02.) Plaintiff reports receiving positive feedback from other members of Active International. (Pl.'s 56.1 Stmt. ¶¶ 100-02.)

In April 2005, Deirdre O'Grady, a vice president at TWC, emailed Mark Gall regarding Plaintiff's performance. She said that Plaintiff was "struggling" with absorbing and retaining information. O'Grady expressed "increasing concern" that dealing with Plaintiff's difficulties [*11] was "not the best use of our resources." (Def.'s 56.1 Stmt. ¶ 105; Pl.'s 56.1 Stmt. ¶ 105.)

During the same time period, Rick Monihan, a director at TWC who reported to O'Grady, also expressed concerns about Plaintiff's performance, work ethic, and ability to retain information. (Def.'s 56.1 Stmt. ¶¶ 107-10; Pl.'s 56.1 Stmt. ¶¶ 107-10.) Additionally, Monihan expressed concern that TWC was not giving Plaintiff adequate support in her development, and that she was "set up for failure" because of the difficulty of her assigned account list. (Pl.'s 56.1 Stmt. ¶¶ 107-10.) Monihan ultimately believed that firing Plaintiff was "probably the right thing to do" at the time. (Def.'s 56.1 Stmt. ¶ 110; Pl.'s 56.1 Stmt. ¶ 110.)

Throughout the spring of 2005, TWC management engaged in discussions regarding Plaintiff's future with the company. Mark Gall spoke with Paul Iaffaldano repeatedly about the issue. Gall told Iaffaldano that several clients had complained about the Plaintiff, that she was not progressing at an acceptable pace, and that she was not working hard to improve. (Def.'s 56.1 Stmt. ¶¶ 117-20; Pl.'s 56.1 Stmt. ¶¶ 117-20.) In late March, Iaffaldano expressed the opinion that Plaintiff [*12] should either be terminated immediately or kept on until an agreed upon date in a lesser position. (Def.'s 56.1 Stmt. ¶ 121; Pl.'s 56.1 Stmt. ¶ 121.) In April 2005, after managing her directly for more than a month, Meade Camp spoke to Iaffaldano about similar concerns, including that Plaintiff lacked the skills necessary to per-

form her job, and that she was not working hard enough to improve. (Def.'s 56.1 Stmt. ¶ 129; Pl.'s 56.1 Stmt. ¶ 129.)

On April 18, 2005, Gall and Camp met with Plaintiff and presented her with a written warning, approved by Iaffaldano. (Def.'s 56.1 Stmt. ¶ 132; Pl.'s 56.1 Stmt. ¶ 132.) The memorandum outlined four major areas of concern: inability to understand business concepts, lack of sales efficiency and productivity, lack of judgment in sales negotiations, and inability to work effectively with clients. The letter confirmed that because of client complaints, Plaintiff would no longer work with Active Media or Initiative Trade. Additionally, Plaintiff would no longer handle Icon International. The letter concluded with three expectations for Plaintiff going forward. First, Plaintiff was to achieve her required sales goals. Second, Plaintiff was to improve [*13] her knowledge of TWC's business and communicate professionally with clients on those matters. Finally, Plaintiff was instructed to effectively demonstrate her understanding of advertising sales business concepts in her client presentations and her internal communications at TWC. Plaintiff was informed that the failure to meet these expectations could result in termination. A follow-up meeting was set for May 12, 2005. (Def.'s 56.1 Stmt. ¶ 132; Pl.'s 56.1 Stmt. ¶ 132; Sack Declaration Ex. JJ, Memorandum from Gall to Woodard.)

On the same day as the meeting regarding her performance, Plaintiff sent an email to various employees at TWC that anyone with questions regarding Active Media or Initiative Trade should contact Mark Gall. She stated that she would still work with Icon International. (Def.'s 56.1 Stmt. ¶ 138; Pl.'s 56.1 Stmt. ¶ 138.) Gall immediately responded by email that Plaintiff's message was incorrect; she would no longer be working with Icon. Further, Gall characterized the email as inappropriate, because management would handle all staff communications regarding assignments. (Sack Declaration Ex. JJ, Emails between Woodard and Gall on April 19, 2005.)

The next day, April [*14] 19, 2005, Plaintiff called Jim Quinn, a buyer with Active International, to inform him that "your superiors ... are looking for or wanted somebody else." (Def.'s 56.1 Stmt. ¶ 140; Pl.'s 56.1 Stmt. ¶ 140.) Quinn then called Gall and relayed the substance of Plaintiff's call. He stated that the conversation put him in an uncomfortable situation. (Def.'s 56.1 Stmt. ¶ 141; Pl.'s 56.1 Stmt. ¶ 141; Sack Declaration Ex. LL "Notes from Lisa Longo during Woodard Performance Discussion and during Woodard follow up on 4/19/2005.") Gall informed Iaffaldano of Mr. Quinn's complaint. (Def.'s 56.1 Stmt. ¶ 145; Pl.'s 56.1 Stmt. ¶ 145.) Gall also informed Human Resources that he believed Plaintiff could not perform the job of Account Manager. (Def.'s 56.1 Stmt. ¶ 147; Pl.'s 56.1 Stmt. ¶ 147.)

Shortly after these events, Gall, Iaffaldano, Camp, along with Human Resources and TWC's Legal Department, made the decision to terminate Plaintiff's employment. She was officially terminated on April 22, 2005. (Def.'s 56.1 Stmt. ¶ 148; Pl.'s 56.1 Stmt. ¶ 148.)

On April 22, 2005, Plaintiff submitted a rebuttal to the written warning issued on April 18, 2005. She contested the accuracy of the warning against her, [*15] stating that she was able and willing to improve her business skills, was currently on track to meet her quarterly revenue goal, and had received positive feedback from clients. (Sack Declaration, Ex. MM, Memorandum from Woodard to Gall.) She also stated that since her complaints about Mary Jo Romeo's comments, she believed she was receiving even less support from management. (Id.) TWC made the decision to terminate Plaintiff prior to receiving Plaintiff's letter response. (Def.'s 56.1 Stmt. ¶ 149; Pl.'s 56.1 Stmt. ¶ 149.)

Plaintiff subsequently filed with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a probable cause finding and a right to sue notice.

## LEGAL STANDARD

Under *Federal Rule of Civil Procedure 56(c)*, summary judgment may not be granted unless all of the submissions taken together show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of a material factual question. In making this determination, a court must view all facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all inferences [*16] against the moving party. *Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006)*. Although the Second Circuit has emphasized the need for district courts to act with caution when considering whether to grant summary judgment to an employer in an employment discrimination case, a plaintiff must provide more than "conclusory allegations . . . and show more than some metaphysical doubt as to the material facts." *Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010)* (internal citations and quotations omitted). A defendant will be entitled to summary judgment unless the plaintiff "can point to evidence that reasonably supports a finding of prohibited discrimination." *Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006)* (citations and quotations omitted).

## DISCUSSION

Plaintiff's complaint states four causes of action: (1) race and gender discrimination under Title VII, *42 U.S.C. § 1981*, NYSHRL, and NYCHRL; (2) unlawful retaliation in violation of Title VII, *42 U.S.C. § 1981*,

NYSHRL, and NYCHRL (3) discriminatory harassment and hostile work environment due to race and gender under Title VII, *42 U.S.C. § 1981*, NYSHRL, and NYCHRL; and (4) pay discrimination because [*17] of race and gender under Title VII, *42 U.S.C. § 1981*, NYSHRL, and NYCHRL.

As a preliminary matter, Plaintiff argues that statements by clients regarding her performance are inadmissible hearsay. They are not hearsay. They are not being offered for the truth of their contents but, rather, for the fact that they were made. *Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 66 n.2 (2d Cir. 2003)* (holding that disputed complaints made against a Plaintiff were admissible because "inaccuracy of reports [made against a Plaintiff] does not matter if ... [the supervisor] believed them.") Plaintiff can produce no evidence to show that these statements were not actually made by TWC clients and not actually received by TWC management. She does not dispute that Iaffaldano, Gall, and Camp, the three TWC managers who ultimately made the decision to terminate Plaintiff, believed that clients had complained about Plaintiff's performance. (Pl.'s 56.1 Stmt. ¶¶ 73 - 83, 97 - 104, 118; Def.'s 56.1 Stmt. ¶¶ 73 - 83; 97 - 104, 118.) Moreover, in her April 22, 2005 response letter, described above, Plaintiff admitted that Siewers complained about her and stated she was "unaware" of any other client [*18] complaints. (Sack Declaration, Ex. MM, Memorandum from Woodard to Gall.) Therefore, the sworn testimony of TWC managers that clients complained to them about Plaintiff is admissible.

**1. Race and Gender Discrimination**

**a. Legal Standard**

Claims of employment discrimination brought under Title VII are examined under the burden-shifting framework of *McDonnell Douglas v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. Under this analysis, the plaintiff must first establish a *prima facie* case of discrimination based on race or gender. If a plaintiff establishes the required elements, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the allegedly discriminatory act. *Farias v. Instructional Sys., 259 F.3d 91, 98 (2d Cir. 2001)* (citation omitted). If the defendant can provide such a reason, the burden shifts back to plaintiff to point to evidence that "reasonably supports a finding of prohibited discrimination." Id. (citation and quotation omitted). If plaintiff is unable to provide such evidence, a defendant will be entitled to summary judgment. Id.

To establish a prima facie case, Plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was [*19] qualified for the position or is performing her duties satisfactorily; (3) she suffered an adverse employment; action; and (4) that action occurred under circumstances giving rise to an inference of discriminatory intent. *Id.*

To establish an inference of discriminatory intent, Plaintiff "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [her] version of the events is not wholly fanciful." *Golden Pac. Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004)* (citations and quotations omitted). Plaintiff "must be able to demonstrate admissible evidence sufficient to permit an inference of discriminatory motive." *Williams v. Alliance Nat'l Inc., No. 98 Civ. 7984 (RCC), 2001 U.S. Dist. LEXIS 2904, at *11 (S.D.N.Y. Mar. 19, 2001)* (citations omitted), aff'd *No. 01 Civ. 7350, 24 Fed. Appx. 50, 2001 U.S. App. LEXIS 25143 (2d Cir. Nov. 19, 2001)*.

**b. Analysis of Federal and State Claims**

In support of her claim for discriminatory discharge, Plaintiff asserts that: (1) in early 2004, prior to Plaintiff's hire, Meade Camp stated he would only hire a "black woman" for Plaintiff's position; (2) in August 2004, after Plaintiff complained that a coworker had [*20] made offensive comments in her presence, her supervisor Mark Gall made discriminatory comments to her; (3) Plaintiff's next supervisor, Mary Jo Romeo, also made discriminatory comments to her in December and January 2005; (4) in October 2004, she was assigned a "dead account list" that set up her for failure at TWC; and (5) throughout her employment with TWC, she was treated less favorably than other white male Account Managers.

Assuming without finding that Plaintiff has established a *prima facie case*, Plaintiff's evidence of discriminatory intent is insufficient to avoid summary judgment.

First, Plaintiff's claim that discriminatory comments made by supervisors Camp, Gall, and Romeo establish an inference of discriminatory motive is unpersuasive. Plaintiff has failed to show how Camp's about that he would only hire a black woman for her position would support an inference that she was eventually fired by him because of her race or gender. See *Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997)* (attributing special significance "when the person who made the decision to fire was the same person who made the decision to hire").

Second, while Gall's derogatory statements about [*21] Jamaicans might otherwise suffice to demonstrate the requisite discriminatory motive, in this case they lack a causal nexus to the termination decision and qualify only as stray remarks. In determining whether a comment should be considered a stray remark, courts consid-

er who made the remark, when the remark was made in relation to the termination, the content of the remark, and the context in which the remark was made. *Pronin v. Raffi Custom Photo Lab., Inc., 383 F.Supp.2d 628, 637 (S.D.N.Y. 2000).* Remarks are especially likely to be considered "stray" when made by a decision maker unrelated to the decision-making process temporally remote from the date of decision. *Campbell v. Alliance Nat. Inc., 107 F.Supp.2d 234, 247 (S.D.N.Y. 2000).* Plaintiff has not demonstrated how such comments affected or were related to the termination decision. Moreover, Gall's comments were made in August 2004, approximately eight months before Plaintiff's termination.

Third, the comments of Mary Jo Romeo in December and January 2005 are not persuasive evidence of discriminatory intent because Plaintiff cannot show that Romeo had any role in TWC's decision to terminate her employment. In fact, Romeo was [*22] fired by TWC within a month of Plaintiff's complaint, more than two months before Plaintiff was terminated. The only comments Romeo allegedly made were on December 3, 2004, when Romeo "made it clear that she believed the Company's diversity policy to be the only reason I was hired" and that "based on [Romeo's] experience in dealing with black women, she finds that black women have problems speaking up and asking questions because they do not want to appear stupid." These remarks qualify as "stray comments," as they were made by a non-decision maker, months away from the termination decision, and did not involve an employment decision. See *Pronin, 383 F.Supp.2d at 637.* Furthermore, given that Romeo was terminated shortly after these remarks were made, Plaintiff cannot successfully argue that such remarks have a "tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007).*

Fourth, Plaintiff has failed to submit evidence that the account list she was given demonstrates discriminatory intent. Plaintiff admits that she had no prior experience selling cable [*23] advertising and was new to the industry when she became an account manager. (Pl.'s 56.1 Stmt. ¶¶ 34, 41; Def.'s 56.1 Stmt. ¶¶ 34, 41.) She also admits that, per her request, she was allowed to keep two additional accounts she had established relationships with in her prior position. (Pl.'s 56.1 Stmt. ¶ 40; Def.'s 56.1 Stmt. ¶ 40.) While the parties agree that Plaintiff was assigned at least a "junior" account list, Plaintiff has failed to demonstrate that the reason for this assignment was discriminatory. Rather, she has admitted facts that establish a rational business reason for the assignment. Moreover, TWC's proffered reason for Plaintiff termination was not low sales performance, but rather was her inability to deal with clients in a professional manner. As a result, the assignment of a less promising account list is not sufficient to establish pretext.

Fifth, Plaintiff's argument that she was treated less favorably than peers outside of her protected class also fails to establish pretext. To support an inference of discriminatory treatment, Plaintiff must demonstrate that she was treated differently than other similarly situated employees outside of the Plaintiff's protected group. [*24] *Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000).* To be similarly situated, the employees must be similar "in all material respects." Id. This does not require that employees be identical, but that courts consider "(1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.*

Plaintiff fails to present evidence of employees who are sufficiently similar to provide a basis for finding pretext. Plaintiff can point to no other employee who was the topic of complaints to TWC management by clients, or who was subject to discipline for conduct of comparable seriousness. As a result, Plaintiff's attempt to establish pretext fails, and her claim of wrongful termination must be dismissed.

**c. NYCHRL Claim**

The Court construes Plaintiff's NYCHRL claim independently from Plaintiff's state and federal claims because the NYCHRL "explicitly requires an independent liberal construction analysis in all circumstances, even where State and federal civil rights laws have comparable language. The independent analysis must be targeted to [*25] understanding and fulfilling . . . the City HRL's 'uniquely broad and remedial' purposes, which go beyond those of counterpart state or federal civil rights laws. " *Williams v. New York City Housing Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009).* Thus, less egregious conduct than that required under Title VII may support a claim of employment discrimination under the NYCHRL. The City law does not impose "an overly restrictive 'severe or pervasive' bar," but defendants can nevertheless "still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Id. at 79-80.*

Having reviewed the record separately with respect to Plaintiff's NYCHRL claim while keeping in mind the New York City law's "uniquely broad and remedial" purposes, the Court concludes that Plaintiff has failed to demonstrate any genuine issue of material fact as to whether she was wrongfully terminated for discrimina-

tory reasons. To the extent that the NYCHRL is more liberal than its state or federal counterparts, Plaintiff has still failed to frame any genuine issue of fact as to discriminatory [*26] termination under the NYCHRL; the conduct alleged is far from a borderline violation. See, e.g., *Williams, 872 N.Y.S.2d at 41* ("[S]ummary judgment will still be available where [employers] can prove that the alleged discriminatory conduct in question does not represent a 'borderline' situation . . . ."). Accordingly, Plaintiff's claim of wrongful discriminatory termination under the NYCHRL is dismissed.

**2. Unlawful Retaliation**

**a. Legal Standard**

In order to make out a prima facie case of unlawful retaliation under Title VII, a plaintiff must adduce sufficient evidence to permit a trier of fact to find that: (1) the plaintiff engaged in a protected activity; (2) the employer knew of this activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection existed between the protected activity and the adverse action. See *Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006)*. Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to establish a legitimate, non-discriminatory reason for the action. See *Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)*. If the employer [*27] meets its burden, then the burden shifts back to the plaintiff to show that "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." *Richardson, 180 F.3d at 443* (citing *Gallagher v. Delaney, 139 F.3d 338, 348 (2d Cir.1998))*.

**b. Analysis of Federal and State Claims**

Plaintiff's retaliation claim centers around two separate complaints of discriminatory treatment by TWC staff members. The first occurred in August 2004, when Plaintiff complained to manager Mark Gall that Paul Celt, a white account manager, made discriminatory comments about Jamaicans. Plaintiff contends that after this complaint, she was subject to adverse employment actions, including a negative performance review and a less attractive compensation package in December 2004. The second complaint was made on January 28, 2005, when Plaintiff submitted a written complaint documenting discriminatory comments made to her by her then supervisor, Mary Jo Romeo. Plaintiff contends that after this complaint, TWC began its efforts to terminate her, and ultimately succeeded in her firing on April 22, 2005.

Defendants argue that Plaintiff has failed [*28] to establish the requisite causal connection between these protected activities and the alleged adverse employment actions. Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady, 252 F.3d 545, 554 (2d Cir.2001)*, many courts in this circuit have held that periods of two months or more defeat an inference of causation. *Ragin v. East Ramapo Cent. School Dist., 2010 U.S. Dist. LEXIS 32576, 2010 WL 1325779 at *24 (S.D.N.Y. March 31, 2010)*. Here, Defendants contend that the gap of six months between Plaintiff's first complaint and the decrease in compensation package defeats the inference of a causal connection. Similarly, Defendants argue that the gap of just under three months between Plaintiff's complaint about Romeo and her termination is too great to establish a causal connection.

The Court agrees that in this circumstance, the extended time periods between each protected activity and adverse action is too attenuated to establish a causal connection.

Further, even if the time period between the protected activity and the retaliatory act was [*29] not too attenuated, Plaintiff fails to introduce evidence demonstrating retaliatory intent. To establish retaliatory intent, a plaintiff must show either direct evidence of retaliatory animus directed at the plaintiff or circumstantial evidence, including "that the protected activity was followed closely by discriminatory treatment" or by evidence of "disparate treatment of fellow employees who engaged in similar conduct." *Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001)*.

Regarding the compensation change in December 2004, Plaintiff admits that the two other employees who were transitioned from CDM to Account Manager, including individuals outside of her protected class, both received similar changes to their compensation package including a reduction of their guaranteed base salary.

As to Plaintiff's termination, Plaintiff can point to no discriminatory treatment closely following her complaint. Moreover, Defendant has produced evidence that Plaintiff was informed by email that management was reconsidering whether the Account Manager position was a fit for Plaintiff immediately before Plaintiff sent her complaint to Human Resources. (Def.'s 56.1 Stmt. ¶ 83; Pl.'s 56.1 Stmt. ¶ 83.) [*30] This undermines Plaintiff's claim that her reprimand and termination were retaliatory.

Similarly, after Plaintiff received her final warning from TWC management on April 18, 2005 outlining the areas she needed to improve in, she admits that she called a client to inform him she would no longer be handling his account. That client then called Mark Gall, reporting that the call had made him "uncomfortable."

Plaintiff's written warning required her to communicate professionally with all clients; the letter explicitly noted that any violation of the terms of the warning could lead to termination. Given that Plaintiff disobeyed this directive just one day after her performance meeting, Plaintiff's argument that the termination was actually retaliatory is unpersuasive. Additionally, she can point to no other employee who was the topic of multiple client complaints and not treated the same way.

Accordingly, Plaintiff's retaliation claims under federal law and the NYSHRL are dismissed.

**c. NYCHRL Claim**

As discussed earlier, this Court recognizes that in light of the 2005 Restoration Act and the recent First Department decision *Williams v. New York City Housing Authority*, we must construe the NYCHRL [*31] "more broadly than federal civil rights laws and the State HRL." *872 N.Y.S.2d at 36-37*. However, even under this more liberal standard, a plaintiff must still link the adverse action to a "retaliatory motivation." *Id. at 35*. Moreover, summary judgment is still appropriate where a defendant "can prove that the alleged discriminatory conduct in question . . . could only be reasonably interpreted as representing no more than petty slights or trivial inconveniences." *Kaur v. New York City Health and Hospitals Corp., 688 F.Supp.2d 317, 340 (S.D.N.Y. 2010)* (alteration in original) (citation and quotation omitted).

This Court has engaged in an "independent analysis" of Plaintiff's claims under this standard and finds that no genuine issue of material fact has been raised indicating that Plaintiff actually suffered from an adverse employment action with the requisite retaliatory motive. Therefore, even under the more liberal standard of the NYCHRL, Plaintiff's claims of retaliatory adverse employment actions cannot constitute retaliation "in any manner" and therefore are dismissed.

**3. Hostile Work Environment**

**a. Legal Standard**

To state a hostile work environment claim, a plaintiff must show that [*32] the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)* (internal quotation marks and citations omitted). A plaintiff "must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006)*. Plaintiff must also show that a "specific basis exists for imputing the conduct that created the hostile environment to the employer." *Briones v. Runyon, 101 F.3d 287, 291 (2d Cir. 1996)*.

"Generally, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Id. (quoting *Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002))*. "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano, 294 F.3d at 374*. "Where reasonable jurors could disagree as to whether alleged incidents [*33] of . . . insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson v. Oneida, 375 F.3d 206, 227 (2d Cir. 2004)*.

**b. Analysis of Federal and State Claims**

In supporting her claim for hostile work environment, Plaintiff points to a variety of conduct by TWC employees. This conduct includes the discriminatory comments by Gall, Camp, and Romeo, as well as a general pattern of poor treatment by supervisors, including their refusal to train her, giving her a negative evaluation in December 2004, and issuing the April 2005 written warning. Additionally, Plaintiff contends that Gall and other white male Account Managers rummaged through her desk and removed her personal belongings. (Pl.'s 56.1 Stmt. ¶ 264.) On "multiple occasions," Plaintiff saw Gall spread his legs on his desk while wearing pants. (Pl.'s 56.1 Stmt. ¶ 350.) She also saw him once rub a baseball bat "in a sexual manner," and on another occasion Gall stood too close to her, making her feel uncomfortable. (Id.) This was part of what she considered "ongoing workplace harassment [*34] against other females and women of color." (Pl.'s Br. 24.)

In this case, the conduct Plaintiff alleges is insufficient as a matter of law to meet the threshold level of severity or pervasiveness that is required for a hostile work environment claim. While Plaintiff reports approximately ten discriminatory comments made by Gall, Camp, and Romeo in her eleven months of employment with TWC, none of the comments were sufficiently severe to amount to materially adverse changes in the terms and conditions of Plaintiff's employment.

Plaintiff's description of Mark Gall's conduct, while perhaps inappropriate, does not rise to the level of the seriousness and pervasiveness required as a matter of law. While Plaintiff alleges that there were "multiple incidents," she does not contend that they were continu-

ous, occurring daily or even weekly. The few incidents Plaintiff described are not severe enough for a reasonable person to find that Plaintiff's work environment was materially altered.

Plaintiff relies heavily on the harassment allegedly suffered by other female employees at TWC. Even taking these allegations as true, where Plaintiff was not the direct recipient of harassing or threatening comments, [*35] they are far less persuasive in establishing a claim of hostile work environment. See *Benette v. Cinemark U.S.A., Inc., 295 F. Supp. 2d 243, 251 (W.D.N.Y. 2003)* ("[M]ost of the incidents were not directed at Benette herself or they did not happen in her presence" but rather "were heard 'second-hand' through other employees.").

Therefore, Plaintiff has failed to show that she suffered from an objectively abusive work environment so permeated with such discriminatory intimidation, ridicule, and insult based on her sex or race that a reasonable person would find that the terms and conditions of employment were altered. Accordingly, Defendants' motion for summary judgment on Plaintiff's hostile work environment claim under Title VII and NYSHRL is granted.

**c. NYCHRL Claim**

As discussed above, the Court construes Plaintiff's NYCHRL claim independently from Plaintiff's state and federal claims, because the NYCHRL "explicitly requires an independent liberal construction analysis in all circumstances, even where State and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling . . . [NYCHRL's] 'uniquely broad and remedial' purposes, [*36] which go beyond those of counterpart State or federal civil rights laws." *Williams v. New York City Housing Auth., 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009)*. Thus, less egregious conduct than that required under Title VII may support a hostile work environment claim under the NYCHRL. The City law does not impose "an overly restrictive 'severe or pervasive' bar," but defendants can nevertheless "still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Id. at 41*.

Even under the less stringent standard of the NYCHRL, Plaintiff has failed to demonstrate any genuine issue of material fact as to whether a hostile work environment existed at TWC. To the extent that the NYCHRL is more liberal than its state or federal counterparts, Plaintiff has still failed to frame any genuine issue of fact as to a hostile work environment under the NYCHRL; the conduct alleged is far from a borderline Title VII violation. Therefore, Plaintiff's hostile work environment claim under the NYCHRL is dismissed.

**4. Pay Discrimination**

**a. Legal Standard**

To establish [*37] a prima facie case of pay discrimination under Title VII, a plaintiff must show that: (1) she belonged to a protected class; (2) she was paid less than members outside of the protected class for work requiring the same level of responsibility; and (3) evidence of discriminatory animus. *Quarless v. Bronx-Lebanon Hospital Center, 228 F.Supp.2d 377, 383 (S.D.N.Y. 2002)*. To avoid summary judgment, Plaintiff must produce some evidence to show that she was "substantially similar" to a member outside of her protected class who received more compensation. The comparison is not valid unless Plaintiff can show that she was "substantially similar" to the comparator employee in all material respects. *Quarless, 228 F.Supp.2d at 383-84* (quoting *McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001))*.

**b. Analysis of Federal and State Claims**

Plaintiff argues that she was compensated less than "various white male Account Managers." (Pl.'s Br. 22.) She alleges that for 2005 her base salary was reduced and her overall compensation package was unchanged, while other white male Account Managers received raises. (Id.) Specifically, she points to Craig Meadow, one of the CDMs who became an Account Manager [*38] in 2004, as a comparator. Meadow also received a substantial decrease in his guaranteed base salary and an increase in his potential commission compensation. However, Meadow received a three percent raise to his overall compensation package in 2005 while Plaintiff received no raise. (Def.'s 56.1 Stmt. ¶29; Pl.'s 56.1 Stmt. ¶ 29; 274 - 79.) [3]

3 Plaintiff's Rule 56.1 Statement lists other white male employees who she contends received raises, including Matt Derella, Paul Celt, and Peter Wright. Plaintiff fails to explain how such employees are "similarly situated" and merely states that they received raises, often months or years after Plaintiff was terminated. Therefore, these allegations are irrelevant to Plaintiff's claim.

Plaintiff's claim of pay discrimination must fail because she cannot point to evidence establishing any "similarly situated" employee outside of her protected class who was better compensated for similar work. Craig Meadow is not "similarly situated" to Plaintiff for the purposes of her pay discrimination claim. Plaintiff admits that she received a less than favorable perfor-

mance review, and she cannot point to other employees who received a raise despite a negative [*39] performance review. Meadow, who received a three percent raise to his total compensation package in 2005, submitted a sworn affidavit that he received "a very good performance review" for 2004. (Affidavit of Craig Meadow, ¶ 6). Moreover, Plaintiff's total compensation package, even with Meadow's raise, exceeded Meadow's total compensation package by more than $25,000 in 2005. Plaintiff has failed to establish a genuine issue of material fact as to her claim of pay discrimination, and-Defendants' motion for summary judgment on the federal and NYSHRL pay discrimination claims is granted.

**c. Analysis of NYCHRL Claim**

For the reasons discussed above, this Court has independently construed Plaintiff's claim of pay discrimination under the more liberal standard of the NYCHRL. Here, Plaintiff cannot even demonstrate that her compensation was actually less favorable than any similarly situated employee. As the conduct alleged is far from a borderline situation, Plaintiff has still failed to frame any genuine issue of fact as to pay discrimination under the NYCHRL's more liberal standard. See, e.g., *Williams, 872 N.Y.S.2d at 41* ("[S]ummary judgment will still be available where [employers] can [*40] prove that the alleged discriminatory conduct in question does not represent a 'borderline' situation . . . ."). Therefore, Plaintiff's claims of pay discrimination under the NYCHRL are dismissed.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is GRANTED. The Clerk of the Court is directed to terminate the case as to Plaintiff Claudia Woodard.

SO ORDERED:

/s/ Barbara S. Jones

Barbara S. Jones

UNITED STATES DISTRICT JUDGE

Dated: New York, New York

January 3, 2011