UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

DANIELLE RAUSA,

Plaintiff,

v.

THE BOARD OF EDUCATION OF THE NORTH SYRACUSE CENTRAL SCHOOL DISTRICT, AND STEVEN WOLF,

Defendants.

---

**AFFIDAVIT**

Civil Action No. 5:11-CV-1152 (TJM/ATB)

STATE OF NEW YORK )
)ss.:
COUNTY OF ONONDAGA)

**ELLEN HARDY**, being duly sworn, deposes and states:

1. I was an administrator employed by the North Syracuse Central School District and assigned to Roxboro Road Middle School ("Roxboro Road") from August 1993 until August 2008. For virtually all of those years, my title was Vice Principal. The sole exception is that I served as Interim Principal for a short period of time.

2. I was Vice Principal at the time that Danielle Rausa began teaching at Roxboro Road. I had the opportunity to work with Ms. Rausa and to observe her and evaluate her work. As explained below, I also made the decision to issue her a Counseling Memo in February 2008.

3. Over the years, I had concerns with respect to Ms. Rausa's personal style with her colleagues. I found Ms. Rausa to be moody. Her personality was subject to swings, from bubbly and upbeat to hostile and aggressive. This hostile and aggressive

behavior was reserved for colleagues and administrators. I did not observe that she treated students with hostility or aggression.

4. Joseph Menard was Principal of Roxboro Road from approximately 2001 to 2007. Mr. Menard's style was non-confrontational, and he tended to work around personnel problems in a way that caused the least amount of personal conflict. At times, it seemed that the loudest voice would be the one appeased. Ms. Rausa demanded a lot for her Drama program, from funds to time with the students to facilities use, and she was quite assertive in pursuing these things. Mr. Menard tended to give Ms. Rausa what she wanted.

5. In February 2008, Patrick Wallace came to me with a concern over a conflict he was having with Ms. Rausa. Mr. Wallace was a new, untenured teacher. Mr. Wallace was leading the 6th/7th grade chorus. Ms. Rausa scheduled her Drama rehearsals for the same time as Mr. Wallace's chorus rehearsals (Tuesdays). Ms. Rausa informed the students that they could not go to any part of Mr. Wallace's chorus rehearsals on Tuesdays. This stood to significantly hurt Mr. Wallace's ability to be ready for their spring concert, as nearly half of his chorus students were also in the Drama production.

6. Earlier in the week, Ms. Rausa and another untenured teacher, Robyn Launt, had informed me that Ms. Launt's 5th grade chorus would perform in the Drama production. They also informed me that Mr. Wallace had asked if his chorus could participate as well, but they told him that it was too late for him to join. (Ms. Rausa was in charge of the Drama production; Ms. Launt was in charge of the 5th grade chorus;

and Mr. Wallace had the 6th and 7th grade chorus.) As the Director of the Drama Club, Ms. Rausa controlled who participated in the Drama production.

7. It had been the custom that the middle school had a single spring choral concert. However, Ms. Rausa and Ms. Launt told me that they had decided to take the 5th grade chorus to perform in the Festival of the Arts, and, therefore, the 5th grade chorus would not perform in a concert with Mr. Wallace's 6th/7th grade chorus. Mr. Wallace was concerned that his students would not have enough of an audience if they performed alone.

8. I was pleased that Mr. Wallace had to come to me with this situation. It was appropriate for him to do so for many reasons, not least of which was that he was a new, untenured teacher. He did not have the political capital for a standoff with Ms. Rausa. Further, I was the building administrator in charge of scheduling at that time.

9. On February 12, 2008, I convened a meeting of the Music Department to work through these issues. Ms. Rausa became angry almost immediately. She said she was upset that Mr. Wallace had involved me. Ms. Rausa was sarcastic, condescending, and downright rude to Mr. Wallace, including saying in front of the rest of the Music Department that Mr. Wallace's chorus was terrible, that he was afraid of "looking bad", and, in essence, that he couldn't teach. Ms. Rausa was extremely loud and visibly angry. Despite my efforts, she refused to move off her demand that the students would go to Drama rehearsals exclusively on Tuesdays.

10. I tried to calm Ms. Rausa and bring her back to a productive, professional tone. As Ms. Rausa was adamant that she would not give an inch, I offered to rework the duty schedule. My offer was to give Ms. Rausa what she wanted (i.e., the students

exclusively to herself on Tuesdays), and I would relieve Mr. Wallace from a duty period once a week so that his chorus could use that time to rehearse. At this point, Ms. Rausa became truly irate and shouted that no one ever offered to relieve her of any duties. She declared that this meeting was a waste of her time and stood up to walk out.

11. At this point, I dismissed the rest of the Department except for Ms. Rausa, Mr. Wallace, and Ms. Launt, as they were directly involved in the scheduling problems. Ms. Rausa rolled her eyes and glared, and she continued to speak to Mr. Wallace and me with sarcasm, hostility and disgust. I asked her three (3) times to tone down her negative attitude. Ms. Rausa declared that she would allow the students to go to Mr. Wallace's rehearsal on that particular day, but never again, and she left the room.

12. Ms. Launt and Mr. Wallace stayed in the room with me. We continued to talk, and Mr. Wallace decided that the best course for him would be to join Mr. Bossert's band concert in the spring. Throughout this entire time, Ms. Launt was calm and considerate, and she was willing to be a part of the solution. Ms. Launt offered to help Mr. Wallace in any way she could. It was clear to me that it was Ms. Rausa, not Ms. Launt, who was driving the decisions that adversely affected Mr. Wallace's chorus.

13. Ms. Rausa's behavior toward Mr. Wallace and me was nothing short of outrageous. I was aware that Ms. Rausa was a strong personality who tended to dominate the Music Department, but her behavior on that particular day was completely unprofessional. I was especially upset that Ms. Rausa insubordinately and defiantly rejected my attempts to come up with a collegial, workable solution.

14. On February 15, 2008, I held a meeting with Ms. Rausa to discuss her behavior. Steve Wolf and Director of Music David Morton also attended this meeting. Ms. Rausa was hostile, and she glared at me throughout the meeting. She refused to acknowledge that she had behaved inappropriately in any way.

15. I decided that Ms. Rausa should receive a Counseling Memorandum. It is my understanding that Ms. Rausa contends that I was directed to do this by Steve Wolf. This is flatly untrue. Neither Mr. Wolf nor anyone else directed me to issue the Counseling Memorandum. I was disturbed and insulted by Ms. Rausa's conduct, and the decision that a Counseling Memorandum was warranted was my own.

16. A copy of my notes of this incident is attached as **Exhibit A**. I made the notes at or around the time of the incident.

17. A copy of the Counseling Memorandum I issued to Ms. Rausa is attached as **Exhibit B**.

18. Ms. Rausa continued in her defiance by refusing to sign the Counseling Memorandum. I made note of this, attached as **Exhibit C**.

19. Ms. Rausa never really spoke to me again.

20. I retired from the District in August 2008.

21. It is my understanding that Ms. Rausa contends that Mr. Wolf favored male faculty. This is wholly inaccurate in my opinion. I knew Mr. Wolf from working with him in the Syracuse City School District, and I was on the hiring committee that resulted in the decision to offer him employment as Principal of Roxboro Road. I fully supported Mr. Wolf's hiring. I am not aware of any situation where Mr. Wolf treated female teachers less favorably than male teachers. In the time I worked with him, I saw no

evidence that Mr. Wolf used his position as Principal to favor any person for any reason. It should be noted for the record that I am a female.

22. It is also my understanding that Ms. Rausa believes Mr. Wolf made the decision to remove her from the instrumental band position and place her in the classroom position. Based on my fifteen (15) years in the District as an administrator, I can attest that music assignments were not made by building level administration; they were made by Director of Music Dr. David Morton. It is true that, technically, building administration had the authority to make these assignments. However, as a practical matter, Dr. Morton was primarily responsible for the District-wide staffing plan for all music positions, and building level administration followed his recommendations.

23. I have been informed that Ms. Rausa contends that I did nothing during the 2007-2008 school year to address inappropriate behavior on the part of a particular male student. This is wholly inaccurate. Concerns about this male student's behavior were brought to my attention on a few occasions. The Principal and I responded with progressive discipline, including a one day in-school suspension and a one day out of school suspension. Student discipline is shared with the parents of the student disciplined, but not with other parents and not with teachers uninvolved in the disciplinary incident. It is understandable that a complaining student's parents might believe we had taken no disciplinary action in response to a complaint because we could not tell them about it. This information was confidential and private and shared only with the parents of the disciplined student.

24. It is my understanding that Ms. Rausa contends that she was treated in a hostile fashion by male colleagues, including Mark Bossert, Patrick Wallace, and

Joseph Clayton. I never saw any evidence of this. I knew Mr. Bossert and Mr. Clayton very well, as I had worked with them for many years. Mr. Wallace was a newer teacher, but I interacted with him frequently. I would characterize all three of these men as non-confrontational. If anything, my observations led me to believe that these men tended to stay out of Ms. Rausa's way so as to reduce the possibility of conflict with her.

25. My personal assessment is that Ms. Rausa is a bully personality. I have concerns about how she treated her colleagues and how she went about getting her way. I have no reason to believe that she is the victim of any form of harassment.

/s/ Ellen Hardy
ELLEN HARDY

Sworn to before me this 27th
day of February, 2013.

/s/ Michael B. Hodge
Notary Public

MICHAEL B. HODGE
Notary Public State of New York
Qualified in Onondaga Co. No. 01H05026426
My Commission Expires April 18, 2014

# Exhibit A

On the morning of February 12, I asked the music department to meet in my office: Mark Bossert, Pat Wallace, Kristen Kopf, Robyn Launt, and Danielle Rausa. It had come to my attention last week that there were some conflicts about 6th and 7th graders in chorus and in the show and overlapping rehearsals.

During the previous week, Danielle and Robyn had stopped by to tell me that they had decided to use the 5th grade chorus in the show. They knew that Pat Wallace had suggested that the 6th and 7th grade chorus be included. They said that they were underway and it was too late for him to join. Pat came to me the next day or so to say that he was upset that Danielle had told his chorus that if they were chosen to be in her show, they could not go to his chorus (both on Tuesday). He said that he had had negative interactions with her in the past and could not address this with her alone. I said we would meet as a department.

At that point I suggested a meeting to work out the issue and verify the dates of the show, the Arts Festival and the Spring Concert dates and who was participating.

The teachers came into the room and I reviewed the schedule and heard that 5th grade (Robyn) was not participating in the spring concert. Pat Wallace stated his concern that he would not have enough time to prepare a May 6 concert if he could not see his 6th and 7th grade students, half of whom were in the show for April 2 and 3. Robyn and Danielle said they were bringing the 5th grade chorus to the Festival of the Arts in April

Danielle was upset that Pat did not remember that they had agreed on the fact that she would have exclusive time with his chorus kids during the show rehearsal time (Mondays and Tuesdays). She accused him of covering up that he did not have enough kids and would "look bad" in a concert. She declared vehemently that she would not allow these 12 common students to go to Pat for 20 minutes/week, as he asked, when she wanted them in show rehearsal. She said that the show came first and she would not give up any rehearsal time. Furthermore, she declared that she was angry that Pat had come to administration for help. She would have preferred to settle it with him on her own.

I offered to relieve Pat from lunch duty 6th and /or 7th period once per week so he could meet with the students in question. Danielle became very irate and loudly said that no one would ever relieve her of duties when she asked. I tried to calm her down, and asked her to stick to the problem at hand. She retorted that this meeting was a waste of her time and she stood up. I encouraged to sit down and help work out an agreement. She said she had more important things to do. At this point, I told Mark Bossert and Kristen Kopf that they could leave because this issue did not pertain to them.

Danielle continued to roll her eyes, talk loudly and exhibit a hostile attitude. She spoke sarcastically and in a condescending tone to me and to Pat Wallace. I asked her three times to tone down her negative attitude. She said she would allow Pat to see his kids today only but that they would remain at her rehearsals from now on. She continued to stand and glare and show her disgust. I asked her to leave.

Pat said he would choose the May 26 concert date and combine with the band. Robyn said she would help him. He said he would go ahead with his meeting this afternoon and try to see his kids at lunchtime if I would cover for him.

Ellen Hardy

# Exhibit B

AK 3/10/08 file p.f. D. Rausa

# North Syracuse Central School District
# ROXBORO ROAD MIDDLE SCHOOL

## Memorandum

TO: Danielle Rausa

FROM: Ellen Hardy, Associate Principal, Roxboro Road Middle school

RE: Counseling Memorandum – Staff Code of Conduct

DATE: February 25, 2008

I continue to be concerned about your professional conduct. Building good relationships with colleagues, maintaining a climate of mutual respect and dignity, keeping lines of communication open and using a mature and professional tone in your speech is important to assure a good working relationship for you and the other professionals at Roxboro Road Middle School. During the meeting of February 12, 2008, you personally attacked a colleague, questioned his motivations, and spoke in a sarcastic and hostile tone to your colleague and administration.

At the meeting of February 15, 2008 with Dr. Morton, Mr. Wolf, Mrs. Berti and myself, you were not truthful about your words and actions at the meeting on February 12. When you denied saying that Pat was only trying to look good and when you denied calling our meeting a "waste of your time", you were not being truthful. Furthermore, when given an opportunity to recognize that you had not been respectful or communicated openly, you denied any wrongdoing.

The intent of this memorandum is to counsel you that such conduct is inappropriate.

When you do not communicate with other members of the music staff before making decisions that affect their programs, you confuse the students and put them in an unfair position of choosing one or the other. When you talk in a sarcastic and condescending tone to peers and supervisors, you jeopardize your ability to be trusted and effective.

Further conduct of this type could lead to disciplinary action.

I would suggest that you make a sincere effort to meet regularly with others in your department regarding use of space and calendar. I would further suggest that you respond honestly and completely when you are asked about past situations by your supervisors, and work diligently at choosing a calm and genuine tone of voice even if you feel attacked.

You are requested to sign this memorandum. Your signature indicates that you have had the opportunity to review the contents of this memorandum. The memorandum will be placed in your personnel folder located in the Office of Human Resources at the District Offices.

______________________________ ____________________
Name Date

# Exhibit C

## North Syracuse Central School District
## ROXBORO ROAD MIDDLE SCHOOL

### Memorandum

TO: Annette Speach

FROM: Ellen Hardy, Associate Principal, Roxboro Road Middle school E Hardy

RE: Counseling Memorandum – Danielle Rausa

DATE: March 6, 2008

Today, I asked Ms. Rausa if she intended to sign the counseling memo and or write a rebuttal. She stated that she was not going to answer that question. She has not signed the memo.