UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DANIELLE RAUSA,

Plaintiff,

v.

THE BOARD OF EDUCATION OF THE NORTH SYRACUSE CENTRAL SCHOOL DISTRICT, AND STEVEN WOLF,

Defendants.

**AFFIDAVIT**

Civil Action No. 5:11-CV-1152 (TJM/ATB)

STATE OF NEW YORK )
)ss.:
COUNTY OF ONONDAGA)

**ANNETTE SPEACH**, being duly sworn, deposes and states:

1. I am employed as Assistant Superintendent for Educator Effectiveness and Human Resources at North Syracuse Central School District (the "District"). I am responsible for all personnel matters within the District, including teachers and non-instructional staff. My responsibilities include hiring, personnel evaluation and improvement, discipline and contract negotiations for all of the District's instructional staff. Although my title has changed over time, I have had District-wide responsibility for instructional and non-instructional personnel matters since August 1998.

2. The District's practice is to investigate incidents of suspected teacher neglect of duties or other forms of misconduct. At times, I conduct the investigation. At other times, the investigation is conducted by building administrators.

3. If a teacher may be counseled or disciplined, we issue the teacher a "Weingarten" letter. A Weingarten letter informs the teacher that a meeting with administration will be held to discuss an incident or an issue and puts the teacher on notice that he/she is entitled to union representation during the meeting.

4. A Weingarten letter is in no way itself a counseling or disciplinary document. It is simply a way of informing a teacher about a meeting to discuss an allegation.

5. The District's practice is that any counseling memorandum issued to a teacher goes through and must be approved by me. This process involves my review and assessment of the situation to determine whether a counseling memorandum is warranted. At times, I will draft the actual memorandum. In other instances, I review a draft prepared by the supervising administrator.

6. The District does not consider counseling memoranda to be disciplinary in nature.

7. In February 2008, I was contacted by Roxboro Road Middle School Assistant Principal Ellen Hardy. Ms. Hardy informed me that music teacher Danielle Rausa had behaved unprofessionally toward a co-worker, including yelling, during a meeting. Ms. Hardy indicated that she felt a counseling memorandum was in order.

8. I informed Ms. Hardy that Ms. Rausa had demonstrated similar behavior in the past. When Ms. Rausa had been at Smith Road Elementary School, she had been unable to get along with the other music teacher in the building, who was also a woman. I had many conversations with then Smith Road Principal Bernard Campbell about that

situation, and Mr. Campbell issued a counseling memo to both women about this in February 2002. (A copy is attached as **Exhibit A**).

9. I consulted with Ms. Hardy in terms of how to respond to Ms. Rausa's behavior. First, Ms. Hardy met with Ms. Rausa and her union representative to discuss her behavior. Then, Ms. Hardy and I spoke again.

10. I concurred that Ms. Rausa's behavior during the February 2008 meeting warranted a counseling memorandum.

11. Ms. Hardy drafted the counseling memorandum, and she sent the draft to me for review. I corrected a typo or two, and I ultimately approved of Ms. Hardy issuing the memorandum to Ms. Rausa.

12. Shortly after this, Ms. Rausa asked about the procedure for filing a harassment complaint against Ms. Hardy. I directed Ms. Rausa to the District's harassment and discrimination policy and provided her with a complaint form for this purpose. Ms. Rausa has never submitted a harassment complaint at any time, not against Ms. Hardy and not against anyone else.

13. In the spring of 2008, I became aware that Ms. Rausa would be assigned to a classroom music/chorus position as of the 2008-2009 school year, and music teacher Patrick Wallace would be reassigned from a classroom music/chorus position to instrumental lessons/band.

14. The reassignment was made via "building massage", which refers to the District's practice of involuntary reassignment within a tenure area within the same building. The District is allowed to make these changes completely irrespective of the

affected teachers' seniority, and being tenured does not prevent the District from reassigning a teacher through building massage.

15. Building massages occur on a regular basis. For instance, an elementary teacher may teach first grade one year and third grade the next year; a high school math teacher may teach geometry one year and algebra the next year, and so on.

16. Director of Fine Arts David Morton, Ph.D. made the recommendation to reassign Ms. Rausa and Mr. Wallace at Roxboro Road Middle School. Dr. Morton explained to me the reasons he believed the change would be programmatically beneficial. I agreed with his recommendation.

17. In mid-May 2008, Roxboro Road Principal Steven Wolf forwarded to me a complaint from music teacher Mark Bossert. Mr. Bossert reported that he and Ms. Rausa had an interaction in which he felt that she had been accusatory, intimidating and aggressive. Mr. Bossert said that Ms. Rausa had angrily confronted him about her transfer back to classroom music and accused him of having been at fault for this. Mr. Wolf was still new to the District at this time. I told Mr. Wolf that I would take the lead in the investigation of this incident.

18. I issued Ms. Rausa a Weingarten letter to schedule an investigatory meeting with Ms. Rausa and her union representative. I held this meeting, and she provided her side of the incident.

19. I considered the information available to me, which was largely two people's differing stories as there were no other witnesses. I ultimately accepted Mr. Bossert's version of the incident. First, Mr. Bossert immediately complained about Ms. Rausa's conduct during this incident, and he seemed genuinely upset and

intimidated. (In contrast, Ms. Rausa did not raise any concern about Mr. Bossert's behavior during this meeting until she was confronted with his allegations against her.) Second, Ms. Rausa's version did not make factual sense. She claimed that the reason she called Mr. Bossert into her room was not to confront him about her transfer back to classroom music but rather to talk about an upcoming concert. However, she admitted that she never actually said anything to him about that topic during their entire discussion. Third, and most importantly in my mind, Mr. Bossert's report of Ms. Rausa behaving in an angry, hostile and intimidating manner was very much like that which Ms. Hardy had witnessed a few months before.

20. I drafted the counseling memorandum, and I provided Ms. Rausa and her union representative with a copy of it. The memorandum was dated June 25, 2008. (A copy is attached as **Exhibit B**.) This was at the very end of the 2007-2008 school year, and the summer vacation followed.

21. In late September 2008, I was made aware of the "Select Chorus" flyer incident. In sum and substance, Ms. Rausa distributed flyers advertising a Select Chorus after Mr. Wolf and Dr. Morton had explicitly told her that a select chorus was inappropriate for middle school. There were also concerns about the tenor and the tone of the flyer, as it implied that other music teachers' choruses (i.e., Mr. Wallace's chorus the previous year) had not been "fun". The investigation was conducted at the building level under Mr. Wolf's leadership. I advised Mr. Wolf as to how to proceed with the investigation.

22. Mr. Wolf gathered information, including meeting with Ms. Rausa, and reported back to me. I concurred that Ms. Rausa should be formally counseled. The

October counseling memorandum is attached as **Exhibit C**. The November counseling memorandum is attached as **Exhibit D**.

23. Both the October 2008 and November 2008 memoranda are contained within Ms. Rausa's personnel file. I maintain the personnel files in my office, and I determine what does and does not go into an employee's personnel file.

24. In the course of this litigation, it has become clear that there is some confusion with respect to these documents. Although I cannot say for certain so many years later, it may be that the October counseling memorandum **(Exhibit C)** was Mr. Wolf's draft of the counseling memorandum that he sent to me for review. I say this because it is written as notes of a meeting. This was the first counseling memorandum that Mr. Wolf had written, and I recall giving him feedback to the effect that a counseling memorandum did not need to capture all of a meeting's discussion. I believe the November memorandum **(Exhibit D)** reflects my suggested edits. In retrospect, it may be that the October memorandum **(Exhibit C)** was intended to be replaced by the November memorandum **(Exhibit D)**. Regardless, it is appropriate that both documents are contained within Ms. Rausa's personnel file, as they both capture conversations and issues discussed with her.

25. Throughout the spring of 2009, I was made aware of many complaints about Ms. Rausa. A few of her fellow teachers came to complain to me directly. These individuals included Kristen Kopf and Mr. Bossert. However, I also heard from Mr. Wolf, Dr. Morton and Interim Associate Principal Kathleen Gramet about Ms. Rausa's troubling behavior. In fact, even Union representatives came to me to discuss that their members (teachers) in the building were upset about Ms. Rausa's conduct. In sum and

substance, the reports were that Ms. Rausa was caustic and uncooperative with colleagues and administration, was getting parents inappropriately involved in school decisions and issues, and was not supervising her students.

26. Mr. Wolf and Assistant Superintendent for Instruction Stanley Finkle were the District representatives who primarily interfaced with Ms. Rausa, her colleagues, and students' parents on a day-to-day basis. However, I was fully informed as to what was occurring and how Mr. Wolf and Mr. Finkle were responding. In fact, I often directed them in terms of how to respond or approach a situation.

27. On or about March 27, 2009 (a Friday), Mr. Wolf informed me that female students had come forward with allegations of sexual harassment during Drama Club. This information was forwarded to our School Resource Officer (SRO), Sheriff's Deputy Christopher Dell. The Sheriff's Department conducted a criminal investigation. Approximately a week later, we learned that Ms. Rausa held a Saturday Drama Club rehearsal and left the building during the rehearsal.

28. I conducted an investigation into the incident on behalf of the District. My investigation was focused on the issue of whether Ms. Rausa, as the paid Director of the Drama Club, had properly supervised the Drama Club students.

29. At around this same time, I learned that Ms. Rausa failed to enter any grades at all for any students for the third marking period. I conducted an investigation into this issue as well.

30. As to all of these issues, I met with Ms. Rausa and her union representative to discuss the concerns with her and to provide her with the opportunity to explain to me her "side of the story".

31. Ultimately, I recommended to Superintendent Jerome Melvin, Ph.D. that Ms. Rausa should be disciplined for several reasons:

A. Ms. Rausa's failure to enter grades for an entire marking period was inexcusable. This is the most basic of a teacher's responsibilities. Her neglect caused several District administrators to have to get involved with BOCES to have the computer grading system reopened so that her grades could be inputted, and in excess of 100 report cards had to be reprinted. In all my years, I cannot think of any other teacher who utterly failed to enter any grades at all for an entire marking period.

B. Ms. Rausa was the District employee responsible for the supervision of students during Drama Club. Ms. Rausa had allowed the students to be behind the curtains backstage with no adult supervision. This had created the opportunity for the incidents to occur. This was insufficient supervision of middle school students, regardless of whether they were "good" kids or "bad" kids. For that reason, Ms. Rausa's defense that she did not know the male student had behaved badly in the past was, quite frankly, irrelevant in my judgment.

C. Merely one week after the female students reported these complaints (and while the Sheriff's investigation was ongoing), Ms. Rausa scheduled a Drama Club rehearsal on a Saturday (Saturday, April 4, 2009) and then left the building for approximately one (1) hour to take her daughter to a music competition. I was absolutely stunned that Ms. Rausa

did this. This solidified in my mind that Ms. Rausa "didn't get it" when it came to the seriousness of the allegations involving her Club or her obligations as a teacher to be responsible for students.

D. Ms. Rausa was at this time continuing to behave unprofessionally. There were many reports from her colleagues that she had behaved poorly, whether being verbally hostile, uncooperative, or undermining them to students or parents. This was not getting better; it was getting worse.

32. It is difficult to fully convey the amount of time, attention and administrative energy we were spending at this time on responding to issues caused by Ms. Rausa. What had started as occasional instances of dissatisfaction with Ms. Rausa had become a host of increasingly serious concerns, and all of them were happening together by the end of the 2008-2009 school year.

33. Dr. Melvin and I discussed this, and we agreed that we would recommend to the Board of Education that Charges be brought against Ms. Rausa.

34. Whenever possible, the District's preference is to agree with a teacher on appropriate discipline instead of going through the time and expense of a formal 3020-a hearing.

35. I met with Ms. Rausa and her union representative. I explained to her that the Superintendent and I felt that discipline was in order at this point. I offered to resolve the allegations for a three (3) day unpaid suspension in lieu of proceeding with formal 3020-a charges. Initially, Ms. Rausa said that she would accept three (3) day suspension. However, she later changed her mind.

36. Therefore, the Superintendent and I met with the Board of Education in Executive Session and presented formal Charges. The Charges are attached as **Exhibit E**. I explained to the Board of Education the incidents involving Ms. Rausa and the results of my investigation. The Superintendent and I recommended to the Board that they vote in favor of the Charges. On or about June 15, 2009, the Board of Education voted in favor of preferring the Charges. Upon information and belief, the District Clerk served the Charges on Ms. Rausa.

37. At the time, the Board of Education consisted of three (3) men and six (6) women.

38. The Charges voted on by the Board called for a maximum disciplinary penalty of a suspension without pay for thirty (30) days. If Ms. Rausa waived the Section 3020-a hearing, the disciplinary penalty would 2be reduced to ten (10) days.

39. My office maintains the teachers' collective bargaining agreements dating back to the mid-1980's. In all of those years, each of the teachers' collective bargaining agreements has contained a provision providing that the District may suspend in advance of a 3020-a hearing. The current provision is attached as **Exhibit F**.

40. The District's practice is to suspend a teacher without pay pending a 3020-a hearing after the Board of Education has voted to prefer the charges and the charges have been served on the teacher. Although I cannot testify as what occurred prior to the time I held a position in Human Resources, I can say that the District has held to this practice in each and every of the 3020-a cases during my time in this position (i.e., since 1998).

41. An independent arbitrator and a 3020-a hearing officer have considered the provision and agreed that it is valid, even after the 1994 amendments to Section 3020-a of the Education Law. Those decisions are attached as **Exhibits G** and **H**, respectively.

42. I informed Ms. Rausa that she would be suspended without pay for 30 days as of the beginning of the 2009-2010 school year.

43. After the District served the original Charges, it came to our attention that Ms. Rausa had failed to enter grades for two of her classes during the second marking period of the 2008-2009 school year. Ms. Rausa had never entered grades for second semester for these students; she had only entered fourth quarter grades and then final grades. The grades she entered for certain students in the fourth quarter and the final quarter made little mathematical sense, and we could not discern how she had arrived at the grades. I investigated this situation.

44. When I met with Ms. Rausa, she had no records and no explanation for how she had arrived at the fourth quarter and final grades. She told me that she had sketched the grades out on pieces of paper at home. Mr. Finkle and I asked for these pieces of paper repeatedly, but Ms. Rausa never produced them to us. Therefore, by this time, we had the added concern that Ms. Rausa was not adequately keeping grade records.

45. This resulted in Amended Charges adding this incident as well.

46. On September 14, 2009, the Board of Education voted to prefer the Amended Charges against Ms. Rausa. A copy is attached as **Exhibit I**.

47. At the time, the Board of Education consisted for four (4) men and five (5) women.

48. At this point, Ms. Rausa was already serving the 30 day suspension as set forth in the original Charges. The District did not increase the penalty against Ms. Rausa in the Amended Charges. Therefore, the Amended Charges did not lengthen Ms. Rausa's suspension, and the Amended Charges continued to offer a compromised suspension of ten (10) days if Ms. Rausa was willing to forego the 3020-a hearing.

49. Ms. Rausa returned to work on or about October 20, 2009.

50. On or about June 28, 2010, Ms. Rausa and the District entered into a settlement agreement. As a result of this settlement agreement, the District compensated Ms. Rausa the value of 25 days of pay. I arranged to have this payment made, and Ms. Rausa accepted the payment.

51. Ms. Rausa has not been issued a counseling memorandum or further discipline since her return to work in October 2009.

52. Between the time of her return to work in October 2009 and through the date Steve Wolf left the District, Ms. Rausa was issued two (2) Weingarten letters to discuss incidents concerning her. In January 2010, Mr. Wolf's secretary Tami Moran reported that Ms. Rausa had screamed at her over the phone and hung up on her. In June 2011, a parent complained about Ms. Rausa. In each instance, Stanley Finkle and I decided to issue the Weingarten letters and we handled these matters, not Mr. Wolf. Neither of these incidents resulted in counseling memoranda, although Ms. Rausa's screaming at Tami Moran certainly justified at least a counseling

memorandum. As an administration, we let this incident go in an effort to calm the waters between Ms. Rausa and the District.

53. In recent years, the District has allowed a few teachers each year to engage in administrative internships. This program is open to teachers who are pursuing their degree and certification in school district administration or school building administration. Teachers apply for this program and, if accepted, the District allows them to split their time between their ordinary teaching duties and an administrative internship within the District.

54. Mr. Wallace applied for and was accepted into this program for the 2010-2011 school year. That year, more female teachers participated in the program than men. Mr. Wallace's schedule was changed to accommodate his approved administrative internship. We also changed the teaching schedules of other teachers, both male and female, as necessary to accommodate their administrative internship schedules.

55. Our middle schools are staffed by a clear of majority of female teachers and staff. At all times relevant to Ms. Rausa's claim, the staff at Roxboro Road Middle School was approximately 77% female.

56. I am aware of Ms. Rausa's allegations in this lawsuit. I have read the Complaint, the Amended Complaint, and I attended Ms. Rausa's 50-h deposition as well as her deposition in this Action. I have no reason to believe that any of Ms. Rausa's allegations of gender harassment are true. I was personally involved in almost every one of the incidents about which Ms. Rausa complains in this Action. Mr. Wolf relied

heavily on me to guide him in his responses to Ms. Rausa and situations involving her.

I am entirely confident that Ms. Rausa was treated fairly and appropriately.

/s/ Annette Speach
ANNETTE SPEACH

Sworn to before me this 28th
day of March, 2013.

/s/ Timothy D. Gural
Notary Public

TIMOTHY D. GURAL
Notary Public State of New York
Qualified in Onondaga Co. No. 4984147
My Commission Expires July 5, 2014

# Exhibit A

Def D

North Syracuse Central School District

SMITH ROAD ELEMENTARY SCHOOL
5959 Smith Road
North Syracuse, New York 13212

BERNARD P. CAMPBELL
Principal
Tel: (315) 452-3035
FAX: (315) 452-3154

DY 2/15/02 file P.F. Danielle Rausa

MEMO

**REDACTED**

TO: Danielle Rausa
[redacted]

FROM: Bernard Campbell BPC

RE: Professional Cooperation

DATE: February 8, 2002

I am disappointed you are unable to communicate in a professional manner to reach compromises regarding program.

All future correspondences are to be done by e mailing or in writing with a copy to me.

Each of you is expected to give me a copy of the program your students will perform at the Vocal Concert scheduled for May 14. Dr. Morton and I will review program content.

It is expected that you will be able to work cooperatively and professionally for the benefit of children, staff and community.

Cc: Dr. David Morton
Annette Speech, Director of Human Resources

EXHIBIT N
Defendant D
2/4/13

*"We're On The Move!"*

# Exhibit B

AS 7/7/08

# Office of Human Resources

North Syracuse Central School District

(315) 218-2149
(315) 218-2146

Annette Speach,
Director of Human Resources

5355 West Taft Road
North Syracuse
New York 13212
Tel: (315) 218-2100
Fax: (315) 218-2185
www.nscsd.org

**Jerome F. Melvin, Ph.D.**
Superintendent of Schools

**Stephen L. Carr**
Assistant Superintendent for Instruction

**Wayne D. Bleau**
Assistant Superintendent for Management

**TO:** Danielle Rausa, Music Teacher

**FROM:** Annette Speach, Director of Human Resources

**DATE:** June 25, 2008

**RE:** Counseling Memorandum – Staff Code of Conduct

I am concerned about the interaction that occurred between you and another member of the music department at Roxboro Road Middle School on May 14, 2008. Although at the investigatory meeting on May 20, 2008 you did not recall several inappropriate statements that you allegedly made, the conclusion of an investigation into this matter reveals that the tone of this exchange between you and your colleague was not in line with the expectations of the Staff Code of Conduct. The purpose of this memorandum is to make you aware that your colleague perceived your statements and interaction as intimidating, causing an uncomfortable feeling in the work environment.

This type of behavior is unacceptable in the workplace. Further conduct of this type could lead to disciplinary action.

As discussed in our meeting on May 14, you are expected to get along in a professional manner with your colleagues and act in accordance with the District's Staff Code of Conduct at all times. It is expected that in the future you will:

- Maintain a climate of mutual respect and dignity.
- Portray a mature, professional demeanor by actions and speech.

You are requested to sign this memorandum. Your signature indicates that you have had the opportunity to review the contents of this memorandum. The memorandum will be placed in your personnel folder located in the Office of Human Resources in the Administrative Office Building.

EXHIBIT
Defendant E
1/24/13
PENGAD 800-631-6989

Danielle Rausa (signature) — 7/3/08

Name — Date

*"We're On The Move!"*

# Exhibit C

# ROXBORO ROAD MIDDLE SCHOOL

## MEMORANDUM

EXHIBIT Defendant 1 2/29/13 PENGAD 800-631-6989

**TO:** Danielle Rausa, Music Teacher, RRMS

**FROM:** Steven A. Wolf, Principal, Roxboro Road Middle school

**RE:** Counseling Memorandum – Insubordination and Violating Staff Code of Conduct

**DATE:** October 20, 2008

Present at the meeting were:
Sue Berti, NSEA Rep.; Stan Finkle, Assistant Superintendent for Instruction; Dr. David Morton, Director of Music; Danielle Rausa, Music Teacher, RRMS; Steven Wolf, Principal, RRMS.

I asked you if you recalled our meeting September 22 when you, Ms. Jackson and myself discussed your hand surgery. You answered that you did recall our conversation of that date. I stated that at that time, we also discussed our expectations for choruses at RRMS. And asked if you remembered that part of the conversation. You responded that you did and stated that I had told you that we needed to separate 5/6 chorus from 7th grade and that Drama Club would be a separate entity. On September 22, you mentioned that you would like to initiate a Select Chorus/Jazz Chorus to me and I stated that I would have to talk to Dr. Morton about that. I asked if you recalled that part of our conversation. You stated that you did.

Upon discussing this with Dr. Morton it was determined that Select Chorus is not done at the middle level and I stated this in the memorandum dated September 29, 2008. I asked if you had received a copy of this memorandum. You stated that you did receive a copy of this memorandum dated September 29, 2008 regarding 5/6 and 7th grade choruses and Select Chorus. You read the section to us and I asked you to summarize its contents. You agreed that the memo stated that there shall be separate choruses and that there cannot be a Select Chorus.

I then showed you a copy of the sign up forms that were left outside your classroom on October 1 stating that there was going to be "...an ***ALL NEW SELECT CHORUS***." These sign up forms also indicated that there would be one RRMS chorus after you were already told both verbally and in writing that there would be two. This is what I am identifying as "insubordination." You stated that these forms were not intended to be circulated and that this was a mistake. You further stated that maybe one of the students put them out.

In September, I asked you about keeping Drama Club separate from chorus and that everyone should be able to tryout regardless if they were in chorus or not. You stated that kids are always given the opportunity to try out for drama. Further, you indicated that you would run chorus and then it would "flip over" into drama. You stated that this was run by Dr. Morton and approved. Dr. Morton stated that it was not approved and neither did he approve the flyer for signup.

Next we spoke about the tenor and tone of your flyer and that it intimated that the previous chorus teacher(s) provided a poor opportunity for students and that your chorus is "***NOT*** like you other chorus experiences-You'll have a great time!" In addition, your flyer indicates that students could turn their

sign up sheets in to other staff members, some of whom had no idea their name was on the form. I stated that this is a violation of NSCSD BOE policy 9100, otherwise known as the Staff Code of Conduct. Specifically, you have violated:

a. 9100 (A) 3-5
b. 9100 (A) 7-8; 10

When you received the notification of today's meeting from my secretary, you began a conversation about its contents with her and you class was unsupervised thereby violating the Staff Code of Conduct. Specifically: 9100 (B) 3. You denied this accusation.

Next, I stated that I am in possession of an email from a former student of yours dated September. In it, the student states:

> "Miss Rausa has been mean to me and (other student) this summer. She deleted my messages I sent her, she deleted me and (other student) off her MySpace, she said wtf to (other student) and sent him a picture of someone's middle finger…I don't know if its her kids or not but that is NO way a teacher should act, right? Anyway how's her job going in class music? (I can't ask her cause she doesn't answer me.)"

I asked you if you recalled the chain of events as indicated above. You stated that you did not remember this incident but you do remember a student apologizing for his or her comments. I asked why would you include young children on your MySpace account. You stated that you do not participate in dialogue with students on your band's MySpace page.

The purpose of this counseling memorandum is to state that you cease and desist any acts of insubordination including anything in writing being distributed to children, staff or community members in this or any building that is contrary to any NSCSD Board of Education policy, the directives of the Superintendent of Schools or his designees and the administrative team of Roxboro Road Middle School.

In addition, you will treat everyone in this building and within the NSCSD with respect and dignity and avoid violating the NSCSD Staff Code of Conduct, specifically Section A, numbers 3, 4, 5, 7, 8 and 10 as well as Section B, number 3.

Furthermore, any incidents of insubordination or violations of Board of Education Policy 9100, or failure to follow the directives set forth is this meeting and the resulting counseling memorandum will result in a meeting at the office of Annette Speach, Director of Human Resources.

You are requested to sign this memorandum. Your signature indicates that you have had the opportunity to review the contents of this memorandum. The memorandum will be placed in your personnel folder located in the Office of Human Resources at the District Offices.

____________________________ ________________
Name Date

* MS. RAUSA HAS NOT SIGNED THIS C.M. 2/13/09 [initials]

# Exhibit D

EXHIBIT
Defendants
12413

# ROXBORO ROAD MIDDLE SCHOOL

## MEMORANDUM

**TO:** Danielle Rausa, Music Teacher, RRMS
**FROM:** Steven A. Wolf, Principal, Roxboro Road Middle School
**RE:** Counseling Memorandum – Insubordination and Violating Staff Code of Conduct
**DATE:** November 10, 2008

I am concerned about your recent acts involving subordination and violations of the staff code of conduct.

In our meeting of October 6, 2008, relative to the charge of insubordination, I specified that even after you and I spoke in September about two separate choruses and no Select Chorus at the middle school level, as well as after a written memorandum from me on September 29th repeating the same, you went ahead with a student sign up form that stated there was going to be two separate choruses as well as a Select Chorus.

Relative to violating the staff code of conduct, the tenor and tone of your signup flyer intimated that the previous chorus teacher(s) provided a poor chorus opportunity for students. In addition, your flyer indicates that students could turn their sign up sheets in to other staff members, some of whom had no idea their name was on the form. These are violations of NSCSD BOE policy 9100, otherwise known as the Staff Code of Conduct. Specifically, you have violated:

3. Convey a supportive attitude toward education and the district.
4. Build good relationships with colleagues and students.
5. Maintain a climate of mutual respect and dignity.
7. Be prepared to do the job with diligence, and demonstrate a willingness to work as a team.
8. Keep lines of communication open.
10. Portray a mature, professional demeanor by dress, actions and speech.

The purpose of this counseling memorandum is to state that you cease and desist any acts of insubordination including anything in writing being distributed to children, staff or community members in this or any building that is contrary to any NSCSD Board of Education policy, the directives of the Superintendent of Schools or his designees and the administrative team of Roxboro Road Middle School.

In addition, you will treat everyone in this building and within the NSCSD with respect and dignity and avoid violating the NSCSD Staff Code of Conduct.

Furthermore, any incidents of insubordination or violations of Board of Education Policy 9100 will result in a meeting at the office of Annette Speach, Director of Human Resources. Further conduct of this type could lead to disciplinary action. Such action could include termination.

You are requested to sign this memorandum. Your signature indicates that you have had the opportunity to review the contents of this memorandum. The memorandum will be placed in your personnel folder located in the Office of Human Resources at the District Offices.

* MS. RAUSA HAS NOT SIGNED THIS C.M. 2/13/09

Name ______________________ Date ______________

# Exhibit E

North Syracuse Central School District

5355 West Taft Road
North Syracuse
New York 13212
Tel: (315) 218-2100
Fax: (315) 218-2185
www.nscsd.org

Jerome F. Melvin, Ph.D.
Superintendent of Schools

Stanley C. Finkle
Assistant Superintendent for Instruction

Wayne D. Bleau
Assistant Superintendent for Management

June 15, 2009

**VIA HAND DELIVERY**

Connie Gibson, District Clerk
North Syracuse Central School District
5355 West Taft Road
North Syracuse, NY 13212

Re: *Filing of Charges Concerning Danielle R. Rausa*

Dear Ms. Gibson:

Attached to this letter for filing are disciplinary charges concerning Danielle R. Rausa. Please see that the Board of Education is notified immediately of the existence of these charges.

Sincerely,

Jerome F. Melvin

Jerome F. Melvin, Ph.D.
Superintendent of Schools

EXHIBIT
PENGAD 800-631-6989
Def. Ex. S WP
12/4/13

"We're On The Move!"

# CHARGES AGAINST MS. DANIELLE R. RAUSA PURSUANT TO SECTION 3020-a OF THE NEW YORK EDUCATION LAW

Jerome F. Melvin, Ph.D., as Superintendent of Schools ("Superintendent") for the North Syracuse Central School District (the "District"), prefers the following Charges against Ms. Danielle R. Rausa ("Ms. Rausa"), a tenured teacher employed by the District, pursuant to Section 3020-a of the New York Education Law:

## CHARGE ONE

## MISCONDUCT AND NEGLECT OF DUTY

1. Ms. Rausa is a tenured Music teacher assigned to the Roxboro Road Middle School.

2. One of Ms. Rausa's responsibilities includes supervision of the student Drama Club at the Roxboro Road Middle School.

3. On multiple dates in or about February and March 2009, during Drama Club rehearsals, Ms. Rausa failed to properly supervise students, resulting in a male student's physical and sexual harassment of female students during rehearsals, including:

   a. on multiple days during rehearsals in or about February and March 2009, a male student whistled and/or made inappropriate and sexually offensive comments to female students about their bodies;

   b. on multiple occasions during rehearsals in or about February and March 2009, a male student touched female students on their breasts and buttocks;

c. on multiple occasions during rehearsals in or about February and March, 2009, a male student hugged female students and/or whispered in the ears of female students;

d. on at least one occasion during a rehearsal in or about March 2009, a male student kissed one or more female students; and

e. on at least one occasion during a rehearsal in or about March 2009, a male student reached down a female student's shirt and grabbed her breasts.

4. On multiple occasions during Ms. Rausa's lunch group in or about February through March 2009, a male student made inappropriate and sexually offensive comments to female students about their bodies and inappropriately touched female students.

5. Ms. Rausa's failure to properly supervise students during Drama Club rehearsals and her student lunch group in or about February and March 2009 resulted in a male student engaging in inappropriate conduct directed at female students that led to the male student's arrest.

6. On April 4, 2009, Ms. Rausa failed to supervise students when she left the building during Drama Club rehearsal for approximately an hour to attend her daughter's musical performance.

7. The foregoing conduct constitutes misconduct and neglect of duty.

## CHARGE TWO

## MISCONDUCT AND NEGLECT OF DUTY

1. Ms. Rausa failed to timely submit student grades for the marking period covering the third quarter of the 2008-2009 school year, causing the need for report cards for Ms. Rausa's students to be re-issued.

2. The foregoing conduct of Ms. Rausa constitutes misconduct and neglect of duty.

## CHARGE THREE

## MISCONDUCT AND CONDUCT UNBECOMING A TEACHER

1. Ms. Rausa has been counseled on four prior occasions – February 25, 2008, June 25, 2008, October 20, 2008, and November 10, 2008 – regarding her failure to abide by the District's Staff Code of Conduct and, more specifically, her lack of professionalism in performing her job duties and acts of insubordination.

2. Since receiving her most recent counseling memo on or about November 10, 2008, Ms. Rausa has continued to act in violation of the Staff Code of Conduct, including:

   a. throughout the 2009 spring semester, Ms. Rausa repeatedly refused to properly communicate with building staff members regarding use of the Roxboro Road Middle School auditorium for rehearsals, and about other subjects related to the performance of her job duties;

   b. throughout the 2009 spring semester, Ms. Rausa repeatedly provided false and inaccurate information to parents and students about use of the school's auditorium and the alleged purchase of a new drum set with fundraised money; and

c. throughout the 2009 spring semester, Ms. Rausa repeatedly criticized at least one staff member and the school's administration in the presence of students and parents.

3. The foregoing conduct constitutes misconduct and conduct unbecoming a teacher.

Based on the above Charges, both individually and/or collectively, the maximum penalty sought if Ms. Rausa waives her right to a hearing on these Charges is a ten (10) work day unpaid suspension from employment. The maximum penalty sought if Ms. Rausa is found guilty of any of the Charges is a thirty (30) work day unpaid suspension from employment.

Dated: June 15, 2009

Jerome F. Melvin, Ph.D.
Superintendent of Schools
North Syracuse Central School District

# Exhibit F

bargaining unit member has affixed his/her signature to the document in question, otherwise he/she will be deemed to have waived his/her right to respond.

### 8.4 PARENT COMPLAINTS

Before the record of any complaint by a parent or by a student is placed in the bargaining unit member's personnel file, the bargaining unit member shall be afforded an opportunity to confront the complaintant and to reply to same; and no derogatory memorandum, letter or report of a complaint shall be placed in the bargaining unit member's file without the bargaining unit member's knowledge and without affording the bargaining unit member an opportunity to make a written statement of defense or explanation to be attached thereto. The bargaining unit member's statement of defense or explanation must be submitted within ten (10) days after the meeting with the complainant, otherwise he/she will be deemed to have waived his/her right to respond.

### 8.5 REPRISALS PROHIBITED

There will be no reprisals taken against any bargaining unit member by reason of his/her membership in the Association or his/her participation in any of its professional activities.

### 8.6 TEACHER SUSPENSION

In the event that any teacher is suspended pending a hearing on charges, such suspension shall be without pay until the findings and recommendations on the charges are determined.

### 8.7 NOTICE OF TENURE DENIAL

Each probationary teacher who is not to be recommended for appointment to tenure shall be so notified by the Superintendent in writing not later than May 1st of the final



year of the probationary period; provided the probationary period commenced on September 1st. For employees whose probationary period started on any date other than September 1st, such notification from the Superintendent shall come no less than sixty (60) days before the end of the probationary period.

### 8.8 JUST CAUSE

No bargaining unit member will be disciplined, reprimanded, reduced in rank or compensation or deprived of any professional advantage without just cause. Any such action shall be subject to the grievance procedure set forth in this Agreement. Elimination or abolishment of position shall not constitute discipline, a reprimand, a reduction in rank or compensation, or deprivation of any professional advantage within the meaning of this paragraph.

### 8.9 MILEAGE REIMBURSEMENT

Those bargaining unit members who use their car during the school day due to their assignment shall be reimbursed at the current IRS rate per mile.

## ARTICLE 9
## INSTRUCTIONAL CONSIDERATIONS

### 9.1 CLASS SIZE

A. The Association and the District recognize the importance of adequate staffing to assure high quality education for all pupils which is a goal of both parties to this Agreement. It is agreed that every effort will be made to maintain the following averages and maximums:

| Grades | Average | Maximum |
|---|---|---|
| Kindergarten | 25 | 30 |
| 1st-3rd | 25 | 30 |
| 4th-6th | 25 | 30 |

# Exhibit G

# American Arbitration Association

## VOLUNTARY LABOR ARBITRATION TRIBUNAL

In the Matter of the Arbitration between

North Syracuse Central School District

and

North Syracuse Education Association

CASE NUMBER: AAA Case No. 15 390 00621 96

## AWARD OF ARBITRATOR

THE UNDERSIGNED ARBITRATOR(S), having been designated in accordance with the arbitration agreement entered into by the above-named Parties, and dated and having been duly sworn and having duly heard the proofs and allegations of the Parties, AWARDS as follows:

For the reasons set forth in the Opinion section of this decision, the Arbitrator Awards as follows:

The District did not violate the Collective Bargaining Agreement by suspending a teacher without pay while Education Law Section 3020-a charges were pending.

The grievance is denied.

STATE OF NEW YORK
} ss.:
COUNTY OF TOMPKINS

I, JAMES A. GROSS , do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my award.

July 8, 1997
(Dated)

James A. Gross
(Signature of Arbitrator)

FORM L14-NYS-2/82 FOR USE IN NEW YORK STATE

*************************************
In the Matter of the Labor Arbitration Between *

North Syracuse Central School District *

and *

North Syracuse Education Association *

AAA Case No. 15 390 00621 96 *

*************************************

The District and the Association chose me to arbitrate the issue set forth below pursuant to the Labor Arbitration Rules of the American Arbitration Association. The Hearing of the case was held on April 29, 1997, in a conference room at the North Syracuse Central School District. Ms. Mary Kassman, Labor Relations Specialist, New York State United Teachers, represented the Association. Larry P. Malfitano, Esq. (Bond, Schoeneck & King) represented the District. Ms. Bonnie Pierce, Grievance Arbitration Chairperson, testified for the Association. The District called no witnesses.

The Hearing of this case was conducted according to the Labor Arbitration Rules of the American Arbitration Association. The District and the Association filed post-Hearing briefs with the American Arbitration Association on June 16, 1997, at which time the proceedings were declared closed.

Issue

The Association and the District agreed to submit the following issue to arbitration:

> Did the District violate the Collective Bargaining Agreement by suspending a teacher without pay while Education Law Section 3020-a charges were pending? If so, what shall the remedy be?

Pertinent Contractual Provisions

3.2 Grievance Definitions

b. "Grievance" shall mean any claimed violation, misinterpretation or inequitable application of the provisions of this agreement,

3.3 Grievance Procedure - Step 3 - Arbitration

e. The arbitrator shall have no power to add to, modify or subtract from provisions of this Agreement, but shall be limited to interpreting and applying the provisions hereof and any applicable rules, procedures, regulations, administrative orders, or work rules which are not in conflict with provisions thereof. The arbitrator shall not use or rely upon any past practices which were not authorized by a written rule or regulation as a restriction upon the rights of the District hereunder.

6.8 Probationary Service of Transferred Teachers

The transfer, promotion, or reassignment of any tenured member of the Faculty to a position outside of his/her existing tenure area, shall require a probationary period in such new position o not more than one (1) year. In the event of such transfer, reassignment or promotion of a non-tenured member of the Faculty, service in such new position shall be added to the probationary service completed at the time of such transfer, reassignment or promotion to the end that such probationary teacher shall not be required to serve a probationary period of more than three (3) years from the date of his/her first hiring by the Board, or one (1) full year of service in the new position, whichever shall be later. If state law requires a longer

probationary period for transferred, promoted or reassigned teachers than specified above, the legal requirement will take precedence over this paragraph.

8.6 Teacher Suspension

In the event that any teacher is suspended pending a hearing on charges, such suspension shall be without pay until the findings and recommendations on the charges are determined.

8.8 Just Cause

No bargaining unit member will be disciplined, reprimanded, reduced in rank or compensation or deprived of any professional advantage without just cause. Any such action shall be subject to the grievance procedure set forth in this Agreement. Elimination or abolishment of position shall not constitute discipline, a reprimand, a reduction in rank or compensation, or deprivation of any professional advantage within the meaning of this paragraph.

22.2 Saving Clause

In any provision of this Agreement or any application of the Agreement to any employee or group of employees shall be found contrary to law, then such provision application shall not be deemed valid and subsisting, except to the extent permitted by law, but all other provisions or applications will continue in full force and effect.

Background

At the Hearing, the District and the Association stipulated the following facts. On September 5, 1996, the District brought conduct unbecoming a teacher charges against a tenured teacher pursuant to Section 3020-a of the Education Law. The teacher's alleged misconduct occurred on August 2, 1996. On September 10, 1996, the District suspended the accused teacher without pay.

In January, 1997, the District and the Association entered into a new Collective Bargaining Agreement, effective July 1, 1996 to June 30, 1999. During the negotiations for the current 1996-1999 Agreement, the Association submitted a proposal to change Article 8.6 of the 1993-1996 Agreement to provide for suspensions "with pay until the findings and recommendations on the charges are determined" (District Exhibit No. 1. Emphasis in the original.). Article 8.6 of the 1993-1996 Agreement stated that such suspensions were to be "without pay." During these negotiations, the District withdrew its proposal to change the language of Article 8.6 and consented to the current 1996-1999 Agreement with Article 8.6 unchanged from the 1993-1996 Contract.

On March 17, 1997, the Section 3020-a Hearing Officer issued his decision and, on March 24, 1997, the District terminated the teacher's employment. Although not part of the Parties' stipulation of facts, there were amendments to Section 3020-a in 1994 that figure prominently in this case. The key amendment, as far as this case is concerned, was made to Section 3020-a 2(b). That provision continued to state that suspensions "shall be with pay" but was amended to allow two exceptions under which an employee "may be suspended without pay": when the employee "has entered a guilty plea to or has been convicted of a felony crime concerning the criminal sale or possession of a controlled substance, a precursor of a controlled substance, or drug paraphernalia as defined in article two hundred twenty or two hundred twenty-one of the penal law; or a felony crime involving the physical or sexual abuse of a minor or student."

Association Position

The Association acknowledges that the language of Article 8.6 of the current Contract has remained unchanged in all contracts between the Parties since 1968. It also does not dispute the fact that the Association proposed but did not obtain a change in that contractual language in the negotiations that led to the current Agreement. The Association also acknowledges that "there was a case from 1978 that stated that 'this section [3020-a of the Education Law] does not absolutely prohibit school boards from negotiating contract provision for payless suspension of teachers'." (Association Brief, p. 3. Citing Historical and Statutory notes, p. 757 Education Law, Teachers and Administrators, Article 61 — Association Exhibit No. 2.)

The Association contends, however, that the 1994 amendments to Section 3020-a 2(b) specifying two exceptions to the statutory provision that suspensions shall be with pay render Article 8.6 of the current "contrary to Education Law." The Association argues "that since the changes in 3020-a in 1994, where exceptions are spelled out, that the Decision in 1978 is no longer valid." The Association adds: "The Legislature, in its great wisdom, had the opportunity to include contract language in the exceptions if it were considered a valid exception." (Association Brief, p. 3.)

The Association also contends that "a similar issue" was raised in a previous arbitration case involving the District and the Association (Association Exhibit No. 3.) in which the District argued that the contractual language at issue violated the

Education Law and was "therefore null and void." The Association emphasizes that the Arbitrator found that "state law ... bars the reduction of [the Grievant's] probationary period. Accordingly ... the grievance must be denied." (Association Brief, p. 3.) The Association asks that the teacher suspended without pay in the instant case "be paid in full salary and benefits from the date of suspension to the date of Board of Education action to terminate the teacher's employment."

District Position

The District maintains that the "plain and unambiguous language of the Parties' Labor Agreement requires that the Association's grievance be denied." According to the District, "If this Arbitrator were to interpret the language of Article 8.6 — language that was negotiated after Section 3020-a was amended — to require that a suspended teacher receive pay pending disciplinary charges, he would be unilaterally imposing an entirely new contract term on the parties." The District says "such an action would be completely beyond the scope of arbitral authority agreed upon by both parties to this proceeding." (District Brief, pp. 4-5. Emphases in the original.)

The District also accuses the Association of attempting "to obtain through this proceeding what it could not achieve in the collective bargaining process." According to the District, "Arbitrators have routinely refused to read a term into an agreement which a party has attempted, but failed, the secure through negotiation" —

particularly "where, as here, the parties are sophisticated and have been negotiating with each other for several decades." (District Brief, pp. 5-6.)

The District also takes the position that Article 8.6 "does not violate the Education Law and, therefore, Article 22.2 of the Parties' Collective Bargaining Agreement is not applicable." The District points out that even before the amendments to Section 3020-a, the New York Court of Appeals held that a teacher could not be suspended without pay pending a hearing except when payless suspensions are authorized by a collective bargaining agreement or statute. The District denies that the 1994 amendments to Section 3020-a changed the legality of payless suspensions in collective bargaining agreements; "what the amendments to Section 3020-a did do is provide statutory authorization to withhold pay when a teacher has been convicted of certain felony crimes." The District emphasizes that the New York Court of Appeals "has consistently held that, through the process of collective bargaining, a board of education may voluntarily negotiate all matters 'unless plainly and clearly prohibited either by statute, by controlling decisional law or by public policy,' even where those negotiations result in a waiver of statutorily provided rights." (District Brief, pp. 6-8. Emphases in the original.)

The District maintains, moreover, that since Section 3020-a was amended "there has not been a single case decided which weakens that precedent — the Association conceded as much at the hearing." The District adds: "To the contrary, the

only decision since 1994 involving this issue indicates that the pre-amendment case law remains intact." According to the District, "This conclusion is supported by the vast number of cases in which the New York courts have upheld and enforced waivers of other rights provided for in the Education Law." (District Brief, pp. 9-11.)

The District also cites language in paragraph 4(b) of Section 3020-a providing, "If the employee is acquitted he or she shall be restored to his or her position with full pay," as evidence that the "Legislature recognizes that teachers may continue to be suspended without pay for reasons unrelated to the felony crimes exception, such as when a collective bargaining agreement provides for it." (District Brief, pp. 11-12. Emphasis in the original.)

In regard to the arbitration decision cited by the Association, the District points out that "unlike the present case," the Parties in the other arbitration "did not agree to waive the requirements of the statute. Rather, they expressly agreed that the statutory limits would control." Consequently, the District maintains, "the question became whether the shorter probationary periods provided for in Article 6.8 were supported by the Education Law." The District concludes: "The question of whether the requirements of the statute could be waived by the parties — the question at issue in this proceeding — was not even raised, since the last sentence of Article 6.8 [the provision at issue] so clearly provided that the parties intended to abide by the statutory time periods." (District Brief, pp. 12-13. Emphases in the original.)

The District asks that the grievance be denied.

## OPINION

The issue to be decided in this case is whether the District violated the Parties' Collective Bargaining Agreement by suspending a teacher without pay while Section 3020-a charges were pending. More specifically, the Association claims that the 1994 amendments to Section 3020-a 2.(b) caused Article 8.6, the payless suspension provision of the Agreement, to become "contrary to law" and invalid pursuant to Article 22.2 of the Contract. For the reasons set forth in this Opinion, the Association's contention cannot be sustained.

Association Grievance Arbitration Chairperson Bonnie Pierce testified that the language of Article 8.6 first appeared in the Parties' 1968 Agreement and has been included in every Contractual Agreement between the Parties since then, including the current 1996-1999 Contract. The never changed language of that provision states clearly and unambiguously that teacher suspensions pending hearings on charges "shall be without pay until the findings and recommendations on the charges are determined." From its effective date in 1970, Section 3020-a has always provided that suspensions pursuant to its procedures are to be with pay. On its face, the continual renewal of Article 8.6 in successive contracts constitutes a voluntary and mutually understood agreement to waive the 3020-a statutory provision providing for suspensions with pay.

That voluntary and mutual agreement to waive that statutory provision continued after the 1994 amendments to 3020-a became effective. In the negotiations that

resulted in the current 1996-1999 Contract, the Association proposed to change the language of Article 8.6 to provide that suspensions pending hearings on charges "shall be with pay until the findings and recommendations on the charges are determined." (District Exhibit No. 1. Emphasis in the original.) Ms. Pierce testified that the Association made this proposal "because the Contract should reflect the law and the law now says that with the exception of certain circumstances suspensions should be with pay." (Quotations from the Arbitrator's notes of the Hearing unless otherwise indicated.) Ms. Pierce testified further that the Association withdrew its proposal "because the District had no intention of making any change in that wording [Article 8.6] regardless of the law."

As will be explained more fully later in this Opinion, 3020-a has since its inception provided for suspensions with pay. The 1994 amendments simply specified two exceptions when suspensions may be without pay. The Association's withdrawal of its proposal and acceptance of a Contract containing an unchanged Article 8.6 constituted a knowing continuance of the agreed upon waiver of the 3020-a provision providing for suspensions with pay. As the District pointed out, moreover, "the parties are sophisticated and have been negotiating with each other for several decades." (District Brief, p. 6.)

The key question is whether the 1994 amendments to Section 3020-a 2.(b) changed the situation and now prohibit a collectively bargained waiver of the suspension

with pay provision. There is no evidence that these amendments have or were intended to have that effect. That conclusion is based in part on the solid legal standing of collectively bargained waivers to the 3020-a suspension with pay provision.

In Matter of Jerry v. Board of Educ., 35 N.Y. 2d 534 at 541 (1974), the Court of Appeals decided that compensation was a substantive right that could not be taken away from a teacher "except pursuant to explicit statutory authorization." The Court found no such authorization in Section 3020-a as it was then worded. In Matter of the Board of Educ. of The City of Rochester, et. al. v. Ewald B. Nyquist, 48 NY 2d 97 (1979), however, the Court of Appeals stated that Matter of Jerry "is not to be read to stand for the proposition that section 3020-a absolutely forbids the withholding of pay during such a suspension." "The critical factor here [in Nyquist], not present in Jerry," the Court said, "is that a negotiated agreement provides for a provisional interruption of pay." (Id. At 104.) Citing a number of case precedents, the Court of Appeals in Nyquist concluded unequivocally that "It is no longer to be disputed that, through the process of collective bargaining, a board of education may voluntarily negotiate all matters in controversy unless plainly and clearly prohibited either by statute, by controlling decisional law or by public policy." (Id. at 104.) The Court found that the parties contractual modification of 3020-a rights concerning suspension with pay did not violate the statute, or decisional law, or public policy.

The Court also noted in Nyquist that courts had sanctioned "modification or supplementing of a protective statutory scheme" only "when the explicit language of the parties' agreement unquestionably manifests their intent to effect such a change." (Id. at 105.) As already discussed, Article 8.6 constitutes such a clear intent to follow a different contractual course than the statutory once concerning suspensions with pay. There was also no contention at the Hearing of the instant case that, prior to the 1994 amendments, Article 8.6 violated the statute, controlling case law or public policy.

In 1984, the Court of Appeals, in Matter of Isidore Adlerstein v. Board of Educ. of the City of New York, 64 NY 2d 90, confirmed that "it is now well settled" that the pay of a teacher suspended pursuant to 3020-a may not be withheld "except as authorized by a collective bargaining agreement or by express statutory authorization." (Id. at 98.) In 1992, the Court of Appeals reaffirmed this decisional law in Matter of David Winter v. Board of Educ. for the Rhinebeck Central School District et. al., 79 NY 2d 1 at 5. In doing so, the Court of Appeals cited Jerry, Nyquist, and Adlerstein.

In Adlerstein, the court of Appeals, citing Jerry, noted that although the Legislature "was free to grant specifically defined authority to withold compensaiton during suspension (35 NY 2d at 543), there has been no amendment to that effect in the intervening years." 64 NY 2d 90 at 98 (1984). Those amendments came in 1994. It is clear from reading Jerry and the other cases discussed here, however, that there are two separate ways to waive the statutorily established suspensions with pay set forth in

Section 3020-a. One is by amending the statutte as was done in 1994 and the other is by negotiating other arrangements in a freely entered into collective bargaining contract.

The amendments set forth in Section 3020-a 2.(b) do not change the fundamental provision in effect since the inception of 3020-a: that suspensions pending a hearing on charges "shall be with pay." The amendments provide two specific and limited exceptions to that long-standing general rule. The amendments state that an employee "may be suspended without pay" in certain circumstances concerning felony crimes involving the "criminal sale or possession of a controlled substance" or the "physical or sexual abuse of a minor or student." (Emphasis added.) As I read those amendments, they constitute what the Court in Adlerstein referred to as "specifically defined authority" granted by the Legislature to withhold compensation during suspensions. The amendments are specific and limited, moreover, because the general statutory rule providing for suspensions with pay remains unchanged.

There is no evidence, in addition, even to suggest that in passing these amendments to Section 3020-a 2.(b), the Legislature intended to nullify the long-standing and firmly-established body of case law permitting collectively bargained agreements for some suspension payment arrangement different from that set forth in Section 3020-a. Absent such evidence that the Legislature "plainly and clearly" intended to nullify such waivers, it is more consistent with the established case law interpreting Section 3020-a to conclude that the 1994 statutory amendments set forth in Section 3020-a 2.(b) simply

permit a school district, under the statutory criteria, to withhold a suspended employee's pay even in the absence of a collective bargaining provision providing for a payless suspension. (See: District Brief, pp. 7-8.)

This conclusion is supported by the only reported case concerning the payment during suspensions issue that has been decided since the 1994 amendments: Brian Brady et. al. v. A Certain Teacher et. al., 166 Misc. 2d 566 (1955). In that case, the Supreme Court of New York, Suffolk County, while reviewing the 1994 amendments to Section 3020-a 2.(b), reaffirmed the continued pertinence of the case precedents that controlled this issue before the 1994 amendments: "it has been consistently held that compensation is a matter of such substantive right on the part of the teacher that it cannot be taken away except pursuant to explicit statutory or collective bargaining authorization." (Id. at 571.)

There is nothing in the Record of the instant case, therefore, that would justify a finding that the Legislature in amending Section 3020-a 2.(b) in 1994 "plainly and clearly" intended to nullify almost twenty-five years of case law in this state affirming and reaffirming the rule that the 3020-a statutory provision for suspension with pay may be waived or modified by collective bargaining agreements as well as statutory amendments.

Finally, I agree with the District that the "Polizzotto" arbitration award relied on by the Association (Association Exhibit No. 3.) is not applicable to the

circumstances of the instant case. The Polizzotto case did not involve the issue that is central to the instant case — whether the requirements of a statute could be waived by the Parties.

For all of the above reasons, I find that the District did not violate the Collective Bargaining Agreement by suspending a teacher without pay while Education Law Section 3020-a charges were pending. Consequently, the grievance must be denied.

# Exhibit H

**STATE OF NEW YORK**
**STATE EDUCATION DEPARTMENT**
**OFFICE OF EMPLOYER-EMPLOYEE RELATIONS**

---

In the Matter of Disciplinary Charges Brought Pursuant to Section 3020-a of the Education Law by

JEROME F. MELVIN Ph.D.,Superintendent of the NORTH SYRACUSE CENTRAL SCHOOL DISTRICT

Employer,

against

**REDACTED**

Respondent.

SED File No. 13,332

**HEARING OFFICERS DECISION ON MOTIONS**

---

**BEFORE:** **THOMAS N. RINALDO, ESQ.**
P. O. Box 1334
Williamsville, NY 14231-1334

The undersigned, by letter dated October 9, 2009, was appointed by the State Education Department to serve as Hearing Officer in this proceeding brought pursuant to Section 3020-a of the Education Law of the State of New York and the Rules and Regulations of the Commissioner of Education. A pre-hearing conference, via telephone, was held on October 27, 2009. Appearing on behalf of the North Syracuse Central City School District ("District") was the law firm of Bond, Schoneck & King, PLLC, by Colin M. Leonard, Esq. and on behalf of [redacted], Respondent-Tenured Teacher ("Respondent") was James R. Sandner, Esq., General Counsel, NYSUT, by Paul D. Clayton,

Esq., Associate Counsel. Prior to the pre-hearing conference, Respondent's counsel filed a motion seeking various forms of relief, including salary and discovery. The District also filed a motion seeking removal of Respondent without a hearing or an order directing suspension of the hearing process pending resolution of a proceeding under 8 NYCRR Part 83. It is noted that the District has withdrawn that branch of its motion seeking a ruling directing suspension of the hearing process. This decision addresses those portions of Respondent's motion seeking salary and discovery and the District's motion for an order directing removal of Respondent without a hearing.

The Parties have submitted submissions after the pre-hearing conference, and all submissions by the Parties relevant to the motions under consideration have been reviewed by the Hearing Officer.

## RESPONDENT'S MOTION FOR SALARY

It is not disputed by the Parties that Respondent, on May 15, 2009, was arrested for robbing a bank in Minoa, New York. He eventually pled guilty to a violation of Section 16.10 of the New York Penal Law, Robbery in the Second Degree, and, on October 20, 2009 was sentenced to a term of incarceration of four years. The record shows that, on June 1, 2009, the District's Board of Education voted that probable cause existed to issue disciplinary charges against Respondent, thus commencing the instant 3020-a proceeding. The District, on June 2, 2009, notified Respondent that he would be suspended without pay

pending resolution of the Charges.

It is also not disputed by the Parties that Section 8.6 of the current Collective Bargaining Agreement between the District and Respondent's labor organization provides:

> In the event that any teacher is suspended pending a hearing on charges, such suspension shall be without pay until the findings and recommendations on the charges are determined.

It is also not disputed that the above provision has been in Collective Bargaining Agreements since at least 1968, and that, on at least two occasions, Respondent's labor organization sought to amend the Contract between the District and the labor organization by deleting the above language from the Agreement. Further, it is not disputed that at least on six other occasions the District has suspended without pay six tenured teachers pending resolution of Section 3020-a Charges. Finally, an arbitration award was issued by Arbitrator James A. Gross, on July 8, 1997, finding that the District did not violate the Collective Bargaining Agreement when it suspended a teacher without pay pending a resolution of 3020-a Charges.

The Respondent notes that the Teachers' Association is not a party to the instant proceeding and that his counsel therefore does not represent the North Syracuse Education Association in this 3020-a proceeding. Rather, Respondent observes, he is the client and the Charges against him are not under a "just cause" provision that is found within Article 8 of the Collective Bargaining Agreement.

The Respondent contends that the 1997 Arbitration Award of James A. Gross

indicates a different issue than the one before the Hearing Officer herein. It is the Respondent's position that the District seeks to "cherry-pick" parts of the Collective Bargaining Agreement between the District and the Teachers' Association while, at the same time, proceeding against Respondent under 3020-a.

According to Respondent, a review of 3020 (1) of the Education Law allows for discipline under disciplinary procedures or under 3020-a. The employee, however, Respondent argues, must be given a choice as to which procedure is to be followed. Respondent maintains that the "District's attempted hybrid procedure is invalid."

The District maintains that the Collective Bargaining Agreement allowing for suspension without pay pending the resolution of Section 3020-a Charges must be considered "lawful and binding." According to the District, the law is clear that parties can negotiate provisions relating to unpaid suspension pending resolution of 3020-a Charges, as can be seen in the decision of the Court of Appeals in ***Board of Education of the City of Rochester v. Nyquist***, 48 NY2d 97 (1979). As to the Legislature's amendment in 1994 of Section 3020-a, the District claims that said amendment did not change the "settled principle that parties could negotiate a provision relating to suspensions without pay that would apply generally to all Section 3020-a cases." Courts that have considered the issue since 1994, according to the District, have all "recognized the continuing viability of a negotiated agreement relating to unpaid suspensions pending Section 3020-a hearings."

The District rejects the Respondent's claim that because the instant proceeding is not

a "just cause" arbitration under a Collective Bargaining Agreement the District is bound to the limited provisions of suspension without pay under Section 3020-a. That is to say, the District maintains that, although the procedures set forth in the Education Law regarding 3020-a Charges are generally applicable, parties have the opportunity, as was done in the instant case, to negotiate changes to the provisions. Further, the District maintains that the Teachers' Association "should not be awarded in this forum that which it has failed to achieve in negotiations." The Award of Arbitrator Gross, the District advises, must be considered binding precedent, which provides an additional ground for denying Respondent's motion.

**DECISION ON RESPONDENT'S MOTION FOR SALARY**

The Respondent is correct in noting that the Teachers' Association is not a party to this proceeding. Nevertheless, the Hearing Officer need not ignore the Award of Arbitrator Gross and can consider whether the Award is persuasive. The Award, which was issued after the 1994 amendments to the Education Law upon which Respondent relies, took note of the 1994 amendments and found that the "key question" was whether they "changed the situation and now prohibited a collectively bargained waiver of the suspension with pay provision." (Gross Award, 10-11). Arbitrator Gross found there was "no evidence that these amendments have or were intended to have that effect." (Id., 11). Thus, Arbitrator Gross found, there was "no evidence ... to suggest that in passing these amendments ... the

Legislature intended to nullify the long-standing and firmly-established body of case law permitting collectively bargained agreements for some suspension payment arrangement different from that set forth in Section 3020-a." (Id., 13).

This Hearing Officer fully agrees with the findings and rationale of Arbitrator Gross, which is consistent with decisional law in the State since the 1994 amendments. The Hearing Officer finds there is no requirement existing in the law of this State that mandated some type of "election" as argued by the Respondent between a "just cause" and 3020-a proceeding. Negotiated agreements not violative of State policy can supplant provisions of the Education Law pertaining to 3020-a proceedings. The decisional law is clear that public policy is not violated by the suspension without pay provisions found in the Collective Bargaining Agreement between Respondent's labor organization and the District. Respondent's motion for salary is therefore denied.

## RESPONDENT'S MOTION FOR DISCOVERY

To set the framework for this motion, the Hearing Officer notes initially that the District has stated that it does not object "to the Respondent's request for relevant, material, non-privileged documents in its possession" as set forth in paragraph 18.A of the moving affidavit of Respondent's counsel, nor does it object "to the production of [Respondent's ] personnel file, as requested in paragraph 18.E." The District does object to the production of items set forth in paragraph 18.B, "other than those items which merely

repeat what has already been requested in paragraph 18.A" on the ground that the request must be considered "vague, unduly broad, and burdensome." As to 18.C of the moving affidavit's request for discovery, the District states that it will provide Respondent "with a list of the names of witnesses it intends to call at any hearing in this case" and if the witnesses are employees of the District a "provision will be made for contact with such individuals only thorough the law offices of District's counsel." The request for production in 18.D of the moving affidavit, according to the District, must be considered "vague, unduly broad, and burdensome." As to the request set forth in paragraph 18.F of the moving affidavit, the District claims that the production of evidence the District intends to introduce at hearing should not be granted. Respondent asserts that, other than privileged material, he is "simply entitled to a full and fair disclosure of the evidence against him." Thus, Respondent objects to the limitations sought by the District "in their entirety."

The Hearing Officer, guided by the principles of full discovery to which a tenured teacher is entitled, particularly in view of said teacher's constitutional right to Due Process of Law, makes the following rulings on discovery, tracking the subparagraphs of paragraph 18 of the moving affidavit of Respondent's counsel:

18.A Respondent is entitled to all the discovery sought in this paragraph save for those items that are protected by statutory privilege.

18.B Respondent is entitled to all the discovery sought in this paragraph save for those items that are protected by statutory privilege

18.C Respondent is entitled to a list of witnesses that the District intends to call including known addresses except for employee-witnesses, and, for

these witnesses, the District should make a provision for contact with the individuals via the law offices of the District's counsel.

18.D This request is granted only to the extent that the District shall identify by name and address (with employees of the District contacted via District's counsel) of individuals who witnessed any of the allegations in the Charges who are not set forth in response to the production demand in 18.C.

18.E The Respondent is entitled to production of the material sought in this paragraph.

18.F The request herein is granted to the extent that the District shall produce all evidence that can be captured in tangible form it intends to introduce at the hearing against the Respondent.

The discovery should be provided to Respondent's counsel at least 30 days before the start of the evidentiary hearing.

**DISTRICT'S MOTION FOR AN ORDER DIRECTING REMOVAL WITHOUT A HEARING**

The Hearing Officer will summarily dispose of this motion by denying it. Respondent's right to Due Process of Law cannot be satisfied without the right to an adversarial hearing. The Hearing Officer, however, strongly encourages the parties to make their best efforts to stipulate as much of the record as they possibly can in view of the somewhat unique circumstances of this case.

THOMAS N. RINALDO, ESQ., HEARING OFFICER

STATE OF NEW YORK )
COUNTY OF ERIE ) SS.:
WILLIAMSVILLE, NEW YORK )

I, THOMAS N. RINALDO, do hereby affirm upon my oath as Hearing Officer that I am the individual described herein and who executed the within Award on January 27, 2010

THOMAS N. RINALDO, ESQ., HEARING OFFICER

# Exhibit I

North Syracuse Central School District

5355 West Taft Road
North Syracuse
New York 13212
Tel: (315) 218-2100
Fax: (315) 218-2185
www.nscsd.org

**Jerome F. Melvin, Ph.D.**
Superintendent of Schools

**Stanley C. Finkle**
Assistant Superintendent for Instruction

**Wayne D. Bleau**
Assistant Superintendent for Management

September 14, 2009

**VIA HAND DELIVERY**

Connie Gibson, District Clerk
North Syracuse Central School District
5355 West Taft Road
North Syracuse, NY 13212

Re: *Filing of Amended Charges Concerning Danielle R. Rausa*

Dear Ms. Gibson:

Attached to this letter for filing are amended disciplinary charges concerning Danielle R. Rausa. Please see that the Board of Education is notified immediately of the existence of these charges.

Sincerely,

Jerome F. Melvin

Jerome F. Melvin, Ph.D.
Superintendent of Schools

EXHIBIT
DeLeah T
12413

PENGAD 800-631-6989

"We're On The Move!"

# AMENDED CHARGES AGAINST MS. DANIELLE R. RAUSA PURSUANT TO SECTION 3020-a OF THE NEW YORK EDUCATION LAW

Jerome F. Melvin, Ph.D., as Superintendent of Schools ("Superintendent") for the North Syracuse Central School District (the "District"), prefers the following Charges against Ms. Danielle R. Rausa ("Ms. Rausa"), a tenured teacher employed by the District, pursuant to Section 3020-a of the New York Education Law:

## CHARGE ONE

## MISCONDUCT AND NEGLECT OF DUTY

1. Ms. Rausa is a tenured Music teacher assigned to the Roxboro Road Middle School.

2. One of Ms. Rausa's responsibilities includes supervision of the student Drama Club at the Roxboro Road Middle School.

3. On multiple dates in or about February and March 2009, during Drama Club rehearsals, Ms. Rausa failed to properly supervise students, resulting in a male student's physical and sexual harassment of female students during rehearsals, including:

   a. on multiple days during rehearsals in or about February and March 2009, a male student whistled and/or made inappropriate and sexually offensive comments to female students about their bodies;

   b. on multiple occasions during rehearsals in or about February and March 2009, a male student touched female students on their breasts and buttocks;

c. on multiple occasions during rehearsals in or about February and March, 2009, a male student hugged female students and/or whispered in the ears of female students;

d. on at least one occasion during a rehearsal in or about March 2009, a male student kissed one or more female students; and

e. on at least one occasion during a rehearsal in or about March 2009, a male student reached down a female student's shirt and grabbed her breasts.

4. On multiple occasions during Ms. Rausa's lunch group in or about February through March 2009, a male student made inappropriate and sexually offensive comments to female students about their bodies and inappropriately touched female students.

5. Ms. Rausa's failure to properly supervise students during Drama Club rehearsals and her student lunch group in or about February and March 2009 resulted in a male student engaging in inappropriate conduct directed at female students that led to the male student's arrest.

6. On April 4, 2009, Ms. Rausa failed to supervise students when she left the building during Drama Club rehearsal for approximately an hour to attend her daughter's musical performance.

7. The foregoing conduct constitutes misconduct and neglect of duty.

## CHARGE TWO

## MISCONDUCT AND NEGLECT OF DUTY

1. Ms. Rausa failed to timely submit student grades for the marking period covering the third quarter of the 2008-2009 school year, causing the need for report cards for Ms. Rausa's students to be re-issued.

2. The foregoing conduct of Ms. Rausa constitutes misconduct and neglect of duty.

## CHARGE THREE

## MISCONDUCT AND CONDUCT UNBECOMING A TEACHER

1. Ms. Rausa has been counseled on four prior occasions – February 25, 2008, June 25, 2008, October 20, 2008, and November 10, 2008 – regarding her failure to abide by the District's Staff Code of Conduct and, more specifically, her lack of professionalism in performing her job duties and acts of insubordination.

2. Since receiving her most recent counseling memo on or about November 10, 2008, Ms. Rausa has continued to act in violation of the Staff Code of Conduct, including:

   a. throughout the 2009 spring semester, Ms. Rausa repeatedly refused to properly communicate with building staff members regarding use of the Roxboro Road Middle School auditorium for rehearsals, and about other subjects related to the performance of her job duties;

   b. throughout the 2009 spring semester, Ms. Rausa repeatedly provided false and inaccurate information to parents and students about use of the school's auditorium and the alleged purchase of a new drum set with fundraised money; and

c. throughout the 2009 spring semester, Ms. Rausa repeatedly criticized at least one staff member and the school's administration in the presence of students and parents.

3. The foregoing conduct constitutes misconduct and conduct unbecoming a teacher.

**CHARGE FOUR**

**MISCONDUCT AND NEGLECT OF DUTY**

1. Ms. Rausa failed to submit grades for two sections of fifth grade students for the marking period covering the second quarter of the 2008-2009 school year.

2. As a result, the students' report cards were issued without second quarter grades from Ms. Rausa.

3. Ms. Rausa failed to keep records of grades for these students, and, therefore, the grades she assigned the students for the fourth quarter and as final grades are of questionable validity and integrity.

4. The foregoing conduct of Ms. Rausa constitutes misconduct and neglect of duty.

Based on the above Charges, both individually and/or collectively, the maximum penalty sought if Ms. Rausa waives her right to a hearing on these Charges is a ten (10) work day unpaid suspension from employment. The maximum penalty sought if Ms. Rausa is found guilty of any of the Charges is a thirty (30) work day unpaid suspension from employment.

Dated: September 14, 2009

Jerome F. Melvin
Jerome F. Melvin, Ph.D.
Superintendent of Schools
North Syracuse Central School District



1574866.1

DD00055