UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DANIELLE RAUSA,

                Plaintiff,

    v.                                    5:11-cv-1152

THE BOARD OF EDUCATION OF THE
NORTH SYRACUSE CENTRAL SCHOOL
DISTRICT and STEVEN WOLF, Principal
of Roxboro Middle School,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiff Danielle Rausa commenced the instant action against Defendants Board of Education of the North Syracuse Central School District (the "District") and Steven Wolf, asserting claims of gender-based discrimination and retaliation under Title VII, the New York State Human Rights Law ("HRL"), and the Fourteenth Amendment; a violation of her Fourteenth Amendment rights to due process of law; a violation of New York Education Law § 3020-a; and prima facie tort and the intentional infliction of emotional distress. Presently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Amended Complaint in its entirety and Plaintiff's motion for summary judgment on her due process claim.

## I. FACTS

Plaintiff commenced working for the District in 1997. Plaintiff initially worked at Smith Road Elementary School. In April 2000, Plaintiff was granted tenure in Music Education. Starting in June 2002, Plaintiff was assigned to the Roxboro Middle School ("Roxboro") as an instrumental and vocal music teacher.

Defendant Steven Wolf became principal of Roxboro in January 2008. Before Wolf became principal, Plaintiff had never received a reprimand.[1] On February 12, 2008, then Assistant Principal Ellen Hardy held a meeting of the music department to discuss scheduling issues. Wolf was not at the meeting. According to Hardy, Plaintiff became angry and acted inappropriately. Plaintiff, on the other hand, claims that Hardy acted inappropriately and declined to let Plaintiff leave to return to her teaching duties. In conjunction with Director of Human Resources, Annette Speach, Hardy issued Plaintiff a counseling memorandum for her behavior at the meeting.[2]

David Morton had District-wide responsibility for the District's music and other fine arts programs. In Spring 2008, Morton recommended that Plaintiff be removed from an instrumental position to a classroom music/chorus position for the 2008-09 school year.[3]

---

[1] In February 2002, Plaintiff did receive a memo from the principal of Smith Road Elementary School concerning Plaintiff's "professional cooperation."

[2] Plaintiff claims that, as Hardy's boss, Wolf must have been involved in the decision to issue the counseling memorandum. Although Wolf was present at a meeting involving the incident (the "Weingarten meeting"), there is no evidence that Wolf had any involvement in the decision to issue the counseling memorandum or its contents.

[3] Plaintiff believes that this recommendation was initiated by music teacher Mark Bossert who allegedly told Morton that Plaintiff was difficult to work with, too aggressive in her teaching, and had no business teaching instrumental music because she was a vocalist.

Wolf and Speach accepted this recommendation.[4] Plaintiff was advised of the decision in April 2008. Plaintiff claims that Wolf "massaged"[5] the building and put Patrick Wallace in the instrumental position despite his lack of prior instrumental teaching experience in the District. Plaintiff further asserts that she was the only person who was moved out of her position.

In May 2008, Plaintiff had a conversation with music teacher Mark Bossert. The subject of this conversation apparently concerned Bossert's purported conversation with Morton concerning Plaintiff's ability to teach instrumental music. Bossert complained to the District concerning Plaintiff's behavior during the conversation. Bossert alleged that Plaintiff intimidated him and accused him of orchestrating her move to the classroom music/chorus position. Plaintiff "believe[s] that this confrontation with Mr. Bossert and the one before with Mr. Wallace, started because Mr. Wolf was the new principal and he showed favoritism toward these male staff members and was also giving them the 'right' to speak to [her] and treat [her] any way they wanted. . . ." Pl. Aff. at ¶ 15. Director of Human Resources, Annette Speach, investigated the matter. Speach issued a letter to Plaintiff advising that there would be a meeting to discuss the incident and that she had the right to union representation at the meeting. After the meeting, Speach determined to credit Bossert's version of the incident and issued Plaintiff a counseling memorandum dated June 25, 2008. Bossert was not issued a counseling memorandum.

---

[4] According to Wolf, this decision was made because Plaintiff was a talented vocalist who sang professionally and the new instrumental teacher, Patrick Wallace, had an impressive instrumental background in a military band. Plaintiff, on the other hand, claims that this decision was made without any investigation into the relative instrumental abilities of Plaintiff and Wallace. Plaintiff further claims that Wallace had no prior instrumental teaching experience.

[5] A "massage" refers to the practice of involuntarily reassigning tenured teachers within their tenure area within the same building. An example would be assigning an elementary school teacher to teach first grade one year and third grade the next, or having a math teacher teach geometry one year and algebra another year.

Plaintiff took over the chorus at the start of the 2008-09 school year. At that time the configuration of the chorus was changed from a combined 6th and 7th grade chorus to a 7th grade only chorus. Plaintiff was responsible for the 7th grade students. The 6th grade students went to the other chorus teacher, Ms. Launt. In September 2008, Plaintiff and Launt met to discuss the creation of a "select chorus." According to Plaintiff, this was in furtherance of Morton's directive that they do whatever was needed to build the vocal program. An after school meeting with the students was planned in September 2008 to announce, among other things, the select chorus. Wolf canceled the meeting because of concerns he had. According to Wolf, he did not want the meeting to go forward until he was able to confer with Morton whether a select chorus would be permitted. Ultimately, Morton determined that a select chorus was educationally inappropriate for the middle school level. Thus, on September 22, 2009, Wolf advised Plaintiff and Launt that a select chorus would not be permitted. This was followed by a memorandum dated September 29, 2008.

Thereafter, it came to the District's attention that flyers advertising the select chorus had been distributed to students. The flyer stated, among other things, that "[t]his is **NOT** like your other chorus experiences - You'll have a great time!" Wolf believed that the flyer inappropriately suggested that the prior chorus teacher's chorus had not been fun. Wolf also believed that the distribution of the flyers was in contravention of the determination not to have a select chorus. Plaintiff admits having the flyers stacked in her classroom, but denies having distributed them. Plaintiff also claims that the disputed sentence in the flyer was not intended as a criticism of the prior chorus teacher, but to highlight the different nature of the chorus in that it would be unique and potentially include jazz or show songs. In October 2008, in consultation with Speach, Wolf issued Plaintiff a counseling memorandum. The

memorandum addressed the issue concerning the chorus and several other matters. Another counseling memorandum was issued in November 2008, which basically repeated the contents of the October 2008 memorandum.

In February 2009, the teachers in the music department requested a meeting involving them, building administration, and the union. Present at the meeting were Wolf, Bossert, Wallace, Sylvia Matousek, Kristen Kopf, Sue Berti, and Stan Finkle. Meeting notes demonstrate that the subject of the meeting was to discuss concerns the music department staff had about Plaintiff.

Plaintiff also complains that Wolf prohibited her from running the soundboard during concert performances, a function she handled for seven years prior to Wolf becoming principal. Wolf mostly ignored Plaintiff's pleas to run the soundboard. In the Spring of 2010, the District hired a professional sound person to handle the sound for the school's auditorium.

Plaintiff also was the director of the drama club, a position which she held continuously from 2003 forward. As such, she was responsible for supervising the drama club students. During a drama club rehearsal, a male student engaged in sexually inappropriate behavior toward female students. The female students complained to the District. The matter was reported to the Sheriff's Department, which conducted a criminal investigation.[6] Approximately one week after the female students complained of the inappropriate conduct, Plaintiff left the building during a drama cub rehearsal.

---

[6] Plaintiff notes that the Sheriff's Department report "does not state anywhere that the conduct occurred because I failed to appropriately supervise the students." Pl. Aff. at ¶ 30.

Speach met with Plaintiff and her union representative to discuss the abuse that occurred during the drama club rehearsal, Plaintiff's having left the building during rehearsal, and Plaintiff's failure to enter grades for the third marking period of the 2008-09 school year. Speach conferred with then Superintendent Jerome Melvin, after which it was determined that Plaintiff should be disciplined. Speach and Melvin decided to recommend to the Board of Education that charges be brought against Plaintiff pursuant to N.Y. Educ. Law § 3020-a. Prior to serving the charges, Speach offered Plaintiff a three day suspension in lieu of formal § 3020-a proceedings. Plaintiff declined the offer.

In June 2009, the District served § 3020-a charges against Plaintiff. The charges consisted of three sets of charges and sought a maximum penalty of a thirty day suspension. In June 2009, Plaintiff claimed that her grade book went missing. On June 12, 2009, Plaintiff and Wolf were scheduled to discuss Plaintiff's year-end summary ("YES") report for the 2008-09 school year. Wolf canceled the meeting and sought to reschedule it during the summer of 2009.

Plaintiff posted on her Facebook page that "[i]f there is any justice in this world . . . and I do believe there is - Wolfie picked the WRONG person to mess with!!!! Oh, yeah – it's ON!!!" Wolf's secretary, who was "friends" with Plaintiff on Facebook, showed the posting to Wolf. Plaintiff believes that Wolf compelled his secretary to show him the Facebook posting.

In September 2009, Plaintiff served a thirty day unpaid suspension pursuant to the § 3020-a charges levied against her. She returned to work in October 20, 2009. While Plaintiff was serving her suspension, the District issued an amended set of charges, including a fourth charge for failure to enter grades for certain students in the second quarter of the 2008-09 school year. The new charges did not seek an increased penalty. After Plaintiff

returned from her suspension, she was never again issued a counseling memo and did not receive any further discipline.

In June 2010, Plaintiff and the District entered into a settlement agreement concerning the § 3020-a matter. The settlement consisted of Plaintiff admitting to one of the charges, the charges would remain in her file, and the penalty would be reduced to a five day suspension. Plaintiff was reimbursed for twenty-five days of work.

In January 2010, Plaintiff was asked to attend a meeting concerning an incident where she was accused of having hung up on Wolf's secretary. No further action was taken concerning this incident.

In the 2010-11 school year, Wallace's teaching schedule was changed to accommodate his administrative internship, which Plaintiff claims shows favoritism towards male employees.

As a result of the foregoing, Plaintiff commenced the instant action claiming that Defendants: (1) engaged in discrimination in violation of Title VII; (2) permitted a hostile work environment in violation of Title VII; (3) treated Plaintiff disparately from similarly situated male employees in violation of Title VII; (4) retaliated against Plaintiff for engaging in protected activity; (5) discriminated against Plaintiff in violation of 42 U.S.C. § 1983; (6) violated Plaintiff's rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment; (7) deprived Plaintiff of her rights without due process of law, in violation of the Fifth and Fourteenth Amendments; (8) discriminated against Plaintiff in violation of the New York Human Rights Law; (9) retaliated against Plaintiff in violation of the New York Human Rights Law; (10) Defendant Wolf aided and abetted violations of the Human Rights Law; (11) violated New York State Education Law § 3020-s; (12) intentionally caused emotional

distress; and (13) engaged in prima facie tortious conduct. Defendants previously moved to dismiss the Amended Complaint. The Court granted the motion in part, dismissing the following claims:

    a.    the disparate treatment claims under Title VII and the Fourteenth Amendment;

    b.    the Human Rights claims against the District;

    c.    the individual claims against Wolf under Title VII;

    d.    the retaliation claims;

    e.    the due process claims with respect to the reprimands, Plaintiff's reputation, and the § 3020-a charges;

    f.    the claim pursuant to § 3020-a;

    g.    the intentional infliction of emotional distress claim; and

    h.    the prima facie tort claim.

The remaining claims are for a hostile work environment in violation of Title VII and 42 U.S.C. § 1983, a violation of her rights as protected by the due process clause because she was not provided a pre-suspension hearing before being suspended without pay, and an aiding and abetting claim under the New York Human Rights Law. Presently before the Court is Defendants' motion for summary judgment seeking dismissal of the remaining claims and Plaintiff's motion for summary judgment on the due process claim.

## II.    STANDARD OF REVIEW

The parties move for summary judgment pursuant to Rule 56. It is well settled that, on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir.

1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

With these standards in mind, the Court will address the pending motions.

**III.    DISCUSSION**

    **a.    Title VII/New York Human Rights Law/§ 1983**

        **1.    Whether Defendant's Actions were Gender-Based**

In the Court's prior Decision and Order, familiarity with which is assume, the Court listed many of the acts Plaintiff claims comprised a hostile work environment. Defendants move for summary judgment on the ground that there is insufficient evidence from which it

reasonably can be concluded that their actions or conduct towards Plaintiff were on account of her gender. In support, Defendants note that there are no allegations of sexual comments, inappropriate touching, derogatory comments concerning Plaintiff's gender, or any other conduct from which it reasonably can be inferred that their actions were on account of Plaintiff's gender. Defendants support their claim by noting that most of the decisions affecting Plaintiff involved both male and female administrators, Wolf (who is the individual alleged to have been motivated by Plaintiff's gender) was rarely the sole decision-maker, female co-workers complained about Plaintiff, and Plaintiff is unable to demonstrate that Plaintiff was treated differently from similarly situated male employees. Plaintiff responds by referencing to the list set forth in the Court's prior decision and order and by asserting that there is evidence of favoritism of male colleagues and, in particular, the "boys' club," thereby demonstrating gender-based motive and that there are numerous incidents where she was treated differently than male employees. Plaintiff claims that evidence of disparate treatment is sufficient to demonstrate gender-based motive. Plaintiff also asserts that the evidence demonstrates an animus towards her.

Plaintiff correctly notes that "[a] showing of disparate treatment - that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside [her] protected group - is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation and citation omitted). "A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." Id. Upon consideration of the record evidence, the Court finds that there is insufficient evidence upon which a fair minded trier of

fact could reasonably conclude that Plaintiff was treated differently than similarly situated male employees or that she was otherwise discriminated against on account of her gender.

While there are instances in the record where Plaintiff was treated differently than male employees, none of those instances, individually or in combination, reasonably suggest that Defendants' actions were on account of Plaintiff's gender. Rather, they represent isolated incidences in which Plaintiff was simply unhappy with the outcome or disagreed with the decision. In each instance, Defendants articulated legitimate, non-discriminatory reasons for their behavior and Plaintiff was unable to point to anything else demonstrating pretext or reasonably suggesting that her gender was a motivating factor. See De la Cruz v. City of New York, 783 F. Supp.2d 622, 645 (S.D.N.Y. 2011) (applying the McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817 (1973), burden shifting analysis to a hostile work environment claim). Even considering the number of such instances together, they are insufficient under the facts and circumstances of this case, to suggest a gender-based motivation. Moreover, as the Court stated in its March 21, 2012 Decision and Order, familiarity with which is assumed, many of the incidents on Plaintiff's long list of items she claims are suggestive of a hostile work environment are simply unrelated to gender on their face. There is insufficient evidence - either direct or circumstantial - evidencing an unlawful motive for Defendants' actions.

For example, Plaintiff claims that, in February 2008, she received a counseling memorandum arising out of the music department meeting, but that Wallace did not.[7]

---

[7] In its prior decision, the Court held that any discrete incidents of discrimination that occurred prior to June 15, 2010 are time-barred. Although this is a discrete incident that, by itself, would be time-barred, discrete acts of discrimination may constitute evidence of a hostile work environment. Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004); Patresi v. New York State Unified Court Sys., 2010 WL
(continued...)

Assuming this to be true, this is not evidence of gender-based motive. According to Plaintiff, it is Wolf who acted on account of Plaintiff's gender. See Pl. Aff. at ¶¶ 2, 4, 11, 15, 21, 22, 23, 24, 28, 29, etc. The undisputed evidence, however, is that Hardy and Speach together made the determination to issue the February 2008 counseling memorandum to Plaintiff. There is no evidence that Wolf counseled, approved, or was otherwise involved in the issuance of the counseling memorandum. The fact that Wolf was Hardy's boss or that he was present at the Weingarten meeting preceding the issuance of the counseling memorandum is, without more, insufficient to suggest that the counseling memorandum was issued with his imprimatur or otherwise on account of Plaintiff's gender.

As another example, Plaintiff also complains of Defendants' decision to switch Plaintiff to the chorus and Wallace (who is male) to instrumental teaching.[8] The proffered reason - that Plaintiff was an accomplished, professional vocalist and Wallace was an accomplished instrumentalist - is a legitimate, non-discriminatory decision. Plaintiff points to nothing showing that gender had anything to do with this decision. Moreover, the evidence demonstrates that, although Wolf approved the change, this decision originated not with Wolf, but Morton. Nothing about this incident is suggestive of gender-based discrimination.

In June 2008, Defendants issued a counseling memorandum to Plaintiff arising out of her conversation with music teacher Mark Bossert.[9] Plaintiff was issued a counseling

---

[7](...continued)
3781961, at *2 (E.D.N.Y. 2010); Urmey v. AT&T Corp., 2006 WL 2819627, at *2 (S.D.N.Y. 2006).

[8] This is another discrete, time-barred incident that is being considered only as evidence in support of a hostile work environment claim. See n.1 *supra*.

[9] This is another discrete, time-barred incident that is being considered only as evidence in support of a hostile work environment claim. See n.1 *supra*.

- 12 -

memorandum, but Bossert was not. This is not evidence of gender-based discrimination. The matter was investigated by Speach (not Wolf), who made the decision to credit Bossert's version of the events and issue the counseling memorandum to Plaintiff. Nowhere is it claimed that Speach acted on account of Plaintiff's gender or that Wolf was otherwise involved and there is insufficient evidence in the record to substantiate such a claim.[10] Defendants were free to credit Bossert's version of the events in light of the facts surrounding the incident. See Speach Aff. at ¶ 19.

Plaintiff lists the events concerning the 6th and 7th grade chorus as evidence in support of her hostile work environment claim. Nothing about the facts of the chorus suggest gender-based motivation. The decision to split the chorus into 6th and 7th grade affected two female teachers. It is unclear how Defendants' actions concerning the select chorus (including the decision not to allow the select chorus and/or to counsel Plaintiff concerning her flyers) relate to Plaintiff's gender. Plaintiff does not identify any similarly situated males sufficient to reasonably give rise to an inference of gender-based discrimination. Further, Plaintiff concedes that she was disciplined concerning the flyers but that Robyn Launt (a female teacher who co-authored the flyer) was not. While this may evidence animus towards Plaintiff personally, it does not support a claim of gender-based discrimination.

With respect to the drama club incident, by Plaintiff's own admission, there were other female teachers present that were not disciplined. Thus, nothing about this incident suggests gender-based discrimination.

---

[10] Plaintiff claims that, during the conversation, Bossert stated "should I bring a gun" and was not reprimanded for making this comment. This claim is not relevant because Speach handled this matter and there is insufficient evidence suggesting that any of Speach's actions towards Plaintiff were on account of her gender and Plaintiff does not argue otherwise..

Plaintiff relates an incident concerning inappropriate sexual conduct between students occurring on the school hallways and on the bus and the bus driver not being disciplined. As Defendants point out, there is no record evidence, admissible in form, substantiating the alleged bus incident. With respect to the hallways, there is no evidence concerning whether the persons responsible for monitoring the hallways were male, female, or both.

Plaintiff alleges that Wallace received favoritism in teaching assignments because his schedule was modified to accommodate an administrative internship. This is not indicative of gender-based motive because the record evidence demonstrates that female teachers, too, received changes in their teaching schedules to accommodate administrative internships.

Plaintiff also claims that she was treated differently from Bossert because he "received blatant leniency with regards to the [counseling memorandum] - not suspension or § 3020-a charges - he received concerning his failure to supervise two of his students who were found having sexual intercourse in his band room." Pl. Mem. of Law at 11. Of course, Plaintiff was the subject of § 3020-a charges. This incident does not evidence similarly situated persons because the § 3020-a charges issued to Plaintiff were not limited to the drama club incident, but also included Plaintiff's having left the building during the drama club rehearsal, failing to enter grades for the third quarter of the 2008-2009 school year, and violating the staff code of conduct. There is no evidence that Bossert similarly left the building, failed to enter grades and/or otherwise violated the staff code of conduct.

Plaintiff also claims that Gary Lipp brought his children to school in violation of school policy, but did not receive any discipline. Plaintiff then asserts that if she had brought

her children to school, she would have been disciplined. This is speculative and not evidence of gender-based discrimination.

Although the Court has not specifically listed each of Plaintiff's claims, it has reviewed them all and finds that, for reasons similar to those discussed above, they are insufficient to reasonably permit the conclusion that Defendants' actions were taken on account of Plaintiff's gender. Plaintiff offers insufficient evidence, admissible in form, from which a fair minded trier of fact could reasonably conclude that Defendants' actions were taken on account of her gender.

Moreover, as stated in the Court's prior decision and order in this matter, Title VII is intended to eliminate unlawful employment practices; not impose a general civility code. See Tepperwien v. Entergy Nuclear Operations, Inc., 63 F.3d 556, 568 (2d Cir. 2011). The conduct must be sufficiently severe and/or pervasive to create an objectively hostile or abusive work environment. Courts review the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 79 (2d Cir. 2010). Although Plaintiff disagrees with the basis for many of the actions taken against her and feels she was wronged, the vast majority of incidents listed by Plaintiff (even when take in conjunction with all other events) are mere workplace annoyances, petty slights, general disagreements, lack of good manners, and problems that constitute minor incidents and trivial harms that are insufficient to withstand summary judgment. They are insufficient, from an objective standpoint, to demonstrate sufficiently severe conduct on account of gender.

Accordingly, the Title VII, Human Rights Law, and § 1983 claims are DISMISSED.

### b. Due Process

Defendants' move to dismiss Plaintiff's due process claim and Plaintiff moves for summary judgment in her favor on that claim. The relevant facts pertinent to this claim are as follows. On June 16, 2009, Plaintiff was served with the § 3020-a charges. Plaintiff was suspended without pay for thirty days commencing on September 8, 2009. At the commencement of the § 3020-a hearing, the parties entered into a settlement agreement. The Settlement Agreement provided, in pertinent part, as follows:

> In Full settlement of the pending 3020-a matter of the North Syracuse School District against Danielle Rausa. . . the undersigned agree to the following:
>
> - Ms. Rausa admits to the conduct as contained in charge TWO, and denies all remaining charges
>
> - The amount of the suspension shall be reduced from 30 days to five days and the money to be refunded to Ms. Rausa shall be issued within 30 days of the day of the settlement agreement.
>
> - Ms. Rausa will have 10 days from the date of this Settlement Agreement to issue a concise response to the memos in her file related to the charges. . . .
>
> - No General Release is required by the School District. . . .
>
> This Agreement is not a waiver of either party's right to commence an action for any relief not specifically addressed herein. . . .

Am. Compl. at Ex C.

Plaintiff claims that being suspended without pay for thirty days without any prior hearing or opportunity to be heard violated her right to due process of law. Defendants respond that: Plaintiff (1) waived her due process rights through the collective bargaining agreement; (2) waived her due process rights through the settlement agreement; and (3) received all process that is due.

- 16 -

As the Court previously held, because Plaintiff was a tenured teacher, she had rights guaranteed by New York State Education Law § 3020-a. That section "provides the exclusive method of disciplining a tenured teacher in New York State." Tebordo v. Cold Spring Harbor Cent. Sch. Dist., 126 A.D.2d 542, 510 N.Y.S.2d 665 (2d Dept. 1987). "Under the statute, a tenured teacher is entitled to a due process hearing prior to the imposition of a . . . suspension for a fixed time without pay. . . ." Id. (quoting Educ. Law § 3020-a(4)). Indeed, given the significance of receiving salary, a tenured teacher may be entitled to a pre-deprivation hearing before having her pay suspended. McCreery v. Babylon Union Free Sch. Dist., 827 F. Supp. 136, 139 (E.D.N.Y. 1993).

Assuming principles of due process entitled Plaintiff to a pre-deprivation hearing,[11] Plaintiff waived these rights. Important constitutional protections, including those under the due process clause, may be waived. Collins v. Foreman, 729 F.2d 108, 120 (2d Cir. 1984) ("to the extent that litigants may have a due process right to appear before an Article III judge in a civil case, they may freely waive that right."); see Ciambriello v. County of Nassau, 292 F.3d 307, 322-23 (2d Cir. 2002); United States v. Local 1804-1, Intern. Longshoreman's

---

[11] For the reasons to be discussed *infra*, the Court need not definitively decide whether the Fourteenth Amendment guarantees Plaintiff the right to continue pay during a suspension. Whether this is a matter of constitutional protection is subject to debate. The New York Court of Appeals has held that while "section 3020-a as now worded does not authorize withholding of pay during a period of suspension," "suspension of a tenured teacher without pay pending the final determination of section 3020-a disciplinary proceedings, provided such determination is not unreasonably delayed, would involve no infringement of the teacher's constitutional rights." Matter of Jerry v. Bd. of Educ. of City School Dist. of City of Syracuse, 35 N.Y.2d 534, 541 (1974). At least one court in this District has noted that "even if there has been a violation of New York Education Law § 3020-a, there has been no violation of the Fourteenth Amendment's Due Process Clause if sufficient post-deprivation process is given within a reasonable time." Myers v. Camden Cen. Sch. Dist., 2012 WL 2921574, at *11 (N.D.N.Y. 2012) (Suddaby, J.). The Myers court stated that "the violation of a state statute (including its procedural requirement) does not, in and of itself, mean that there has been a violation of the Constitution (including denial of what process was due under the Fourteenth Amendment)." Id. at * 6; see also id. at n.4. It, therefore, is questionable whether the right to continued pay during § 3020-a proceedings gives rise to a protected property interest.

Ass'n, AFL-CIO, 44 F.3d 1091, 1098 n.4 (2d Cir. 1995); Chaney v. Suburban Bus Div. of Regional Transp. Auth., 52 F.3d 623, 630 (7th Cir. 1995) ("A union might bargain away its members' pre-deprivation rights for something else or waive them for some reason. . . ."). The New York Court of Appeals expressly held that rights under § 3020-a may be waived. See Feinerman v. Board of Co-op. Educ. Servs. of Nassau County, 48 N.Y.2d 491, 497 (1979);[12] Abramavich v. Bd. of Ed. of Central Sch. Dist. No. 1 of Towns of Brookhaven and Smithtown, 46 N.Y.2d 450 (1979). Section 3020 (which references the procedures set forth in § 3020-a) expressly recognizes the possibility of waiver with respect to contracts negotiated between "the city school district of the city of New York and any employee organization representing employees or titles that are or were covered by any memorandum of agreement executed by such city school district and the united federation of teachers. . . ." § 3020(4). While it may be argued that the statutory availability of waiver to the New York City school district precludes a waiver for other school districts, the statute does not so provide. See Abramovich, 46 N.Y.2d at 455 ("we first observe that the statute contains no express provision preventing a teacher from waiving its benefits."). Prior to the 2004 amendment of the statute, the New York Court of Appeals held that § 3020-a's protections could be waived through collective bargaining agreements. Had the legislature intended to end the availability of that practice, it would have expressly done so. Indeed, as the parties' settlement agreement in satisfaction of the § 3020-a charges demonstrates, Plaintiff chose to

---

[12] ("In Abramovich, we held that a tenured teacher could waive the protections afforded by section 3020-a of the Education Law if such waiver was freely, knowingly and openly made. Although recognizing that this section is grounded in strong public policy considerations in that it safeguards tenured teachers from official or bureaucratic caprice by delineating a method whereby tenured teachers are to be removed, this court nevertheless concluded 'that section 3020-a is not so sacrosanct as to be impervious to waiver.'").

waive her right to a hearing under § 3020-a and she does not argue that such a waiver is invalid. See Pollock v. Kiryas Joel Union Free Sch. Dist., 52 A.D.3d 722, 724 (a tenured teacher may forfeit the protections pursuant to Education Law § 3020-a "only if that settlement is shown to be have been voluntary and noncoerced.").

As noted, the waiver of these rights may be accomplished through a collective bargaining agreement. "Whatever [Plaintiff's] procedural rights under state law, state courts clearly hold that any such rights may be properly bargained away by a labor representative." Grandi v. New York City Transit Auth., 175 F.3d 1007 (2d Cir. 1999) (quoting Romano v. Canuteson, 11 F.3d 1140, 1141 (2d Cir. 1993)); see Board of Ed. of City of Rochester v. Nyquist, 48 N.Y.2d 97 (1979) (holding that "a provision for a payless suspension may properly be a term of a negotiated agreement."). In Matter of Winter v. Bd. of Educ. for Rhinebeck Cent. Sch. Dist., 79 N.Y.2d 1, 5 (1992), the New York Court of Appeals noted that although compensation is a matter of substantive right, it can be taken away pursuant to explicit statutory or collective bargaining authority. More recently, in Matter of Elmore v. Mills, 296 A.D.2d 704 (3d Dept. 2002), the Appellate Division, Third Department stated that "[n]otwithstanding the provisions of Education Law § 3020-a(2)(b), a CBA may allow a school district to suspend its teachers without pay as long as the agreement's terms clearly manifested the parties' intent to do so."[13]

Here, the collective bargaining agreement provides that:

In the event that any teacher is suspended pending a hearing on charges, such suspension shall be without pay until the findings and recommendations on the charges are determined.

---

[13] § 3020-a(2)(b) provides that, with certain exceptions, "[t]he suspension shall be with pay. . . ."

This is a clear waiver of Plaintiff's rights under § 3020-a.[14] Accordingly, the due process claim must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, Plaintiff's cross-motion for summary judgment is DENIED, and the Complaint is DISMISSED. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

Dated: May 8, 2013

_____
Thomas J. McAvoy
Senior, U.S. District Judge

---

[14] Plaintiff argues that the Court's ruling in connection with the motion to dismiss effectively decided the due process claim in her favor. The Court disagrees. The Court made no ruling on the merits of the due process claim. The prior decision simply held that Plaintiff alleged sufficient facts to state a due process claim. Dkt. No. 23 at 18. While the Court's *dicta* at footnote 7 may be read to suggest that a collective bargaining agreement may not effectuate a waiver of a tenured teacher's due process rights, the Court did not so hold. The Court merely noted that: (i) Defendants argued that Plaintiff's rights were waived by the CBA; (ii) § 3020(4) expressly permits the procedures set forth in § 3020-a to be modified by a negotiated agreement involving the city school district of the city of New York and an employee organization representing its employees; and (iii) after the New York Court of Appeals's decision in Nyquist, § 3020-a was amended to require suspensions with pay (subject to certain exceptions not applicable here). The Court did not hold that the CBA cannot effectuate a waiver of Plaintiff's § 3020-a rights.